IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------x
                                            :
FREEDOM MORTGAGE                            :    Case Number:
CORPORATION,                                :
                                            :
                    Plaintiff,              :
                                            :    COMPLAINT AND
        v.                                  :    JURY DEMAND
                                            :
IRWIN FINANCIAL CORPORATION, and            :
IRWIN MORTGAGE CORPORATION,                 :
                                            :
                    Defendants.             :
                                            :
                                            :
----------------------------------------------------x
```

Plaintiff Freedom Mortgage Corporation ("Freedom"), by its undersigned attorneys, for its complaint for breach of contract and for specific performance against defendants Irwin Financial Corporation ("Irwin Financial") and its subsidiary, Irwin Mortgage Corporation ("Irwin Mortgage") (collectively Irwin Financial and Irwin Mortgage are referred to as "Irwin") alleges as follows:

**NATURE OF THE ACTION**

1.      Freedom has been the victim of a bait and switch. In the Fall of 2006, the defendants sold to Freedom all of the assets of their business of originating and selling mortgage loans through retail, wholesale, direct lending and correspondent divisions (the "Business"). The sale included substantially all of the personnel and executives who had operated the Business. As part of that sale, defendants included the assignment to Freedom of a valuable contract between Irwin Mortgage and another Irwin Financial subsidiary, Irwin Home Equity Corporation ("IHE"). At the time of the sale, that

contract (the "IHE Agreement") contained valuable commercial terms which could not be obtained elsewhere in the industry. For example, it obligated IHE to purchase from Freedom certain mortgage loans which had been underwritten according to guidelines which were not "industry standard," and it restricted the circumstances under which IHE could require that Freedom buy back loans.

2. However, prior to the closing of the sale of the Business, without telling Freedom (and contrary to Irwin's obligations to Freedom) Irwin set into motion a secret plan to change the terms of the IHE Agreement. The plan appears to have been continued even after the date of the sale closing. For example, immediately after the closing of the sale, certain former Irwin executives had joined Freedom; however, for no discernable reason, except a possible loyalty to their old employer, they urged a Freedom manager to sign a so-called "Addendum" to the IHE Agreement.

3. Simultaneously and apparently acting in concert with Irwin, IHE refused to honor its obligations under the IHE Agreement unless and until the Addendum was signed. As part of the scheme, IHE wrongfully held millions of dollars worth of original collateral documents it had received in connection of the sale of loans to IHE under the pretense of honoring the IHE Agreement. IHE then held those valuable collateral documents hostage to the execution of the Addendum. At that time, this action by IHE was especially coercive because market conditions were creating intense pressure for Freedom to sell the loans at issue, but IHE had made it impossible to do so unless the Addendum was signed.

4.    Faced with the combination of economic duress regarding the collateral and outstanding loans which IHE held, together with the apparently sincere insistence of the former Irwin executives, a manager who was misled signed the Addendum.

5.    Under the Asset Purchase Agreement ("APA") which governed the sale to Freedom of substantially all the assets of the Business, Irwin Financial specifically promised to use its position as indirect controlling shareholder of IHE to ensure that IHE gave to Freedom the full benefit of the IHE Agreement – in the form that such agreement existed prior to closing and prior to the Addendum (APA Section 9.1(g): "… the Seller and Shareholder shall, and shall cause their respective Affiliates to … provide Buyer, at no cost to Buyer, with all of the rights and benefits (subject to all of the obligations) under any such Contract…."). A true copy of the APA (without most schedules) is annexed to this complaint as Exhibit A.

6.    After Freedom received repurchase demands from Irwin Mortgage, Freedom disputed the validity of the demands. Freedom and Irwin have engaged in extended negotiations concerning their disputes, but the matters of Irwin's obligations under the APA, and Freedom's contention that the Addendum to the IHE Agreement is invalid and void or voidable, have not been resolved. Irwin eventually referred Freedom to its lawyers.

7.    Accordingly, Freedom brings this action to compel specific performance by Irwin Financial to require its wholly-controlled subsidiary, IHE, to honor the IHE Agreement in its original form as required by the terms of the APA. Freedom also seeks damages for breaches of the APA by the defendants.

## PARTIES

8.      Plaintiff Freedom Mortgage Corporation ("Freedom") is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Mt. Laurel, New Jersey.  Freedom is a signatory to the APA.

9.      Defendant Irwin Financial Corporation ("Irwin Financial") is a corporation organized under the laws of the State of Indiana, with its principal place of business in Columbus, Indiana.  Irwin Financial is a signatory to the APA.

10.     Defendant Irwin Mortgage Corporation ("Irwin Mortgage") is a corporation organized under the laws of the State of Indiana, with its principal place of business in Columbus, Indiana.  Irwin Mortgage is a signatory to the APA and is the entity whose assets – in particular, substantially all of the assets of the Business – were sold to Freedom under the terms of the APA.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship of the parties, and the amount in controversy as set forth below, in the Demand for Relief, far exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     Venue is proper in this Court because the parties to the APA, which are all of the parties to this action, in Section 11.7 of the APA, consented to the mandatory, exclusive jurisdiction of the Federal and State courts of Delaware "with regard to any action or claim arising out of or relating to [the APA] or the transactions contemplated hereby."  In that same section of the APA, the parties also submitted to personal jurisdiction in the State of Delaware for any such action.

## RELATED PROCEEDINGS

13.     There is presently pending in the United States District Court for the Northern District of California, Oakland Division, Case No. C08-00472 (PJH), a related action (the "IHE Action") with Freedom as defendant, and IHE and another member of the Irwin family of companies, Irwin Union Bank and Trust Company, as plaintiffs. Neither Irwin Financial nor Irwin Mortgage is a party to the IHE Action.

14.     The IHE Action concerns the IHE Agreement. In specific, IHE alleges, among other things, that Freedom breached the IHE Agreement by failing to repurchase loans from IHE. A copy of the IHE Agreement is attached to this Complaint as Exhibit B.

15.     The IHE Agreement contains an arbitration clause. (IHE Agreement Section 8.09).

16.     Simultaneously with the commencement of this action, Freedom is commencing an arbitration pursuant to the terms of the IHE Agreement (the "IHE Arbitration"). Also simultaneously, Freedom is moving in the IHE Action for dismissal and/or stay of that action on the grounds of the arbitration clause, and to compel arbitration in the IHE Arbitration.

17.     In the IHE Arbitration, Freedom will request that the arbitrators abstain from any proceedings until the instant action's claim for specific performance is resolved. The grounds for such abstention will be that if this Court upholds Freedom's claim, and orders specific performance of Section 9.1(g) of the APA, then Irwin Financial (which controls IHE) will require IHE to disavow the Addendum and to honor the IHE

Agreement as it was written on the day of the closing of the sale under the APA, so that Freedom will receive the benefit of the bargain it made.

18.     There is no arbitration provision in the APA, and Freedom has not consented to any arbitration of the APA claims.  Accordingly, the IHE Arbitration cannot be consolidated with this action.

## ALLEGATIONS COMMON TO ALL COUNTS

19.     On May 15, 2006, Freedom and Irwin signed a letter of intent (the "LOI").

20.     Thereafter, Freedom undertook due diligence concerning Irwin Mortgage's Business.

21.     Between the date of the execution of the LOI, and the date of the closing of the APA, the parties negotiated the terms of the asset purchase agreement ("APA").

22.     The APA was executed on August 6, 2006 and was dated "as of" August 7, 2006.  The closing of the sale pursuant to the APA (the "Sale") took place in two stages:  The first closing of the Sale, which concerned the Operating Assets of the Business (as defined in the APA), took place effective as of September 18, 2006.  The second closing of the Sale, which concerned the Warehouse Assets (as defined in the APA), took place effective as of September 26, 2006.

23.     Pursuant to the APA, Freedom purchased substantially all of the assets of the Business of Irwin Mortgage, as the term "Business" is defined in Section 1.1 of the APA.

**The IHE Agreement**

24.     Under the APA, Section 2.1(a), Irwin Mortgage assigned to Freedom the IHE Agreement.  The IHE Agreement was a "Purchased Asset" specifically listed on Schedule 1.1(b)(iii).

25.     The assignment of the IHE Agreement was a material term of the APA.

26.     The IHE Agreement was a valuable contract.  The IHE Agreement, as it existed on the date of execution of the LOI, on the date of execution of the APA, as well as on the date that Irwin Mortgage assigned the IHE Agreement to Freedom, included an obligation on the part of IHE to purchase from Irwin Mortgage certain mortgage loans which had been underwritten according to underwriting guidelines which were not "industry standard" guidelines.  The underwriting guidelines contained in the IHE Agreement were more favorable to Irwin Mortgage (and therefore to Irwin Mortgage's assignee, Freedom) than industry standard guidelines.

27.     Also at the time that Irwin Mortgage assigned the IHE Agreement to Freedom, the IHE Agreement contained limited circumstances under which IHE might require Irwin Mortgage (or Freedom) to repurchase nonperforming loans.

**Irwin Secretly Planned A Material Amendment**

28.     At and prior to the time of the assignment of the IHE Agreement to Freedom, on information and belief, Irwin and IHE together had plans to materially change the terms of the IHE Agreement, which changes would materially deprive Freedom of the full benefits of the IHE Agreement as it existed at the time of the APA closing.

29.    The changes secretly planned by Irwin and IHE were to be incorporated into a document styled as an "Addendum."

30.    Under the terms of the Addendum prepared by Irwin and IHE, the Irwin companies proposed that the IHE Agreement be revised so that, among other things, loans with nonstandard underwriting could no longer be sold to IHE and so that there were materially different, broader grounds for IHE to demand that Freedom repurchase loans.

31.    Prior to the closing of the APA, Freedom was not told of these plans. Irwin intentionally withheld from Freedom the fact that Irwin had agreed, or was negotiating to agree, with IHE to materially change the terms of the IHE Agreement.

**Irwin Represented That There Were No Material Amendments or Negotiations**

32.    In the APA, both Irwin Financial (defined as the "Shareholder" in the APA) and Irwin Mortgage (defined as the "Seller" in the APA) represented and warranted to Freedom, as of the closing date, as follows:

a.    Pursuant to Section 4.5 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that except for certain scheduled items not relevant to this action, "since the date of the Latest Balance Sheet, the Business has been conducted in the ordinary course and there has not occurred: (i) any event or condition which has had, or would reasonably be expected to result in, a Seller Material Adverse Effect, or (ii) any acquisition, sale, transfer or encumbrance, other than a Permitted Encumbrance, of any of the Purchased Assets not in the ordinary course of business."

- 8 -

b.    Pursuant to Section 4.5 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that among other things Irwin Mortgage has not:

    i.    "instituted or permitted any material change in the conduct of the Business, or any change in its method of purchase, sale, lease, management, marketing, promotion or operation." (APA 4.5(j)).

    ii.    "negotiated or entered into any agreement to do any of the things described in any of the preceding clauses." (APA 4.5(k)).

c.    Pursuant to Section 4.8 (c) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[t]he sale, transfer and assignment of the Purchased Assets as contemplated by this Agreement will give Buyer possession of, and the right to use, all of the Assets and Properties…required for the conduct of the Business as presently conducted in all material respects."

d.    Pursuant to Section 4.10 (b) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[e]ach such Contract is in full force and effect and has not been further amended."

e.    Pursuant to Section 4.19(d) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[e]ach Company Mortgage Loan is a Marketable Loan."

f.     Pursuant to Section 4.19(f) of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[Irwin Mortgage] has complied in all material respects with all applicable Mortgage Loan Regulations with respect to the Company Mortgage Loans. The Seller has timely filed all reports required in respect of Company Mortgage Loans by any Investor, any Insurer, and the Mortgage Loan Regulations."

g.     Pursuant to Section 4.25 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that schedule 4.25 "sets forth an accurate and complete list of all Contracts, understandings, transfers of assets or liabilities or other commitments or transactions, whether or not entered into in the ordinary course of business consistent with past practice, to or by which Seller, on the one hand, and any Affiliate of the Seller, on the other hand, are parties and that are currently pending or in effect and relate to or affect the business of the Seller or any of the Purchased Assets or Assumed Liabilities."

h.     Pursuant to Section 4.20 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that "[t]he Seller has not authorized or implemented any plans or practices that would cause any Approved Pipeline Loan to be processed and underwritten to guidelines any less stringent in any material respect than those applied to Company Mortgage Loans. The Seller has complied in all material respects with all contractual obligations which relate to any of the Approved Pipeline Loans."

i.     Pursuant to Section 4.26 of APA Article IV, both Irwin Financial and Irwin Mortgage represented and warranted that:

> <u>Representations Complete</u>.  ***None of the representations*** or warranties made by Seller and Shareholder herein, subject to the exceptions contained in the Disclosure Schedules, and none of the statements, representations or warranties contained in the Seller Disclosure Schedule or in any certificate, list or other writing furnished to Buyer by Seller pursuant to this Agreement or any of the Ancillary Agreements, when all such documents are read together in their entirety, contains any untrue statement of material fact, or ***omits to state any material fact necessary*** in order to make the statements contained herein or therein, ***in light of the circumstances under which made***, ***not misleading***.

(Emphasis added).

33.    Pursuant to Section 6.1(b)(i) of APA Article VI, both Irwin Financial and Irwin Mortgage covenanted and agreed that prior to the Closing:

a.    Seller would conduct its business in the ordinary course consistent with past practice.  (APA 6.1(b)(i)).

b.    Seller would not "terminate, cancel or ***request any material change in, or agree to any material change in, any Assigned Contract***, Shared Assigned Contract; or enter into, amend, modify, extend, substitute, supplement or renew any material Contract."    (APA 6.1(b)(xii))(emphasis added).

c.    Seller would "not agree to do, authorize or enter into any contract or otherwise make any commitment to do any of the foregoing…."  (APA (b)(xvii).

34.    Pursuant to Section 6.3(b) of APA Article VI, both Irwin Financial and Irwin Mortgage covenanted and agreed "to obtain as promptly as practicable all waivers, consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained by Seller from any third party."

**Irwin's Deceit**

35.    The APA contemplated that some consents would not have been obtained by the time of the closing.  Accordingly, the APA provides a mechanism for Irwin to obtain such consents after the closing.  Thus, for example, pursuant to Section 9.1(f) of the APA, both Irwin Financial and Irwin Mortgage were required to "use commercially reasonable efforts to obtain as promptly as possible such third party consents as are required hereunder with respect to the transfer of the Assigned Contracts," including the IHE Agreement.

36.    The closing of the sale under the APA in fact took place without Irwin having previously obtained the consent of IHE to the assignment of the IHE Agreement.

37.    After the closing, when Freedom sought to sell mortgages to IHE, IHE initially refused to purchase them.  IHE received from Irwin Mortgage or Freedom tens of millions of dollars worth of original collateral documents for loans which had already been funded by Freedom (or by Irwin Mortgage prior to the closing of the Sale).  But despite having received those loan documents, IHE refused to pay for the loans.  Freedom then demanded that the collateral documents be returned so that Freedom could attempt to sell them to another investor.

38.    IHE improperly refused to honor its consent unless and until Freedom had executed the Addendum.

39.    At this time, Freedom was placed at great risk by IHE's decision to hold the loans hostage to the Addendum.  Not only was the market rapidly deteriorating and placing millions of dollars at risk, but underwriting standards were being revised negatively, so that it was possible that due to IHE's intransigence, the loans at issue could

no longer be sold to any other investor. Furthermore, on information and belief, IHE knew that Freedom did not have readily available alternative investors for loans of this character under such timing constraints. In other words, IHE knew that it had Freedom over a barrel, and deliberately proceeded to take unfair advantage.

40.    On information and belief, this was a set-up. Irwin intentionally planned for the Addendum to slip through the cracks at the heat of the moment, in the processing of documents relating to the closing. Irwin deliberately took advantage of Freedom to exercise upon its pre-meditated power play to shift the economic advantage of the IHE Agreement from Freedom, an outsider to the Irwin family, and back to its subsidiary IHE.

41.    Irwin required a manager at Freedom, April Schneider, who at the time held the title Senior Vice President, Capital Markets, to sign an "Addendum" to the IHE Agreement, which purported to have the effect of depriving Freedom of certain of the benefits of the IHE Agreement as they existed as of the closing of the APA.

42.    By way of example, under the IHE Agreement that existed at the time of closing, Irwin Mortgage (and consequently its assignee Freedom) was only required to repurchase a loan from IHE if the Mortgagor failed to make the first Monthly Payment due after the Sale Date, as set forth in Section 6.01(d) of the IHE Agreement. However, the Addendum purports to broaden the repurchase obligation by requiring a repurchase if the Mortgagor fails to make any of the first, second or third payments due after the Sale Date, as set forth in Section D of the Addendum.

43.    At the time that IHE refused to either purchase the loans or return the collateral, IHE – a subsidiary of Irwin Financial – knew or should have known that it was obliged to purchase the loans on the terms in place prior to the Addendum, pursuant to

the IHE Agreement as it existed as of the closing of the APA. IHE also knew or should have known that its ultimate parent, Irwin Financial, had agreed to require IHE to consent to the assignment of the IHE Agreement without amendment. However, notwithstanding this knowledge by IHE, IHE nevertheless falsely represented to Freedom's manager, that IHE could and would refuse to purchase the loans, and that IHE could and would refuse to return the collateral documents, unless Freedom executed the Addendum.

44.    Faced with a catastrophic stoppage of business unless the Addendum was signed, and in light of intentionally misleading statements by IHE and other Irwin personnel that IHE could and would refuse to accept the loans or return the collateral documents, Freedom's manager signed the Addendum under sheer duress.

45.    Irwin knew that the Addendum would deprive Freedom of valuable and material benefits of the IHE Agreement.

46.    IHE was, and still is, the an "Affiliate" of Irwin Financial as that term is defined in Section 1.1 of the APA, and an agent of Irwin Financial, because IHE is under the dominion and control of Irwin Financial. Irwin Financial indirectly owns and possesses the full economic interest in IHE. IHE reports its financial results on a consolidated basis with Irwin Financial.

**Irwin Is Bound To Compel IHE To Honor The Original IHE Agreement**

47.    Pursuant to Section 9.1(g) of Article IX of the APA, Irwin Financial and Irwin Mortgage are required to cause Affiliates (including IHE) to take actions as follows:

> . . . Seller and Shareholder shall, and shall cause their respective Affiliates to, use commercially reasonable efforts, to assist Buyer at no cost to Buyer to obtain promptly any such approval, consent or waiver…

- 14 -

> [Seller and Shareholder] shall commencing on the Closing and prior to obtaining any such approval, consent or waiver, ***provide Buyer***, at no cost to Buyer, with ***all of the rights and benefits*** (subject to all of the obligations) ***under any such Contract***, through the term of such Contact ***including enforcement for the benefit of Buyer of any and all rights of the Seller***, Shareholder or its Affiliates against any other party arising our of any breach or cancellation of any such Contract by such other party and, if requested by Buyer, acting as an agent on behalf of Buyer or as Buyer shall otherwise reasonably require.

(Emphasis added).

48.     Pursuant to Section 9.1(g) of the APA, Irwin Financial and Irwin Mortgage are each required to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to Freedom.

49.     Section 9.1(g) also, separately and additionally, requires Irwin Financial and Irwin Mortgage, at no cost to Freedom, to provide Freedom all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

50.     Irwin has failed to provide the benefits of the IHE Agreement to Freedom.

## Irwin Is Obligated To Indemnify Freedom

51.     Pursuant to Section 10.2 of Article X of the APA, Irwin Financial and Irwin Mortgage shall jointly and severally indemnify, defend and hold harmless Freedom from and against any and all costs, losses, liabilities, obligations, damages, lawsuits, deficiencies, claims, demands, and expenses, as set forth in Section 10.2 (a) (a "Loss"), directly or indirectly based upon, arising out of, resulting from or relating to, for example:

a.  Any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Irwin Financial or Irwin Mortgage in the APA.  (Section 10.2 (a)(i)).

b.  Any breach of or default in connection with any of the covenants or agreements.  (Section 10.2 (a)(ii)).

c.  Any failure of Irwin Mortgage to service mortgage loans in accordance with the provisions of the Transition Services Agreement.  (Section 10.2 (a)(ii)).

52.     Freedom's losses resulted from intentional misconduct by Irwin Mortgage or its Affiliates and, as a result, the Indemnity Threshold in Section 10.2(b) does not apply.

**Irwin Is Obligated to Repurchase Loans**

53.     Pursuant to Section 10.2(c), Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom any Covered Company Loans, as defined in the APA, which IHE demands that Freedom repurchase.

54.     IHE has demanded that Freedom repurchase Covered Company Loans and, as a consequence, Irwin is obligated to repurchase them from Freedom.

55.     Pursuant to Section 10.2(d) of Article X of the APA, Irwin Financial and Irwin Mortgage are required to required to repurchase from Freedom Company Mortgage Loans, as defined in the APA, as follows:

> In the event that, for the first due date for a Company Mortgage Loan on or subsequent to the Closing Date, the initial monthly payment is not made within thirty (30) days of such due date, or for the second or third due dates following the Closing Date, the related monthly payment is not made within thirty (30) days of such due date, then the Seller or the Shareholder shall repurchase

such Company Mortgage Loan at the Repurchase Price upon demand of the Buyer.

56.    Freedom has demanded that Irwin repurchase Company Mortgage Loans, and Irwin is obligated to repurchase them from Freedom.

57.    Notwithstanding Freedom's demand, Irwin has refused to repurchase the loans.

58.    Irwin's intentional misconduct in concealing the negotiations and agreement to the Addendum, and in compelling that it be signed, has permeated the APA, and it is anticipated that additional representations and provisions breached by Irwin may be identified.

## AS AND FOR A FIRST CAUSE OF ACTION
(Specific Performance)

59.    Plaintiff realleges and incorporate the foregoing paragraphs as if fully set forth herein.

60.    The APA is a valid and enforceable contract.

61.    Plaintiff has performed all of its obligations under the APA.

62.    Pursuant to Section 9.1(g) of Article IX of the APA, Irwin Financial and Irwin Mortgage are required to cause their Affiliate IHE to honor the IHE Agreement with plaintiff as written as of the date of the APA closing and, in specific: (a) provide plaintiff with all of the rights and benefits under the IHE Agreement, and (b) enforce for the benefit of plaintiff any and all rights of Irwin Mortgage under the IHE Agreement.

63.    Irwin Financial has refused to take steps to ensure that its subsidiary, IHE, honors the IHE Agreement as written as of the date of the APA closing.

64.    Irwin Mortgage has refused to take steps to ensure that its Affiliate, IHE, honors the IHE Agreement as written as of the date of the APA closing.

65.    Pursuant to Sections 10.2 (c) of the APA, Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom Covered Company Loans.

66.    Pursuant to Section 10.2 (d) of the APA, Irwin Financial and Irwin Mortgage are obligated to repurchase from Freedom Company Mortgage Loans.

67.    Irwin has refused to repurchase the Covered Company Loans, and Irwin has refused to repurchase the Company Mortgage Loans.

68.    Pursuant to Section 10.2 of the APA, Irwin Financial and Irwin Mortgage shall jointly and severally indemnify, defend and hold harmless Freedom from and against Losses arising from, among other things, (a) any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Irwin Financial or Irwin Mortgage in the APA, and (b) any breach of or default in connection with any of the covenants or agreements given or made by Irwin Financial or Irwin Mortgage in the APA.

69.    Irwin Financial and Irwin Mortgage made misrepresentations and inaccuracies, including by failing to disclose that they had reached an informal "understanding" with IHE that Section 6.01(d) would be amended to permit IHE to require Irwin Mortgage to buy back EPDs beyond the first 30 days after the sale of the underlying property.

70.    Irwin Financial and Irwin Mortgage breached covenants and agreements they made in the APA, as set forth herein, including by failing to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to

Freedom, and by failing to provide Freedom with all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

71.     As a result, Freedom has suffered Losses including but not limited to the IHE Action, any further claims by IHE, and all associated costs and expenses.

72.     The balance of equities favors an order of specific performance.

73.     Plaintiff has no adequate remedy at law.

<u>**AS AND FOR A SECOND OF ACTION**</u>

(Breach of Contract)

74.     Plaintiff realleges and incorporate the foregoing paragraphs as if fully set forth herein.

75.     The APA is a valid and binding contract.

76.     Plaintiff has performed all of its obligations under the APA.

77.     Irwin has breached Section 9.1(g) of the APA by failing to use commercially reasonable efforts to obtain IHE's approval to the assignment of the IHE Agreement to Freedom.

78.     Irwin has breached Section 9.1(g) of the APA by failing to provide to Freedom all of the rights and benefits under the IHE Agreement as it existed on the date of closing.

79.     Irwin has breached the representations in Sections 4.5, 4.8 (c), 4.10 (b), 4.19 (d), 4.19 (f), 4.20, 4.25 and 4.26 of the APA by failing to disclose that Irwin Mortgage had been negotiating and entering into an agreement (and by in fact negotiating and entering into such an agreement) with its subsidiary, IHE, to materially change the terms of the IHE Agreement that Irwin was assigning to Freedom in order to benefit

Irwin's subsidiary, IHE, at the expense of Freedom. These constitute Seller Material Adverse Effects as defined by the APA.

80.    Irwin has breached Section 6.1(b)(i) of the APA by deviating from conducting business in the ordinary course by negotiating a deal whereby Irwin would divest itself and consequently its assignee Freedom, of the benefits of the IHE Agreement.

81.    Plaintiff has been damaged by Irwin's breaches of the APA, in that, among other things: (a) Freedom is compelled to defend itself against the IHE Action; (b) Freedom faces buy-back demands that it should not have received; and (c) Freedom has lost the availability of this unique contract.

82.    As a result of Irwin's breach of contract, plaintiff has been damaged in an amount to be determined at trial but believed to be in excess of $8,000,000, and plaintiff is entitled to judgment in such amount, together with interest thereon.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, Plaintiff Freedom Mortgage Corporation demands judgment as follows:

A.    On the first cause of action, ordering specific performance of the APA, and thereby requiring defendants, jointly and severally:

1.    to compel IHE (a) to abandon further attempts to enforce the Addendum, (b) to acknowledge that the Addendum is void, voidable or rescinded, (c) to concede the IHE Arbitration on the grounds that the Addendum is void, voidable or rescinded, and (d) to reaffirm the terms of the IHE Agreement as it existed at the closing of the sale of the Business;

2.    to repurchase relevant Company Covered Loans and Company Mortgage Loans as required by the APA; and

3.    to indemnify Freedom against the IHE Action and any further claims by IHE; and

B.    On the second cause of action, awarding Plaintiff actual damages against defendants, jointly and severally, in an amount to be determined at trial but reasonably expected to exceed $8,000,000, together with interest thereon; and

C.    Granting Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Freedom Mortgage Corporation demands trial by a jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

William M. Lafferty (#2755)
Theodore Kittila (#3963)
Karl G. Randall (#5054)
1201 N. Market Street
Wilmington, Delaware  19801
(302) 658-9200

*Attorneys for Plaintiff Freedom Mortgage Corporation*

OF COUNSEL:

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
875 Third Avenue
New York, New York 10022
(212) 223-6700

March 12, 2008

# EXHIBIT A
# Part 1 of 4

EXECUTION COPY

---

# ASSET PURCHASE AGREEMENT

by and among

Irwin Financial Corporation,

Irwin Mortgage Corporation

and

Freedom Mortgage Corporation

Dated as of August 7, 2006

1926-001 #57092/v12

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................................1

1.1       Definitions....................................................................................................1

ARTICLE II PURCHASE AND SALE OF THE PURCHASED ASSETS; CLOSING .............18

2.1       Purchase and Sale of Purchased Assets; Assumed Liabilities. ...................18
2.2       Determination of Adjustments; Outstanding Charges. ...............................21
2.3       Closing.........................................................................................................22
2.4       Closing Obligations .....................................................................................23
2.5       Allocation of Purchase Price .......................................................................23

ARTICLE III CONDITIONS TO CLOSING........................................................................24

3.1       Conditions to the Obligations of the Buyer and the Seller and the Shareholder .........24
3.2       Conditions to the Obligations of the Buyer .................................................24
3.3       Conditions to the Obligations of the Seller and Shareholder.......................25

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLER .......................26

4.1       Organization, Authority ...............................................................................26
4.2       No Conflict....................................................................................................27
4.3       [Intentionally Omitted] ................................................................................27
4.4       Financial Statements ...................................................................................28
4.5       Absence of Changes or Events ....................................................................28
4.6       Undisclosed Liabilities.................................................................................29
4.7       Taxes............................................................................................................29
4.8       Properties.....................................................................................................30
4.9       Intellectual Property.....................................................................................30
4.10      Contracts......................................................................................................31
4.11      Litigation; Decrees.......................................................................................33
4.12      Insurance......................................................................................................33
4.13      Benefit Plans.................................................................................................33
4.14      Compliance with Applicable Laws ..............................................................36
4.15      Licenses; Permits .........................................................................................36
4.16      Environmental Matters..................................................................................36
4.17      Employee and Labor Matters........................................................................36
4.18      No Brokers ....................................................................................................37
4.19      Mortgage Loans............................................................................................37
4.20      Pipeline Loans and Applications ..................................................................39
4.21      Servicing ......................................................................................................39
4.22      Investor Commitments, Forward Delivery Contracts, and Derivative Contracts.........39
4.23      Restrictions on Business Activities..............................................................40
4.24      Solvency........................................................................................................40
4.25      Interested Party Transactions.......................................................................40
4.26      Representations Complete ............................................................................40

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE BUYER ........................41

5.1        Organization, Authority ....................................................................41
5.2        No Conflict........................................................................................41
5.3        Sufficient Funds ...............................................................................42
5.4        Litigation and Liabilities ..................................................................42
5.5        Compliance with Laws; Permits ......................................................42
5.6        Solvency............................................................................................42
5.7        No Brokers ........................................................................................42
5.8        No Other Representations or Warranties ..........................................42

ARTICLE VI COVENANTS ........................................................................................42

6.1        Covenants of the Seller ....................................................................42
6.2        Covenants of the Buyer.....................................................................45
6.3        Consents and Approvals; Cooperation; Notification. .......................46
6.4        Publicity ............................................................................................47
6.5        Updated Schedules ...........................................................................47
6.6        Further Assurances............................................................................48
6.7        Independent Investigation and Evaluation .......................................48
6.8        Payments Received ...........................................................................49
6.9        Non-Competition. .............................................................................49
6.10       Non-Solicitation; Non-Hire ..............................................................51
6.11       Outstanding Charges.........................................................................51
6.12       Ongoing Payments to Former Employees ........................................51
6.13       Confirmation of Company Mortgage Loans .....................................51

ARTICLE VII TAX MATTERS ...................................................................................52

7.1        Tax Returns.......................................................................................52
7.2        Contests.............................................................................................52
7.3        Notices ..............................................................................................52

ARTICLE VIII EMPLOYEES AND EMPLOYEE BENEFITS MATTERS.................53

8.1        Employees.........................................................................................53
8.2        Benefit Plans .....................................................................................53
8.3        Buyer's Post-Closing Benefit Obligations........................................53
8.4        Allocation of Benefit Obligations ....................................................54
8.5        COBRA Coverage .............................................................................54
8.6        WARN Act.........................................................................................54
8.7        Retirement Plan.................................................................................55
8.8        Immigration Matters. ........................................................................55

ARTICLE IX OTHER CONTRACTS ..........................................................................55

9.1        Multi-Affiliate Contracts. .................................................................55

ARTICLE X INDEMNIFICATION ..............................................................................57

10.1       Survival .............................................................................................57
10.2       Indemnification by the Seller. ..........................................................57
10.3       Indemnification by the Buyer. ..........................................................61

|        |                                  |     |
|--------|----------------------------------|-----|
| 10.4   | Indemnification Procedures       | 62  |
| 10.5   | Limitations.                     | 63  |
| ARTICLE XI MISCELLANEOUS          |        | 64  |
| 11.1   | Assignment                       | 64  |
| 11.2   | No Third-Party Beneficiaries     | 64  |
| 11.3   | Termination.                     | 64  |
| 11.4   | Expenses                         | 66  |
| 11.5   | Amendments                       | 66  |
| 11.6   | Notices                          | 66  |
| 11.7   | Consent to Jurisdiction          | 67  |
| 11.8   | Severability                     | 68  |
| 11.9   | Waiver                           | 68  |
| 11.10  | Counterparts; Facsimile          | 68  |
| 11.11  | Entire Agreement                 | 68  |
| 11.12  | Governing Law                    | 68  |
| 11.13  | Interpretation                   | 68  |
| 11.14  | Disclosure Schedules.            | 69  |
| 11.15  | Certain Understandings.          | 69  |

EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Excluded Assets and Contracts |
| Exhibit B | Non-Loan Purchased Asset Value |
| Exhibit C | Forms of Ancillary Agreements |
| Exhibit D | Methodologies and Procedures |
| Exhibit E | Reference Balance Sheet |
| Exhibit F | Legal Opinion |
| Exhibit G | Form Employment Agreement |
| | |
| Schedule 1.1(a)(i) | Seller's Knowledge Parties |
| Schedule 1.1(a)(ii) | Buyer's Knowledge Parties |
| Schedule 1.1(b)(i) | Company Mortgage Loans |
| Schedule 1.1(b)(ii) | Pipeline Loans and Pipeline Applications |
| Schedule 1.1(b)(iii) | Assigned Contracts |
| Schedule 1.1(b)(iv) | Real Property Leases |
| Schedule 1.1(b)(v) | Personal Property Leases |
| Schedule 1.1(b) (vi) | Tangible Personal Property |
| Schedule 1.1(b)(vii) | Company Intellectual Property |
| Schedule 1.1(b)(viii) | Prepayments, Refunds, Insurance Proceeds |
| Schedule 1.1(b)(ix) | Permits and Licenses |
| Schedule 2.5 | Allocation of Purchase Price |
| Schedule 3.2(e) | Payments to Employees |
| Schedule 3.2(f) | Buyer Required Consents |
| Schedule 3.2(k) | Employees |

Schedule 3.3(d)            Seller Required Consents

Schedule 6.1 (b)           Conduct Prior to Closing

Schedule 8.1               Continuing Employee Matters

Schedule 9.1(a)            Shareholder Assigned Contracts

Schedule 9.1(c)            Shared Contracts

Schedule 9.1(d)            Agreements Subject to Transition Services Agreement

Schedule 9.1(h)            Seller Guarantees

SELLER DISCLOSURE SCHEDULE

Schedule 4.1               Qualification; Good Standing

Schedule 4.2(a)            No Conflict

Schedule 4.2(b)            Regulatory Approvals

Schedule 4.4               Financial Statements of Seller

Schedule 4.5               Absence of Changes or Events

Schedule 4.6               Undisclosed Liabilities

Schedule 4.7               Tax Matters

Schedule 4.8(a)(i)         Encumbrances

Schedule 4.8(a)(ii)        Leasehold Interests to Third Parties

Schedule 4.8(b)(i)         Real Property Leases of Seller

Schedule 4.8(c)            Exceptions to Continued Use

Schedule 4.9(a)(i)         Intellectual Property Owned by Seller

Schedule 4.9(a)(ii)        Intellectual Property Licensed by Seller

Schedule 4.9(b)            Intellectual Property Claims

Schedule 4.9(c)            Owned Intellectual Property Requiring Consent or Approval

| Schedule 4.10(a) | Material Contracts |
| Schedule 4.10(b) | Breaches of Material Contracts |
| Schedule 4.10(c) | Certain Branch Contracts |
| Schedule 4.11 | Litigation |
| Schedule 4.12 | Insurance |
| Schedule 4.13(a)(i) | Seller Employee Plans |
| Schedule 4.13(a)(ii) | Transferred Benefit Plans |
| Schedule 4.13(e) | Seller Affiliate Plans Subject to Erisa Funding Rules |
| Schedule 4.13(i) | Continued Benefits and Coverage |
| Schedule 4.13(j) | Compensation Improvements |
| Schedule 4.13(l) | Benefit Liability |
| Schedule 4.13(n) | Acceleration of Benefits and Severance |
| Schedule 4.14 | Compliance with Applicable Laws |
| Schedule 4.15 | Licenses and Permits |
| Schedule 4.16 | Environmental Matters |
| Schedule 4.17(a)(i) | Employees Planning to Terminate Employment |
| Schedule 4.17(a)(ii) | Seller's Employee Immigration Obligations |
| Schedule 4.17(b) | Employee List |
| Schedule 4.19(c) | Company Mortgage Loan Claims |
| Schedule 4.22 | Investor Commitments, Forward Delivery Contracts and Derivative Contracts |
| Schedule 4.25 | Interested Party Transactions |

EXECUTION COPY

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of August 7, 2006 (the "Agreement"), is by and among Irwin Financial Corporation, an Indiana corporation (the "Shareholder"), Irwin Mortgage Corporation, an Indiana corporation (the "Seller"), and Freedom Mortgage Corporation, a New Jersey corporation (the "Buyer"). The Shareholder, the Seller and the Buyer are referred to collectively herein as the "Parties" and each individually as a "Party."

### Background

A.    The Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, substantially all of the operating assets of the Seller's Business upon the terms and subject to the conditions set forth herein.

B.    The Shareholder indirectly owns all of the issued and outstanding common stock of the Seller, and, as an inducement to Buyer to enter into this Agreement, joins in this Agreement to make certain agreements with respect to the transactions contemplated by this Agreement.

### Terms

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Agreement" has the meaning set forth in the opening paragraph.

"Accounts Receivable" means all trade accounts receivable (specifically excluding mortgage loans other than Unsettled Mortgage Loans), as reflected on the books of the Seller.

"Action or Proceeding" means any action, suit, complaint, petition, proceeding, arbitration, litigation or any Governmental Authority audit or proceeding, or to the Knowledge of the applicable Person, any investigation pending, whether civil or criminal, in law or in equity, or before or by any arbitrator or Governmental Authority.

"Adjustment Date" has the meaning set forth in Section 2.2(b).

"Affiliate" shall have the meaning given to such term in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended as of the date hereof.

"Agency" means the Federal Housing Administration (FHA), or any successor thereof; the Farmers Home Administration, now known as RHCDS, or Rural Housing and Community Development Services, or any successor thereof; Fannie Mae (Fannie Mae), also known as the Federal National Mortgage Association, or any successor thereof; Freddie Mac (Freddie Mac), also known as the Federal Home Loan Mortgage Corporation, or any successor thereof; the Government National Mortgage Association (GNMA), or any successor thereof; the United States Department of Veterans' Affairs (VA), or any successor thereof; the Rural Housing Service of the U.S. Department of Agriculture (RHS), or any successor thereof; the Department of Housing and Urban Development (HUD) or any successor thereof; or any state agency with authority to (i) regulate the business of the Seller, including any state agency with authority to determine the investment, origination, lending or Servicing requirements with regard to mortgage loans originated, purchased or serviced by the Seller as the case may be, or (ii) originate, purchase, or service mortgage loans, or otherwise promote mortgage lending, including state and local housing finance authorities.

"Allocation" has the meaning set forth in Section 2.5.

"Applicable Accounting Standards" means the same accounting methods, policies, practices and procedures, with consistent classification, judgments and estimation methodology, as were used by the Seller in preparing the Financial Statements, not taking into account any Events occurring after the close of business on the Closing Date, except to the extent such Events provide indications of conditions on the Closing Date.

"Approved Investor" has the meaning set forth in Section 10.2(d).

"Approved Pipeline Loan" means a Pipeline Loan the application for which has undergone credit underwriting and received approval (conditional or unconditional) for funding by Seller, as evidenced by an approval letter issued by the Seller to the borrower pursuant to which all conditions expressly identified to borrower in such letter have been satisfied.

"Ancillary Agreements" means, collectively, the Transition Services Agreement, the Sublease, the License Agreement and all other agreements to be entered into in connection with the transactions contemplated by this Agreement.

"Applicable Schedules" has the meaning set forth in Section 6.5.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including cash, cash equivalents, investment assets, accounts and notes receivable, chattel paper, documents, instruments, licenses, Contracts, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"Assigned Contracts" means only the following written or oral Contracts or agreements to which Seller is a party and which are used or held for use by Seller primarily in, or are necessary for, the conduct of the Business as a going concern: (a) the Contracts set forth in Schedule 1.1(b)(iii), including the Investor Commitments, Forward Delivery Contracts and

2

Derivative Contracts related to Company Mortgage Loans or Pipeline Loans listed on the final form of <u>Schedule 4.22</u>; (b) Transferred Benefit Plans listed on <u>Schedule 4.13</u>; (c) the Shareholder Assigned Contracts listed on <u>Schedule 9.1(a)</u>; (d) the Real Property Leases listed on <u>Schedule 1.1(b)(iv)</u>; and (e) the Personal Property Leases listed on <u>Schedule 1.1(b)(v)</u>; provided, however, that the Contracts listed on Schedule 4.22 that have a settlement date after September 5, 2006 will not be Assigned Contracts (and will be Excluded Assets) if the Buyer delivers a written notice to Seller within 10 Business Days after the date hereof indicating the same; and <u>provided, further</u>, that such term is not intended to encompass Company Mortgage Loans and Pipeline Loans (which shall nevertheless be assigned to Buyer at the Closing), and such term excludes all Servicing Agreements and the Contracts listed or described on <u>Exhibit A</u> to this Agreement and all Excluded Assets, which are excluded and shall not be assigned.

"<u>Assumed Liabilities</u>" means the Seller Assumed Liabilities and the Shareholder Assumed Liabilities, collectively.

"<u>Assumed Payables</u>" means the liabilities of Seller as of a date of reference under the following accounts set forth on the Reference Balance Sheet in the column labeled "Purchased Assets/Assumed Liabilities", each calculated in accordance with the procedures and methodologies set forth in <u>Exhibit D</u>, and in a manner consistent with the Reference Balance Sheet: 22060 (A/P – Appraisals), 22150 (A/P – Other), 22300 (Accrued Salaries and Bonuses), 22010 (Interest Rate Lock Commitments), 22158 (A/P Correspondent SRP), 22100 (A/P Trade), and 26050 (Completion Escrow).

"<u>Business</u>" means the Seller's business of originating and selling mortgage loans through its retail, wholesale, direct lending and correspondent divisions, but does not encompass (i) Seller's activity of originating or acquiring Construction Loans, (ii) Seller's activity of Servicing mortgage loans and (iii) Seller's activity of acquiring, holding and selling MSR held under Servicing Agreements.

"<u>Business Day</u>" means any day other than (i) a Saturday or Sunday or (ii) a day on which banks in Indianapolis or Philadelphia are authorized to close.

"<u>Business Permit</u>" has the meaning set forth in Section 4.15.

"<u>Buyer</u>" has the meaning set forth in the opening paragraph.

"<u>Buyer Indemnified Parties</u>" has the meaning set forth in Section 10.2(a).

"<u>Buyer Loan Confirmation</u>" has the meaning set forth in Section 6.15.

"<u>Buyer Material Adverse Effect</u>" means any Event that would prevent or materially impair the ability of Buyer to perform its obligations under this Agreement or any of the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby in a timely manner.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended as of the date hereof, and the regulations promulgated thereunder.

"Claim Notice" has the meaning set forth in Section 10.4(a)

"Closing" has the meaning set forth in Section 2.3.

"Closing Balance Sheet" has the meaning set forth in Section 2.2(a).

"Closing Date" has the meaning set forth in Section 2.3.

"Closing Forward Commitments" means the Investor Commitments, Forward Delivery Contracts, Derivative Contracts or other similar arrangements held by the Seller as of a specified date and entered into for the purpose of hedging the risk of fluctuations in market value of Company Mortgage Loans or Pipeline Loans or both.

"COBRA" has the meaning set forth in Section 8.5.

"Code" means the Internal Revenue Code of 1986, as amended as of the date hereof, and the regulations promulgated thereunder.

"Collateral" means the real property and all improvements thereon securing a Company Mortgage Loan.

"Company Intellectual Property" means all the Intellectual Property that is used or held for use by the Seller primarily in, or is necessary for, the conduct of the Business as a going concern (including Seller's goodwill therein) as currently conducted or in connection with products of the Business under design or development.

"Company Mortgage Loans" as of a specified date means all 1-4 family residential mortgage loans and rehabilitation loans owned by the Seller for a period of no longer than one hundred twenty (120) days as of such date, other than (i) Construction Loans, (ii) loans that are not Marketable Loans or as to which there is an identified violation of Laws applicable thereto as listed in the Buyer Loan Confirmation, (iii) loans that do not conform with the Seller's historical loan parameters with respect to bona fide third party loans of the same type consistent with Seller's past practices as listed in the Buyer Loan Confirmation and (iv) loans for which the Seller has received written notice that would have been required to be set forth on Schedule 4.19(c) had such written notice been delivered prior to the date hereof.

"Company Organizational Documents" has the meaning set forth in Section 4.2(a).

"Confidentiality Agreement" has the meaning set forth in Section 6.2(a).

"Construction Loans" means all loans provided to fund construction, planned or in progress, owned by the Seller (excluding any rehabilitation loans).

"Continuing Employees" has the meaning set forth in Section 8.1.

"Contract" means any agreement, lease, license, evidence of indebtedness, mortgage, indenture, security agreement or other contract or arrangement (whether written or oral) setting forth a legal obligation or right of a party thereto with respect to the subject matter thereof (including all amendments, supplements thereto, restatements thereof and consents, waivers and notices thereunder which affect the rights and/or obligations of any of the parties thereto).

"Covered Company Loan" has the meaning set forth in Section 10.2(c).

"CPA Firm" has the meaning set forth in Section 2.2(a).

"Custodial Account" means all funds held or controlled by the Seller with respect to any mortgage loan, including all principal and interest funds and any other funds due Investors, buydown funds, funds for the payment of Taxes, assessments, insurance premiums, ground rents and similar charges, funds from hazard insurance loss drafts, and other mortgage escrow and impound amounts (including interest thereon for the benefit of mortgagors, if applicable).

"Deferral Payment Date" has the meaning set forth in Section 2.1(a).

"Derivative Contracts" means Contracts of Seller acquired or held for the purpose of hedging fluctuations in market values or interest rates bearing on Company Mortgage Loans or Pipeline Loans.

"Determination Date" has the meaning set forth in Section 2.2(a).

"Disclosure Schedules" has the meaning set forth in the forepart of Article IV.

"Earn-Out Payments" has the meaning set forth in Section 2.1(e).

"Eligible Gain" has the meaning set forth in Section 2.1(d).

"Employee List" has the meaning set forth in Section 4.17(b).

"Employment Agreement" has the meaning set forth in Section 4.10(a)(i).

"Encumbrance" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance or restriction of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Environmental Laws" means all Laws concerning pollution or protection of the environment or relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Substances, including (i) CERCLA, (ii) RCRA, (iii) the Federal Water Pollution Control Act, (iv) the Federal Clean Air Act, (v) the Toxic Substances Control Act, (vi) the Safe Drinking Water Act, (vii) the Pollution Control Act of 1990, (viii) the Federal

Insecticide, Fungicide and Rodenticide Act and (ix) comparable state and local Laws, as each of the foregoing has been amended as of the date hereof.

"Environmental Permits" has the meaning set forth in Section 4.16.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event" means any event, circumstance, change, occurrence or effect.

"Excluded Assets" means (i) cash, cash equivalents, amounts due from banks, bank deposits, all Accounts Receivable, and all Custodial Accounts and investment securities, including the capital stock of Irwin Reinsurance Company (other than the cash (Correspondent SRP) and the Accounts Receivable (Housing Commitment Fees and Accrued Interest) set forth in account numbers 11103, 13390 and 13570 on the Reference Balance Sheet in the column labeled "Purchased Assets/Assumed Liabilities"), (ii) the leasehold in Seller's Fishers, Indiana headquarters, (iii) Old Mortgage Loans, Construction Loans and applications for Construction Loans, and chattel paper (other than Company Mortgage Loans), (iv) the MSR and all Servicing Agreements, Tax service agreements, and flood insurance tracking agreements, (v) the Intercompany Capital Loan, the Intercompany Credit Line, and other warehouse lending facilities of the Seller used to fund mortgage loans, (vi) interests in the Servicing Portfolio and all data and records related thereto, (vii) any Contract of Seller or any of its Affiliates that is not an Assigned Contract, Company Mortgage Loan or Pipeline Loan, including those Contracts set forth on Exhibit A to this Agreement, (viii) insurance policies (other than rights to insurance proceeds directly related to the Purchased Assets, including rights under PMI issued in respect of Company Mortgage Loans and other than insurance policies that are Transferred Benefit Plans), (ix) REOs, (x) Seller's corporate or employee records, including stock transfer records and minutes books, Seller's employee health records and originally executed employee agreements, this Agreement and related and Ancillary Agreements, (xi) all trademark, trade name, service mark or service name rights in the names "Irwin Mortgage Corporation," "Irwin," or the Irwin "I" symbol in any form, and related goodwill, and all internet domain names, (xii) all Tangible Personal Property, Intellectual Property (including all rights in the Servicing database and the Servicing computer and telephone systems, including LSAMS) and Contracts (including personal property leases) which relate solely to Servicing (sometimes referred to herein as the "Servicing Platform") and any interest in the Servicing Portfolio, (xiii) claims, causes of action, choses in action, rights of recovery, and rights of set off and rights of recoupment that are unrelated to Company Mortgage Loans, (xiv) those assets set forth on Exhibit A to this Agreement, as well as any copyright or Intellectual Property right in any of the foregoing, and (xv) any files, data and records with respect to any of the foregoing.

"Excluded Liabilities" means all of the Liabilities of the Seller and any Affiliate other than the Assumed Liabilities, including (i) for Taxes (other than Taxes under OC Tax Returns) applicable to operations of Seller or the Business and attributable to periods (or portions thereof) ending on or prior to the Closing Date, (ii) under employment agreements between Seller and any employee of Seller in effect prior to the Closing, (iii) under this Agreement and the Ancillary Agreements, (iv) arising from Excluded Assets, (v) under the Intercompany Capital Loan, the Intercompany Credit Line and other warehouse lending facilities of the Seller used to

fund mortgage loans, and (vi) with respect to any Seller Employee Plan (including severance agreements with the Seller's employees) other than the Transferred Benefit Plans.

"Final Account Value" has the meaning set forth in Section 2.2(a).

"Final Assumed Payables" has the meaning set forth in Section 2.2(a).

"Final LHFS Other Accounts" has the meaning set forth in Section 2.2(a).

"Final Net Outstanding Charges Balance" is defined in Section 2.2(b).

"Final Other Assets" has the meaning set forth in Section 2.2(a).

"Financial Statements" has the meaning set forth in Section 4.4.

"First Payment" has the meaning set forth in Section 2.1(a).

"Freedom Retirement Plan" means the Freedom Mortgage 401(k) Plan.

"Forward Delivery Contract" means a Contract of Seller providing for the future delivery for funding or sale of Company Mortgage Loans or Pipeline Loans.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Gain Statement" has the meaning set forth in Section 2.1(d).

"Governmental Authority" means any domestic or foreign entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission, court, tribunal, judicial body or instrumentality of any union of nations, federation, nation, state, municipality, county, locality or other political subdivision thereof.

"Hazardous Substances" means "hazardous substances" pursuant to CERCLA, "hazardous waste" pursuant to RCRA, "toxic pollutants" pursuant to the Federal Water Pollution Control Act and any asbestos-containing materials, polychlorinated byphenyls, radioactive materials and petroleum products, by-products or breakdown products or any chemical, material or substance defined or regulated as toxic or hazardous or as a pollutant or contaminant or waste under any applicable Environmental Law; provided, however that "Hazardous Substances" do not include ordinary cleaning supplies, typical household products, machinery, computers and other electronic devices, batteries, non-asbestos containing building materials, personal care items, cosmetics, or materials normally present in trucks, automobiles and other vehicles used by the Seller and/or its employees.

"Indebtedness Payoff Amount" means the amount required to pay all (i) obligations of Seller under the Intercompany Credit Line, and (ii) outstanding obligations of Seller under any warehouse lending facility of Seller used to fund Company Mortgage Loans, as confirmed in writing respectively by Irwin Union Bank & Trust Company and the Seller's other mortgage loan warehouse lenders for the Parties on or before the Closing Date; provided, that the

sum of (i) and (ii) shall not exceed the aggregate Stated Principal Balance of the Company Mortgage Loans.

"Indemnified Parties" has the meaning set forth in Section 10.2(a).

"Indemnitor" has the meaning set forth in Section 10.4(a).

"Indemnity Threshold" has the meaning set forth in Section 10.2(b)(iii).

"Insurer" means a Person who insures or guarantees for the benefit of the mortgagee all or any portion of the risk of loss upon borrower default on any of the mortgage loans, including the FHA, the VA, the RHS or any private mortgage insurer, and any provider of hazard, title or other insurance with respect to any of the mortgage loans or the Collateral securing such mortgage loans.

"Intellectual Property" means any or all of the following and all rights in, arising out of, or associated with any or all of the following: (i) all patents and patent rights (including all patents, patent applications, and any and all divisions, continuations, continuations-in-part, reissues, re-examinations and extensions thereof, and all invention registrations and invention disclosures); (ii) all trademarks and trademark rights, service marks and service mark rights, trade names and trade name rights, service names and service name rights (including all goodwill, common law rights and governmental or other registrations or applications for registration pertaining thereto), designs, trade dress, brand names, business and product names, Internet domain names, logos and slogans (excluding any such registration, application or name using the name "Irwin Mortgage Corporation" or "Irwin" or the Irwin "I" symbol in any form and related goodwill); (iii) all copyrights and copyright rights (including all common law rights and governmental or other registrations or applications for registration pertaining thereto, and renewal rights therefor); (iv) all *sui generis* database rights, ideas, inventions, (whether patentable or not), invention disclosures, improvements, technology, know-how, trade secrets, formulas, systems, processes, designs, methodologies, industrial models, works of authorship, databases, content, graphics, technical drawings, statistical models, algorithms, modules, computer programs, technical documentation, business methods, work product, intellectual and industrial property licenses, proprietary information, customer lists, and documentation relating to any of the foregoing; (v) all computer software including all source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded; (vi) all similar, corresponding or equivalent rights to any of the foregoing; and (vii) all documentation related to any of the foregoing.

"Intercompany Capital Loan" means the amount, as of the date of reference, of outstanding advances made by Irwin Union Bank & Trust Company to the Seller pursuant to that certain Amended and Restated Intercompany Capital Allocation Agreement dated as of January 1, 2004 and the related note issued thereunder, which amount represents the portion of the Shareholder's hybrid capital that is allocated on a quarterly basis to the Seller.

"Intercompany Credit Line" means the amount, as of the date of reference, of outstanding advances made by Irwin Union Bank & Trust Company to the Seller pursuant to that

certain Irwin Mortgage Corporation Credit Line Agreement dated as of January 1, 2006 and the related note issued thereunder.

"Investor" means any Person (including an Agency) having a beneficial interest in a mortgage loan or a security backed by or representing an interest in a mortgage loan, or in the Servicing rights to a mortgage loan that is serviced by the Seller pursuant to a mortgage Servicing Agreement.

"Investor Commitment" means the optional or mandatory commitments of a Person to purchase (i) a mortgage loan, a Pipeline Loan or a portion of a mortgage loan or Pipeline Loan owned or to be acquired by the Seller, or (ii) securities backed by or representing an interest in such mortgage loans or Pipeline Loans.

"Knowledge" means the knowledge, after due inquiry of: (i) with respect to the Seller, the Persons listed on Schedule 1.1(a)(i), and (ii) with respect to the Buyer, the Persons listed on Schedule 1.1(a)(ii).

"Latest Balance Sheet" has the meaning set forth in Section 4.4(a).

"Laws" mean all constitutions, laws, statutes, ordinances, rules, rulings, regulations, orders, charges, directives, determinations, executive orders, writs, judgments, injunctions or decrees of any Governmental Authority.

"LHFS Other Accounts Amount" means the net amount as of a date of reference in the following accounts set forth on the Reference Balance Sheet under the caption "Loans Held For Sale" in the column labeled "Purchased Assets/Assumed Liabilities", each calculated in accordance with the procedures and methodologies set forth in Exhibit D, and in a manner consistent with the Reference Balance Sheet: 14110, 14115, 14120, 14106, 14107, 14200, 14450, 14630, 14640, 15250, 23100, 23110, 23120, 14400, 14410, 14440, 15130 (but excluding accounts 14100 (Mtge Rec – Loans Held For Sale) and 14105 (Mortgage Loans Closed Not Funded).

"Liabilities" shall mean any and all debts, losses, liabilities, obligations, offsets, claims, damages, fines, penalties, interest, payments and accounts payable (including those arising out of any award, demand, assessment, settlement, judgment or compromise relating to any claim or proceeding), and accruals for out-of-pocket costs and expenses (including reasonable attorneys' fees and reasonable expenses incurred in investigating, preparing, defending or litigating any claim or proceeding).

"License Agreement" means the proposed License Agreement to be entered into at Closing in substantially the form of Exhibit C-3, hereto.

"Loan Basis" has the meaning set forth in Section 2.1(d).

"Loan Documents" mean all documents whether on hard copy, computer record or any other format, evidencing or pertaining to a particular Company Mortgage Loan with respect to the processing, origination, Servicing, subservicing, payment and foreclosure of such Company Mortgage Loan, including the Mortgage Note, Mortgage, ledger or other cards, tax

bills, accruals records, insurance policies, payment and remittance records and any documents required to be maintained under, or that are necessary to comply with applicable Mortgage Loan Regulations.

"Loss" has the meaning set forth in Section 10.2(a).

"Losses" has the meaning set forth in Section 10.2(a).

"Marketable Loan" means a Company Mortgage Loan that is insured by the FHA or the VA, or otherwise conforms to the underwriting standards of Fannie Mae, Freddie Mac, GNMA or any other secondary market purchaser and is deliverable in the secondary market.

"Material Contracts" has the meaning set forth in Section 4.10(a).

"MDMC" means Mortgage Data Management Corporation.

"Mortgages" means the mortgages, deeds of trust, security deeds and other instruments creating a lien on real property with respect to the Company Mortgage Loans.

"Mortgage Files" means, with respect to any Company Mortgage Loan or any Pipeline Loan, the file or files containing the photostatic copy or copies on other media and, to the extent required by applicable Law, original documents, of the Mortgage Note, any mortgage or other documents creating or evidencing a security interest in the related Collateral and other Loan Documents with respect to each Company Mortgage Loan or Pipeline Loan, as well as the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents reasonably necessary to (i) establish the eligibility of the mortgage loans or Pipeline Loans for insurance by an Insurer or for sale or delivery to an Investor, (ii) service the mortgage loans in accordance with the Mortgage Loan Regulations, or (iii) comply with the Mortgage Loan Regulations regarding documentation to be maintained by a servicer of a mortgage loan or a Pipeline Loan, or by the document custodian thereof.

"Mortgage Escrow Payments" means the portion, if any, of the mortgage loan payment in connection with a mortgage loan that, pursuant to the related Mortgage Files, must be made by a Mortgagor for deposit in a Custodial Account for the payment of real estate Taxes and assessments, insurance premiums, ground rents and similar items.

"Mortgage Loan Regulations" means (i) federal, state and local Laws with respect to the origination, insuring, purchase, sale, pooling, Servicing or subservicing of, or filing of claims in connection with, a Company Mortgage Loan, including Laws relating to real estate settlement procedures, consumer credit protection, truth in lending, usury limitations, fair housing, transfers of Servicing, collection practices, equal credit opportunity and adjustable rate mortgages, (ii) the responsibilities and obligations relating to the Company Mortgage Loans set forth in any agreement between the Seller, on the one hand, and any Agency, Investor or Insurer, on the other hand, (iii) applicable Laws as well as applicable guidelines, handbooks and other published written requirements of an Investor, Agency or Insurer with respect to the origination, insuring, purchase, sale, pooling, Servicing or subservicing of, or filing of claims in connection with, a Company Mortgage Loan, (iv) federal and state fair labor standards Laws or similar wage

and hour Laws, and (v) the terms and provisions of the Mortgage Note and the other Mortgage Files.

"Mortgage Note" means a written obligation to pay a sum of money at a stated interest rate, which rate may be fixed or adjustable during the term of the obligation, executed by a Mortgagor and secured by a Mortgage.

"Mortgagor" means the obligor(s) on a Mortgage Note.

"MSR" means the mortgage Servicing rights held by the Seller with respect to the mortgage loans in the Servicing Portfolio.

"Non-Loan Purchased Asset Value" means the amount set forth on Exhibit B.

"OC Tax Return" has the meaning set forth in Section 7.1(b).

"Old Mortgage Loans" as of specified date means loans that would be otherwise deemed to be Company Mortgage Loans hereunder except for the fact that they have been owned by the Seller for a period of more than one hundred twenty (120) days.

"Order" has the meaning set forth in Section 3.1(b).

"Originator" means, with respect to any mortgage loan, the entity or entities that (i) took the relevant mortgagor's loan application, (ii) processed the relevant mortgagor's loan application, or (iii) closed and/or funded such mortgage loan.

"Other Assets" means the amount as of a date of reference under the following accounts set forth on the Reference Balance Sheet in the column labeled "Purchased Assets/Assumed Liabilities", each calculated in accordance with the procedures and methodologies set forth in Exhibit D, and in a manner consistent with the Reference Balance Sheet: 13390 (A/R – Housing Commitment Fees), 19810 (Unexpired Commitment Fee-Govt), 19500 (Deposits) and 13570 (Accrued Interest).

"Outstanding Charges" means utilities charges (including telephone, water, sewer, electric and gas), rental charges, equipment charges, real property Taxes, personal property Taxes, and service Contracts included among the Assigned Contracts (including amounts owed pursuant to transferable permits included among the Purchased Assets) that (i) relate in whole or in part to the period prior to Closing but have not been paid by Seller and are not past due, or (ii) relate in whole or in part to the period following Closing but have been paid by Seller; provided, however, that Outstanding Charges shall not include any Assumed Payables.

"Party" has the meaning set forth in the opening paragraph.

"Parties" has the meaning set forth in the opening paragraph.

"Permitted Encumbrances" means (i) mechanics', materialmen's, carriers', workmen's, repairmen's, contractors' or other similar Encumbrances arising or incurred in the ordinary course of business and for amounts which are not delinquent, (ii) Encumbrances or

11

other restrictions not detracting materially from the use, occupancy, value or marketability of title of the assets subject thereto, (iii) Encumbrances for Taxes not yet due and payable or for Taxes that the Taxpayer is contesting, (iv) purchase money Encumbrances securing rental payments under capital lease arrangements, (v) in the case of the Real Property Leases, zoning, building or other restrictions, variances, covenants, rights of way, conditions, easements and other minor irregularities in title, (vi) Encumbrances arising as a matter of Law in favor of landlords, (vii) other Encumbrances arising in the ordinary course of business and not incurred in connection with the borrowing of money.

"Permitted Exceptions" has the meaning set forth in Section 4.19(b).

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority.

"Personal Property Leases" means all leases and subleases of Tangible Personal Property to which Seller is a party covering Tangible Personal Property which is used or held for use by Seller primarily in, or is necessary for, the conduct of the Business as a going concern.

"Pipeline Applications" means the applications for mortgage loans (other than applications for Construction Loans) taken by sales persons of the Seller or by correspondent or brokerage Originators approved by the Seller and entered into the pipeline tracking system of the Seller prior to the Closing Date, in each case which are active but not closed and funded before the close of business on the Closing Date.

"Pipeline Loans" means those pending loans to be secured by a mortgage with respect to which, as of a reference date, a Pipeline Application has been submitted by the prospective borrower with (i) the Seller or (ii) a correspondent or brokerage Originator (and which, in the case of those loans referred to in this clause (ii), such correspondent or brokerage Originator has registered such loan with the Seller), and which in each case have not yet closed or been purchased from the correspondent or brokerage Originator on the relevant reference date.

"Plan Termination Date" shall mean, with respect to a Seller Employee Plan, the date on which Seller terminates such Seller Employee Plan (or terminates its sponsorship of such Seller Employee Plan), which is expected to be the latest date on which any Retained Employee remains eligible to participate in such Seller Employee Plan.

"Pre-Closing Account Value" means the Pre-Closing Assumed Payables minus the Pre-Closing Other Assets (whether a positive or negative amount).

"Pre-Closing Assumed Payables" means the Assumed Payables as of the Pre-Closing Date set forth on the Pre-Closing Balance Sheet.

"Pre-Closing Balance Sheet" has the meaning set forth in Section 2.1(g).

"Pre-Closing Date" has the meaning set forth in Section 2.1(g).

"Pre-Closing LHFS Other Accounts" means the LHFS Other Accounts Amount as of the Pre-Closing Date set forth on the Pre-Closing Balance Sheet.

"Pre-Closing Other Assets" means the Other Assets as of the Pre-Closing Date set forth on the Pre-Closing Balance Sheet.

"Prior Servicer" means any party that was a servicer or subservicer of any mortgage loan before the Seller or the current servicer, as applicable, became the servicer or subservicer of the mortgage loan.

"Purchase Price" has the meaning set forth in Section 2.1(f).

"Purchased Assets" means all of Seller's right, title and interest in and to and under all Assets and Properties of Seller used or held for use by the Seller primarily in, or necessary for, the conduct of the Business as a going concern, including (i) Company Mortgage Loans (and related Mortgage Notes and Mortgage Files), including those set forth on Schedule 1.1(b)(i) as delivered in accordance with Section 6.5; (ii) the Pipeline Loans and Pipeline Applications, including those set forth on Schedule 1.1(b)(ii) as delivered in accordance with Section 6.5; (iii) Assigned Contracts, including those set forth on Schedule 1.1(b)(iii); (v) real property leases as set forth on Schedule 1.1(b)(iv) (the "Real Property Leases"); (v) Personal Property Leases, as set forth on Schedule 1.1(b)(v); (vi) Tangible Personal Property, including those items set forth on Schedule 1.1(b)(vi); (vii) Company Intellectual Property, including those items set forth on Schedule 1.1(b)(vii); (viii) prepayments, refunds, insurance proceeds and rights to insurance proceeds related to Purchased Assets, including those set forth on Schedule 1.1(b)(viii); (ix) to the extent transferable, franchises, approvals, permits, licenses, orders, registrations, certificates, variances and similar rights obtained from any Governmental Authority, including those set forth on Schedule 1.1(b)(ix) (excluding those necessary to conduct Servicing activities); (x) causes of action, choses in action, rights of recovery, rights of set off and recoupment that are related to Company Mortgage Loans; (xi) improvements, fixtures, fittings, easements, rights of way and other appurtenances (such as appurtenant rights in and to public streets); (xii) all existing data, documents, databases, books, records, correspondence, business plans, projections, records of sales, customer and vendor lists, files, papers relating to the Business or any of the Purchased Assets; (xiii) the platform and content of Seller's websites and the Shareholder's websites referenced in the License Agreement, subject to Section 6.3(e), excluding domain names; provided, that the Purchased Assets shall not include any Excluded Assets. For purposes of determining the Company Mortgage Loans, Pipeline Loans, Pipeline Applications and Investor Commitments, Forward Delivery Contracts and Derivative Contracts related to the Company Mortgage Loans or Pipeline Loans transferred by the Seller to Buyer at Closing, this definition shall be deemed to refer to the schedules delivered by the Seller in accordance with Section 6.5. For avoidance of doubt, all asset accounts set forth on the Reference Balance Sheet in the column labeled "Purchased Assets/Assumed Liabilities", that have a numerical balance other than zero other than account 13220 (Sales Receipt Clearing), are Purchased Assets.

"RCRA" means the Resource Conservation and Recovery Act of 1976, as amended as of the date hereof, and the regulations promulgated thereunder.

"Real Property Leases" has the meaning set forth in the definition of "Purchased Assets."

"Reference Balance Sheet" has the meaning set forth in Section 2.1(g).

"Replacement Plans" has the meaning set forth in Section 8.2.

"Representatives" has the meaning set forth in Section 4.29.

"Repurchase Price" has the meaning set forth in Section 10.2(d).

"REO" means any residential real property owned by the Seller (whether for its own account or on behalf of an Investor, FHA or VA) as a result of a foreclosure.

"Retained Employees" has the meaning set forth in Section 8.1.

"Retirement Plan" means the Irwin Mortgage Corporation Retirement and Profit Sharing Plan.

"Rollover Contributions" has the meaning set forth in Section 8.7.

"RP Administrator" has the meaning set forth in Section 8.7.

"Review Period" has the meaning set forth in Section 2.2.

"Schedules" means the schedules to this Agreement (including the Disclosure Schedules) delivered on the date hereof (as appropriately adjusted pursuant to Section 6.14).

"Second Payment" has the meaning set forth in Section 2.1(a).

"Seller" has the meaning set forth in the opening paragraph.

"Seller Assumed Liabilities" means (i) all expenses which arise and are incurred after the Closing Date and relate directly to the Business; (ii) all Liabilities of Seller to be performed after the Closing Date under the Assigned Contracts; (iii) all Liabilities of Seller, including trade accounts payable, incurred on behalf of a customer in connection with any Company Mortgage Loan or Pipeline Loan arising after the Closing Date; (iv) all Liabilities of Seller under or with respect to the Company Mortgage Loans or Pipeline Loans arising or to be performed after the Closing Date, other than in respect of amounts owed under the Intercompany Capital Loan, the Intercompany Credit Line and any warehouse lending facility of the Seller used to fund Company Mortgage Loans; (v) the Assumed Payables as of the Closing Date; (vi) the Outstanding Charges; and (vi) sponsorship of all visas or lawful permanent residence applications for, and employment-related immigration obligations with respect to, employees of the Business; except, in each case, to the extent such obligations (A) would have been paid, performed or otherwise discharged on or prior to the Closing Date but for a breach or default by the Seller or (B) arise out of any breach or default by Seller. Notwithstanding anything else contained herein to the contrary, the Seller Assumed Liabilities shall not include account 13220

14

(Sales Receipts Clearing) set forth on the Reference Balance Sheet in the column labeled "Purchased Assets/Assumed Liabilities".

"Seller Employee Plans" has the meaning set forth in Section 4.13(a).

"Seller ERISA Affiliate" has the meaning set forth in Section 4.13(a).

"Seller Guarantees" has the meaning set forth in Section 9.1(h).

"Seller Indemnified Parties" has the meaning set forth in Section 10.3(a).

"Seller Material Adverse Effect" means any Event that has, or would be reasonably expected to have, a material and adverse effect on (i) the business, assets, liabilities, condition (financial or otherwise), or operating results of the Seller, or (ii) the ability of the Seller or the Shareholder to perform its obligations under this Agreement or any of the Ancillary Agreements to which it is or will become a party, and the transactions contemplated hereby and thereby in a timely manner; provided that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Seller Material Adverse Effect: any Event arising from or relating to (A) changes in national or international political or social conditions, including acts of sabotage or terrorism, or the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war (it being understood that any such conditions or acts may be the cause of a Seller Material Adverse Effect,) (B) changes in general economic conditions or in U.S. or global financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (C) the taking of any action contemplated by this Agreement and the Ancillary Agreements, (D) any acts or omissions of the Buyer prior to the Closing, (E) any acts or omissions of the Seller prior to Closing taken at the written request of the Buyer or with the prior written consent of the Buyer, (F) the existence of any item fully and properly disclosed in the Disclosure Schedules hereto which have been delivered by Seller.

"Seller's Liability Amount" shall have the meaning set forth in Section 10.2(b)(iv).

"Seller's Tax Group" means the affiliated group of corporations of which Shareholder is the common parent corporation within the meaning of Section 1504 of the Code or any similar provision of state or local Tax Law which files a consolidated Tax Return.

"Servicing" means residential mortgage loan servicing and subservicing rights and obligations and the exercise or performance thereof, including one or more of the following functions (or a portion thereof): (i) the administration and collection of payments for the reduction of principal and/or the application of interest on a residential mortgage loan; (ii) the collection of payments on account of Taxes and insurance; (iii) the remittance of appropriate portions of collected payments; (iv) the provision of escrow administration; (v) the pursuit of foreclosure and alternate remedies against the Collateral; and (vi) the administration and liquidation of any real property as a result of foreclosure or a deed in lieu of foreclosure, together with the right to receive the Servicing compensation and any ancillary fees, the benefit of the related Custodial Accounts and any other related accounts pursuant to applicable Mortgage Loan Regulations and, in each case, all rights, powers and privileges incident to any of the foregoing.

"Servicing Agreement" means an agreement between an Investor and the Seller pursuant to which the Seller owns the Servicing and services mortgage loans in the Servicing Portfolio.

"Servicing Platform" has the meaning set forth in the definition of "Purchased Assets."

"Servicing Portfolio" means the portfolio of mortgage loans not owned by the Seller but as to which the Seller provides Servicing.

"Settlement Proceeds" has the meaning set forth in Section 2.1(d).

"Shared Contracts" has the meaning set forth in Section 9.1(c).

"Shared Assigned Contracts" has the meaning set forth in Section 9.1(c).

"Shareholder" has the meaning set forth in the opening paragraph.

"Shareholder Assigned Contracts" has the meaning set forth in Section 9.1(a).

"Shareholder Contracts" has the meaning set forth in Section 9.1(a).

"Shareholder Assumed Liabilities" means the liabilities and obligations of Shareholder or other Seller Affiliate after the Closing Date arising under the Shareholder Assigned Contracts that are assigned to the Buyer except to the extent such obligations (A) would have been paid, performed or otherwise discharged on or prior to the Closing Date but for a breach or default by such party or (B) arise out of any breach or default by such party.

"Stated Principal Balance" has the meaning set forth in Section 10.2(d).

"Sublease" means the proposed Sublease to be entered into at Closing in substantially the form of Exhibit C-2 hereto (it being understood and agreed that the Buyer shall sublease at least the entire third floor and the portion of the second floor represented by the noncommon usable space west of the elevator lobby (i.e. the short end), and may sublease other space in the building that the Buyer specifies in writing to the Seller within 15 Business Days after the date hereof (provided, that Buyer must first elect to sublease the remainder of the second floor before subleasing any portion of the first or fourth floors), and the amounts payable thereunder shall be based on the amounts paid by Seller multiplied by a fraction, the numerator of which shall be the total square footage of usable space subleased by Buyer and the denominator of which shall be the total square footage of usable space leased by Seller.)

"Survival Period" has the meaning set forth in Section 10.1.

"Surviving Entity" has the meaning set forth in Section 6.9(a).

"Tangible Personal Property" means all furniture, fixtures, machinery, equipment, tools, computers (including computer hardware), demonstration equipment, prototypes and other tangible personal property which are used or held for use by Seller primarily in, or are necessary

16

for, the conduct of the Business as a going concern at the locations at which the Business is conducted or which are otherwise used or held for use by Seller primarily in, or are otherwise necessary for, the conduct of the Business.

"Tax" (and, with correlative meaning, "Taxes" and "Taxable") shall mean any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind in the nature thereof (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Government Authority, including: taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs duties, tariffs, and similar charges.

"Tax Return" shall mean any return, declaration, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax and all federal, state, local and foreign returns, reports and similar statements.

"Termination Date" has the meaning set forth in Section 11.3(a)(i).

"Third Party Claim" has the meaning set forth in Section 10.4(b).

"Third Payment" has the meaning set forth in Section 2.1(a).

"Transferred Benefit Plan" means only those Benefit Plans as set forth on Schedule 4.13(a) that are specifically designated on Schedule 4.13(a) as Benefit Plans that will be assigned to, and assumed by, Buyer at Closing.

"Transition Services Agreement" means the proposed Transition Services Agreement to be entered into at Closing in substantially the form of Exhibit C-1 hereto (it being understood and agreed that the Parties shall negotiate in good faith to develop schedules prior to Closing that describe in greater detail the services to constitute "Irwin Provided Services" and the "Freedom Provided Services" listed in Appendix A and Appendix B thereto and the types of tasks involved in such services, in each case based upon the Summary of Transition Services attached as Exhibit A thereto at the fee as indicated therein).

"Twelve-Month Period" has the meaning set forth in Section 2.1(e).

"Unsettled Mortgage Loans" means mortgage loans that, prior to Closing, the delivery and sale of which by Seller to a third party investor has been completed, other than Seller's receipt of payment therefor, as evidenced by a written bona fide trade advice or commitment letter dated as of a date prior to the Closing.

"WARN Act" has the meaning set forth in Section 8.6(a).

"Wholesale Offices" has the meaning set forth in Section 6.3(f).

## ARTICLE II

### PURCHASE AND SALE OF THE PURCHASED ASSETS; CLOSING

2.1    <u>Purchase and Sale of Purchased Assets; Assumed Liabilities.</u>

(a)    On the terms and subject to the conditions of this Agreement, at the Closing referred to below, the Buyer shall purchase from the Seller, and the Seller shall sell, transfer, convey, assign and deliver, free and clear of all Encumbrances other than the Permitted Encumbrances, to the Buyer, all of the Purchased Assets. At the Closing, the Buyer shall pay to the Seller in immediately available funds to an account designated by the Seller an amount equal to the 50% of the Non-Loan Purchased Asset Value (the "<u>First Payment</u>"). Simultaneously with Closing, Buyer shall pay the Indebtedness Payoff Amount calculated as of the Closing directly to Irwin Union Bank & Trust Company and other warehouse lenders, as applicable, in the respective amounts necessary to pay the Intercompany Credit Line and each warehouse lending facility of Seller used to fund mortgage loans (in an amount equal to the aggregate Stated Principal Balance of the Company Mortgage Loans). The Buyer shall pay to Seller an amount equal to 25% of the Non-Loan Purchased Asset Value (the "<u>Second Payment</u>"), on or before the date 45 days after the Closing Date. The Buyer shall pay to Seller an amount equal to 25% of the Non-Loan Purchased Asset Value (the "<u>Third Payment</u>") on or before the date 75 days after the Closing Date. The Buyer shall pay to Seller on or before the earlier of 75 days after the Closing Date or three (3) Business Days after the Buyer has effected the sale of all Company Mortgage Loans (the "<u>Deferral Payment Date</u>") either the Pre-Closing LHFS Other Accounts Amount or, in the event that the Final LHFS Other Accounts Amount has been determined pursuant to Section 2.2(a) by the Deferral Payment Date, then the Buyer shall pay the Final LHFS Other Accounts Amount to Seller on the Deferral Payment Date; <u>provided</u>, <u>however</u>, no payment shall be due to Seller on the Deferral Payment Date if the Pre-Closing LHFS Other Accounts, or the Final LHFS Other Accounts, as the case may be, is a negative amount. In the event that the Pre-Closing LHFS Other Accounts Amount or the Final LHFS Other Accounts, as the case may be, is a negative amount, then Seller shall pay to Buyer on the Deferral Payment Date such negative amount.

(b)    As additional consideration for the Purchased Assets and the agreements and undertakings set forth in this Agreement, at Closing the Buyer will assume and agree to pay, satisfy and discharge, when due, the Assumed Liabilities. Notwithstanding anything to the contrary in this Agreement, the Buyer shall not assume or in any way become liable for any of the Seller's Liabilities or obligations of any nature whatsoever other than the Assumed Liabilities, whether accrued, absolute, contingent or otherwise, whether known or unknown, whether due or to become due, whether related to the Seller's business or the Purchased Assets and whether disclosed on the schedules attached hereto, and regardless of when or by whom asserted.

(c)    In the event that the Pre-Closing Account Value exceeds the Final Account Value (as determined pursuant to Section 2.2), Buyer shall pay Seller such excess amount within three (3) Business Days after the Determination Date (provided, however, that if the Second Payment or Third Payment has not yet been made, the Buyer shall pay 25% of such amount on the date of the Second Payment and 25% on the date of the Third Payment, as applicable, and the remainder on the Determination Date). In the event that the Final Account Value exceeds the Pre-Closing Account Value (as determined pursuant to Section 2.2 and subject

18

to any holdback set forth therein); the Seller shall pay such excess amount to Buyer within three Business Days after the Determination Date (provided, however, that if the Second Payment or Third Payment has not yet been made, the Buyer shall deduct such excess amount from such upcoming payment(s) owed to Seller and the remainder of such amount shall be paid by Seller to Buyer within three (3) Business Days after the Determination Date). In the event that the Pre-Closing LHFS Other Accounts, rather than the Final LHFS Other Accounts, is paid on the Deferral Payment Date, (i) to the extent that the Pre-Closing LHFS Other Accounts Amount exceeds the Final LHFS Other Accounts, Seller shall pay Buyer such excess amount within three (3) Business Days after the Determination Date; and (ii) to the extent that the Final LHFS Other Accounts Amount exceeds the Pre-Closing LHFS Other Accounts, Buyer shall pay Seller such excess amount within three (3) Business Days after the Determination Date. If the Final Net Outstanding Charges Balance (determined pursuant to Section 2.2) is positive, Seller shall pay such amount to Buyer within three (3) Business Days after the Adjustment Date. If the Final Net Outstanding Charges Balance is negative, Buyer shall pay such amount to Seller within three (3) Business Days after the Adjustment Date.

(d)    After the Closing Seller shall collect in due course the gross settlement proceeds to which it is entitled in respect of Unsettled Mortgage Loans (represented by account 14100 on the Reference Balance Sheet under the Excluded Assets column and determined in a manner consistent with Seller's past practice under FAS 140, the "Settlement Proceeds"). Within five (5) Business Days after all Settlement Proceeds have been received, Seller's Chief Financial Officer will (A) calculate, in good faith: (i) the Settlement Proceeds, (ii) the Stated Principal Balance for the Unsettled Mortgage Loans less any points paid by the borrower to Seller in exchange for reduction of interest rate in respect of an Unsettled Mortgage Loan (the "Loan Basis") as of the applicable sale date of each such loan (the "Sale Date"); (iii) the origination costs and fees paid associated with the Unsettled Mortgage Loans as of the Sale Date as reflected by account numbers 14630, 14640, and 15250 on the Reference Balance Sheet under the Excluded Assets column (the "Origination Costs"), each determined in accordance with the procedures and methodologies set forth in Exhibit D, and in a manner consistent with the Reference Balance Sheet, and (B) deliver to Buyer a statement certified by the Seller's Chief Financial Officer (the "Gain Statement") setting forth such foregoing amounts and the amount equal to 50% of the difference of the Settlement Proceeds minus the Loan Basis minus the Origination Costs (the "Eligible Gain") and reasonable supporting documentation for the same. At the time of delivery of the Gain Statement, Seller shall pay to Buyer an amount equal to the Eligible Gain. Buyer shall have ten (10) Business Days to review the Gain Statement, and Seller shall afford Buyer with access to supplemental records and information as Buyer may reasonably request for such purpose. If Buyer does not object to Seller's calculation of the Eligible Gain by delivering written notice before the end of such period setting forth in reasonable detail the disputed items, the amounts and estimated amounts of the disputed items and the basic facts underlying Buyer's objections, the Eligible Gain reflected on the Gain Statement shall be final and binding. If Buyer gives timely notice of objection to the calculation of the Eligible Gain (setting forth in reasonable detail the disputed items, the amounts or estimated amounts of the disputed items and the basic facts underlying the Buyer's objections), the Parties will try in good faith to resolve the objections. Failing such resolution, either Party may refer the disputed matter to the CPA Firm using the procedures prescribed in Section 2.2(a). The Eligible Gain that becomes final and binding is referred to herein as the "Final Eligible Gain." The date the Final Eligible Gain is finally determined is the "Eligible Gain Date". In the event that the Eligible Gain

19

set forth in the Gain Statement exceeds the Final Eligible Gain (as determined pursuant to Section 2.2), Seller shall pay Buyer such excess amount within three (3) Business Days after the Eligible Gain Date. For avoidance of doubt, the Eligible Gain shall be determined without regard to any accrued interest, points or fees (other than points paid by the borrower to Seller in exchange for reduction of interest rate) received or to be received by Seller in respect of the Unsettled Mortgage Loans, all of which shall be wholly retained and inure to the credit of Seller.

(e)     As additional purchase price, the Seller shall be eligible to receive Earn-Out Payments from Buyer for each of the first three twelve (12) month-periods following the Closing (each a "Twelve-Month Period") on the terms and conditions set forth herein. Each "Earn-Out Payment" shall be an amount equal to three (3) basis points (.03) multiplied by the difference of (i) the total principal amount of mortgage loans originated or acquired by Buyer during the applicable Twelve-Month Period through Buyer's branches previously operated by Seller or as a result of loan production activities of Continuing Employees (even if such Continuing Employees are relocated by Buyer) less (ii) $9.5 Billion. Within thirty (30) days after the end of the applicable Twelve-Month Period, Buyer shall calculate the Earn-Out Payment for such period and deliver to Seller an officer's certificate setting forth the calculation of such Earn-Out Payment and pay to Seller such amount, if any, provided however, that if Buyer does not deliver such notice and pay such amount within the foregoing time period, Seller shall provide written notice to Buyer of same, and Buyer shall be able to cure within (5) days after receipt of such notice. The calculation of the Earn-Out Payment will be final, conclusive and binding on Seller unless within thirty (30) days after receipt from Buyer of the calculation of the Earn-Out Payment for the applicable Twelve-Month Period, Seller shall notify Buyer in writing of Seller's objections to Buyer's calculation of the applicable Earn-Out Payment, specifically identifying the disputed items, the amounts or estimated amounts of the disputed items and the basic facts underlying the Seller's objections. If the parties are unable to resolve a dispute regarding an Earn-Out Payment within 30 days after Seller's notification of its dispute, either party may elect to utilize the procedure described in Section 2.2 to engage the CPA Firm to determine the resolution of any disputed Earn-Out Payment. Notwithstanding the foregoing, Buyer shall have no obligation to make Earn-Out Payments in the aggregate in excess of $750,000 or in excess of $250,000 with respect to any Twelve-Month Period.

(f)     The sum of the Non-Loan Purchased Asset Value, Pre-Closing Assumed Payables, Pre-Closing LHFS Other Accounts Amount (or the Final LHFS Other Accounts Amount if such amount is paid on the Deferral Payment Date), the Indebtedness Payoff Amount, the Final Eligible Gain, any adjustment pursuant to Section 2.1(c) (with any amounts paid to Seller as an addition and any amounts paid by Seller as a subtraction) and any Earn-Out Payments, are referred to collectively in this Agreement as the "Purchase Price."

(g)     Attached hereto as Exhibit E is a balance sheet of the Business (the "Reference Balance Sheet") setting forth the parties' good faith estimation of the book value of the Purchased Assets and the Assumed Liabilities as of June 30, 2006, each calculated in accordance with GAAP (including FASB 91) or otherwise in accordance with the procedures and methodologies set forth in Exhibit D. Seller shall cause its Chief Financial Officer to prepare a balance sheet dated within six (6) Business Days prior to the Closing (the "Pre-Closing Balance Sheet") based upon the same methodology on which the Reference Balance Sheet was prepared and pursuant to which there shall be determined the book value of the Purchased Assets and Assumed Liabilities as of six (6) Business Days prior to the Closing Date (the "Pre-Closing

20

Date") and such Pre-Closing Balance Sheet shall be delivered to Buyer no later than two (2) Business Days prior to the Closing Date. Seller shall cause its Chief Financial Officer to prepare and deliver to Buyer and MDMC on the date which is seven (7) days prior to the Closing updated lists, as of such date, of the Company Mortgage Loans and Pipeline Loans in the same format as Schedule 1.1(b)(i) and Schedule 1.1(b)(ii) hereof and a "tape" of such Company Mortgage Loans.

(h)    Notwithstanding the foregoing, the Second Payment, Third Payment, any payments due on the Deferral Payment Date and any adjustments provided for in subsections (c) and (d) above payable by the Buyer to the Seller shall be offset dollar for dollar to the extent of any amount that Seller owes to Buyer pursuant to subsection (c) and (d) above (including amounts subject to bona fide dispute in accordance with the provisions hereof).

2.2    <u>Determination of Adjustments; Outstanding Charges.</u>

(a)    Within 15 days after the Closing, the Seller will prepare and deliver to the Buyer a balance sheet of the Purchased Assets and Assumed Liabilities as of the Closing Date (the "<u>Closing Balance Sheet</u>"), which will be prepared in accordance with GAAP (including FASB 91) or otherwise in accordance with the procedures and methodologies set forth in <u>Exhibit D</u>, and in a manner consistent with the Reference Balance Sheet. The Buyer will provide reasonable support to the Seller and its Representatives to enable them to prepare the Closing Balance Sheet, including providing reasonable access to and the right to copy the books and records of the Business. Buyer will have the opportunity to review the Closing Balance Sheet for 45 days after the Closing Balance Sheet is delivered by the Seller solely for the purpose of verifying the LHFS Other Accounts, Assumed Payables and Other Assets as set forth therein (the "<u>Review Period</u>"). During the Review Period, the Seller will provide to the Buyer and its Representatives reasonable access to information to enable Buyer to review the Closing Balance Sheet. The Closing Balance Sheet will be final, conclusive and binding on the Buyer unless, during the Review Period, the Buyer notifies the Seller in writing of the Buyer's objections to the Seller's determination of the LHFS Other Accounts, Assumed Payables or Other Assets set forth therein, specifically identifying the disputed items, the amounts or estimated amounts of the disputed items and the basic facts underlying the Buyer's objections. If the Buyer gives notice of any objection to the LHFS Other Accounts, Assumed Payables or Other Assets set forth in the Closing Balance Sheet, the Parties will try in good faith to resolve the objections within 30 days after the delivery of notice by the Buyer. If the Parties resolve the objections within that time period, they will promptly record the resolution in a writing signed by each of them, and the resolution will be final, conclusive and binding on each of them. If the Parties are unable to resolve the objections within that time period, the Parties promptly will refer any disputed matter to the Chicago office of Grant Thornton LLP (the "<u>CPA Firm</u>"). Should such firm be unable or unwilling to serve, the CPA Firm shall be a regionally or nationally recognized certified public accounting firm having no prior relationship with the Parties or their Affiliates mutually selected by the Buyer and the Seller, which will be independent of Buyer, Seller, Shareholder and their respective Affiliates; provided that if the Parties are unable to mutually agree upon the substitute CPA Firm within 60 days, the Buyer and the Seller will each designate an accounting firm, and such accounting firms will promptly thereafter jointly select the substitute CPA Firm. Each of the Buyer and Seller will pay one-half of the fees and expenses of such accounting firm. The CPA Firm will act as a neutral arbitrator, and to the extent GAAP, this Agreement and the procedures and methodologies set forth in <u>Exhibit D</u> leave room for discretion, will exercise that

discretion independently, but within the range of differences between the Parties. The Parties will be afforded an opportunity to present their positions and such materials as the CPA Firm will deem appropriate. The CPA Firm will be instructed to revise the LHFS Other Accounts, Assumed Payables and/or Other Assets, as applicable, to reflect its resolution of the disputed matters within 90 days following its engagement, which resolution will be final, conclusive and binding on the Parties. The LHFS Other Accounts, Assumed Payables and the Other Assets in the form that is final, conclusive and binding on the Parties hereunder, is referred to in this Agreement as the "Final LHFS Other Accounts," the "Final Assumed Payables" and the "Final Other Assets," respectively. The date on which any of the foregoing amounts is finally determined in accordance with this Section 2.2 is referred to as the "Determination Date" with respect to such amount. The Final Assumed Payables minus the Final Other Assets is referred to herein as the "Final Account Value." If any dispute remains unresolved on the date the Second Payment or Third Payment is due under Section 2.1, Buyer shall timely pay the Second Payment or Third Payment to Seller, as applicable, net of the amount subject to bona fide dispute as evidenced by its notice of objection.

(b)      Within sixty (60) days following Closing, Buyer shall prepare and deliver to Seller a reconciliation of the Outstanding Charges on which (i) that portion of each of the Outstanding Charges that relates or is attributable to the period prior to Closing, but had not been paid by Seller is reflected as a positive number (for the account of Seller) and (ii) that portion of each of the Outstanding Charges that relates or is attributable to the period on and subsequent to Closing, but was paid by Seller, is reflected as a negative number (for the account of Buyer). Such reconciliation shall be certified by the Chief Financial Officer of Buyer and shall be provided in an item by item detail with reasonable supporting documentation. Seller shall have ten (10) Business Days to review the reconciliation of Outstanding Charges, and Buyer shall afford Seller with access to supplemental records and information as Seller may reasonably request for such purpose. If Seller does not object to Buyer's reconciliation by delivering written notice before the end of such period setting forth in reasonable detail the disputed items, the amounts and estimated amounts of the disputed items and the basic facts underlying Seller's objections, the net Outstanding Charges balance reflected thereon shall be final and binding. If Seller gives timely notice of objection to the reconciliation (setting forth in reasonable detail the disputed items, the amounts or estimated amounts of the disputed items and the basic facts underlying the Seller's objections), the Parties will try in good faith to resolve the objections. Failing such resolution, either Party may refer the disputed matter to the CPA Firm using the procedures prescribed in Section 2.2(a). The net Outstanding Charges balance that becomes final and binding is the "Final Net Outstanding Charges Balance." The date the Final Net Outstanding Charges Balance is finally determined is the "Adjustment Date".

2.3    Closing. Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to Section 11.3, the closing of the transactions contemplated hereby (the "Closing") shall take place five Business Days after the satisfaction or waiver of the conditions set forth in Article III (other than those that by their nature are satisfied at the Closing), at the offices of Barnes & Thornburg LLP, 11 South Meridian Street, Indianapolis, Indiana unless another date, time or place is agreed to in writing by the Parties (the time and date on which the Closing occurs is hereinafter referred to as the "Closing Date"). For financial and accounting purposes (including any adjustments pursuant to Section 2.1) the Closing shall be deemed to have occurred as of 12:00:01 a.m. on the Closing Date.

2.4    Closing Obligations.

(a)    Deliveries of the Seller.

(i)    No later than two Business Days prior to the Closing Date, the Seller shall deliver to the Buyer payment instructions indicating the bank account or accounts to which the Buyer should pay, by wire transfer of immediately available funds, any payments required hereunder.

(ii)    At the Closing, the Seller shall deliver to the Buyer: (A) possession of the Purchased Assets; (B) assignments and other instruments of conveyance, including a bill of sale, reasonably acceptable to the Buyer, that are sufficient to transfer to the Buyer the Purchased Assets in accordance with this Agreement; (C) written consents, approvals, authorizations and waivers of third parties, if required hereunder, with respect to the transfer of the Purchased Assets (including rights under the Assigned Contracts); (D) true and complete copies of resolutions of the Seller's and Shareholder's Board of Directors certified by the Secretary of the Seller and Shareholder, respectively, authorizing the consummation of the transactions contemplated by this Agreement; (E) a certificate of existence from the state of incorporation as to the corporate status of Seller; (F) a true and complete copy of the Articles of Incorporation of Seller and all amendments thereto certified by the state of incorporation of Seller; (G) a true and complete copy of the Bylaws of Seller certified by the Secretary of Seller; (H) a certificate from the Secretary of Seller stating that the Seller's Articles of Incorporation have not been amended since the date of the certificate described in subsection (F) above and that nothing has occurred since the date of issuance of the certificate of existence specified in subsection (E) above that would adversely affect its corporate existence; (I) a certificate from Seller's Secretary as to the incumbency and signatures of Seller's officers who will execute documents at the Closing and who have executed this Agreement; and (J) any and all other agreements, certificates, instruments and documents as may be required of the Seller under this Agreement or as Buyer may reasonably request in order to effectuate the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Deliveries of the Shareholder.    At the Closing, the Shareholder shall deliver to the Buyer:    (A) assignments and other instruments of conveyance, reasonably acceptable to the Buyer, that are sufficient to transfer to the Buyer the Shareholder Assigned Contracts in accordance with this Agreement; and (B) any and all other agreements, certificates, instruments and documents as may be required of the Shareholder under this Agreement.

(c)    Deliveries of the Buyer.    At the Closing, the Buyer shall deliver to the Seller or the Shareholder, as applicable: (A) the First Payment; (B) one or more instruments or agreements, reasonably acceptable to the Seller and Shareholder, that provides for the Buyer's assumption of the Seller Assumed Liabilities and the Shareholder Assumed Liabilities; (C) true and complete copies of resolutions of the Buyer's Board of Directors certified by the Secretary of the Buyer authorizing the consummation of the transactions contemplated by this Agreement; and (D) any and all other agreements, certificates, instruments and documents as may be required of the Buyer under this Agreement or as Seller may reasonably request in order to effectuate the transactions contemplated by this Agreement and the Ancillary Agreements.

2.5    Allocation of Purchase Price.    The Purchase Price will be allocated in accordance with Section 1060 of the Code and as set forth on Schedule 2.5 (the "Allocation"). After the

Closing, the Parties will make consistent use of the allocation, fair market value and useful lives specified in Schedule 2.5 for all Tax purposes and in all filings, declarations and reports with the IRS in respect thereof. The Buyer and the Seller shall each file an IRS Form 8594 "Asset Acquisition Statement Under Section 1060" at the time and in the manner as required by Treasury Regulation 1.1060-T consistent with the Allocation concerning the Purchase Price. The Allocation shall be conclusive and binding on the Parties for all purposes, including reporting and disclosure requirements under the Code, and any other state or local Tax Laws.

## ARTICLE III
## CONDITIONS TO CLOSING

3.1     Conditions to the Obligations of the Buyer and the Seller and the Shareholder. The respective obligations of the Buyer and the Seller and Shareholder to effect the transactions contemplated hereby shall be subject to the satisfaction or waiver by the Buyer and the Seller at or prior to the Closing Date of the following conditions:  (i) No Law that restrains, enjoins or otherwise prohibits the transactions contemplated hereby shall have been enacted, adopted or promulgated and be in full force and effect, (ii) no temporary restraining order, preliminary or permanent injunction or other order of a court of competent jurisdiction or other Governmental Authority which materially impairs, restrains, enjoins or otherwise prohibits the transactions contemplated hereby (an "Order") shall have been issued, entered or enforced and be in effect, and (iii) no action or proceeding by a Governmental Authority seeking such an Order shall be pending.

3.2     Conditions to the Obligations of the Buyer. The obligation of the Buyer to effect the transactions contemplated hereby shall be subject to the satisfaction or waiver by the Buyer at or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties.    Each of the representations and warranties of the Seller and Shareholder set forth in this Agreement, the Ancillary Agreements and the annexes, schedules and exhibits to this Agreement that is qualified by reference to Seller Material Adverse Effect or other materiality qualifier shall be true and correct in all respects and all such representations and warranties not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, except that such representations and warranties that are made as of a specific date need only be so true and correct as of such date; provided, however, that, notwithstanding anything herein to the contrary, the condition set forth in this Section 3.2(a) shall be deemed to have been satisfied even if any such representations and warranties are not true and correct unless the failure of such representations and warranties to be so true and correct (disregarding any materiality or Seller Material Adverse Effect qualification of such representations and warranties), individually or in the aggregate, has had or can reasonably be expected to have a Seller Material Adverse Effect.

(b)     Covenants and Agreements.   The Seller and the Shareholder shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or before the Closing.

(c)     Officer's Certificate.    The Seller and Shareholder shall each have delivered to the Buyer a certificate from a duly authorized officer, dated as of the Closing Date,

24

stating that the applicable conditions specified in subsections (a) and (b) of this Section 3.2 have been satisfied.

(d)    Closing Deliveries. The Seller and the Shareholder shall have delivered all of the closing deliveries set forth in Section 2.4(a) and 2.4(b).

(e)    Officer Payments. At or prior to the Closing, Shareholder shall have caused Seller to pay to the individuals listed on Schedule 3.2(k) the amounts set forth opposite their names on Schedule 3.2(e)(i) as provided in existing agreements among such officers, Seller and Shareholder.

(f)    Required Approvals. The Buyer shall have been approved as a national HUD lender.

(g)    Required Consents. Each of the notices, consents, approvals, waivers and authorizations listed on Schedule 3.2(f) shall have been given, made or obtained and shall be in full force and effect (provided, however, that if such consent, approval, authorization or waiver is not obtained from a third party solely due to such third party's concern regarding the financial wherewithal of the Buyer, which concern shall be expressed in a writing signed by such third party, then such consent, approval, authorization or waiver shall not be required pursuant to this Section 3.2(g)).

(h)    Ancillary Agreements. The Seller or Shareholder, as appropriate, shall have executed and delivered (i) a Transition Services Agreement, substantially in the form of Exhibit C-1, (ii) Sublease (or assignment of lease) providing for Buyer's use of a portion of Seller's Fishers, Indiana headquarters, substantially in the form of Exhibit C-2 and (iv) the License Agreement substantially in the form of Exhibit C-3.

(i)    No Seller Material Adverse Effect. No Seller Material Adverse Effect shall have occurred since the date of this Agreement.

(j)    Opinion. Buyer shall have received from Barnes & Thornburg LLP, counsel to Seller (or other counsel acceptable to Buyer in its reasonable judgment), a legal opinion with respect to the matters set forth in Exhibit F attached hereto, which shall be addressed to Buyer dated as of the Closing Date and in form and substance reasonably satisfactory to Buyer.

(k)    Employees. Each of the individuals named in Schedule 3.2(k) shall have executed and delivered to the Buyer the Employment Agreement substantially in the form attached as Exhibit G, respectively, and each such Employment Agreement shall be in full force and effect.

(k)    The Seller must have delivered to the Buyer a statement of cash flows of the Seller for the six months ended June 30, 2006, not less than 15 days prior to the Closing.

3.3    Conditions to the Obligations of the Seller and Shareholder. The obligation of the Seller and the Shareholder to effect the transactions contemplated hereby shall be subject to the satisfaction or waiver by the Seller or the Shareholder at or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of the Buyer set forth in this Agreement, the Ancillary Agreements and the annexes,

25

schedules and exhibits to this Agreement that is qualified by reference to Buyer Material Adverse Effect or other materiality qualifier shall be true and correct in all respects and all such representations and warranties not so qualified shall be true and correct in all material respects, in each case, as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, except that such representations and warranties that are made as of a specific date need only be so true and correct as of such date; provided, however, that, notwithstanding anything herein to the contrary, the condition set forth in this Section 3.3(a) shall be deemed to have been satisfied even if any such representations and warranties are not so true and correct unless the failure of such representations and warranties to be so true and correct (disregarding any materiality or Buyer Material Adverse Effect qualification of such representations and warranties), individually or in the aggregate, has had or can reasonably be expected to have a Buyer Material Adverse Effect.

(b)    Covenants and Agreements.  The Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by it under this Agreement at or before the Closing.

(c)    Officer's Certificate.  The Buyer shall have delivered to the Seller a certificate from a duly authorized officer of the Buyer, dated as of the Closing Date, stating that the applicable conditions specified in subsections (a) and (b) of this Section 3.3 have been satisfied.

(d)    Required Consents.  Each of the notices, consents, approvals and authorizations listed on Schedule 3:3(d) shall have been given, made or obtained and shall be in full force and effect;

(e)    Ancillary Agreements.  The Buyer shall have executed and delivered (i) a Transition Services Agreement, substantially in the form of Exhibit C-1, (ii) Sublease (or assignment of lease) providing for Buyer's use of a portion of Seller's Fishers, Indiana headquarters, substantially in the form of Exhibit C-2, and (iii) the License Agreement substantially in the form of Exhibit C-3; and

(f)    Closing Deliveries.  The Buyer shall have delivered all of the closing deliveries set forth in Section 2.4(c).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Subject only to such exceptions as are specifically disclosed in the disclosure schedules hereto, which contain specific numbered sections and lettered subsections corresponding to those in this Article IV, and which have been delivered by or on behalf of the Seller on the date hereof (the "Disclosure Schedules"), the Seller and Shareholder, as of the date hereof and as of the Closing Date, hereby jointly and severally represent and warrant to the Buyer as follows:

4.1    Organization, Authority.  The Seller is a corporation duly organized and validly existing under the Laws of the State of Indiana.  The Seller is qualified to do business as a foreign entity and is in good standing in each jurisdiction listed in Schedule 4.1. Each of the Shareholder and the Seller has the requisite corporate power and authority to enter into this

Agreement and to consummate the transactions contemplated hereby. All necessary corporate action and other proceedings required to be taken by each of the Shareholder and the Seller to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or will become a party and to consummate the transactions contemplated hereby and thereby have been duly and properly taken. This Agreement and the Ancillary Agreements to which the Seller or Shareholder is or will become a party have been duly executed and delivered by each of the Seller and the Shareholder and constitute the legal, valid and binding obligation of the Seller and the Shareholder, enforceable against each of the Seller and the Shareholder in accordance with its terms, except as such enforceability may be limited by general principles of equity or to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies and except that the indemnification provisions under this Agreement may further be limited by principles of public policy.

4.2    <u>No Conflict</u>.

(a)    The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby will not (i) violate or conflict with the Articles of Incorporation, as amended, or By-laws of the Seller (the "<u>Company Organizational Documents</u>"), (ii) assuming satisfaction of the requirements set forth in Section 4.2(b) below, violate any provision of Law to which the Seller is subject or violate or conflict with any order, judgment, injunction or decree applicable to the Seller or (iii) except as set forth on <u>Schedule 4.2(a)</u>, (A) violate, breach or constitute a default under, (B) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (C) require Seller to obtain any consent, approval or action of, make any filing with or give any notice to any Person (other than any Governmental Authority) as a result of or under, (D) result in or give to any Person any additional rights or entitlement to increased, additional or guaranteed payments or performance under, (E) result in the loss of any material benefit under, (F) or result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any of the Purchased Assets pursuant to (with or without notice or the lapse of time or both), any provision of any material agreement, Contract, note, bond, mortgage, indenture, lease or other instrument binding upon the Seller or any material license, franchise, permit or other similar authorization held by the Seller.

(b)    The execution, delivery and performance by the Seller of this Agreement or the Ancillary Agreements and the consummation by the Seller of the transactions contemplated hereby and thereby do not require any consent, approval, order, authorization or action of, or any filing with or any notice to, any Governmental Authority with respect to the Seller, or any of the Purchased Assets, except for (i) Agency notices or consents listed on <u>Schedule 4.2(b)</u>, and (ii) such other consents and filings which, if not obtained or made, would not reasonably be expected to prevent, or materially alter or delay, any of the transactions contemplated by this Agreement. Seller makes no representation or warranty with respect to any notices or consents with respect to any Governmental Authority that Buyer may need to make or obtain in order to own the Purchased Assets or operate the Business following the Closing.

4.3    [Intentionally Omitted]

4.4    Financial Statements.   Schedule 4.4 contains the following financial statements of the Seller (the "Financial Statements"):

(a)    the unaudited consolidated balance sheet of the Seller as of June 30, 2006 (the "Latest Balance Sheet") and the related statement of income for the month then ended; and

(b)    the unaudited consolidated balance sheet of the Seller as of December 31, 2005 and the related statement of income for the twelve (12)-month period then ended.

Each of the foregoing Financial Statements (including in all cases the notes thereto, if any) presents fairly in all material respects the financial condition, results of operations and cash flows of the Business throughout the periods covered thereby (subject, in the case of the unaudited statements, to the absence of notes and year-end audit adjustments, which adjustments will not be material in amount) in accordance with GAAP (including FASB 91) consistently applied throughout the periods involved, except as may be noted therein.

4.5    Absence of Changes or Events.   Except as set forth in Schedule 4.5 or as otherwise contemplated by this Agreement, since the date of the Latest Balance Sheet, the Business has been conducted in the ordinary course and there has not occurred: (i) any event or condition which has had, or would reasonably be expected to result in, a Seller Material Adverse Effect or (ii) any acquisition, sale, transfer or encumbrance, other than a Permitted Encumbrance, of any of the Purchased Assets not in the ordinary course of business.   Without limiting the generality of the foregoing, since the date of the Latest Balance Sheet, except as set forth in Schedule 4.5, the Seller has not:

(a)    paid any dividends or other distributions in respect of any class of its capital stock, or made any payment to redeem, purchase or otherwise acquire, or call for redemption, any of such stock;

(b)    merged or consolidated with or acquired the business of any other Person or, except in the ordinary course of business, acquired any material property or material assets of any other Person;

(c)    adopted or amended in any material respect any Seller Employee Plan or increased the compensation or benefits payable or to become payable of any of its directors, officers, or employees except in the ordinary course of business consistent with past practice;

(d)    made any change in its accounting policies, principles, methods, practices or procedures or made any revaluation of any of its assets;

(e)    entered into any agreement with the Shareholder or any Affiliate, including any agreement to make advances or loans, except for intercompany transactions made in the ordinary course of business;

(f)    entered into any Material Contract or any material amendment or termination of, other than in the ordinary course of business and as made available to Buyer, or defaulted under, any Material Contract to which the Seller is a party or by which any of its Assets and Properties are bound;

(g)    incurred any additional indebtedness for borrowed money, issued any debt securities or assumed, guaranteed or endorsed the obligations of any other Person in excess of

Fifty Thousand Dollars ($50,000), except for (i) arrangements for the funding or sale of Company Mortgage Loans in the ordinary course of business: (ii) endorsements for the purpose of collection; and (iii) any intercompany loans among the Seller and its Affiliates in the ordinary course of business;

   (h) incurred any physical damage, destruction or other loss (whether or not covered by insurance) affecting any material Purchased Asset;

   (i) sold, pledged, leased, licensed or disposed of any of its material assets (including the Purchased Assets), except in the ordinary course of business;

   (j) instituted or permitted any material change in the conduct of the Business, or any change in its method of purchase, sale, lease, management, marketing, promotion or operation; or

   (k) negotiated or entered into any agreement to do any of the things described in any of the preceding clauses.

  4.6 <u>Undisclosed Liabilities</u>.  As of the date of this Agreement, the Seller does not have any material obligations or liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and regardless of when or by whom asserted) arising from or related to the Business, except for: (a) liabilities disclosed, reflected or reserved against in the Financial Statements, (b) liabilities incurred after the date of such Financial Statements in the ordinary course of business consistent with past practice, (c) the matters disclosed in or arising out of matters disclosed in <u>Schedule 4.6</u>, (d) Excluded Liabilities, and (e) liabilities and obligations incurred in connection with this Agreement and the transactions contemplated hereby.

  4.7 <u>Taxes</u>.  The Seller has filed or caused to be filed in a timely manner (within any applicable extension periods) all material Tax returns, reports and forms that were required to be filed by the Seller under the Code or by applicable Tax Laws (collectively, "<u>Tax Returns</u>"), and each Tax Return is true, complete and correct in all material respects.  (i) All Taxes shown to be due on such Tax Returns have been or will be timely paid in full; (ii) no Tax liens have been filed and no material claims are being asserted against the Seller with respect to any Taxes; (iii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given with respect to the Seller for any taxable years; (iv) as of the date of this Agreement, the Tax Returns filed by, or with respect to, the Seller are not, to the Knowledge of the Seller, being examined by, and no written notification of intention to examine has been received from the Internal Revenue Service ("<u>IRS</u>") or any other Governmental Authority with respect to Taxes; and (v) as of the date of this Agreement, no currently pending issue involving the Seller has been raised by the IRS or any other Governmental Authority in connection with any Tax Return.  The Seller's Tax Group has timely and properly filed consolidated federal income Tax Returns for the Seller's Tax Group that properly include the Seller for all Taxable periods (or any portion thereof) in which the Seller was a member of the Seller's Tax Group.  No Tax audits or administrative or judicial proceedings are pending or proceeding, or to the Knowledge of the Seller, currently threatened, with respect to the Seller's Tax Group or any member thereof in which the Seller's Tax Group's privilege to file consolidated federal income Tax returns, or the inclusion of any member in such consolidated federal income Tax returns, is being or will be challenged. None of the Assumed Liabilities is an obligation to make a payment that is not

deductible under Section 280G of the Code. Except as provided in <u>Schedule 4.7</u> and under Treas. Reg. §1.1502-6 (or any similar provision under state, local, or foreign law), Seller has no liability for the Taxes of any Person as a transferee or successor, by law, contract or otherwise. Except as set forth on <u>Schedule 4.7</u>, there are no tax sharing or allocation agreements in effect between Seller and any other Person. Seller is not subject to any joint venture, partnership or other agreement, contract or arrangement that would cause it to be treated as a partner of a partnership for Tax purposes.

    4.8    <u>Properties</u>.

    (a)    The Seller has good valid title to, or a valid and binding leasehold interest in, all of the Purchased Assets free and clear of all Encumbrances, except (i) those Encumbrances disclosed in <u>Schedule 4.8(a)(i)</u>, all of which will be released on or prior to the Closing Date (ii) leasehold interests and licenses granted by the Seller to third parties as disclosed on <u>Schedule 4.8(a)(ii)</u>, and <u>(iii)</u> Permitted Encumbrances. Seller has full right and power to sell, convey, assign, transfer and deliver to Buyer good and valid title to all of the Purchased Assets, free and clear of any and all Encumbrances except for Permitted Encumbrances. The Purchased Assets are not subject to any preemptive right, right of first refusal or similar right or restriction. The tangible Purchased Assets are, in all material respects, in good operating condition and repair, reasonable wear and tear excepted, and are suitable and adequate for use in the ordinary course of business.

    (b)    Set forth on <u>Schedule 4.8(b)(i)</u> is a true and complete list of all leases covering all real property other than REOs being leased by the Seller as of the date hereof. Set forth on <u>Schedule 1.1(b)(v)</u> is a true and complete list of all Personal Property Leases as of the date hereof. The Seller owns no real property (other than, in the case of Seller, REOs acquired for liquidation in the ordinary course of business). All of the Real Property Leases, Personal Property Leases are valid, binding and enforceable on Seller in accordance with their terms, and, to the Knowledge of Seller, are enforceable against the other party or parties thereto in accordance with their terms, subject, in each such case, to bankruptcy and insolvency laws, laws affecting creditors rights generally and principles of equity. The Seller is not in default under any such lease and there has not occurred any event that, either alone or with the giving of notice or lapse of time or both, would constitute a default by Seller under any such lease. To the Knowledge of Seller, there is no current default by any other party to any such lease and no event has occurred that, either alone or with the giving of notice or lapse of time or both, would constitute a default by such party under any such lease.

    (c)    The sale, transfer and assignment of the Purchased Assets as contemplated by this Agreement will give Buyer possession of, and the right to use, all of the Assets and Properties (other than the Excluded Assets, the Shared Contracts and Contracts entered into by Seller Affiliates excluding the Shared Assigned Contracts) required for the conduct of the Business as presently conducted in all material respects. Except as set forth in Schedule 4.8(c), after the Closing Date, Buyer will be entitled to the continued possession and use of the real property covered by the Real Property Leases and the Tangible Personal Property covered by the Personal Property Leases for the terms specified in such leases and for the purposes consistent with the past practices of Seller.

    4.9    <u>Intellectual Property</u>.

(a)    Each material item of Company Intellectual Property that is owned by the Seller and used in the Business is set forth on <u>Schedule 4.9(a)(i)</u>. Each material item of Company Intellectual Property that is licensed to Seller and used in the Business is set forth on <u>Schedule 4.9(a)(ii)</u>. Such Intellectual Property owned or licensed by the Seller constitutes all the material, owned and licensed Intellectual Property used or, held for use by the Seller primarily in or necessary for the conduct of the Business, as is currently conducted. The Seller owns exclusively all right, title and interest in and to, or is licensed or otherwise possesses a valid and enforceable right to use, the respective items of Intellectual Property set forth on <u>Schedules 4.9(a)(i)</u> and <u>(ii)</u>, free and clear of all claims and/or rights of other Persons (subject, in the case of licensed Intellectual Property, to rights of licensors).

(b)    Except as set forth on <u>Schedule 4.9(b)</u>: (i) there is no pending written charge, complaint, claim, demand or notice alleging that the business operations of the Seller infringe the Intellectual Property rights of any third party; (ii) to the Knowledge of the Seller, no third party is currently infringing upon any material Intellectual Property of the Seller; and (iii) no action, suit, proceeding, hearing, charge, complaint, claim or demand is pending, or, to the Knowledge of the Seller, is threatened, which in each case challenges the enforceability, use or ownership of any material Intellectual Property of the Seller.

(c)    Except as set forth on <u>Schedule 4.9(c)</u> the Seller's rights in and to its owned material Intellectual Property included in the Purchased Assets are freely transferable and assignable and no approval or consent of any Person is needed so that the interest of Buyer in such Intellectual Property shall continue to be in full force and effect and enforceable by Buyer following the transactions contemplated by this Agreement.

(d)    The Seller has not (i) licensed any of its owned Intellectual Property in source code form to any party; or (ii) entered into any exclusive agreements relating to its owned Intellectual Property.

4.10    <u>Contracts</u>.

(a)    <u>Schedule 4.10(a)</u> sets forth all of the following types of Contracts to which the Seller is a party in relation to the Business (collectively, the "<u>Material Contracts</u>"):

(i)    employment or consulting agreements (excluding any such contract or arrangement for which the total compensation during each of the last two years was less than One Hundred Thousand Dollars ($100,000) per Person or any contract which is terminable by the Seller at will, subject to the severance policies of the Seller) (each such agreement, an "<u>Employment Agreement</u>");

(ii)    employee collective bargaining agreements or other Contracts with any labor union;

(iii)    any Contract for the acquisition of the securities or assets of any other Person in excess of One Hundred Thousand Dollars $100,000 (other than Contracts relating to mortgage-backed securities entered into in the ordinary course of business consistent with past practice);

(iv)    Contracts under which the Seller is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by a third party requiring an annual rental payment in excess of One Hundred Thousand Dollars ($100,000);

(v)    Contracts (excluding purchase orders in the ordinary course of business) that involve the obligation of the Seller to purchase materials, supplies, equipment or services from any Person for payment of more than One Hundred Thousand Dollars ($100,000) over the remaining life of the contract and which are not terminable by the Seller on ninety (90) days' notice or less without penalty or premium;

(vi)    Contracts (excluding purchase orders in the ordinary course of business) that involve the obligation of the Seller to deliver products or services to any Person for annual payment of more than One Hundred Thousand Dollars ($100,000) and which are not terminable by the Seller on ninety (90) days' notice or less without penalty or premium;

(vii)    any Contract that expires or may be renewed at the sole option of any Person other than the Seller so as to expire more than one (1) year after the date of this Agreement and that involves payment of more than One Hundred Thousand Dollars ($100,000) per year (excluding any Contract with automatic renewal provisions that may be terminated with notice by the Seller);

(viii)    Contracts under which the Seller has borrowed any money or issued any note, bond, indenture or other similar evidence of indebtedness or guaranteed indebtedness, liabilities or obligations of others, in each case for an amount in excess of One Hundred Thousand Dollars ($100,000);

(ix)    Contracts granting an Encumbrance (including Encumbrances upon properties acquired under conditional sales, capital leases or other title retention or security devices) securing obligations of Seller in excess of One Hundred Thousand Dollars ($100,000);

(x)    any Contract that (i) automatically terminates or provides for termination by any Person other than Seller upon consummation of the transactions contemplated by this Agreement or (ii) contains any covenant or other provision which limits Seller's (and, after the Closing, would limit Buyer's) ability to compete with any Person in any line of business comprising the Business or in any market, area, jurisdiction or territory; or

(xi)    any partnership or joint venture agreements of the Seller with a third party.

(b)    Except as disclosed on Schedule 4.10(b), the Seller has performed all of the material obligations required to be performed by them and are entitled to all accrued benefits under, and are not in material breach or default or alleged to be in material breach or default, under any Assigned Contract or Shared Assigned Contract and, to the Knowledge of the Seller, no other party to any such Contract is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder. Each such Contract is in full force and effect and has not been further amended, and there exists no event, occurrence, condition or act, with respect to the Seller or, to the Knowledge of the Seller, with respect to any other contracting party, which, with the giving of notice, the lapse of the time or the happening of any other event or condition, would become a material default or event of default under any such Contract. True, correct and complete copies of all Material Contracts constituting Assigned Contracts or Shared Assigned Contracts (or accurate written descriptions, in the case of oral Contracts) have been delivered or made available to Buyer. Assigned Contracts that constitute Broker Sales Agreements are substantially in the form of the exemplar forms of such agreements provided by Seller to Buyer.

(c)    The Assigned Contracts related to branch services and voice/data services, (i) as to which copies have not been delivered to Seller, or (ii) that constitute oral agreements, are described on <u>Schedule 4.10(c)</u> hereof. Except as set forth on <u>Schedule 4.10(c)</u>, none of such agreements provide for annual payments by the Seller of more than $10,000 or are not terminable on 90 days' notice or less without penalty or premium.

4.11    <u>Litigation; Decrees</u>.  Except as set forth on <u>Schedule 4.11</u> as of the date of this Agreement, there are no material Actions or Proceedings pending or, to the Knowledge of the Seller threatened in writing, and since January 1, 2003, there have not been any material Actions or Proceedings initiated in writing against the Seller, in each case relating to or affecting the Seller, or any of its officers or directors (in connection with the Business) or any of their Assets and Properties. Except as disclosed on <u>Schedule 4.11</u>, there is no judgment, order or decree of any Governmental Authority against or affecting the Seller or any of the Purchased Assets that has not been satisfied or resolved.  The Seller is not in material default under any judgment, order or decree.  To the Knowledge of Seller there is no fact or circumstance that would reasonably be expected to give rise to any Action or Proceeding against, relating to or affecting the Seller or its Assets and Properties (taken as a whole) in a material adverse manner.

4.12    <u>Insurance</u>.  Set forth on <u>Schedule 4.12</u> is a list of all policies of insurance held by, or maintained on behalf of, the Seller related to any of the Purchased Assets, the Assumed Liabilities or the Business, in effect for policy periods beginning on or after January 1, 2005, indicating, for each policy, the carrier, the insured, the type of insurance, the amounts of coverage and the expiration date. Except as set forth on <u>Schedule 4.12</u>, all such policies are in full force and effect, all premiums due and payable thereon have been paid in full, and the Seller has not received any written notice of cancellation, amendment or dispute as to coverage with respect to any such policies.

4.13    <u>Benefit Plans</u>.

(a)    Schedule 4.13(a)(i) lists, with respect to the Seller and any trade or business (whether or not incorporated) which is treated as a single employer with the Seller (a "<u>Seller ERISA Affiliate</u>") within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA, (i) all employee benefit plans (as defined in Section 3(3) of ERISA, whether written or oral, and whether or not subject to ERISA), maintained by, contributed to, sponsored by or benefiting employees of the Seller, (ii) any other supplemental retirement, severance, sabbatical, employee relocation, cafeteria benefit (Code Section 125) or dependent care (Code Section 129), life insurance or accident insurance plans, programs or arrangements maintained by, contributed to, or sponsored by or benefiting employees of the Seller, (iii) all other bonus, pension, profit sharing, savings, deferred compensation, equity-based compensation or incentive plans, programs or arrangements maintained by, contributed to, or sponsored by or benefiting the employees of the Seller, (iv) other fringe or employee benefit plans, programs or arrangements that apply to employees or former employees of the Seller, whether or not sponsored by the Seller and (v) any current or former employment or executive compensation or severance agreements (including any agreement providing for salary reductions), written or otherwise, of the Seller, or relating to any present or former employee, consultant or director of the Seller (together, the "<u>Seller Employee Plans</u>").  Schedule 4.13(a)(ii) also lists all of the Transferred Benefit Plans.

(b)    Except for the IFC Employee's Pension Plan, the Seller has provided or made available to Buyer a copy of each of the Seller Employee Plans and related plan documents (including insurance policies or Contracts, employee booklets, summary plan descriptions, amendments and other authorizing documents, and any material employee communications relating thereto, if applicable) and has, with respect to each of the Seller Employee Plans which is subject to ERISA reporting requirements, provided copies of the Form 5500 reports, financial statements and actuarial reports filed for the last three plan years. Any of the Seller Employee Plans intended to be qualified under Section 401(a) of the Code has obtained from the Internal Revenue Service a favorable determination letter as to its qualified status under the Code (which has not been revoked, modified or limited). The Seller has also furnished Buyer with a copy of the most recent Internal Revenue Service determination letter issued with respect to each such Seller Employee Plan, and, to the Knowledge of the Seller, nothing has occurred since the issuance of each such letter which could reasonably be expected to adversely affect the tax-qualified status of any of the Seller Employee Plans subject to Code Section 401(a).

(c)    Each of the Seller Employee Plans is, and its administration by the Seller or any Seller ERISA Affiliate (including with respect to reporting and disclosure) is and has been, in material compliance with its terms and with ERISA, the Code (including all tax rules compliance with which is required for any intended favorable tax treatment is intended) and any and all other applicable law.

(d)    All contributions, premiums and other payments required by law or otherwise to have been made under any Seller Employee Plan have been made; and any and all contributions, premiums and other payments with respect to compensation or service before and through the Closing, or otherwise with respect to periods before and through the Closing, due from any of the Seller or its affiliates to, under or on account of each Seller Employee Plan sponsored solely by the Seller shall have been paid prior to Closing.

(e)    Except as set forth in Schedule 4.13(e), neither the Seller nor any Seller ERISA Affiliate currently sponsors, contributes to, maintains or has any liability (whether contingent or otherwise) under (i) a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) or (ii) an employee benefit plan that is or was subject to Part 3 of Subtitle B of Title I of ERISA, or Section 412 of the Code, or Title IV of ERISA, nor have any of them ever done so.

(f)    With respect to each Seller Employee Plan, the Seller has complied, in all material respects, with (i) the applicable health care continuation and notice provisions of COBRA and the regulations thereunder, (ii) the applicable requirements of the Family Medical and Leave Act of 1993 and the regulations thereunder, and (iii) the applicable requirements of the Health Insurance Portability and Accountability Act of 1996.

(g)    There is no suit, action, dispute, claim, arbitration or legal, administrative or other proceeding or governmental investigation pending, or, to the Knowledge of the Seller, threatened, alleging any breach of the terms of any Seller Employee Plan or of any fiduciary duties thereunder or violation of any applicable law with respect to any such plan.

(h)    Neither the Seller nor, to the Knowledge of the Seller, any "party in interest" (as defined in Section 3(14) of ERISA) or any "disqualified person" (as defined in Section 4975 of the Code) with respect to any such plan, has engaged in a non-exempt "prohibited transaction" within the meaning of Section 4975 of the Code or Section 406 of ERISA.

(i)    (A) Except as set forth in Schedule 4.13(i), no Seller Employee Plan that is a "welfare benefit plan" as defined in Section 3(1) of ERISA provides for continuing benefits or coverage for any participant or beneficiary or covered dependent of a participant after such participant's termination of employment, except to the extent required by law; (B) there has been no violation of Section 4980B of the Code or Sections 601 through 608 of ERISA with respect to any such plan that could result in any material liability; and (C) no such plans are "multiple employer welfare arrangements" within the meaning of Section 3(40) of ERISA.

(j)    Except as set forth in Schedule 4.13(j), the Seller has not agreed or otherwise committed to, whether in writing or otherwise, increase or improve the compensation, benefits or terms and conditions of employment or service of any director, officer, employee or consultant.

(k)    The Seller has properly classified for all purposes (including for all Tax purposes and for purposes of determining eligibility to participate in any employee benefit plan) all employees, consultants and independent contractors.

(l)    Except as set forth in Schedule 4.13(l), on and after the Closing, no Seller Employee Plan in which the Seller participates after Closing shall cover or otherwise benefit any individuals other than any current or former employees of the Seller  (and their dependents and beneficiaries), and Buyer shall have no liability or obligation under or in connection with any Seller equity plan, or with respect to any grant or award under any such plan.

(m)    The Seller does not (A) maintain any "group trust" within the meaning of Revenue Ruling 81-100, collective investment funds or similar account, on behalf of any "employee benefit plan" as defined in Section 3(3) of ERISA or "plan" as defined in Section 4975 of the Code (or any person acting on behalf of such "employee benefit plan" or "plan"), (B) sponsor any master or prototype plans or individual retirement accounts, or (C) have any prohibited transaction individual exemptions from the U.S. Department of Labor.

(n)    Without limiting any other provision of this Section 4.13, to the Knowledge of the Seller no event has occurred and no condition exists, with respect to any employee benefit plan that has subjected or could subject the Seller, or any Seller Employee Plan or any successor thereto, to any tax, fine, penalty or other liability. Buyer shall have no liability for, under, with respect to or otherwise in connection with any Seller Employee Plan, which liability arises under ERISA or the Code, by virtue of the Seller, being aggregated, with any other person that is an ERISA Affiliate, in a controlled group or affiliated service group for purposes of ERISA or the Code at any relevant time prior to Closing. Except as set forth on Schedule 4.13(n), no Seller Employee Plan exists which could reasonably be expected to result in the payment of money or any other property or rights, or accelerate or provide any other rights or benefits, to any current or former employee of the Seller (or other current or former service provider thereto) that would not have been required but for the transactions provided for herein, and the Seller is not a party to any plan, program, agreement, arrangement, practice, policy or understanding that would result, separately or in the aggregate, in the payment (whether in connection with any termination of employment or otherwise) of any "excess parachute payment" within the meaning of Section 280G of the Code with respect to a current or former employee of, or current or former independent contractor to, the Seller. Except as set forth on Schedule 4.13(n), the Seller does not maintain any Seller Employee Plan that provides severance benefits to current or former employees or other service providers. Each Seller Employee Plan

35

may be amended and terminated in accordance with its terms, and, each such Seller Employee Plan provides for the unrestricted right of the Seller to amend or terminate such Plan. The Seller will not have any liability under the Workers Adjustment and Retraining Notification Act, as amended, with respect to any events occurring or conditions existing on or prior to Closing.

4.14    Compliance with Applicable Laws.  Except as set forth on Schedule 4.14, the Seller is in material compliance with all Laws with respect to the conduct of their businesses or the ownership or operation of their Assets and Properties. Except as set forth on Schedule 4.14, the Seller has not received any written communication from any Governmental Authority that alleges that the Seller is in material violation of any Law, the substance of which communication has not been resolved.

4.15    Licenses; Permits.  The Seller has all of the governmental licenses, permits or authorizations material to the conduct of its Business as currently conducted (each a "Business Permit"). Seller's employees required to be so licensed have the governmental licenses, permits or authorizations required to conduct the Seller's business as such business is now conducted. The Seller has complied with all material requirements in connection therewith and the same will not be subject to suspension, modification or revocation as a result of this Agreement or the consummation of the transactions contemplated hereby, except as set forth on Schedule 4.15. To the extent required for the conduct of the Business, the Seller is approved (i) by FHA as an approved mortgagee and servicer for FHA Loans, (ii) by VA as an approved lender and servicer for VA Loans, (iii) by Fannie Mae and Freddie Mac as an approved seller/servicer of first lien residential mortgages and (iv) by GNMA as an authorized issuer and approved servicer of GNMA-guaranteed mortgage-backed securities.

4.16    Environmental Matters.  Except as set forth on Schedule 4.16 hereto, the Seller has all permits, licenses and other authorizations material to the conduct of their business under applicable Environmental Laws ("Environmental Permits") and is in compliance with all material terms and conditions of such Environmental Permits. The Seller, with respect to its business, is in material compliance with all applicable Environmental Laws. The Seller has not: (i) operated any underground storage tanks on or under any site or facility to be transferred to Buyer pursuant to this Agreement, whether owned, operated, occupied or leased, or (ii) illegally released any amount of any Hazardous Substances (other than office and janitorial supplies properly and safely maintained) at, in, on, under or from any such site or facility. No Hazardous Substances (other than office and janitorial supplies properly and safely maintained) are present at, in, on or under any such site or facility, whether owned, operated, occupied or leased. The Seller has no Knowledge of any fact or circumstance which is reasonably likely to involve such party in any environmental litigation or to impose upon such party any environmental liability. The representations and warranties contained in this Section 4.16 shall be the sole and exclusive representations and warranties with respect to environmental matters.

4.17    Employee and Labor Matters.

(a)    Except as set forth on Schedule 4.17(a)(i) hereto, as of the date hereof, to the Knowledge of the Seller, no employee of the Business has informed the Seller of any plans to terminate his status as an employee of the Business, including upon consummation of the transactions contemplated hereby (assuming such employees are offered employment with Buyer as contemplated herein). The Seller is not a party to any collective bargaining agreement or

36

other labor union contract applicable to persons employed by the Seller. There is no labor strike, organized labor dispute or material work stoppage or lockout actually pending or, to the Knowledge of the Seller threatened against or affecting the Business. As of the date hereof, there is no unfair labor practice charge or complaint pending or, to the Knowledge of the Seller, threatened against the Seller before the United States National Labor Relations Board. Schedule 4.17(a)(ii) sets forth all of the Seller's visa or lawful permanent residence sponsorship obligations for, and employment-related immigration obligations with respect to, employees of the Business.

(b)     Annexed hereto as Schedule 4.17(b) is a true, complete and accurate list of each employee of the Seller as of the date hereof, his or her date(s) of hire, position and title (if any), current rate of compensation (including bonuses, commissions and incentive compensation, if any), earned vacation days remaining, earned sick days remaining, whether such person is hourly or salaried, whether such person is exempt or non-exempt (the "Employee List").

4.18     No Brokers.  No agent, broker, investment banker, financial advisor or other Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee in connection with any of the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Seller or its Affiliates, except for J.P. Morgan Securities Inc. whose fees and expenses are the sole responsibility of the Seller or an Affiliate of the Seller.

4.19     Mortgage Loans.

(a)     Schedule 1.1(b)(i), delivered in accordance with Section 6.5, will set forth, as of the date thereof, a true and complete list of each Company Mortgage Loan, including the loan number, principal amount and interest rate of such loan. On the Closing Date, subject to Investor Commitments and other funding arrangements set forth in Schedule 4.22, the Seller will be the sole owner of each of the Company Mortgage Loans, and, as of the Closing Date, the Seller will be the sole owner or beneficiary of or under the Mortgage Notes and agreements in the related Mortgage Files, except to the extent any Company Mortgage Loan is prepaid in full, free and clear of any adverse claims or Encumbrances other than Permitted Exceptions.

(b)     The lien of each Company Mortgage Loan is subject only to "Permitted Exceptions" which consist of the following: (A) covenants, conditions, restrictions, reservations, rights, Encumbrances, easements, encroachments and other material matters affecting title acceptable to prudent mortgage lending institutions generally; and (B) rights of tenants with no options to purchase or rights of first refusal to purchase.  The security interest granted by the Mortgagor in the Collateral is a valid and binding first or second priority lien on the Collateral with the exception of (a) liens for real estate taxes and special assessments not yet due and payable (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such security interest which are acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Company Mortgage Loan and (c) Permitted Exceptions.  Neither the Collateral nor any party to any related security agreement securing a Company Mortgage Loan has been released, with the exception of releases required by divorce decrees, releases required by assumptions, and other releases effected in accordance with Investor requirements.

(c)    Except as set forth in <u>Schedule 4.19(c)</u>, at the date hereof, the Seller has received no written notice asserting any offset, defense (including the defense of usury), claim (including claims of lender liability) counterclaim, or right to rescission with respect to any Company Mortgage Loan, related Mortgage Note or other related agreements.

(d)    Each Company Mortgage Loan is a Marketable Loan. All Company Mortgage Loans were fully disbursed or, in the case of rehabilitation loans, the funds for which have been deposited into escrow accounts pending periodic progress payments, fully funded, and made or consummated in material compliance with applicable Law. All monies received with respect to each Company Mortgage Loan have been properly accounted for and applied. The Seller has complied with all material contractual obligations which relate to any of the Company Mortgage Loans.

(e)    The Loan Documents are genuine, legally valid, binding and enforceable (except as may be limited by applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally) obligations of the Mortgagors and have been duly executed by or on behalf of a Mortgagor of legal capacity, and all insertions in any such Loan Documents were correct when made. The Loan Documents were in compliance in all material respects with all Mortgage Loan Regulations upon origination and are complete in all material respects including with regard to origination and servicing activity. All tax identifications and property descriptions contained in any Loan Documents are legally sufficient.

(f)    The Seller has complied in all material respects with all applicable Mortgage Loan Regulations with respect to the Company Mortgage Loans. The Seller has timely filed all reports required in respect of Company Mortgage Loans by any Investor, any Insurer and the Mortgage Loan Regulations.

(g)    Any Company Mortgage Loan purported to be insured by the FHA or guaranteed by the VA complies in all material respects with all FHA requirements for FHA insurance or all VA requirements for VA guaranties, as the case may be, and such Company Mortgage Loans are in fact or, within 120 days after origination, will be, insured by the FHA or guaranteed by the VA, and said insurance or guaranty payments or fees with respect to such Company Mortgage Loans have been paid in full (or are being paid monthly in accordance with the terms of such Company Mortgage Loans and applicable Mortgage Loan Regulations and are current). All Company Mortgage Loans purported to be insured or guaranteed by PMI comply in all material respects with all provisions of the Contract with the provider of the PMI, all such contracts are consistent with applicable Mortgage Loan Regulations and are in full force and effect, and such Company Mortgage Loans are in fact or, within 120 days after origination, will be, insured or guaranteed by such PMI in amounts complying with applicable Company Mortgage Loan Regulations. The provider of the PMI was acceptable under applicable Mortgage Loan Regulations at the time the PMI insured Company Mortgage Loan was originated and at all other relevant times. Neither the FHA, the VA nor any provider of the PMI has issued to the Seller any notice disclaiming liability on the insurance or guaranty of any Company Mortgage Loan purported to be insured by the FHA or the provider of the PMI or guaranteed by the VA and to the Sellers' Knowledge there exist no facts that would provide a basis for rescission of any such insurance or guaranty, or would, with the passage of time or the giving of notice, or both, provide such a basis for rescission. The Seller has not canceled PMI policies with respect to any of the Company Mortgage Loans that were insured by providers of PMI at or subsequent to the time of the origination of the Company Mortgage Loans without the

38

prior approval of the applicable Agency or Investor, unless such cancellation was permitted or required by applicable Mortgage Loan Regulations.

(h)    Each Mortgage Note and Mortgage related to a Company Mortgage Loan is covered by a mortgage title insurance policy issued by a title insurer qualified to do business in the jurisdiction where the Collateral is located (and both the policy and the title insurer were acceptable to the applicable Investor at the time of origination), or are covered by an abstract of title and certification of attorney's mortgage lien opinion insuring the first or second priority lien of the Mortgage in the original principal amount of the related Mortgage Note. If required by the applicable Mortgage Loan Regulations, the appropriate Investor is the insured under such title insurance policy.

(i)    There is no defect in the title to the real estate and improvements thereon securing any Company Mortgage Loan other than usual and customary exceptions that do not materially and adversely affect title thereto or the ownership, marketability or insurability thereof. There exists no uninsured physical damage to the Collateral from fire, wind, storm, earthquake or any other casualty, circumstance or condition, which physical damage would cause any Company Mortgage Loan to become delinquent or materially and adversely affect the marketability of any Company Mortgage Loan or the Collateral.

4.20    Pipeline Loans and Applications.  Schedule 1.1(b)(ii) delivered under Section 6.5 will set forth, as of the date indicated thereon, the name of each potential borrower who has submitted a Pipeline Application for review (provided that the Pipeline Application is then in force and has not resulted in a closed loan) together with: (i) the name of the originating loan officer, broker or correspondent responsible for taking the Pipeline Application; (ii) the name of the intended Investor, if any; (iii) the type of loan program and any rate which the Seller has committed to the related borrower; (iv) the expected loan amount; (v) if known, the closing date; (vi) whether the Pipeline Application has been approved by the Seller; and (vii) whether it constitutes a locked Pipeline Application. The Approved Pipeline Loans comply in all material respects with all applicable Mortgage Loan Regulations.  The Seller has not authorized or implemented any plans or practices that would cause any Approved Pipeline Loan to be processed and underwritten to guidelines any less stringent in any material respect than those applied to Company Mortgage Loans.  The Seller has complied in all material respects with all contractual obligations which relate to any of the Approved Pipeline Loans. The Mortgage Files that relate to the Approved Pipeline Loans are correct and complete in all material respects.

4.21    Servicing.  The Servicing of each Company Mortgage Loan now serviced by the Company has been serviced in accordance with standard industry servicing practices of prudent servicers and in compliance in all material respects with the terms of all applicable Mortgage Loan Regulations. The Mortgage Files contain all documents, instruments and information necessary to enforce and service the Company Mortgage Loans in accordance with all applicable Mortgage Loan Regulations.

4.22    Investor Commitments, Forward Delivery Contracts, and Derivative Contracts. Schedule 4.22 sets forth a true and complete list, as of the date indicated thereon, of: (i) each Investor Commitment, Forward Delivery Contract (including the aggregate amount thereof) and Derivative Contract to which the Seller is a party, (ii) the name of each Investor and/or counterparty, (iii) the trade and settlement dates of each Investor Commitment, Forward Delivery

39

Contract and Derivative Contract, and (iv) the types of loans covered by such Investor Commitments, Forward Delivery Contracts and Derivative Contracts. Each Investor Commitment, Forward Delivery Contract and Derivative Contract constitutes a valid and binding obligation of the Seller, and, to the Knowledge of the Seller, all of the other parties thereto, enforceable in accordance with its terms, subject to bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether applied in a proceeding in equity or at law).

4.23    Restrictions on Business Activities.    There is no agreement, judgment, injunction, order or decree binding upon Seller which would reasonably be expected to apply to Buyer after the Closing and which has, or would reasonably be expected to have, the effect of prohibiting or impairing any current business practice of Seller relating to the Business or the conduct of the Business as currently conducted.

4.24    Solvency.    The Seller is not, and immediately after the consummation of the transactions contemplated herein will not (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liability on its existing debts as they mature), (b) have unreasonably small capital with which to engage in its business (it being understood that, following the Closing, the business of the Seller will consist solely of holding the Excluded Assets and will not involve active operations) or (c) have incurred debts beyond its ability to pay as they become due.

4.25    Interested Party Transactions.    Schedule 4.25 sets forth an accurate and complete list of all Contracts, understandings, transfers of assets or liabilities or other commitments or transactions, whether or not entered into in the ordinary course of business consistent with past practice, to or by which Seller, on the one hand, and any Affiliate of the Seller, on the other hand, are parties and that are currently pending or in effect and relate to or affect the business of the Seller or any of the Purchased Assets or Assumed Liabilities. Each such Contract that constitutes an Assigned Contract was entered into, or incurred, as the case may be, on terms and conditions as favorable to Seller as would have been obtainable by Seller in a comparable arm's-length transaction with a Person other than an Affiliate of Seller.

4.26    Representations Complete.    None of the representations or warranties made by Seller and Shareholder herein, subject to the exceptions contained in the Disclosure Schedules, and none of the statements, representations or warranties contained in the Seller Disclosure Schedule or in any certificate, list or other writing furnished to Buyer by Seller pursuant to this Agreement or any of the Ancillary Agreements, when all such documents are read together in their entirety, contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading. It is the explicit intent of each Party hereto that the Seller, the Shareholder and their Affiliates are making no representation or warranty except as set forth in this Agreement, the Ancillary Agreements, the Seller Disclosure Schedule, and the certificates, documents and instruments delivered hereunder and thereunder and except further that nothing in this sentence shall be construed to absolve Seller, Shareholder and their Affiliates from liability for fraud or intentional misrepresentation. Notwithstanding anything to the contrary, neither the Seller, the Shareholder, their Affiliates nor any other Person makes any

(and hereby expressly disclaims and negates any) representation or warranty to the Buyer or any other Person with respect to any projections, estimates, budgets, forecasts or plans heretofore delivered, conveyed in any form (including orally, electronically or in writing) or made available to the Buyer or any of its officers, directors, agents, counsel, accountants, advisors or other representatives (its "Representatives") regarding the Seller, whether in relation to financial matters or anything else.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Subject only to such exceptions as are specifically disclosed in the disclosure schedules hereto, which contain specific numbered sections and lettered subsections corresponding to those in Article V, and which have been delivered by or on behalf of the Buyer, the Buyer, as of the date hereof and as of the Closing Date, hereby represents and warrants to the Seller as follows:

5.1    Organization, Authority. The Buyer is a corporation duly organized and validly existing under the Laws of the State of New Jersey. The Buyer has all corporate or similar power and corporate or similar authority to enter into this Agreement and to consummate the transactions contemplated hereby. All necessary corporate or similar action and other proceedings required to be taken by the Buyer to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken. This Agreement has been duly executed and delivered by or on behalf of the Buyer and constitutes the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as such enforceability may be limited by general principles of equity or to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies and except that the indemnification provisions under this Agreement may further be limited by principles of public policy.

5.2    No Conflict.

(a)    The execution, delivery and performance by the Buyer of this Agreement and the Ancillary Agreements and the consummation by the Buyer of the transactions contemplated hereby and thereby will not (i) violate or conflict with the Articles of Incorporation or Bylaws (or similar governing documents) of the Buyer, (ii) assuming satisfaction of the requirements set forth in Section 5.2(b) below, violate any provision of Law to which the Buyer is subject or violate or conflict with any order, judgment, injunction or decree applicable to the Buyer or (iii) (A) violate, breach or constitute a default under, (B) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, any right or obligation of the Buyer under, or result in the creation of any Encumbrance on any of the properties or assets of the Buyer pursuant to, any provision of any material agreement, contract, note, bond, mortgage, indenture or lease or other instrument binding upon the Buyer or any license, franchise, permit or other similar authorization held by the Buyer.

(b)    The execution, delivery and performance by the Buyer of this Agreement or the Ancillary Agreements and the consummation by the Buyer of the transactions contemplated hereby do not require any consent from, filing with or consent, approval, order, authorization or action, or any of filing with or notice to any Governmental Authority with respect to the Buyer, except for consents and filings which, if not obtained or made, will not have

41

# EXHIBIT A

# Part 2 of 4

and would not reasonably be expected to have, individually, or in the aggregate, a Buyer Material Adverse Effect.

5.3    Sufficient Funds.  The Buyer has sufficient funds or capital commitments in place to purchase the Purchased Assets and assume the Assumed Liabilities on the terms and conditions contained in this Agreement and will have such funds or capital commitments on the Closing Date.

5.4    Litigation and Liabilities.  There are no lawsuits or proceedings pending or, to the Knowledge of the Buyer, threatened, against the Buyer or any of its Affiliates or obligations or liabilities of the Buyer or any of its Affiliates, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, except for those that would not reasonably be expected to cause a Buyer Material Adverse Effect.

5.5    Compliance with Laws; Permits.  Except with respect to regulatory matters referred to in Section 5.2(a) and 5.2(b), no investigation or review by any Governmental Authority with respect to the Buyer or any of its Affiliates is pending or, to the Knowledge of the Buyer, threatened, nor has any Governmental Authority indicated an intention to conduct the same, except for those the outcome of which will not, and would not be reasonably expected to cause a Buyer Material Adverse Effect.

5.6    Solvency.  At and immediately following the Closing, the Buyer will not (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liability on its existing debts as they mature), (b) have unreasonably small capital with which to engage in its business or (c) have incurred debts beyond its ability to pay as they become due.

5.7    No Brokers.  No agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee in connection with any of the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Buyer except for Classic Strategies Group, LLC whose fees and expenses are the sole responsibility of the Buyer.

5.8    No Other Representations or Warranties.  It is the explicit intent of each Party hereto that the Buyer is making no representation or warranty except as set forth in this Agreement, the Ancillary Agreements, the Buyer Disclosure Schedule, and the certificates, documents and instruments delivered hereunder or thereunder and except further that nothing in this sentence shall be construed to absolve Buyer from liability for fraud or intentional misrepresentation.

### ARTICLE VI
### COVENANTS

6.1    Covenants of the Seller.  The Seller and the Shareholder, as applicable, hereby covenant and agree as follows:

(a)    Access.  Prior to the Closing, the Seller shall (i) give the Buyer and its Representatives reasonable access to the officers, management, agents, books, records, offices

and other facilities and properties of the Seller during mutually agreeable business hours and (ii) furnish to the Buyer and its Representatives such information concerning the Business, the Purchased Assets and the Assumed Liabilities which is reasonably requested; provided, however, that any such access shall be granted at reasonable times during normal business hours and in such a manner as not to interfere with the normal business operations of the Seller. Notwithstanding the foregoing, (A) the Seller may, in its sole discretion, deny or restrict such access to any information the disclosure of which is restricted by contract or Law or which would result in the waiver of any privileges (including the attorney-client privilege), (B) granting such access does not include access to conduct any environmental sampling or testing without the prior written consent of the Seller, and (C) no investigation by the Buyer or its Representatives pursuant to this Section 6.1(a) shall affect or be deemed to modify any representation or warranty made by the Seller herein or create or constitute any new representation or warranty of the Seller or any other Person. Within five (5) Business Days following the end of each month occurring after the date hereof and prior to the Closing Date, Seller shall prepare and deliver to Buyer updated lists, as of such preceding month end, of the Company Mortgage Loans and Pipeline Loans in the same format as Schedule 1.1(b)(i) and Schedule 1.1(b)(ii) hereof.

(b)    Ordinary Conduct. From and after the date hereof and prior to the Closing or earlier termination of this Agreement, except (A) as consented to in writing by the Buyer, (B) to the extent required to comply with any Law, (C) as set forth in Schedule 6.1(b), or (D) as otherwise contemplated by this Agreement, the Seller shall:

(i)    conduct its business in the ordinary course consistent with past practice;

(ii)    pay and perform its material debts, obligations and liabilities relating to the Business, the Purchased Assets as and when due;

(iii)    comply in all material respects with all Laws that may be applicable to any of the Business and the Purchased Assets;

(iv)    use its commercially reasonable efforts to preserve its business intact, to maintain the services of its present key employees and to preserve current relationships with, and the goodwill of its suppliers, customers and others having business dealings with it;

(v)    maintain the books and records relating to the Business or the Purchased Assets in a manner consistent with past business practices;

(vi)    not issue any capital stock or rights, warrants or options to acquire shares of such capital stock (including any phantom interest) or issue any securities convertible into such shares or convertible into securities in turn so convertible, or grant any options, warrants or rights to acquire any such convertible securities;

(vii)    not declare or pay any dividend or other distribution in respect of any class of its capital stock, or make any payment to redeem, purchase or otherwise acquire, or call for redemption, any of such stock, except for intercompany dividends;

(viii)    not merge, consolidate or engage in any other business combination transaction with or acquire the business of any other Person or, except in the ordinary course of business, acquire any material property or material Assets and Properties of any other Person;

43

(ix) not adopt or amend any Seller Employee Plan, nor enter into or amend any employment or consulting agreement or arrangement with respect to any Person to be employed in the Business or any Continuing Employee, or increase the compensation of any Continuing Employee, except for regular periodic salary or wage adjustments (not exceeding a 5% increase in any individual case) for not more than 5% of the Continuing Employees consistent with past practice;

(x) not sell, pledge, lease, license, dispose of, transfer or Encumber any of the Purchased Assets except in the ordinary course of business consistent with past practice (i) where immaterial (both individually and in the aggregate) in amount and significance, or (ii) with respect to sales or arrangements for sales of mortgage loans;

(xi) not incur any additional indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse the obligations of any Person, in each case in excess of One Hundred Thousand Dollars ($100,000), except for indebtedness incurred in the ordinary course of business (including the funding of Company Mortgage Loan acquisitions) consistent with past practice, endorsements for the purpose of collection, or intercompany loans among the Seller and its Affiliates;

(xii) not violate, breach or default under, in any material respect, or take or fail to take any action that (with or without notice or lapse of time or both) would constitute a material violation or breach of, or material default under, any term or provision of any Assigned Contract, Shared Assigned Contract or any Business Permit; or terminate, cancel or request any material change in, or agree to any material change in, any Assigned Contract, Shared Assigned Contract; or enter into, amend, modify, extend, substitute, supplement or renew any material Contract; and

(xiii) not terminate, cancel or request any material change in, or agree to any material change in or enter into, amend, modify, extend, substitute, supplement or renew any lease for real property or Tangible Personal Property;

(xiv) not make any change with respect to its accounting policies, principles, methods or procedures, including revenue recognition policies, other than as required by GAAP;

(xv) except with respect to Taxes that constitute Excluded Liabilities, not make any material Tax election or settle or compromise any material Tax liability relating to the Business or the Purchased Assets;

(xvi) not permit any insurance policy naming Seller as a beneficiary or a loss payee and relating to the Business, the Purchased Assets, or the Assumed Liabilities to be cancelled, terminated or not renewed, except in the ordinary course of business consistent with past practice;

(xvii) not agree to do, authorize or enter into any Contract or otherwise make any commitment to do any of the foregoing (other than such actions set forth in paragraphs (i) through (v) above); provided, however, that nothing contained in this Agreement is intended to give the Buyer, directly or indirectly, the right to control or direct the Seller's Business or operations prior to the Closing.

(c) Agreement Regarding Intercompany Debt. At or prior to the Closing, and notwithstanding anything in Section 6.1(b) to the contrary, the Seller may pay any Affiliate

44

intercompany receivables to the entity entitled thereto; provided, that (i) Custodial Accounts, escrow deposits and other amounts on deposit in accounts with the Shareholder or its Affiliates shall remain on deposit in the ordinary course of business; (ii) the Intercompany Capital Loan and the Intercompany Credit Line owed by the Seller to Irwin Union Bank & Trust Company may, but need not, be repaid in whole or in part prior to Closing (it being understood that the Intercompany Credit Line shall be discharged in part in connection with the payment of the Indebtedness Payoff Amount in accordance with Section 2.1(a)); and (iii) intercompany allocations of expense items under vendor arrangements shall be treated in accordance with the Transition Services Agreement. The Seller is permitted to draw upon its existing financing sources with nonaffiliates to provide for preclosing repayment or reduction of the Intercompany Capital Loan and the Intercompany Credit Line. The Shareholder and Irwin Union Bank & Trust Company shall have no obligation to make advances under the Intercompany Credit Line or the Intercompany Capital Loan to the Buyer after the Closing Date.

6.2     Covenants of the Buyer. The Buyer covenants and agrees as follows:

(a)     Confidentiality. The Buyer acknowledges that all information provided to it by the Seller, the Shareholder and their respective Affiliates and Representatives, including information provided pursuant to Section 6.1(a), is subject to the terms of a confidentiality agreement dated March 9, 2006 between the Buyer and the Seller (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.

(b)     Post-Closing Information. After the Closing, the Buyer shall make available to the Seller and its Representatives any and all books, records, Contracts and other information of the Seller existing on the Closing Date (whether in the possession of the Buyer or the Seller) requested by the Seller in connection with any purposes contemplated by this Agreement, including preparation of Tax returns, resolution of Tax contests and any of the purposes set forth in Article VII or Article X. The Buyer shall hold all of the books and records included in the Purchased Assets and all books, records and data relating to the Old Mortgage Loans or inactive mortgage loans and not destroy or dispose of any such books or records for a period of five (5) years following the Closing Date or such time as may be required by Law, and thereafter, if it desires to destroy or dispose of such books and records, it will offer first in writing at least sixty (60) days prior to such destruction or disposition to surrender them to the Shareholder. The Seller and the Shareholder shall be provided access, upon reasonable notice and during normal business hours, to the historical customer information and Mortgage Files included in the Purchased Assets or relating to the Old Mortgage Loans or inactive mortgage loans in the custody of Buyer or under its control. For a period of five (5) years following the Closing Date, Seller shall preserve its existing records relating to the Continuing Employees and, subject to applicable Laws, shall provide Buyer and its representatives with access during normal business hours to (and copies at no expense, of) such Continuing Employee records. After the Closing, the Seller shall make available to the Buyer and its Representatives any and all books, records, Contracts and other information of the Seller related to the Excluded Assets existing on the Closing Date that are retained by Seller and reasonably requested by the Buyer in connection with any purposes contemplated by this Agreement, including preparation of Tax returns, resolution of Tax contests, and any of the purposes set forth in Article VII or Article X.

(c)     Communication with Customers, Etc. Prior to the Closing, neither the Buyer nor any of the Buyer's Affiliates shall, nor shall they permit any of their respective

Representatives to, communicate with customers, vendors, suppliers or others having business dealings with the Seller, without the prior written consent of the Seller, which will not unreasonably be withheld.

6.3    Consents and Approvals; Cooperation; Notification.

(a)    The Seller and the Buyer shall cooperate with each other and use (and shall cause their respective Affiliates to use) commercially reasonable efforts to take or cause to be taken all actions, and to do or cause to be done all things necessary, reasonably proper or advisable on their respective parts under this Agreement and applicable Law to consummate and make effective, as promptly as practicable, the purchase and sale of the Purchased Assets and the other transactions contemplated by this Agreement, including: (i) the obtaining of all necessary actions or non-actions, consents, waivers and approvals from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any), and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Authority, and (ii) the taking of all steps as may be necessary to lift any injunction or other legal bar in order to consummate the purchase and sale of the Purchased Assets and any of the other transactions contemplated by this Agreement.

(b)    The Seller and its Affiliates shall use commercially reasonable effects to prepare and file as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all waivers, consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained by Seller from any third party.

(c)    The Seller, the Shareholder and the Buyer each shall, upon request by the other, furnish the other with all information concerning itself, its Affiliates, its directors, officers and shareholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Seller, the Buyer or any of their respective Affiliates to any third party and/or any Governmental Authority in connection with the purchase and sale of the Purchased Assets and the other transactions contemplated by this Agreement.

(d)    Subject to applicable Law and the instructions of any Governmental Authority, each of Buyer, Seller and the Shareholder shall give prompt notice to the others of (i) any notice or other communication from any Person alleging that any consent, waiver or approval of such Person is or may be required in connection with any of the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Authority in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements; (iii) any Action or Proceeding commenced or, to its Knowledge, threatened in writing against, relating to or involving or otherwise affecting Buyer or Seller that relates to the Business or may affect the consummation of any of the transactions contemplated by this Agreement or the Ancillary Agreements; (iv) the occurrence of a material default or event, or an event that, with the giving of notice or lapse of time or both, will become a material default under any Assigned Contract or Shared Assigned Contract; and (v) any change, event or occurrence that could reasonably be expected to render any of Buyer's or Seller's representations and warranties untrue or incorrect in any material respect, or to materially delay or materially impede the ability of either Buyer or Seller to perform their respective obligations pursuant to

46

this Agreement and to effect the consummation of the purchase and sale of the Purchased Assets and the other transactions contemplated by this Agreement or the Ancillary Agreements.

(e)    Seller shall have the right, prior to the Closing, to remove from the website content included in the Purchased Assets any reference to the Shareholder or any of its Affiliates other than Seller or to any Excluded Assets.

(f)    In the event that within 15 Business Days after the date hereof Buyer instructs the Seller in writing that it will assume the Contracts related to Seller's wholesale office locations at San Diego, California and Englewood, Colorado (the "Wholesale Offices"): (i) such Contracts shall be deemed to constitute Assigned Contracts (and Real Property Leases and Personal Property Leases, as applicable) hereunder, (ii) the personal property related to the Wholesale Offices shall be deemed to constitute Tangible Personal Property hereunder, (ii) at the Closing, Seller shall deliver to Buyer, as applicable, a revised Schedule 1.1(b)(iii) (Assigned Contracts), Schedule 1.1(b)(iv) (Real Property Leases), Schedule 1.1(b)(v) (Personal Property Leases), and Exhibit A (Excluded Assets and Contracts), each appropriately updated to include the Contracts and tangible personal property related to the Wholesale Offices as Purchased Assets (and to reflect their removal from the Excluded Assets), and (iv) such Contracts shall be assigned to and assumed by Buyer at the Closing in the same manner as the other Assigned Contracts provided herein.

(g)    Seller shall cause all liens on the Company Mortgage Loans to be released upon or before the Closing.

6.4    Publicity.    Prior to the Closing, none of the Seller, the Shareholder or their Affiliates, on the one hand, nor the Buyer or its Affiliates, on the other hand, shall issue any press release or other public announcement concerning the transactions contemplated hereby without the prior consent of the other Party, except as such release or announcement may be required by Law, in which case the Party required to make the release or announcement shall notify the other Party and, to the extent possible, allow the other Party reasonable time to comment on such release or announcement in advance of such issuance. The Seller, the Shareholder and the Buyer shall use all reasonable efforts to develop a joint communications plan, and each Party shall use all reasonable efforts (i) to ensure that all press releases (or portions thereof) and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan and (ii) unless otherwise required by Law or by obligations pursuant to any listing agreement with or rules of any securities exchange, to consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby.

6.5    Updated Schedules.    Immediately prior to the Closing, the Seller shall deliver updated versions of Schedule 1.1(b)(i)-(ix), Schedule 4.22 and the Employee List (the "Applicable Schedules") as of the Closing Date or the latest practicable date. To the extent any representation included in Section 4.19, Section 4.20 or Section 4.22 hereof refers to the Applicable Schedules as of the Closing Date, it shall be deemed to refer to the respective updated versions of such Applicable Schedules delivered pursuant to this Section 6.5. To the extent any representation other than those included in Section 4.19, Section 4.20, or Section 4.22 refers to the Applicable Schedules or other schedules of this Agreement as of the Closing Date, it shall be deemed to refer to such schedules delivered as of the date hereof.

47

6.6    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, the Seller, the Shareholder and the Buyer will, severally, use their or its commercially reasonable best efforts to (i) ensure the conditions set forth in Article III hereof are satisfied, insofar as such matters are within the reasonable control of such Party, (ii) execute and deliver such instruments and take such actions as the other Parties hereto may reasonably require in order to carry out the intent of this Agreement or the Ancillary Agreements, (iii) in the case of Seller and Shareholder, file or obtain the Agency notices, consents and authorizations and other third party consents listed in Schedules 4.2(a) and 4.2(b), and (iv) otherwise take all actions and do all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    If Buyer notifies Seller in writing prior to Closing, that, despite its reasonable best efforts to obtain requisite state licensure for its continued operation after Closing of Seller's retail branches in any of Greensboro, North Carolina, Newport News, Virginia, Rocky Hill, Connecticut, or Valparaiso, Indiana, any such license application remains pending, then, to the extent permitted by applicable law, Seller and Buyer agree to use their reasonable best efforts to enter into an operating agreement with a term of not more than 120 days after Closing whereby (i) the office lease, Assigned Contracts and Tangible Personal Property, associated solely with the branch or branches for which license approval is delayed, will be excluded from assignment at Closing (but without any adjustment to the Purchase Price or payment provisions of Article II); and (ii) Seller will retain such assets and the employees associated with such offices, and continue to operate such offices, under Seller's direction, but at Buyer's cost and for Buyer's benefit, such that Buyer will pay all operating expenses and purchase all acquired mortgage loans originated in such branches for a purchase price equal to Seller's book value with respect to such loans, subject only to the warranty set forth in Section 4.19. At the conclusion of the term of such operating agreement, or earlier, upon Buyer's receipt of requisite licensure, Seller shall assign the office lease, Assigned Contracts, and Tangible Personal Property associated with such excluded offices to Buyer, for no additional consideration.

(c)    From the date hereof to one year following the Closing Date, if Buyer identifies a Contract to which Seller is a party that has been used in the operation of the Business and that reasonably determines is necessary to Buyer's continued operation of the Business, but such Contract is not identified in this Agreement, the Ancillary Agreements, or any schedule or exhibit hereto or thereto, and Buyer is unable to obtain a replacement Contract on commercially comparable terms, to the extent such Contract remains in effect, upon Buyer's written request and at no expense to the Buyer, Seller shall use commercially reasonable efforts to obtain any required consent to assignment, and to cause such Contract to be assigned to Buyer, for no additional consideration, subject to Buyer's assumption of post-Closing obligations thereunder.

6.7    Independent Investigation and Evaluation. The Buyer acknowledges that (a) it is experienced in the operation of the type of business conducted by the Seller, (b) it has completed to its full satisfaction its own due diligence review with respect to the Business, (c) it has had access to its full satisfaction to the Purchased Assets and the Business and its books, records, employees, agents and other Representatives and (d) it has had the opportunity to seek such accounting, legal or other advice or information in connection with its entry into this Agreement and the other documents referred to herein relating to the consummation of the transactions contemplated hereby and thereby as it has seen fit. Neither the Seller nor any of its Affiliates nor

any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Purchased Assets or the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement. In connection with the Buyer's investigation of the Business, the Buyer and its Representatives have received from the Seller or its Representatives certain projections and other forecasts for the Seller and certain estimates, plans and budget information. The Buyer acknowledges and agrees that (i) there are uncertainties inherent in attempting to make such projections, forecasts, estimates, plans and budgets, (ii) the Buyer is familiar with such uncertainties, (iii) the Buyer is taking full responsibility for making its own evaluations of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to the Buyer or its Representatives and (iv) the Buyer will not (and will cause all of its Affiliates and all other Persons and Representatives acting on its behalf not to) assert any claims or causes of action against the Seller or against any of the Seller's or the Shareholder's direct or indirect officers, directors, shareholders, Affiliates, or Representatives, or hold any such Persons liable with respect thereto.

6.8     Payments Received. After the Closing, the Seller and the Buyer will (i) hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash or other funds), electronic fund or similar transfers, insurance proceeds, and other property that they may receive on or after the Closing which properly belongs to the other, and will account to the other for all such receipts and (ii) any notices from third parties that affect the other party or the assets of the other party. Without limiting the generality of the foregoing, within three Business Days following receipt, the Buyer will remit to the Seller, without offset, all customer payments received on account of the Accounts Receivable or any other payments received on account of the Excluded Assets, and the Seller will remit to the Buyer, without offset, any payments received on account of the Purchased Assets. Seller and Buyer, upon reasonable notice to the other, may audit, at their own expense, the books and records of the other to ensure compliance with this Section 6.8.

6.9     Non-Competition.

(a)     Each of the Seller and the Shareholder shall not (and shall cause each of their respective Affiliates not to), for a period of three (3) years from and after the Closing Date, directly or indirectly, engage in or participate in (whether as an owner, principal, agent, stockholder, member, partner, trustee, venturer, lender or other investor or through the agency of any corporation, limited liability company, partnership, association or otherwise), anywhere in the United States, any business or enterprise that shall be in whole or in part competitive with the first residential mortgage origination or acquisition operations of the Business; provided, however, that the foregoing covenant shall not be deemed breached as a result of (i) the ownership of not more than 3% of the outstanding securities of any class of any entity that are listed on a national securities exchange or traded in the over-the-counter market, (ii) the ongoing first mortgage activities of Irwin Union Bank & Trust Company and Irwin Union Bank, FSB consistent with the existing practice of such businesses (including the expansion of such businesses), (iii) the first mortgage related activities of Irwin Home Equity Corporation consistent with the existing practices of such business (including the expansion of such business); provided that in no event whatsoever shall such activities permitted by the foregoing

clauses (ii) and (iii) exceed 1% of the then national residential market as measured by the Mortgage Bankers Association of America. In addition, this covenant shall not be deemed breached as a result of activities engaged in by an entity or business resulting from any business combination or acquisition after the Closing Date by the Seller or any Affiliate, if (A) as a result of such business combination or acquisition the aggregate first mortgage activities of the Shareholder and its subsidiaries does not exceed 1% of the then national residential market as measured by the Mortgage Bankers Association of America, or (B)(1) a majority of the equity in the entity or business resulting from such business combination (the "Surviving Entity") is not owned, directly or indirectly, by the Seller, Shareholder or any Affiliate, or the equity owners of Seller, Shareholder or any Affiliate and (2) a majority of the board of directors or other governing body of the Surviving Entity is not selected by Seller, Shareholder or any Affiliate or comprised of individuals who served as officers, directors or employees of Seller, Shareholder or any Affiliate before such combination. In the event that Seller or an affiliate proposes to effect an acquisition or business combination that, if effected, would include first mortgage acquisition or origination activities that would (when aggregated with other such operations of Seller and its Affiliates) exceed the limitation set forth in clause (A) of the foregoing sentence, Seller or its Affiliates shall (i) if possible, effectuate the proposed transaction in a manner that excludes the first mortgage activities that would exceed the limitations of clause (A), or (ii) on or before the date 180 days after such acquisition or combination, dispose of assets or otherwise discontinue activities representing first mortgage acquisition or origination activities in excess of the limitation of clause (A). For avoidance of doubt, this covenant does not restrict Seller or Shareholder's conduct of mortgage servicing activities.

(b)     The parties hereto recognize that the laws and public policies of the various states of the United States may differ as to the validity and enforceability of covenants similar to those set forth in this Section 6.9. It is the intention of the Parties that the provisions of this Section 6.9 be enforced to the fullest extent permissible under the laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such laws or policies) of any provisions of this Section 6.9 shall not render unenforceable, or impair, the remainder of the provisions of this Section 6.9. Accordingly, if any provision of this Section 6.9 shall be determined to be invalid or unenforceable, such invalidity or unenforceability shall be deemed to apply only with respect to the operation of such provision in the particular jurisdiction in which such determination is made and not with respect to any other provision or jurisdiction.

(c)     The parties hereto acknowledge that the relevant market for the Business is national in scope, and that there exists intense national competition for the products and services of the Business. The parties hereto further acknowledge and agree that the restrictions contained in this Section 6.9 are reasonable and necessary in order to protect the value of the Purchased Assets and the goodwill of the Business.

(d)     In the event of a breach or threatened breach of the provisions of this Section 6.9, the each of the Seller and Shareholder agrees and acknowledges that the injury which could be suffered by Buyer would be of a character which could not be fully compensated for solely by a recovery of monetary damages. Accordingly, each of the Seller and Shareholder agrees that in the event of a breach or threatened breach of this Section 6.9, in addition to and not in lieu of any damages sustained by Buyer and any other remedies which Buyer may pursue hereunder or under any applicable law, Buyer shall have the right to equitable relief, including

issuance of a temporary or permanent injunction or restraining order, by any court of competent jurisdiction against the commission or continuance of any such breach or threatened breach, without the necessity of proving any actual damages or posting of any bond or other surety therefor. In addition to, and not in limitation of the foregoing, each of Seller and Shareholder understands and confirms that, in the event of a breach or threatened breach of this Section 6.9, it may be held financially liable to Buyer for Losses suffered by Buyer as a result.

6.10    Non-Solicitation; Non-Hire. Each of the Seller and the Shareholder hereby agrees and covenants that for a period of three (3) years from and after the Closing Date, such party shall not, without the prior written consent of the Buyer, directly or indirectly, recruit or hire (or allow or cause its subsidiaries to do so) any then current employee of Buyer, or any individual who has served in any such capacity at any time six (6) months prior thereto, for employment or any other relationship, or induce or seek to cause (or allow or cause its subsidiaries to do so) such person to terminate his or her employment arrangement with Buyer, provided, however, that the foregoing provision shall not prevent the Seller, the Shareholder or its Affiliates, without such consent, from engaging in any mass media solicitation, any advertisement, or any employment database notice or listing (including any website posting), in each case generally available to the mortgage banking industry or the general public and not directed or targeted specifically at employees of the Buyer or the hiring of any employee as a result of such general solicitation, advertisement or listing whose aggregate compensation including benefits does not exceed $50,000 annually at the time of hire.

6.11    Outstanding Charges. All Outstanding Charges shall be the responsibility of the Buyer regardless of whether such payments relate to periods prior to the Closing Date, subject to the reconciliation procedure set forth in Section 2.2(b).

6.12    Ongoing Payments to Former Employees. Shareholder shall cause Seller to pay to each individual listed on Schedule 3.2(k) the amounts required to be paid to him under the agreement identified opposite his name on Schedule 3.2(e)(ii), without duplication of, and subject to the terms and conditions of, such agreement, including the timing of such payments.

6.13    Confirmation of Company Mortgage Loans. Buyer shall, at its discretion and expense, direct MDMC to analyze the data concerning Seller's mortgage loans delivered pursuant to Section 2.1(g) and to identify only those mortgage loans which do not qualify as Company Mortgage Loans under subsection (ii) or (iii) of the definition thereof. At or prior to Closing, Buyer shall deliver a confirmation to Seller (the "Buyer Loan Confirmation"), accompanied by a true and complete copy of the report of MDMC indicating those mortgage loans of the Seller, if any, that based on the report of MDMC do not constitute Company Mortgage Loans as a result of the failure to meet the requirements of subsection (ii) or (iii) of the definition thereof. Buyer shall have no right to exclude loans from the Purchased Assets on any other basis and, without limiting the foregoing, the Buyer Loan Confirmation shall not exclude or include any loans on the basis of its pricing terms or estimated market value.

6.14    Adjustment of Schedules and Exhibit A. The Parties will deliver revised Schedules and a revised Exhibit A with appropriate adjustment and revision as reasonably agreed by the Parties in good faith within ten Business Days of the date hereof to reflect that the Seller shall be retaining the Servicing Platform. Such revised Schedules and revised Exhibit A will be deemed to have been delivered on the date of this Agreement.

51

## ARTICLE VII
## TAX MATTERS

7.1   Tax Returns.

(a)   Seller and Seller's Tax Group shall have the exclusive obligation and authority to file or cause to be filed all Tax Returns for Taxes constituting Excluded Liabilities that are required to be filed by or with respect to the Seller, the Business and the Purchased Assets for all taxable years or other taxable periods, or portions thereof, ending on or prior to the Closing Date.

(b)   Buyer shall have the exclusive obligation and authority to file or cause to be filed all Tax Returns that are required to be filed for Taxes constituting Outstanding Charges as separately identified with the Final Net Outstanding Charges reconciliation; provided that such Tax Returns are in respect of a period commencing prior to the Closing Date and ending after the Closing Date (an "OC Tax Return"). For the avoidance of doubt, the Buyer shall have the responsibility to file or cause to be filed any such OC Tax Return in respect of any period ending on or prior to the Closing Date (except to the extent such Tax Return has been filed prior to the Closing).

7.2   Contests.

(a)   The Seller, the Shareholder and their Representatives shall have the exclusive authority to control any audit examination by any Governmental Authority, initiate any claim for refund, amend any Tax Return and contest, resolve and defend against any assessment for additional Taxes, notice of Tax deficiency or other adjustment of Taxes reflected on, or relating to Tax liability for periods covered by, and any Tax Returns described in, Section 7.1(a). In connection with any taxable year or other taxable period or portion thereof ending on or prior to the Closing Date, the Seller (i) shall be entitled to any Tax refund relating to the Taxes described in Section 7.1(a) and (ii) shall pay all additional Taxes relating thereto.

(b)   Subject to, and except as otherwise provided in Article X, the Buyer shall have the exclusive authority to control any audit examination by any Governmental Authority, initiate any claim for refund, amend any OC Tax Return and contest, resolve and defend against any assessment for additional Taxes, notice of Tax deficiency or other adjustment of Taxes relating to an OC Tax Return. Notwithstanding the final reconciliation under Section 2.2(b), the Buyer and Seller (i) shall be entitled to any a pro-rata portion of any Tax Refund relating to the Taxes described in Section 7.1(b) and (ii) shall pay their pro-rata portion of any additional Taxes relating thereto. The pro-rata portion of any such Tax or Tax Refund shall be equitably determined in good faith by the Buyer and Seller and the limitations set forth below in Article X shall not be applicable thereto.

7.3   Notices.

(a)   The Buyer shall promptly forward to the Seller all written notifications and other communications from any taxing authority received by the Buyer relating to any Tax audit, and other Tax notice relating to information included in the Mortgage Loan Files, or other proceeding relating to any OC Tax Return described in Section 7.1(a).

(b)    The Seller shall promptly forward to the Buyer all written notifications and other communications from any taxing authority received by the Seller relating to any Tax audit or other proceeding relating to any OC Tax Return described in Section 7.1(b).

## ARTICLE VIII
## EMPLOYEES AND EMPLOYEE BENEFITS MATTERS

8.1    <u>Employees</u>.  On and effective as of the Closing Date, the Buyer shall offer employment to substantially all of the employees of the Business.  Those employees of Seller who are employed by Buyer ("<u>Continuing Employees</u>") shall be engaged by Buyer on substantially economically equivalent terms and conditions, including pay and benefits, as their terms and conditions with the Seller on the Closing Date, as more particularly described on <u>Schedule 8.1</u>.  Employees of Seller who are not offered, or who do not accept, employment with Buyer at Closing are referred to as "<u>Retained Employees</u>".

8.2    <u>Benefit Plans</u>.  To comply with Section 8.1 Buyer shall make available to Continuing Employees either Transferred Benefit Plans or, with respect to benefits arrangements that have been available under the Seller Employee Plans that are not to be transferred to Buyer, benefits under the benefit plans sponsored by Buyer ("<u>Replacement Plans</u>"), as set forth on <u>Schedule 8.1</u>.

8.3    <u>Buyer's Post-Closing Benefit Obligations</u>.  The Buyer agrees that for a period ending no earlier than December 31, 2007, (or, with respect to a particular benefit plan or arrangement, such longer period as may be reflected in <u>Schedule 8.1</u>) and subject to such additional terms and conditions as may be set forth in <u>Schedule 8.1</u>, it will (i) maintain in full force and effect and unimpaired for the benefit of the Continuing Employees either (A) the Transferred Benefit Plans and the Buyer's Replacement Plans or (B) with respect to any Transferred Benefit Plan or the Buyer's Replacement Plans, a replacement plan that provides substantially similar benefits and (ii) maintain the salary and bonus compensation arrangements of Continuing Employees who are retained in their positions at a level that is substantially equivalent or greater in aggregate to that in effect on the Closing Date.  For avoidance of doubt, the Continuing Employees are at-will employees and may be terminated by the Buyer for any reason or no reason, and, in such event, shall be entitled to only such benefits as are normally provided by Buyer to terminated employees (subject to any written employment agreement between Buyer and such Continuing Employee).  For purposes of determining the eligibility, vesting, participation and seniority of Continuing Employees under a Transferred Benefit Plan, a Buyer's Replacement Plan or other benefit program, plan or arrangement maintained by the Buyer after the Closing for which a Continuing Employee is otherwise eligible, each Continuing Employee shall be given full credit under such employee benefit program, plan or arrangement for such Continuing Employee's period of service with the Seller and its predecessors prior to the Closing to the same extent such service was credited under a Seller Employee Plan.  In addition, a Continuing Employee who meets the eligibility requirements under the Retirement Plan immediately prior to Closing shall be eligible to participate in the Freedom Retirement Plan as of the Closing without regard to any age, service or other eligibility requirements of the Freedom Retirement Plan.  Continuing Employees shall be given full credit for deductibles, co-payment or out-of-pocket limits satisfied under Seller Employee Plans toward any deductibles,

53

co-payment or out-of-pocket limits for the same period following the Closing under analogous Buyer benefit plans to the extent any such plan allows for credit without an increase in incremental cost to the Buyer other than a nominal administrative fee. The Buyer shall cause to be waived any waiting periods, evidence of insurability requirements or pre-existing condition limitations for any Continuing Employee covered under a Seller Employee Plan immediately prior to the Closing. The Buyer shall honor all vacation pay, sick leave and other paid time off accrued by any Continuing Employee to the extent reflected as a Final Assumed Payable.

8.4    Allocation of Benefit Obligations.  The Seller shall pay or shall cause the applicable Seller Employee Plan to pay any benefits or expenses covered by the group medical and dental plans included within the Seller Employee Plans (other than the Transferred Benefit Plans) which in the case of any such medical or dental plans, are incurred by Continuing Employees or their dependents prior to the Closing Date. The Buyer shall pay or cause the applicable Transferred Benefit Plan or Buyer's Replacement plan (or any replacement plan) to pay any such benefits or expenses which in the case of any such medical or dental plans, are incurred by the Continuing Employees or their dependents on or after the Closing Date. A medical or dental expense is "incurred" for purposes of this Section 8.4 as of the date when the services that give rise to the expense are rendered, and not when the expense is billed.

8.5    COBRA Coverage.  The Seller or the Seller Employee Plans shall be solely responsible for claims relating to coverage under COBRA attributable to "qualifying events" with respect to any Continuing Employee and his or her beneficiaries and dependents that occur before the Closing Date. The Buyer, a Transferred Benefit Plan or a Buyer's Replacement Plan shall be solely responsible for claims relating to coverage under COBRA attributable to "qualifying events" occurring on or after the Closing Date with respect to Continuing Employees and their beneficiaries and dependents. "COBRA" means Section 601 et seq. of ERISA and Section 4980B of the Code and any similar applicable state Laws.

8.6    WARN Act.

(a)    The Buyer shall be solely responsible for any Loss arising under the Worker Adjustment Retraining Notification Act, as amended ("WARN Act"), or any equivalent state or local statute or ordinance, in each case requiring the provision of notices to Continuing Employees affected by a plant closing, mass layoff, or the like, relating to or arising from the failure to retain in employment, or the termination or layoff of any Continuing Employees or any other employment decision made by the Buyer on or after the Closing Date. The Buyer shall also take all other steps necessary to eliminate any obligation of the Seller or any of its Affiliates under the WARN Act and any similar Law to give notice of transfer of any operations or the loss of employment or loss of pay or benefits or to pay any amounts in lieu of such notice with respect to Continuing Employees.

The Seller shall be solely responsible for any Loss arising under the WARN Act, or any equivalent state or local statute or ordinance, in each case requiring the provision of notices to Retained Employees affected by a plant closing, mass layoff, or the like, relating to or arising from the failure to retain in employment, or the termination or layoff of any Retained Employees or any other employment decision made by the Seller on or after the Closing Date. The Seller shall also take all other steps necessary to eliminate any obligation of the Buyer or any of its Affiliates under the WARN Act and any similar Law to give notice of transfer of any

54

operations or the loss of employment or loss of pay or benefits or to pay any amounts in lieu of such notice with respect to Retained Employees.

8.7    Retirement Plan.  Seller shall terminate the Retirement Plan as of the Plan Termination Date and as soon as practicable thereafter shall file "IRS Form 5310 – Application for Determination for Terminating Plan" seeking a determination that the Retirement Plan is qualified under Section 401(a) of the Code.  The Freedom Retirement Plan will accept rollover contributions from the Retirement Plan on behalf of Continuing Employees as soon as administratively practicable after Closing ("Rollover Contributions").  Immediately prior to the initial Rollover Contribution, the plan administrator of the Retirement Plan (the "RP Administrator") shall provide to the plan administrator of the Freedom Retirement Plan (the "FR Administrator") a letter representing that (i) the Retirement Plan has satisfied or intends to satisfy all requirements under Section 401(a) of the Code and (ii) that the Retirement Plan has been operated in accordance with Section 401(a) of the Code.  Upon receipt by the Retirement Plan of either (i) a favorable determination letter that the Retirement Plan was a qualified plan through the date of its termination or (ii) a communication from the IRS that the Retirement Plan was not a qualified plan as of the date of its termination, the Seller hereby agrees to cause the RP Administrator to immediately provide a copy of such determination letter or such other communication to the FR Administrator.  In the event that the IRS should indicate that it cannot issue a favorable determination letter to the Retirement Plan or issues a ruling that the Retirement Plan was not a qualified plan, Seller hereby covenants and agrees to indemnify and hold Buyer, the Freedom Retirement Plan, its plan participants and fiduciaries, and the FR Administrator (the "FR Indemnitees"), harmless from and against all loss, cost or expenses of any nature whatsoever (including reasonable legal and accounting fees) incurred reasonably and in good faith by the FR Indemnitees in connection with (i) the acceptance of any Rollover Contribution and (ii) the distribution of all Rollover Contributions to the Continuing Employees who had made such Rollover Contributions.

8.8    Immigration Matters.  At Closing Buyer shall assume sponsorship of all visas or lawful permanent residence applications for, and employment-related immigration obligations with respect to, employees of the Business as set forth on Schedule 4.17(a)(ii) hereof.  If Buyer shall be required to pay any deportation or related costs in connection with the termination of employment within six months of the Closing Date of the individuals listed on Schedule 4.17(a)(ii), Seller shall reimburse Buyer for any such costs.

## ARTICLE IX
## OTHER CONTRACTS

9.1    Multi-Affiliate Contracts.

(a)    Schedule 9.1(a) contains a list of agreements that are used by the Business and that have been entered into by an Affiliate of the Seller and that are included in the Purchased Assets (collectively, the "Shareholder Assigned Contracts").

(b)    [Intentionally Omitted].

(c)    Schedule 9.1(c) contains a list of agreements (i) to which the Shareholder or an Affiliate is party or under which it derives benefits along with the Seller but which primarily benefits the Business, or (ii) that pertain to both Purchased Assets and Excluded Assets (the "Shared Contracts").  The Seller and Shareholder will use commercially reasonable efforts

to separate the Shared Contracts as appropriate prior to the Closing (such separated Contracts relating to the Business shall be referred to as the "Shared Assigned Contracts").

(d)     Schedule 9.1(d) contains a list of agreements of the Seller or an Affiliate that will be subject to the Transition Services Agreement.

(e)     The Seller, Shareholder and their Affiliates shall use commercially reasonable efforts to obtain the transfer, amendment or replacement, at the Seller's option, for the benefit of Buyer after the Closing of such portion of each Shared Contract that relates to the Business. Upon any transfer of such a Contract or portion thereof, as the case may be to the Buyer, the Buyer shall assume all liabilities and obligations of the Seller, the Shareholder or their Affiliates, as applicable, related to the transferred portion of such Contract, except to the extent such liabilities and obligations (A) would have been paid, performed or otherwise discharged on or prior to transfer date but for a breach or default by the Seller, the Shareholder or their Affiliates, or (B) arise out of any breach or default by any such party.

(f)     The Seller, Shareholder and their Affiliates shall use commercially reasonable efforts to obtain as promptly as possible such third party consents as are required hereunder with respect to the transfer of the Assigned Contracts and Shareholder Assigned Contracts. Upon any transfer of such a Contract to the Buyer, the Buyer shall assume all liabilities and obligations of the Seller, the Shareholder or their Affiliates, as applicable, related to such Contract, except to the extent such liabilities and obligations (A) would have been paid, performed or otherwise discharged on or prior to transfer date but for a breach or default by the Seller, the Shareholder or their Affiliates, or (B) arise out of any breach or default by any such party.

(g)     Notwithstanding anything to the contrary contained in this Agreement, to the extent that the transfer, assignment, amendment, modification or replacement of any Assigned Contract, Shareholder Assigned Contract or Shared Contract (or Shared Assigned Contract, as the case may be) would require any approval, consent or waiver by another Person, and such approval, consent or waiver shall not have been obtained prior to the Closing, the Closing shall (subject to the satisfaction or waiver of the conditions set forth in Article III) proceed without the transfer, assignment, amendment, modification or replacement of any such Contract (or portion thereof, as the case may be), and this Agreement shall not constitute an unauthorized transfer, assignment or amendment of any such Contract or any portion thereof or an attempt thereof, provided that in the event that the Closing so proceeds without the transfer, assignment, amendment, modification or replacement of any such Contract or portion of any such Contract, then following the Closing, the Seller and Shareholder shall, and shall cause their respective Affiliates to, use commercially reasonable efforts, to assist Buyer at no cost to Buyer, to obtain promptly any such approval, consent or waiver and shall commencing on the Closing and prior to obtaining any such approval, consent or waiver, provide Buyer, at no cost to Buyer, with all of the rights and benefits (subject to all of the obligations) under any such Contract, through the term of such Contract including enforcement for the benefit of Buyer of any and all rights of the Seller, Shareholder or its Affiliates against any other party arising out of any breach or cancellation of any such Contract by such other party and, if requested by Buyer, acting as an agent on behalf of Buyer or as Buyer shall otherwise reasonably require. Buyer acknowledges that where the Seller Assigned Contracts, Shareholder Assigned Contracts or the Shared Contracts contain pricing or other terms based on the volume of goods, services or activity of the Seller, Shareholder, its Affiliates or their employees related to the activities under such Contract

56

or a related Contract, the counterparties to such Contracts may charge higher prices or impose less favorable terms upon Buyer as assignee or under a replacement Contract than those that have been available to Seller because Buyer will not be able to support such higher volume, usage or activity; and with respect to such Seller Assigned Contracts, Shareholder Assigned Contracts or Shared Contracts Seller shall not be responsible to bear any portion of any such incremental cost incurred by Buyer as assignee or under such a replacement Contract hereunder.

(h)    Schedule 9.1(h) contains a true and complete list of all obligations of the Business that are secured by a guarantee by the Seller, the Shareholder or any of its Affiliates (the "Seller Guarantees"). To the extent that any Seller Guarantees cannot be discharged or extinguished prior to or at the Closing Date, the Buyer shall use commercially reasonable efforts to cause the Buyer or one of its Affiliates to be substituted for the Seller, Shareholder or its Affiliate, as applicable, with respect to, and cause the Seller, the Shareholder or such Affiliate of the Shareholder to be released from, any such Seller Guarantees, provided, however, that to the extent such guarantees cannot be extinguished on or prior to the Closing, the Buyer shall use reasonable efforts to do so as promptly as practicable following the Closing and shall reimburse the Seller, the Shareholder and its Affiliates for, and indemnify and hold them harmless from and against, any and all Losses resulting from any payment following the Closing Date by any of the Shareholder or its Affiliates under any such Seller Guarantee.

## ARTICLE X
## INDEMNIFICATION

10.1    Survival. The representations and warranties set forth in Article IV and Article V shall generally survive the Closing and continue in full force and effect for a period of twenty four (24) months after the Closing Date. Notwithstanding the foregoing, the representations and warranties of the Parties contained in Sections 4.1 (Organization, Authority), 4.7 (Taxes), 4.8(a) (Title to Purchased Assets), and 4.21 (Servicing) shall survive the Closing and continue in full force and effect for a period beginning on the applicable Closing Date and ending sixty (60) days following the expiration of the applicable statute of limitations, and they shall thereafter be of no further force or effect. All covenants and agreements of the Parties contained in this Agreement shall survive the applicable Closing and will remain in full force and effect thereafter until (i) in the case of all covenants and agreements that have specified terms or periods, until the expiration of the terms or periods specified therein; and (ii) in the case of all other covenants and agreements that do not have specified terms or periods, until the fulfillment thereof. Neither the period of survival nor the liability of any Party with respect to its representations and warranties shall be reduced by any investigation made at any time by or on behalf of any other Party hereto. Notwithstanding anything to the contrary in this Agreement, the period of time that a provision survives the Closing and remains in full force and effect pursuant to this Section 10.1 (the "Survival Period") shall automatically be extended to include any time period necessary to resolve a specific claim for indemnification which was timely and properly made prior to expiration of the Survival Period but not resolved prior to its expiration; provided, however, that any such extension shall apply only as to claims asserted and not so resolved within the original Survival Period.

10.2    Indemnification by the Seller.

(a)    Subject to the terms and conditions of this Agreement (including Section 10.2(b)), each of the Seller and Shareholder shall jointly and severally indemnify, defend and

hold harmless the Buyer and its Affiliates and their respective officers, directors, advisors, agents, employees, successors and assigns (the "Buyer Indemnified Parties") from and against any and all costs, losses, liabilities, obligations, damages, lawsuits, deficiencies, claims, demands, and expenses (whether or not arising out of third-party claims), including interest, penalties, fines, costs of mitigation, costs of investigation, court costs, and reasonable attorneys', accountants', consultants' or experts' fees and disbursements but excluding incidental or consequential damages or diminution in value (each a "Loss" and, collectively the "Losses") directly or indirectly based upon, arising out of, resulting from or relating to:

(i)     any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Seller or Shareholder in this Agreement, any of the Ancillary Agreements, or any certificate, instrument or document required to be delivered to Buyer pursuant to this Agreement or any of the Ancillary Agreements; provided, however, that if any such representation or warranty in Article IV (other than those in Section 4.4 (Financial Statements; Section 4.6 (Undisclosed Liabilities); the last sentence of 4.8(a) and 4.8(c) (Properties); Section 4.9 (Intellectual Property); Section 4.15 (Licenses and Permits), other than the second sentence thereof; the first sentence of Section 4.16 (Environmental Matters); Section 4.20 (Pipeline Loans) or Section 4.26 (Representations Complete)) is qualified in any respect by materiality or by reference to a Seller Material Adverse Effect, for purposes of this provision such materiality or Seller Material Adverse Effect qualification will in all respects be ignored;

(ii)    any breach of or default in connection with any of the covenants or agreements given or made by Seller or Shareholder in this Agreement, any of the Ancillary Agreements, or any certificate, instrument or document required to be delivered to Buyer pursuant to this Agreement or any of the Ancillary Agreements; provided, however, that if any such covenant or agreement is qualified in any respect by materiality, for purposes of this provision such materiality qualification will in all respects be ignored;

(iii)   any Excluded Liability;

(iv)    the ownership or use of the Purchased Assets or the operation of the Seller's business on or before the Closing Date;

(v)     any failure of Seller to Service mortgage loans in accordance with the provisions of the Transition Services Agreement (disregarding any limitation of warranty or liability provisions contained therein); and

(vi)    the failure of Seller to comply (if required to comply) with any applicable bulk sales law.

(b)     Notwithstanding anything contained in this Agreement to the contrary, the Seller's and Shareholder's obligation to indemnify, defend and hold the Buyer Indemnified Parties harmless shall be limited as follows:

(i)     No claim may be asserted nor may any action be commenced against the Seller or Shareholder pursuant to Section 10.2(a)(i) unless written notice of such claim or action is received by the Seller describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or action on or prior to the date on which the representation or warranty on which such claim or action is based ceases to survive as provided herein, irrespective of whether the subject matter of such claim or action shall have occurred before or after such date.

(ii)    For purposes of computing the aggregate amount of claims against the Seller and Shareholder, the amount of each claim by a Buyer Indemnified Party shall be deemed to be an amount equal to, and any payments by the Seller or Shareholder pursuant to Section 10.2(a) shall be limited to, the amount of Losses that remain after deducting therefrom any insurance proceeds and any indemnity, contributions or other similar payment paid by any third party with respect thereto.

(iii)    No indemnity shall be payable pursuant to Section 10.2(a)(i) in respect of Losses arising from any particular claim or matter, unless and until all Losses arising from such particular matter exceed $1,500 (but in the event such related Losses exceed $1,500 then all such Losses shall be subject to indemnity pursuant to Section 10.2(a)(i)); provided, that multiple Losses of the same nature arising from a substantially identical cause, defect, error or a systemic problem, shall be aggregated and treated as one particular claim or matter. In addition, no indemnity shall be payable pursuant to Section 10.2(a)(i) unless and until the aggregate of all Losses (other than those excluded from indemnity by the foregoing sentence) suffered by Buyer Indemnified Parties shall exceed $300,000 in the aggregate (the "Indemnity Threshold"), and then only to the extent of Losses in excess of such amount. (For example, and for avoidance of doubt, a claim for $1,000 under Section 10.2(a)(i) would not be subject to indemnity and would not count toward the Indemnity Threshold, but a claim for $2,000 under such section would count toward the Indemnity Threshold.) The Indemnity Threshold set forth in the immediately preceding sentence shall not apply to Losses resulting from fraud or intentional misconduct by the Seller or its Affiliates, which shall be recoverable without respect to such threshold.

(iv)    Other than with respect to the (A) Seller's indemnification obligations pursuant to Section 10.2(a)(i) with respect to the representations and warranties contained in Sections 4.1 (Organization, Authority), 4.2 (No Conflict) 4.7 (Taxes), 4.8(a) (Title to Purchased Assets), and 4.16 (Environmental Matters) and (B) Seller's repurchase obligations under Section 10.2(c) and (d), (C) Seller's indemnification obligations pursuant Section 10.2(a)(iii)-(vi), and (D) Seller's Liabilities under any of the Ancillary Agreements, the aggregate liability of the Seller and Shareholder for Losses or otherwise with respect to the subject matter of this Agreement and the transactions contemplated hereby is, and shall be, limited to an aggregate amount equal to $3,000,000 (the "Seller's Liability Amount"), except in the event of fraud or intentional misconduct by the Seller or its Affiliates, and the Buyer, on behalf of itself and all Buyer Indemnified Parties, agrees not to seek recovery or indemnity for any such Losses in excess of the Seller's Liability Amount that may be sustained or incurred by any and all Buyer Indemnified Parties.

(c)    Notwithstanding any provision in Section 10.2(a) or (b) and 10.4 to the contrary, with respect to any Company Mortgage Loan purchased by Buyer from Seller at the Closing that is resold by the Buyer to a third party Investor in the ordinary course of business either pursuant to a Seller Investor Commitment or Forward Delivery Contract or a secondary market residential mortgage loan sale agreement (a "Covered Company Loan"), if an Approved Investor requests the repurchase of a Covered Company Loan based on an asserted breach of a representation or warranty, or if any other Investor requests the repurchase of a Covered Company Loan based on an asserted breach of a commercially reasonable and customary representation or warranty in its residential mortgage loan sale agreement with the Buyer, at the option of Buyer, Seller or Shareholder shall repurchase such Covered Company Loan from the Buyer or the applicable Investor, provided that written demand for the repurchase is received by

Seller from the Buyer within six (6) years after the Closing of the transactions contemplated in this Agreement. The price for such repurchase shall be the Repurchase Price, which shall be divided between the Buyer and Investor appropriately with the balance of the Repurchase Price in excess of the amount demanded by the Investor being paid to the Buyer. Prior to Buyer causing the Seller or the Shareholder to repurchase any Covered Company Loan under this Section 10.2(c), Buyer shall (i) promptly notify Seller of the assertion by a third party of a repurchase obligation, and (ii) either (A) give the Seller or the Shareholder the opportunity to cure, remedy or mitigate the Event, fact, claims, breach or other condition, as applicable, resulting in the repurchase obligation, and to assert defenses against such repurchase demand directly against the Investor making such repurchase demand, or (B) at the Seller or the Shareholder's request use reasonable efforts, in cooperation with and at the reasonable direction of Seller or the Shareholder, and at their cost and expense, to cure, remedy or mitigate the Event, fact, claim, breach or other condition resulting in the repurchase obligation, including using reasonable efforts to assert defenses or achieve a mutually agreeable settlement with a party entitled to require repurchase from Buyer.

(d)     In the event that, for the first due date for a Company Mortgage Loan on or subsequent to the Closing Date, the initial monthly payment is not made within thirty (30) days of such due date, or for the second or third due dates following the Closing Date, the related monthly payment is not made within thirty (30) days of such due date, then the Seller or the Shareholder shall repurchase such Company Mortgage Loan at the Repurchase Price upon demand of the Buyer. Prior to Buyer causing the Seller or the Shareholder to repurchase any Company Mortgage Loan under this Section 10.2(d), the Buyer shall (i) give the Seller or the Shareholder the opportunity to collect the amounts due under such Company Mortgage Loan, or (ii) at the Seller or the Shareholder's request, and at their cost and expense, use reasonable efforts, in cooperation with and at the reasonable direction of Seller or the Shareholder, to collect the amounts due under such Company Mortgage Loan.

For purposes of this section, (i) "Repurchase Price" means, with respect to any Company Mortgage Loan, a price equal to (A) the Stated Principal Balance of such mortgage loan, plus (B) interest on such Stated Principal Balance at the Mortgage Note interest rate from and including the last due date through which interest has been paid by or on behalf of the Mortgagor to either: (I) in the case where the Investor purchasing such mortgage loan was required in connection with such purchase to advance a full month's interest, the first day of the month following the date of repurchase, or (II) in all other cases, the date of repurchase of such mortgage loan, less, in each case, amounts received in respect of such repurchased mortgage loan which are being held for distribution in connection with such mortgage loan, plus (C) any unreimbursed servicing advances and any unpaid servicing fees allocable to such mortgage loan paid by any party other than the Seller, plus (D) any Losses incurred by the Buyer or the servicer in respect of the breach or defect giving rise to the repurchase obligation including any Losses incurred by any such party in connection with any violation by any such mortgage loan of any predatory or abusive lending Law, plus (E) any Final LHFS Other Accounts Amount related to such loan, as equitably allocated, (ii) "Stated Principal Balance" means, as to each Company Mortgage Loan as of any date of determination, (A) the principal balance of such Mortgage Loan as of the Closing Date, minus (B) all amounts previously distributed to the Buyer or its transferee with respect to the such mortgage loan representing payments or recoveries of principal; and (iii) "Approved Investor" means Fannie Mae, Freddie Mac or GNMA or any of the following companies or their Affiliates: Bear Stearns/EMC; Chase; Citimortgage/Citibank; Countrywide; CSFB; Deutsche

Bank; GMAC; Goldman Sachs; Greenpoint; Impac; IndyMac; Lehman/Aurora; Morgan Stanley; National City; RFC; Washington Mutual; or Wells Fargo.

10.3    Indemnification by the Buyer.

(a)    Subject to the other terms and conditions of this Agreement (including Section 10.3(b), the Buyer shall indemnify, defend and hold harmless the Seller and its Affiliates and their respective officers, directors, advisors, agents, employees, successors and assigns (the "Seller Indemnified Parties" and, together with the Buyer Indemnified Parties, the "Indemnified Parties") from and against any and all Losses directly or indirectly based upon, arising out of, resulting from or relating to:

(i)    any misrepresentation or inaccuracy in or breach of any of the representations or warranties given or made by Buyer in this Agreement, any of the Ancillary Agreements, or any certificate, instrument or document delivered to Seller pursuant to this Agreement or any of the Ancillary Agreements; provided, however, that if any such representation or warranty is qualified in any respect by materiality or by reference to a Buyer Material Adverse Effect, for purposes of this provision such materiality or Buyer Material Adverse Effect qualification will in all respects be ignored;

(ii)    any breach of or default in connection with any of the covenants or agreements given or made by Buyer in this Agreement, any of the Ancillary Agreements, or any certificate, instrument or document delivered to Seller pursuant to this Agreement or any of the Ancillary Agreements; provided, however, that if any such covenant or agreement is qualified in any respect by materiality, for purposes of this provision such materiality qualification will in all respects be ignored;

(iii)    from and after the Closing, any Seller Assumed Liability and any Shareholder Assumed Liability; and

(iv)    the ownership or use of the Purchased Assets or the operation of the Business following the Closing Date and the Servicing by any party of (i) the Company Mortgage Loans after Servicing is transferred and released from Seller, and (ii) any other mortgage loans originated or acquired by Buyer.

(b)    Notwithstanding anything contained in Section 10.3(a) to the contrary, the Buyer's obligation to indemnify, defend and hold the Seller Indemnified Parties harmless shall be limited as follows:

(i)    No claim may be asserted nor may any action be commenced against the Buyer pursuant to Section 10.3(a)(i) unless written notice of such claim or action is received by the Buyer describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or action on or prior to the date on which the representation or warranty on which such claim or action is based ceases to survive as set forth in Section 10.1, unless otherwise provided herein, irrespective of whether the subject matter of such claim or action shall have occurred before or after such date.

(ii)    For purposes of computing the aggregate amount of claims against the Buyer, the amount of each claim by a Seller Indemnified Party shall be deemed to be an amount equal to, and any payments by the Buyer pursuant to Section 10.3(a) shall be limited to,

61

the amount of Losses that remain after deducting therefrom any insurance proceeds and any indemnity, contributions or other similar payment paid by any third party with respect thereto.

(iii)     No indemnity shall be payable pursuant to Section 10.3(a)(i) unless and until the aggregate of all Losses suffered by Seller Indemnified Parties shall exceed the Indemnity Threshold in the aggregate, and then only to the extent of Losses in excess of such amount. The dollar threshold set forth in the immediately preceding sentence shall not apply to Losses resulting from fraud or intentional misconduct by the Buyer or its Affiliates, which shall be recoverable without respect to such threshold.

10.4     Indemnification Procedures.

(a)     Any Seller Indemnified Party or Buyer Indemnified Party (each, an "Indemnified Party") seeking indemnification hereunder shall give to the Party obligated to provide indemnification hereunder (the "Indemnitor") written notice of any claim or matter that gives rise to a claim for indemnification hereunder (a "Claim Notice"), promptly upon becoming aware of a fact, condition or event for which indemnification is provided under this Article X but in any event within thirty (30) days after such Person has actual knowledge of the facts constituting the basis for indemnification; provided, however, that the failure of an Indemnified Party to give such notice shall not relieve any Indemnitor of its obligations under this Agreement, except to the extent that such failure materially prejudices the rights of any such Indemnitor. The Claim Notice shall set forth Indemnified Party's good faith reasonable estimate of all Losses incurred or expected to be incurred pursuant to the claim.

(b)  -     The Indemnitor shall have the right to control and direct, through counsel of its own choosing reasonably satisfactory to the Indemnified Party, the defense or settlement of any proceeding brought by a Person who is not a Party or an Affiliate of a Party (a "Third Party Claim"), so long as (i) the Indemnitor is not otherwise a party to the proceeding or the Indemnified Party has otherwise determined in good faith that there would be no conflict of interest, (ii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (iii) the Indemnitor conducts the defense of the Third Party Claim actively and diligently and (iv) the Indemnitor keeps the Indemnified Party apprised of all developments, including settlement offers, with respect to the Third Party Claim and permits the Indemnified Party to participate in the defense of the Third Party Claim. With respect to any such Third Party Claim, the Indemnitor shall be liable for any settlement of such action effected pursuant to and in accordance with this section and for any final judgment (subject to any right of appeal).

(c)     So long as the Indemnitor is conducting the defense of the Third Party Claim in accordance with Section 10.4(b); (i) the Indemnitor will not be responsible for any attorneys' fees incurred by the Indemnified Party regarding the Third Party Claim (other than reasonable attorneys' fees incurred prior to the Indemnitor's assumption of the defense pursuant to Section 10.4(b)) and (ii) neither the Indemnified Party nor the Indemnitor will consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the other Party (which consent will not be unreasonably withheld, delayed or conditioned) unless such settlement (x) includes an unconditional release of the Indemnified Party from all liability on claims that are or could have been the subject matter of such action, and (y) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of the Indemnified Party. The Indemnified Party shall have the

right to effect a settlement over the objection of the Indemnitor; provided, however, that if (i) the Indemnitor is contesting the claim in good faith or (ii) the Indemnitor has assumed the defense from the Indemnified Party, the Indemnified Party must waive any right to indemnity therefor from Indemnitor. In no event shall the refusal of a Party to enter into or consent to a settlement that requires such Party to admit liability be considered unreasonable.

(d)    If any condition in Section 10.4(b) is or becomes unsatisfied, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim with the consent of the Indemnitor (which consent shall not be unreasonably withheld, delayed or conditioned), (ii) the Indemnitor will reimburse the Indemnified Party promptly and periodically (but no less often than monthly) for the costs of defending against the Third Party Claim, including reasonable attorneys' fees and expenses, and (iii) the Indemnitor will remain responsible for any Losses the Indemnified Party may incur relating to or arising out of the Third Party Claim to the fullest extent provided in this Article X.

10.5    Limitations.

(a)    To the extent that any Event, fact, claim, breach or other condition giving rise to a claim for indemnification under this Agreement against the Seller is capable of cure, remedy or mitigation, the Buyer must, as a condition precedent to asserting a claim for indemnification with respect thereto, afford the Seller a reasonable opportunity to cure, remedy or mitigate the Event, fact, claim, breach or other condition. The Buyer will use commercially reasonable efforts and/or assist the Seller, to cure, remedy or mitigate the Event, fact, claim, breach or other condition at the Seller's sole cost and expense.

(b)    To the extent the Seller or Shareholder indemnifies the Buyer with respect to any claim under this Agreement, the Buyer will assign to the Seller, to the fullest extent allowable, its rights and causes of action with respect to such claim against other Persons, or in the event assignment is not permissible, the Seller will be allowed to pursue, at the Seller's expense, such claim in the name of the Buyer. If there are recoveries with respect to such a claim, the Seller will be entitled to retain all such recoveries. The Buyer will provide the Seller and the Shareholder reasonable assistance in pursuing any such claim, including making its books and records relating to such claim available to the Seller, its Affiliates and Representatives, and making its employees available for interviews, testimony and similar assistance. If the Buyer or any of its Affiliates recovers from a third party any part of a claim that has previously been paid by the Seller pursuant to this Agreement, the Buyer will promptly remit to the Seller the amount paid by the Seller as indemnification with respect to such claim.

(c)    "Losses" shall not include any losses, liabilities, damages, remediation costs, fines, penalties, demands, claims, actions, judgments, causes of action, costs and expenses (a) relating to the passing of, or any change in, any Law after the date of this Agreement even if the change has retroactive effect or (b) resulting from the Buyer's failure to comply with any Laws after the Closing Date. "Losses" shall be calculated net of Tax benefits actually realized and, as provided in Sections 10.2(b)(ii) and 10.3(b)(ii), any indemnity, contributions or other payments paid by any third party with respect thereto. "Losses" do not include incidental or consequential damages or diminution in value. No "multiple of earnings" or other similar Loss calculation methodology will be applied in calculating any Loss that may be claimed hereunder.

(d)    After the Closing, except for remedies that cannot be waived as a matter of law, the enforcement of the indemnification provisions of Article X shall be the exclusive remedy, other than in the case of fraud of the Parties, for any breach of any warranty, representation, covenant or agreement contained in this Agreement; provided, however, that such exclusivity shall not limit or restrict a Party's ability to obtain specific performance or injunctive relief.

## ARTICLE XI
## MISCELLANEOUS

11.1    Assignment. This Agreement and the rights hereunder shall not be assignable or transferable by any Party without the prior written consent of the other Parties hereto. This Agreement shall inure to the benefit of, and be binding upon and enforceable against, the respective successors and permitted assigns of the Parties.

11.2    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties and such respective successors and permitted assigns, any legal or equitable rights hereunder.

11.3    Termination.

(a)    This Agreement may be terminated by written notice (given by the Buyer to the Seller or by the Seller to the Buyer, as the case may be):

(i)    by either the Seller or the Buyer, if the Closing shall not have occurred on or before December 31, 2006 (the "Termination Date") (unless the failure to consummate the transactions contemplated hereby is attributable to a failure on the part of the Party seeking to terminate this Agreement to perform any material obligation required to be performed by such Party at or prior to the Closing);

(ii)    by either the Seller or the Buyer, if (A) the purchase and sale of the Purchased Assets contemplated hereby violates any non-appealable final order, decree or judgment of any Governmental Authority having competent jurisdiction or (B) there exists a Law which makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited;

(iii)    by the Buyer, if it is not in material breach of its obligations under this Agreement, and if (A) at any time that any of the representations and warranties of the Seller herein become untrue or inaccurate such that Section 3.2(a) would not be satisfied or (B) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that Section 3.2(b) would not be satisfied, and, in both case (A) and case (B), such breach (if curable) has not been cured within thirty (30) days after the Buyer has provided written notice of such breach to the Seller; or

(iv)    by the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (A) at any time that any of the representations and warranties of the Buyer herein become untrue or inaccurate such that Section 3.3(a) would not be satisfied or (B) there has been a breach on the part of the Buyer of any of its covenants or agreements contained in this Agreement such that Section 3.3(b) would not be satisfied, and, in

64

both case (A) and case (B), such breach (if curable) has not been cured within thirty (30) days after the Seller has provided written notice of such breach to the Buyer.

        (b)    In the event of termination by the Seller or the Buyer pursuant to paragraph (a) of this Section 11.3, written notice thereof shall be given to the other Party and the transactions contemplated by this Agreement shall be terminated without further action by any Party. If the transactions contemplated by this Agreement are terminated as provided herein:

        (i)    The Buyer shall return all documents and other material received from the Seller, the Shareholder or any of their respective Affiliates or Representatives relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Seller;

        (ii)    all confidential information received by the Buyer with respect to the Business shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement; and

        (iii)    the provisions of Sections 6.2(a), 6.2(c), 11.3, 11.4, 11.7, 11.8, 11.10, 11.11, 11.12, 11.13, and 11.15 hereof shall remain in full force and effect.

        (c)    In no event shall any termination of this Agreement limit or restrict the rights and remedies of a Party hereto against the other Party which has willfully breached any of the agreements or other provisions of this Agreement prior to termination hereof.

        (d)    In the event that (A)(i) all of the Seller's and the Shareholder's closing conditions set forth in Sections 3.1 and 3.3 have been met, (ii) the Agreement has not been terminated in accordance with Section 11.3, and (iii) the Buyer agrees to close the transactions contemplated by this Agreement but the Seller refuses to close the transactions contemplated by this Agreement, or (B) this Agreement is terminated by the Buyer or Seller pursuant to Section 11.3(a)(i) and the condition set forth in Section 3.2(h) (No Seller Material Adverse Effect) is not satisfied at such time (other than as a result of the departure of any Seller employee or employees or the unwillingness of any Seller employee or employees to accept employment with Buyer), then the Seller or the Shareholder shall reimburse the Buyer for the reasonable and documented out-of-pocket expenses and fees incurred by the Buyer and its Affiliates on or prior to date of such refusal to close or termination and incurred in connection with this Agreement and the transactions contemplated by this Agreement, up to (but not to exceed) the amount of $1,300,000. In the event that (A) (i) all of the Buyer's closing conditions set forth in Sections 3.1 and 3.2 have been met, (ii) the Agreement has not been terminated in accordance with Section 11.3, and (iii) the Seller agrees to close the transactions contemplated by this Agreement but the Buyer refuses to close the transactions contemplated by this Agreement, or (B) this Agreement is terminated by Buyer or Seller pursuant to Section 11.3(a)(i) and a Buyer Material Adverse Effect has occurred, then the Buyer shall reimburse the Seller for the reasonable and documented out-of-pocket expenses and fees incurred by the Seller and its Affiliates on or prior to date of such refusal to close or termination and incurred in connection with this Agreement and the transactions contemplated by this Agreement, up to (but not to exceed) the amount of $1,300,000. Any such expenses due hereunder shall be paid within three (3) Business Days after the Party to be reimbursed has submitted to the other Party reasonable documentation evidencing the amount of such expenses and fees. The remedy provided in this Section 11.3 shall not

prevent the assertion by a Party of any other rights or the seeking of any other remedies such Party may have against any other Party.

11.4    Expenses. Except as provided in Section 11.3(d), whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs or expenses.    Notwithstanding the foregoing, the Seller shall pay when due all documentary, stamp, sales, transfer, excise, or other Taxes incurred in connection with the consummation of the transactions contemplated by this Agreement. The Seller shall, at its own expense, file all necessary Tax Returns and other documentation with respect to such Taxes and fees.

11.5    Amendments. No amendment to or modification of this Agreement shall be effective unless it shall be in writing and signed by the Buyer and the Seller.

11.6    Notices. All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally, (b) on the date of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission, (c) on the Business Day after delivery to a reputable nationally recognized overnight courier service with the requisite payment and instructions to effect delivery on the next Business Day, or (d) upon receipt after being mailed by registered or certified mail (return receipt requested) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

(i)    If to the Buyer, to:

Freedom Mortgage Corporation
907 Pleasant Valley Avenue,
Suite 3
Mt. Laurel, New Jersey  08054
Attention: Stanley Middleman, Chief Executive Officer
Facsimile: (775) 593-5131

With a required copies to:

Brian Simon, Senior Vice President, at the above address
David Altman, Corporate Counsel, at the above address

Zukerman Gore & Brandeis, LLP
875 Third Avenue
New York, New York 10022
Attention: Nathaniel S. Gore, Esq.
Facsimile: (212) 223-6433

(ii)    If to the Seller, to:

Irwin Mortgage Corporation
500 Washington Street
Columbus, Indiana 47201

Attention: Thomas D. Washburn, Chairman
Facsimile:

With a required copy to:

Irwin Union Bank & Trust Company
500 Washington Street
Columbus, Indiana 47201

Attention: Steven R. Schultz, First Vice President and General
Counsel
Facsimile: 812-376-1709

(iii)    If to the Shareholder, to:

Irwin Financial Corporation
500 Washington Street
Columbus, Indiana 47201

Attention: William Miller, Chairman
Facsimile: 812-376-1709

With a required copy to:

Steven R. Schultz, First Vice President and General Counsel,
at the above address

Such addresses may be changed from time to time by means of a notice given in the manner provided in this Section 11.6 (provided that no such notice shall be effective until it is received by the other Party hereto).

11.7    Consent to Jurisdiction.    THE PARTIES AGREE TO BE SUBJECT TO PERSONAL JURISDICTION IN THE STATE OF DELAWARE WITH REGARD TO ANY ACTION OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE PARTIES FURTHER AGREE THAT ANY ACTION OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR, IN THE ABSENCE OF FEDERAL JURISDICTION, IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE, COUNTY OF NEWCASTLE, OR IN THE ABSENCE OF THE

JURISDICTION OF EITHER THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR THE COURT OF CHANCERY OF THE STATE OF DELAWARE, COUNTY OF NEWCASTLE, IN A COURT IN THE STATE OF DELAWARE WITH PROPER JURISDICTION TO HEAR THE DISPUTE. THE PARTIES FURTHER: (a) AGREE NOT TO BRING ANY ACTION RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY OTHER COURT (EXCEPT TO ENFORCE THE JUDGMENT OF SUCH COURTS), (b) AGREE NOT TO OBJECT TO VENUE IN SUCH COURTS OR TO CLAIM THAT SUCH FORUM IS INCONVENIENT AND (c) AGREE THAT NOTICE OR THE SERVICE OF PROCESS IN ANY PROCEEDING SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY SECTION 11.6.

11.8    Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

11.9    Waiver.  Waiver of any term or condition of this Agreement by any Party shall be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of any other term of this Agreement.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

11.10    Counterparts; Facsimile.  This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when one (1) or more such counterparts have been signed by each Party and delivered to the other Party.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

11.11    Entire Agreement.    This Agreement, including the Ancillary Agreements, Disclosure Schedules and Exhibits hereto, and the Confidentiality Agreement contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and understandings, oral or written, relating to such subject matter.

11.12    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without regard to the conflicts of law principles thereof.

11.13    Interpretation.  All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars.  The table of contents and headings contained in this Agreement or any schedules hereto are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation."

Unless the context otherwise requires, references in this Agreement to Articles, Sections, Exhibits and Disclosure Schedules shall be deemed references to Articles and Sections of, and Exhibits and Disclosure Schedules to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.    All references to Contracts, agreements, leases or other arrangements shall refer to oral as well as written matters. The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Nothing in this Agreement shall be construed to require any Party hereto to violate any Law.

11.14  Disclosure Schedules.  Disclosures included in the Disclosure Schedules hereto shall be considered to be made for all purposes of this Agreement. Inclusion of any matter or item in any section of the Disclosure Schedules does not imply that such matter or item would, under the provisions of this Agreement, have to be included in any other section of the Disclosure Schedules or that such matter or term is otherwise material. Each item disclosed in the Disclosure Schedules shall constitute an exception to the representation and warranty to which it relates and shall be deemed to be disclosed with respect to each section of the Disclosure Schedules and for any representation or warranty contained in this Agreement, so long as the applicability of such item is reasonably apparent from such disclosure.

11.15  Certain Understandings.  Each of the Parties is a sophisticated Person that was advised by experienced counsel and, to the extent it deemed necessary, other advisors in connection with this Agreement. Accordingly, each of the Parties hereby acknowledges that (a) no Party has relied or will rely in respect of this Agreement or the transactions contemplated hereby upon any document or written or oral information previously furnished to or discovered by it or its Representatives, other than this Agreement (including the Disclosure Schedules hereto) and (b) the Parties' respective rights and obligations with respect to this Agreement and the events giving rise thereto will be solely as set forth in this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed as of the date first written above.

<u>BUYER</u>:

**FREEDOM MORTGAGE CORPORATION**

By: _____

   Name: Stanley Middleman

   Title:  Chief Executive Officer

<u>SELLER</u>:

**IRWIN MORTGAGE CORPORATION**

By: _____

   Name:

   Title:

<u>SHAREHOLDER</u>:

**IRWIN FINANCIAL CORPORATION**

By: _____

   Name:

   Title:

**[Signature Page to Asset Purchase Agreement]**

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

FREEDOM MORTGAGE CORPORATION

By: _____

    Name:

    Title:

**SELLER:**

IRWIN MORTGAGE CORPORATION

By: _____

    Name:  Robert H. Griffith

    Title:  President and Chief Executive Officer

**SHAREHOLDER:**

IRWIN FINANCIAL CORPORATION

By: _____

    Name:  Gregory F. Ehlinger

    Title:  Chief Financial Officer and
           Senior Vice President

# EXHIBIT A

# Part 3 of 4

**Schedule 1.1(a)(i)**
Seller's Knowledge Parties

Thomas D. Washburn, Chairman

Gregory F. Ehlinger, Director

William I. Miller, Director

Matthew F. Souza, Director

Robert H. Griffith, President and Chief Executive Officer

Terry L. Acree, Senior Vice President, Wholesale and Retail Lending

Duncan Y. Chiu, Senior Vice President, Loan Administration

John F. Macke, Senior Vice President, Strategic Planning and Business Development

Timothy L. Murphy, Senior Vice President and Chief Financial Officer

Steven R. Schultz, Secretary

David S. Meyercord, President, Irwin Shared Services

Mark Braden, Chief Information Officer and Senior Vice President

**Schedule 1.1(a)(ii)**
Buyer's Knowledge Parties

Stan Middleman, Chief Executive Officer

Brian Simon, Senior Vice President, Development

Stan Moskowitz, Chief Financial Officer

David Altman, Corporate Counsel

April Schneider, Director of Capital Markets

Terri Waring, Chief Credit Officer

Robert D'Urbano, Chief Information Officer

Gerard DeVita, Vice President, Financial Planning & Analysis

John Ricca, Division Manager

**Schedule 1.1(a)(i)**
Seller's Knowledge Parties

Thomas D. Washburn, Chairman

Gregory F. Ehlinger, Director

William I. Miller, Director

Matthew F. Souza, Director

Robert H. Griffith, President and Chief Executive Officer

Terry L. Acree, Senior Vice President, Wholesale and Retail Lending

Duncan Y. Chiu, Senior Vice President, Loan Administration

John F. Macke, Senior Vice President, Strategic Planning and Business Development

Timothy L. Murphy, Senior Vice President and Chief Financial Officer

Steven R. Schultz, Secretary

David S. Meyercord, President, Irwin Shared Services

Mark Braden, Chief Information Officer and Senior Vice President

### Schedule 1.1(a)(ii)
Buyer's Knowledge Parties

Stan Middleman, Chief Executive Officer

Brian Simon, Senior Vice President, Development

Stan Moskowitz, Chief Financial Officer

David Altman, Corporate Counsel

April Schneider, Director of Capital Markets

Terri Waring, Chief Credit Officer

Robert D'Urbano, Chief Information Officer

Gerard DeVita, Vice President, Financial Planning & Analysis

John Ricca, Division Manager

3

**Schedule 1.1(b)(i)**
Company Mortgage Loans

See Attachment 1.1(b)(i), which is incorporated herein by reference.

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| **Funded Loans Held for Sale:** | | | | | | | |
| 80806920 | 46,327.38 | 1,276.00 | 7.250 | 05/31/06 | 6/6/2006 | 108 | 10/1/2006 |
| 80901028 | 115,430.00 | (1,465.96) | 7.500 | 06/27/06 | 6/28/2006 | 81 | 10/1/2006 |
| 80903297 | 188,000.00 | (876.08) | 8.125 | 06/28/06 | 6/30/2006 | 80 | 10/1/2006 |
| 80894280 | 115,760.00 | 121.55 | 8.500 | 06/29/06 | 7/5/2006 | 79 | 10/1/2006 |
| 80889918 | 169,099.99 | (1,851.65) | 8.625 | 07/07/06 | 7/7/2006 | 71 | 10/1/2006 |
| 80913221 | 280,000.00 | (632.80) | 7.250 | 06/30/06 | 7/7/2006 | 78 | 9/1/2006 |
| 80869795 | 242,131.15 | (332.29) | 6.750 | 07/10/06 | 7/10/2006 | 68 | 10/1/2006 |
| 80914377 | 60,971.62 | - | 10.345 | 06/30/06 | 7/11/2006 | 78 | 10/1/2006 |
| 80902737 | 165,600.00 | 505.08 | 7.500 | 07/11/06 | 7/11/2006 | 67 | 10/1/2006 |
| 80889934 | 228,954.00 | (2,667.32) | 8.500 | 07/07/06 | 7/11/2006 | 71 | 10/1/2006 |
| 80881212 | 41,178.21 | 359.25 | 12.875 | 07/12/06 | 7/12/2006 | 66 | 10/1/2006 |
| 80872146 | 181,100.00 | (1,812.81) | 8.750 | 07/14/06 | 7/14/2006 | 64 | 10/1/2006 |
| 80967250 | 136,600.00 | (177.58) | 7.625 | 07/14/06 | 7/17/2006 | 64 | 10/1/2006 |
| 80841760 | 175,405.00 | (473.59) | 7.250 | 07/17/06 | 7/17/2006 | 61 | 10/1/2006 |
| 80962533 | 212,450.00 | (2,390.06) | 7.750 | 07/14/06 | 7/17/2006 | 64 | 10/1/2006 |
| 80922123 | 292,467.00 | (541.12) | 7.250 | 07/11/06 | 7/17/2006 | 67 | 10/1/2006 |
| 80959224 | 367,174.00 | (4,344.57) | 7.250 | 07/13/06 | 7/17/2006 | 65 | 10/1/2006 |
| 80954431 | 240,000.00 | (2,640.00) | 8.500 | 07/13/06 | 7/18/2006 | 65 | 10/1/2006 |
| 80881543 | 236,260.99 | (366.20) | 8.500 | 07/05/06 | 7/19/2006 | 73 | 10/1/2006 |
| 80893951 | 241,781.07 | 7,338.24 | 6.000 | 07/20/06 | 7/20/2006 | 58 | 9/1/2006 |
| 80900590 | 272,800.00 | (3,028.08) | 8.375 | 07/20/06 | 7/20/2006 | 58 | 10/1/2006 |
| 80952609 | 332,000.00 | (1,248.32) | 9.875 | 07/13/06 | 7/20/2006 | 65 | 10/1/2006 |
| 80956675 | 80,000.00 | 13.60 | 8.125 | 07/21/06 | 7/21/2006 | 57 | 10/1/2006 |
| 80979271 | 112,000.00 | 57.12 | 9.750 | 07/21/06 | 7/21/2006 | 57 | 9/1/2006 |
| 80954886 | 409,500.00 | (7,862.40) | 7.750 | 07/21/06 | 7/21/2006 | 57 | 10/1/2006 |
| 73680068 | 162,662.82 | - | 6.750 | 07/24/06 | 7/24/2006 | 54 | 10/1/2006 |
| 80932882 | 163,154.36 | (1,609.37) | 4.990 | 07/20/06 | 7/24/2006 | 58 | 10/1/2006 |
| 80973142 | 268,000.00 | (3,363.40) | 7.375 | 07/24/06 | 7/24/2006 | 54 | 10/1/2006 |
| 80875933 | 181,946.28 | - | 5.625 | 07/25/06 | 7/25/2006 | 53 | 10/1/2006 |
| 80981418 | 267,960.00 | (241.16) | 7.375 | 07/21/06 | 7/25/2006 | 57 | 10/1/2006 |
| 80943533 | 52,500.00 | (1,031.63) | 8.500 | 07/26/06 | 7/26/2006 | 52 | 9/1/2006 |
| 80810450 | 100,908.69 | 2,299.77 | 6.500 | 07/26/06 | 7/26/2006 | 52 | 10/1/2006 |
| 80989452 | 128,800.00 | (115.92) | 7.500 | 07/24/06 | 7/27/2006 | 54 | 10/1/2006 |
| 80975709 | 158,400.00 | (1,987.92) | 8.375 | 07/25/06 | 7/27/2006 | 53 | 10/1/2006 |
| 80955370 | 170,392.00 | (76.68) | 7.500 | 07/27/06 | 7/27/2006 | 51 | 10/1/2006 |
| 80905755 | 43,178.75 | 782.35 | 9.500 | 07/28/06 | 7/28/2006 | 50 | 10/1/2006 |
| 80835523 | 190,899.00 | (76.36) | 8.500 | 07/28/06 | 7/28/2006 | 50 | 10/1/2006 |
| 80891872 | 207,050.00 | (1,944.20) | 9.750 | 07/28/06 | 7/28/2006 | 50 | 10/1/2006 |
| 80657612 | 211,616.00 | (5,023.76) | 7.500 | 07/28/06 | 7/28/2006 | 50 | 10/1/2006 |
| 80802044 | 214,000.00 | (941.60) | 7.250 | 07/28/06 | 7/28/2006 | 50 | 10/1/2006 |
| 80982283 | 333,440.00 | (2,277.40) | 6.875 | 07/26/06 | 7/28/2006 | 52 | 10/1/2006 |
| 80891740 | 135,000.00 | (1,478.25) | 8.375 | 07/31/06 | 7/31/2006 | 47 | 10/1/2006 |
| 80817026 | 163,292.00 | 269.43 | 8.375 | 07/31/06 | 7/31/2006 | 47 | 10/1/2006 |
| 80964778 | 166,000.00 | (2,896.70) | 8.375 | 07/31/06 | 7/31/2006 | 47 | 9/1/2006 |
| 80813199 | 203,208.00 | (2,013.79) | 8.250 | 07/31/06 | 7/31/2006 | 47 | 10/1/2006 |
| 80960297 | 229,600.00 | 151.54 | 7.875 | 07/31/06 | 7/31/2006 | 47 | 10/1/2006 |
| 80974769 | 229,600.00 | (1,308.72) | 8.250 | 07/31/06 | 7/31/2006 | 47 | 10/1/2006 |
| 80865165 | 102,400.00 | 4,094.98 | 6.750 | 07/28/06 | 8/1/2006 | 50 | 9/1/2006 |
| 80973324 | 156,436.00 | (31.29) | 6.500 | 07/28/06 | 8/1/2006 | 50 | 10/1/2006 |
| 80961790 | 206,615.99 | (301.66) | 8.375 | 07/27/06 | 8/1/2006 | 51 | 10/1/2006 |
| 80984669 | 95,130.00 | (185.51) | 7.250 | 07/31/06 | 8/2/2006 | 47 | 9/1/2006 |
| 80957293 | 159,529.99 | (2,265.33) | 7.875 | 08/02/06 | 8/2/2006 | 45 | 10/1/2006 |
| 80964752 | 289,000.00 | (4,011.32) | 8.000 | 07/25/06 | 8/2/2006 | 53 | 10/1/2006 |
| 80987266 | 192,500.00 | (3,499.65) | 7.875 | 08/03/06 | 8/3/2006 | 44 | 10/1/2006 |
| 80877988 | 45,850.00 | (71.07) | 8.000 | 08/02/06 | 8/4/2006 | 45 | 10/1/2006 |
| 80939036 | 121,000.00 | (1,139.82) | 7.125 | 08/04/06 | 8/4/2006 | 43 | 10/1/2006 |
| 80968126 | 157,600.00 | (1,048.04) | 8.375 | 08/04/06 | 8/4/2006 | 43 | 10/1/2006 |
| 80973688 | 209,600.00 | (3,144.00) | 7.625 | 07/28/06 | 8/4/2006 | 50 | 10/1/2006 |
| 80983448 | 136,000.00 | (1,387.20) | 8.625 | 08/07/06 | 8/7/2006 | 40 | 10/1/2006 |
| 80999873 | 172,500.00 | (1,888.88) | 7.625 | 08/04/06 | 8/7/2006 | 43 | 10/1/2006 |
| 80999899 | 236,250.00 | (2,586.94) | 7.625 | 08/04/06 | 8/7/2006 | 43 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 80919681 | 199,920.00 | (491.80) | 9.000 | 08/09/06 | 8/9/2006 | 38 | 10/1/2006 |
| 80933328 | 417,000.00 | (5,091.57) | 8.000 | 08/04/06 | 8/9/2006 | 43 | 9/1/2006 |
| 80892847 | 159,865.58 | (1,680.00) | 6.875 | 08/10/06 | 8/10/2006 | 37 | 10/1/2006 |
| 80956758 | 182,880.00 | (1,133.86) | 7.500 | 08/10/06 | 8/10/2006 | 37 | 10/1/2006 |
| 81006553 | 25,000.00 | 226.25 | 12.750 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 81019580 | 54,000.00 | (858.60) | 8.250 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 81006512 | 100,000.00 | (911.00) | 7.875 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 73044786 | 108,954.22 | - | 8.000 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 81005373 | 129,231.93 | 2,992.86 | 5.000 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 80962566 | 181,993.00 | (1,774.43) | 7.750 | 08/11/06 | 8/11/2006 | 36 | 10/1/2006 |
| 80992779 | 50,750.00 | (806.93) | 8.750 | 08/14/06 | 8/14/2006 | 33 | 10/1/2006 |
| 81043960 | 102,480.00 | 393.52 | 6.125 | 08/14/06 | 8/14/2006 | 33 | 10/1/2006 |
| 80797038 | 207,208.00 | - | 8.000 | 08/14/06 | 8/14/2006 | 33 | 10/1/2006 |
| 80960057 | 290,630.54 | 2,531.26 | 5.500 | 08/14/06 | 8/14/2006 | 33 | 10/1/2006 |
| 81021370 | 24,000.00 | 258.96 | 7.250 | 08/11/06 | 8/15/2006 | 36 | 10/1/2006 |
| 81019721 | 135,481.00 | (1,517.38) | 8.375 | 08/15/06 | 8/15/2006 | 32 | 10/1/2006 |
| 80992100 | 163,000.00 | 118.99 | 6.750 | 08/10/06 | 8/15/2006 | 37 | 10/1/2006 |
| 80985716 | 182,000.00 | (3,084.90) | 7.625 | 08/11/06 | 8/15/2006 | 36 | 10/1/2006 |
| 81033839 | 270,000.00 | (3,753.00) | 7.000 | 08/11/06 | 8/15/2006 | 36 | 10/1/2006 |
| 80954506 | 106,896.00 | 377.34 | 6.125 | 08/16/06 | 8/16/2006 | 31 | 10/1/2006 |
| 80809627 | 123,922.00 | 2,483.74 | 5.750 | 08/16/06 | 8/16/2006 | 31 | 10/1/2006 |
| 81007205 | 132,960.00 | (1,688.59) | 8.000 | 08/16/06 | 8/16/2006 | 31 | 10/1/2006 |
| 81020612 | 153,500.00 | (758.29) | 6.750 | 08/17/06 | 8/17/2006 | 30 | 10/1/2006 |
| 80925928 | 38,000.00 | (332.88) | 6.875 | 08/18/06 | 8/18/2006 | 29 | 10/1/2006 |
| 81029373 | 44,000.00 | 1,320.00 | 9.700 | 08/11/06 | 8/18/2006 | 36 | 10/1/2006 |
| 81018160 | 58,000.00 | (490.68) | 6.750 | 08/18/06 | 8/18/2006 | 29 | 10/1/2006 |
| 80973308 | 68,000.00 | (1,500.00) | 8.750 | 08/16/06 | 8/18/2006 | 31 | 10/1/2006 |
| 81004871 | 222,000.00 | (2,508.60) | 8.125 | 08/18/06 | 8/18/2006 | 29 | 10/1/2006 |
| 80993702 | 29,950.00 | (299.50) | 11.050 | 08/21/06 | 8/21/2006 | 26 | 10/1/2006 |
| 81012239 | 128,000.00 | (1,319.68) | 8.000 | 08/09/06 | 8/21/2006 | 38 | 10/1/2006 |
| 80994544 | 192,000.00 | (1,113.60) | 7.375 | 08/15/06 | 8/21/2006 | 32 | 10/1/2006 |
| 81011553 | 17,000.00 | (297.50) | 13.800 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80955016 | 36,750.00 | 1,330.35 | 9.875 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 81008658 | 68,000.00 | (1,142.40) | 8.500 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80980238 | 74,750.00 | (1,238.61) | 7.625 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 81024135 | 78,400.00 | (1,470.00) | 8.500 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 81012064 | 80,000.00 | (197.60) | 7.625 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80980469 | 84,500.00 | (1,400.17) | 7.625 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80954928 | 110,250.00 | (1,286.62) | 7.375 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80982069 | 132,000.00 | (1,096.92) | 8.750 | 08/18/06 | 8/22/2006 | 29 | 10/1/2006 |
| 80983745 | 140,000.00 | 306.60 | 8.000 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80981988 | 142,405.00 | 771.84 | 8.875 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80980360 | 143,200.00 | (1,759.93) | 7.250 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 81007916 | 191,950.00 | (2,399.38) | 7.875 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80996077 | 200,000.00 | (3,750.00) | 7.000 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80955990 | 206,500.00 | 1,422.79 | 7.375 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 81019648 | 219,500.00 | (599.24) | 7.000 | 08/17/06 | 8/22/2006 | 30 | 10/1/2006 |
| 80979008 | 235,125.00 | (1,109.79) | 6.875 | 08/22/06 | 8/22/2006 | 25 | 10/1/2006 |
| 80933468 | 39,687.91 | (289.67) | 8.500 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 80993819 | 68,667.00 | (1,132.32) | 7.250 | 08/23/06 | 8/23/2006 | 24 | 9/1/2006 |
| 81003014 | 74,270.00 | - | 7.125 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81056996 | 101,600.00 | (91.44) | 7.750 | 08/21/06 | 8/23/2006 | 26 | 10/1/2006 |
| 81046831 | 132,000.00 | - | 7.250 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81046500 | 133,200.00 | (1,332.00) | 6.375 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81030264 | 135,000.00 | (1,856.25) | 7.125 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81010035 | 141,600.00 | 359.66 | 7.250 | 08/22/06 | 8/23/2006 | 25 | 10/1/2006 |
| 81012247 | 172,000.00 | (2,967.00) | 7.500 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81038333 | 176,250.00 | (888.54) | 7.750 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 80966666 | 192,000.00 | (4,289.28) | 7.375 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81050726 | 199,000.00 | (69.65) | 7.125 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 80989270 | 212,000.00 | (2,696.64) | 8.500 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 80957780 | 216,000.00 | 1,080.00 | 7.500 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 80903271 | 400,882.00 | (9,067.96) | 7.750 | 08/23/06 | 8/23/2006 | 24 | 10/1/2006 |
| 81022063 | 54,400.00 | (1,085.28) | 8.375 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81045833 | 62,400.00 | (1,394.64) | 7.250 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81038572 | 70,000.00 | (105.70) | 7.125 | 08/23/06 | 8/24/2006 | 24 | 10/1/2006 |
| 80975162 | 93,600.00 | (288.29) | 9.500 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81012601 | 93,600.00 | (119.81) | 9.500 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 80983505 | 98,000.00 | (257.74) | 8.375 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81007866 | 107,200.00 | (96.48) | 7.750 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 60997901 | 116,000.00 | - | 7.750 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81009250 | 124,355.00 | (1,270.91) | 6.875 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 80878200 | 130,935.00 | (940.11) | 6.875 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81020570 | 160,800.00 | 968.02 | 7.000 | 08/23/06 | 8/24/2006 | 24 | 10/1/2006 |
| 80997521 | 175,000.00 | (1,450.75) | 7.250 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81042129 | 178,400.00 | (2,941.82) | 7.000 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 80985849 | 190,400.00 | (800.00) | 7.250 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81003220 | 224,000.00 | (3,357.76) | 7.250 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81063828 | 292,000.00 | (5,451.64) | 9.250 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81004921 | 302,800.00 | (2,564.72) | 7.625 | 08/24/06 | 8/24/2006 | 23 | 10/1/2006 |
| 81031551 | 40,250.00 | (447.98) | 14.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81009557 | 49,098.00 | 122.75 | 12.575 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81037681 | 52,000.00 | - | 7.000 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 80737141 | 62,300.00 | 1,212.36 | 10.000 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81042913 | 72,000.00 | (688.32) | 7.500 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81045080 | 72,000.00 | (823.68) | 7.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81031262 | 74,750.00 | (1,849.32) | 7.250 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81044885 | 76,032.00 | (869.81) | 7.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81025157 | 76,800.00 | (1,220.35) | 7.500 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81009516 | 91,181.00 | (1,906.59) | 7.125 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81000986 | 92,800.00 | 845.41 | 7.750 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 80975170 | 94,400.00 | (196.35) | 9.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81042616 | 94,400.00 | (196.35) | 9.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81018855 | 105,000.00 | (562.80) | 6.500 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81047755 | 105,000.00 | (1,625.40) | 7.625 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81057127 | 115,200.00 | (1,014.91) | 7.000 | 08/23/06 | 8/25/2006 | 24 | 10/1/2006 |
| 80737091 | 115,700.00 | (2,566.23) | 7.250 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81059206 | 129,600.00 | (129.60) | 7.125 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81010571 | 137,600.00 | - | 7.500 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81002289 | 139,920.00 | 243.46 | 7.250 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81028771 | 143,000.00 | - | 6.750 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 80993140 | 150,000.00 | (115.50) | 7.625 | 08/23/06 | 8/25/2006 | 24 | 10/1/2006 |
| 81007015 | 171,200.00 | - | 6.625 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 80969652 | 171,500.00 | 852.36 | 7.000 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81014409 | 171,610.00 | (229.98) | 7.125 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81006256 | 180,000.00 | (1,632.60) | 8.250 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81015349 | 208,000.00 | (3,619.20) | 7.500 | 08/24/06 | 8/25/2006 | 23 | 10/1/2006 |
| 81034134 | 210,900.00 | (4,376.17) | 7.125 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81036949 | 217,600.00 | (3,542.53) | 6.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81001703 | 240,000.00 | - | 6.625 | 08/25/06 | 8/25/2006 | 22 | 10/1/2008 |
| 81056954 | 262,500.00 | (5,410.13) | 7.750 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 80966534 | 1,000,000.00 | (5,660.00) | 6.875 | 08/25/06 | 8/25/2006 | 22 | 10/1/2006 |
| 81032880 | 37,950.00 | (379.50) | 10.675 | 08/23/08 | 8/28/2006 | 24 | 10/1/2006 |
| 81016792 | 42,300.00 | (317.25) | 13.020 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81070583 | 47,400.00 | (3.79) | 13.000 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81040818 | 60,200.00 | (990.29) | 7.000 | 08/25/06 | 8/28/2006 | 22 | 10/1/2006 |
| 81033912 | 84,000.00 | (325.08) | 7.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80929417 | 94,818.88 | 614.65 | 6.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80996994 | 97,520.00 | 44.86 | 7.250 | 08/25/06 | 8/28/2006 | 22 | 10/1/2006 |
| 81054777 | 98,640.00 | (1,875.15) | 7.500 | 08/24/06 | 8/28/2006 | 23 | 10/1/2006 |
| 81016743 | 98,700.00 | (1,490.37) | 7.625 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80954969 | 103,425.09 | 1,699.27 | 7.625 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80887557 | 108,000.00 | 3,240.00 | 6.125 | 08/22/06 | 8/28/2006 | 25 | 10/1/2006 |
| 80885726 | 112,800.00 | (271.85) | 7.000 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81017352 | 121,000.00 | (2,410.32) | 7.000 | 08/23/06 | 8/28/2006 | 24 | 10/1/2006 |
| 81042202 | 123,300.00 | 752.13 | 6.375 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80992563 | 131,000.00 | (527.93) | 6.875 | 08/23/06 | 8/28/2006 | 24 | 10/1/2006 |
| 81012528 | 132,000.00 | 2,310.00 | 7.000 | 08/22/06 | 8/28/2006 | 25 | 10/1/2006 |

3

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 80857154 | 140,000.00 | 1,050.00 | 7.250 | 08/24/06 | 8/28/2006 | 23 | 10/1/2006 |
| 81042764 | 158,000.00 | - | 6.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81013724 | 161,250.00 | (2,115.60) | 7.875 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81025165 | 164,000.00 | (2,236.96) | 7.625 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81014078 | 175,616.00 | (3,765.21) | 7.875 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80955503 | 177,450.00 | (3,770.81) | 7.000 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81035479 | 180,000.00 | 1,593.00 | 7.250 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81032799 | 180,800.00 | (2,773.47) | 7.500 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81053308 | 203,000.00 | (3,552.50) | 7.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80894835 | 207,745.71 | (513.13) | 7.500 | 08/28/06 | 8/28/2006 | 19 | 9/1/2006 |
| 81037772 | 244,000.00 | (3,742.96) | 7.500 | 08/23/06 | 8/28/2006 | 24 | 10/1/2006 |
| 81017584 | 251,992.00 | (3,674.04) | 7.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81051963 | 255,920.00 | (3,646.86) | 7.750 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80995566 | 264,000.00 | (3,843.84) | 8.500 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 80839814 | 304,000.00 | (1,471.36) | 7.500 | 08/24/06 | 8/28/2006 | 23 | 10/1/2006 |
| 81044356 | 311,000.00 | (5,694.41) | 7.500 | 08/28/06 | 8/28/2006 | 24 | 10/1/2006 |
| 80961980 | 315,000.00 | (1,052.10) | 6.875 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81045643 | 338,000.00 | (1,326.34) | 6.750 | 08/23/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81008245 | 348,000.00 | (2,700.48) | 7.125 | 08/23/06 | 8/28/2006 | 24 | 10/1/2006 |
| 81037533 | 408,000.00 | (6,120.00) | 8.625 | 08/23/06 | 8/28/2006 | 24 | 10/1/2006 |
| 80996572 | 593,600.00 | (3,525.98) | 7.000 | 08/28/06 | 8/28/2006 | 19 | 10/1/2006 |
| 81053886 | 30,350.00 | 75.88 | 12.450 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81066797 | 32,000.00 | - | 10.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81069650 | 32,600.00 | (5.54) | 11.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81072332 | 48,900.00 | - | 12.500 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81042004 | 49,600.00 | (488.06) | 8.000 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| 81015786 | 51,400.00 | (113.08) | 15.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81015836 | 52,000.00 | (114.40) | 15.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81044695 | 54,292.00 | 2,128.79 | 9.375 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 81049066 | 58,500.00 | (1,024.34) | 7.625 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 81034795 | 70,000.00 | (1,137.50) | 7.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 80979735 | 71,500.00 | (1,519.38) | 8.125 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 81047565 | 77,400.00 | (1,736.86) | 7.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81024630 | 84,000.00 | (1,865.64) | 7.375 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 81030447 | 88,400.00 | (762.01) | 7.625 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81014219 | 92,000.00 | (1,675.32) | 7.500 | 08/23/06 | 8/29/2006 | 24 | 10/1/2006 |
| 81030488 | 98,400.00 | (848.21) | 7.625 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81088835 | 99,306.33 | (1,845.36) | 8.000 | 08/29/06 | 8/29/2006 | 18 | 11/1/2006 |
| 74304171 | 104,430.41 | - | 6.375 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81058182 | 105,600.00 | 2,015.90 | 6.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 80995939 | 116,000.00 | - | 7.500 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81053241 | 117,446.00 | (981.85) | 7.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81026981 | 120,000.00 | 14.40 | 7.500 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 81053852 | 121,500.00 | (2,612.25) | 9.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81067969 | 123,624.00 | (2,781.54) | 7.625 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 80970353 | 126,591.51 | 2,573.61 | 7.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81057549 | 130,400.00 | (1,779.96) | 7.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81053894 | 136,000.00 | (2,256.24) | 7.375 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| 81015604 | 154,160.00 | (2,713.22) | 7.625 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| 81040750 | 160,000.00 | 89.60 | 6.500 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| 81044919 | 167,920.00 | - | 6.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81046146 | 168,000.00 | (840.00) | 7.125 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 81046237 | 181,500.00 | (907.50) | 7.125 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 81072308 | 183,450.00 | (2,760.93) | 7.375 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81066409 | 183,960.00 | (266.74) | 7.250 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81069924 | 189,600.00 | (4,019.52) | 8.250 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 81056343 | 191,200.00 | (869.96) | 6.875 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| 81026221 | 192,430.00 | (134.71) | 6.875 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 80545544 | 199,000.00 | - | 6.625 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81036550 | 203,200.00 | (3,186.18) | 7.000 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| 81015760 | 205,600.00 | (3,748.09) | 9.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81015802 | 208,000.00 | (3,791.84) | 9.000 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| 81044646 | 217,164.00 | (2,095.63) | 7.375 | 08/28/06 | 8/29/2006 | 19 | 10/1/2006 |
| 80998065 | 220,000.00 | - | 7.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |

| LOAN | | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|---|
| | 81027377 | 228,000.00 | (807.12) | 7.250 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| | 81044810 | 230,750.00 | (4,615.01) | 7.125 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| | 81060287 | 241,920.00 | (77.41) | 7.625 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| | 80021140 | 245,000.00 | (3,773.00) | 6.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| | 81065377 | 260,000.00 | 93.60 | 7.500 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| | 80992175 | 288,000.00 | (2,378.88) | 7.125 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| | 81053043 | 304,575.00 | (3,024.43) | 7.250 | 08/24/06 | 8/29/2006 | 23 | 10/1/2006 |
| | 81059131 | 359,250.00 | (3,229.66) | 7.500 | 08/25/06 | 8/29/2006 | 22 | 10/1/2006 |
| | 81014490 | 442,500.00 | (539.85) | 7.750 | 08/29/06 | 8/29/2006 | 18 | 10/1/2006 |
| | 81051427 | 23,400.00 | 475.25 | 12.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81031171 | 32,000.00 | (337.60) | 13.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81038820 | 32,539.00 | 767.27 | 9.125 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81044430 | 33,125.00 | - | 13.000 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81073264 | 35,000.00 | - | 13.400 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81059172 | 36,200.00 | - | 12.500 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81053167 | 55,200.00 | (89.98) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81049942 | 64,503.00 | (226.22) | 6.875 | 08/25/06 | 8/30/2008 | 22 | 10/1/2006 |
| | 81060907 | 64,900.00 | 1,225.31 | 9.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80924871 | 65,000.00 | (812.50) | 7.250 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81069007 | 76,700.00 | (1,295.46) | 7.000 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81006314 | 80,000.00 | (131.20) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81003642 | 84,000.00 | (1,367.52) | 7.500 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81059180 | 84,800.00 | (1,076.96) | 7.625 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81060378 | 86,400.00 | (967.68) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81055535 | 87,012.00 | (1,718.96) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 11/1/2006 |
| | 81074551 | 87,685.00 | (1,500.29) | 7.000 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80997414 | 89,000.00 | (445.00) | 7.250 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| | 80814676 | 92,800.00 | (186.53) | 7.500 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81051187 | 93,600.00 | (756.29) | 7.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81003139 | 99,375.00 | (1,893.09) | 7.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81044414 | 99,375.00 | (1,893.09) | 7.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81028813 | 100,000.00 | - | 6.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81043291 | 100,000.00 | (1,000.00) | 6.875 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81032138 | 100,100.00 | (1,388.39) | 7.750 | 08/24/06 | 8/30/2006 | 23 | 10/1/2006 |
| | 81045494 | 104,139.00 | (2,041.13) | 6.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81073181 | 105,000.00 | (768.60) | 7.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81077075 | 106,550.00 | 1,277.53 | 5.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81031429 | 108,600.00 | (760.20) | 7.000 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80895352 | 116,223.00 | 1,363.30 | 6.750 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| | 80911761 | 119,900.00 | (1,863.25) | 7.250 | 08/23/06 | 8/30/2006 | 24 | 10/1/2006 |
| | 81024770 | 127,920.00 | (1,279.20) | 6.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81031148 | 128,000.00 | (1,445.12) | 7.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81038861 | 130,155.00 | (1,733.66) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81048670 | 132,000.00 | 3,018.84 | 6.625 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80831001 | 138,394.00 | 5,484.55 | 4.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81031635 | 140,700.00 | (1,805.18) | 7.375 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81056137 | 140,800.00 | (2,464.00) | 7.250 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| | 81065617 | 140,800.00 | (2,438.66) | 7.875 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| | 81063836 | 143,250.00 | (2,111.51) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81059081 | 144,800.00 | (28.96) | 7.375 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81059677 | 148,100.00 | 1,369.93 | 6.750 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81067076 | 160,100.00 | (1,903.59) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80990575 | 161,992.00 | (2,616.17) | 8.625 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81003956 | 168,250.00 | - | 7.000 | 08/29/06 | 8/30/2006 | 18 | 10/1/2006 |
| | 81061426 | 177,600.00 | (317.90) | 7.250 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| | 81041444 | 181,000.00 | (5,430.00) | 11.325 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81067126 | 205,000.00 | (541.20) | 6.500 | 08/24/06 | 8/30/2006 | 23 | 10/1/2006 |
| | 81036436 | 212,000.00 | (3,938.96) | 6.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81028193 | 228,750.00 | 514.69 | 6.625 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81036345 | 239,400.00 | (1,280.79) | 6.750 | 08/25/06 | 8/30/2006 | 22 | 10/1/2006 |
| | 81031684 | 252,000.00 | (3,011.40) | 6.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81051906 | 259,600.00 | (1,827.58) | 7.250 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 81046161 | 320,000.00 | (3,043.20) | 7.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| | 80978174 | 331,415.00 | (23.19) | 6.600 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |

5

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81038002 | 360,000.00 | (4,230.00) | 7.875 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| 81054801 | 386,250.00 | (127.47) | 6.375 | 08/28/06 | 8/30/2006 | 19 | 10/1/2006 |
| 80987241 | 403,000.00 | (4,437.03) | 7.875 | 08/23/06 | 8/30/2006 | 24 | 10/1/2006 |
| 81069643 | 404,925.00 | (8,256.42) | 7.750 | 08/29/06 | 8/30/2006 | 18 | 10/1/2006 |
| 81057614 | 405,000.00 | (9,112.50) | 9.250 | 08/24/06 | 8/30/2006 | 23 | 10/1/2006 |
| 81038309 | 417,000.00 | (5,237.52) | 6.875 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| 81033128 | 433,000.00 | (9,742.50) | 7.125 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| 81002883 | 480,000.00 | (979.20) | 6.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| 81041253 | 724,000.00 | (17,745.24) | 7.750 | 08/30/06 | 8/30/2006 | 17 | 10/1/2006 |
| 81028383 | 17,580.00 | 789.52 | 9.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81060931 | 41,265.00 | (46.22) | 14.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81073942 | 43,600.00 | 436.00 | 12.500 | 08/30/06 | 8/31/2006 | 17 | 10/1/2006 |
| 81086548 | 52,000.00 | (797.16) | 7.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81063364 | 53,600.00 | (1,072.00) | 8.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81056350 | 61,000.00 | (68.32) | 10.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81074395 | 66,000.00 | (1,980.00) | 11.200 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81056384 | 68,000.00 | 848.64 | 10.500 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81028375 | 70,320.00 | (249.64) | 8.125 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81065690 | 74,550.00 | (1,406.76) | 8.125 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81055162 | 75,000.00 | (1,261.50) | 7.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81060774 | 76,635.00 | (1,669.88) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81077372 | 79,500.00 | - | 11.900 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 80975006 | 81,000.00 | 303.75 | 6.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81057242 | 91,553.00 | 542.91 | 6.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81053118 | 92,000.00 | (1,713.04) | 8.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 80965056 | 92,330.00 | 1,589.00 | 6.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81056665 | 100,000.00 | 67.00 | 6.375 | 08/28/06 | 8/31/2006 | 19 | 10/1/2006 |
| 81031619 | 103,000.00 | 257.50 | 12.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81049892 | 107,252.00 | 126.56 | 6.375 | 08/30/06 | 8/31/2006 | 17 | 10/1/2006 |
| 81066896 | 108,669.00 | 1,086.69 | 7.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81075384 | 110,400.00 | (834.62) | 6.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81046336 | 115,000.00 | (86.25) | 6.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81052938 | 116,000.00 | (1,922.55) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81057994 | 118,000.00 | (784.70) | 6.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81029092 | 121,143.00 | 1,998.86 | 6.000 | 08/26/06 | 8/31/2006 | 21 | 10/1/2006 |
| 81066003 | 123,200.00 | (1,283.74) | 7.375 | 08/24/06 | 8/31/2006 | 23 | 10/1/2006 |
| 81076986 | 125,950.00 | (1,259.50) | 10.800 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81014458 | 126,000.00 | (1,562.40) | 7.500 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81070401 | 126,000.00 | (2,394.00) | 7.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81071060 | 126,350.00 | (2,001.39) | 6.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81061723 | 128,000.00 | (1,280.00) | 6.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81054579 | 132,800.00 | (1,961.46) | 7.625 | 08/24/06 | 8/31/2006 | 23 | 10/1/2006 |
| 80988512 | 137,750.00 | (973.90) | 7.260 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81065476 | 138,500.00 | (529.07) | 6.375 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 80401409 | 138,821.00 | (2,477.95) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81042095 | 145,600.00 | (2,355.81) | 7.125 | 08/30/06 | 8/31/2006 | 17 | 10/1/2006 |
| 81048308 | 150,000.00 | 474.00 | 7.200 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81065294 | 152,400.00 | (1,804.42) | 7.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81051682 | 160,000.00 | (2,080.00) | 7.500 | 08/22/06 | 8/31/2006 | 25 | 10/1/2006 |
| 80936529 | 161,100.00 | - | 7.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81037525 | 164,000.00 | - | 7.375 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81063760 | 165,600.00 | (687.24) | 6.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81046005 | 165,688.00 | (3,698.16) | 7.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81073900 | 174,400.00 | (845.84) | 7.625 | 08/30/06 | 8/31/2006 | 17 | 10/1/2006 |
| 81062820 | 193,500.00 | - | 6.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81020034 | 200,000.00 | (296.00) | 7.000 | 08/25/06 | 8/31/2006 | 22 | 10/1/2006 |
| 81077901 | 202,500.00 | (716.85) | 6.500 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81027294 | 210,000.00 | (2,902.20) | 7.500 | 08/25/06 | 8/31/2006 | 22 | 10/1/2006 |
| 81064172 | 210,000.00 | (3,047.10) | 7.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81011637 | 219,504.00 | - | 7.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81031585 | 224,000.00 | (3,100.16) | 6.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81026262 | 236,000.00 | (1,062.00) | 7.125 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81072571 | 238,500.00 | (2,780.91) | 7.500 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81022774 | 240,000.00 | (996.00) | 6.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81056335 | 244,000.00 | (5,577.84) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81000937 | 258,386.00 | (4,782.72) | 7.875 | 08/28/06 | 8/31/2006 | 19 | 10/1/2006 |
| 81072183 | 264,100.00 | (5,268.80) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 80988272 | 270,400.00 | (505.65) | 7.125 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81056319 | 272,000.00 | (2,132.48) | 7.375 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81063067 | 317,350.00 | (4,474.64) | 6.875 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81072225 | 325,000.00 | (2,398.50) | 13.000 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81057887 | 373,600.00 | (1,479.46) | 7.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81020927 | 375,000.00 | (3,630.00) | 7.750 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81027708 | 412,000.00 | 379.04 | 7.375 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81056830 | 503,800.00 | (5,158.91) | 7.500 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81055956 | 508,000.00 | (12,252.96) | 7.625 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81063166 | 765,000.00 | (17,212.50) | 7.375 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81071920 | 975,000.00 | (19,256.25) | 7.250 | 08/31/06 | 8/31/2006 | 16 | 10/1/2006 |
| 81069072 | 12,510.00 | 248.07 | 11.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80876832 | 20,800.00 | - | 9.500 | 09/01/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81061236 | 24,000.00 | 362.88 | 11.750 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81078370 | 25,000.00 | (33.25) | 16.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81045841 | 34,700.00 | (347.00) | 10.400 | 09/01/06. | 9/1/2006 | 15 | 10/1/2006 |
| 81001778 | 40,200.00 | 354.56 | 10.500 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81039729 | 43,508.00 | 539.93 | 11.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81082760 | 44,999.75 | 1,358.09 | 10.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81085052 | 45,000.00 | 900.00 | 11.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81057697 | 47,851.82 | (3.35) | 7.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81069049 | 50,040.00 | (333.27) | 7.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81034449 | 51,100.00 | (383.25) | 12.900 | 08/25/06 | 9/1/2006 | 22 | 10/1/2006 |
| 81073892 | 52,050.00 | (390.38) | 12.400 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81069056 | 56,158.00 | 1,113.61 | 12.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81058661 | 60,000.00 | 600.00 | 9.725 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80999618 | 64,000.00 | (127.36) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81081341 | 65,000.00 | (150.80) | 11.750 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81035826 | 67,900.00 | (831.77) | 7.125 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81073629 | 68,750.00 | 69.44 | 6.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81073884 | 71,400.00 | (1,074.57) | 15.000 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 80876840 | 83,200.00 | - | 7.000 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81047896 | 84,000.00 | 645.12 | 12.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81069122 | 84,600.00 | 103.21 | 6.875 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81033888 | 87,500.00 | (29.75) | 12.750 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 81034662 | 89,111.00 | (1,277.85) | 7.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81068827 | 90,350.00 | (1,355.25) | 7.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81053589 | 91,451.00 | (2,136.29) | 7.000 | 09/01/06 | 9/1/2006 | 15 | 11/1/2006 |
| 81034381 | 94,850.00 | (2,047.81) | 7.500 | 08/25/06 | 9/1/2006 | 22 | 10/1/2006 |
| 81073868 | 96,750.00 | (2,213.65) | 7.125 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81078206 | 100,000.00 | (58.00) | 8.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80726474 | 101,403.00 | - | 6.250 | 09/01/06 | 9/1/2006 | 15 | 11/1/2006 |
| 80990187 | 103,000.00 | (956.87) | 6.875 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81031072 | 103,574.00 | 108.75 | 6.375 | 09/01/06 | 9/1/2006 | 15 | 11/1/2006 |
| 81069015 | 104,292.00 | (1,891.86) | 7.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80733843 | 108,771.00 | 934.34 | 6.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80847023 | 108,850.00 | 1,088.50 | 6.500 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81074528 | 109,000.00 | (1,471.50) | 7.125 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81055774 | 113,000.00 | - | 7.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81072811 | 115,600.00 | (1,184.90) | 7.000 | 08/29/06 | 9/1/2006 | 18 | 10/1/2006 |
| 80983653 | 120,000.00 | (236.40) | 7.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81030223 | 120,000.00 | (1,332.00) | 7.250 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 81082778 | 125,999.00 | (2,710.24) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81045825 | 138,800.00 | (1,185.35) | 7.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81043192 | 139,928.00 | (2,035.95) | 6.500 | 09/01/06 | 9/1/2006 | 15 | 11/1/2006 |
| 80992548 | 141,750.00 | (355.79) | 7.125 | 08/22/06 | 9/1/2006 | 25 | 10/1/2006 |
| 81046872 | 142,000.00 | (284.00) | 6.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80982663 | 142,100.00 | 204.62 | 6.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81012452 | 142,400.00 | 118.19 | 6.625 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81075038 | 144,000.00 | (233.28) | 8.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81059347 | 148,799.00 | (2,938.78) | 7.000 | 09/01/06 | 9/1/2006 | 15 | 11/1/2006 |

7

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81047888 | 156,000.00 | (3,120.00) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81016024 | 158,080.00 | 1,270.98 | 7.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81001679 | 160,800.00 | (1,411.82) | 7.500 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81033847 | 162,500.00 | (3,656.25) | 7.500 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 81050312 | 168,000.00 | (2,436.00) | 7.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81063653 | 171,500.00 | (2,725.14) | 7.500 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 81036659 | 174,032.00 | (1,507.12) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81081762 | 180,000.00 | (1,035.00) | 7.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81060352 | 182,422.00 | (304.64) | 6.000 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81056756 | 207,200.00 | (4,309.76) | 7.875 | 08/24/06 | 9/1/2006 | 23 | 10/1/2006 |
| 80886310 | 217,500.00 | (73.95) | 15.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81022733 | 221,251.00 | - | 5.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81001372 | 224,000.00 | - | 7.250 | 08/25/06 | 9/1/2006 | 22 | 10/1/2006 |
| 81058653 | 240,000.00 | (600.00) | 6.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81054678 | 241,500.00 | (3,839.85) | 7.875 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 81068843 | 244,500.00 | (2,623.49) | 7.250 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81070658 | 257,050.00 | 976.79 | 6.375 | 08/29/06 | 9/1/2006 | 18 | 10/1/2006 |
| 81011520 | 260,000.00 | 1,300.00 | 6.875 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81080673 | 260,000.00 | 338.00 | 6.875 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81057291 | 270,000.00 | (1,890.00) | 6.625 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81082620 | 275,000.00 | (1,831.50) | 6.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81070864 | 285,600.00 | (4,092.65) | 8.500 | 08/31/06 | 9/1/2006 | 16 | 10/1/2006 |
| 81020018 | 310,000.00 | 2,740.40 | 6.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80972847 | 314,000.00 | 913.74 | 6.375 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81080764 | 334,998.83 | (4,892.03) | 7.625 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80971070 | 351,000.00 | (863.46) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81031015 | 353,700.00 | 618.97 | 6.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81024580 | 372,000.00 | (6,621.60) | 7.250 | 08/30/06 | 9/1/2006 | 17 | 10/1/2006 |
| 80998172 | 403,000.00 | (3,324.75) | 6.875 | 08/29/06 | 9/1/2006 | 18 | 10/1/2006 |
| 81020257 | 420,000.00 | (1,096.20) | 6.500 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80886328 | 471,250.00 | (10,084.76) | 7.375 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 81039315 | 483,000.00 | 2,526.09 | 7.750 | 09/01/06 | 9/1/2006 | 15 | 10/1/2006 |
| 80866288 | 600,000.00 | 5,034.00 | 6.500 | 08/28/06 | 9/1/2006 | 19 | 10/1/2006 |
| 81063513 | 14,000.00 | (33.32) | 13.250 | 08/29/06 | 9/5/2006 | 18 | 11/1/2006 |
| 81074825 | 15,000.00 | 450.00 | 9.920 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81058380 | 27,600.00 | 1,013.20 | 7.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81080319 | 28,180.00 | - | 11.025 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81023608 | 30,600.00 | (35.19) | 13.375 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81066748 | 33,250.00 | 40.90 | 13.625 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81059057 | 33,990.00 | (339.90) | 12.800 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81054306 | 36,200.00 | - | 14.125 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81054421 | 38,700.00 | - | 14.125 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81057770 | 40,700.00 | (610.50) | 12.800 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81065724 | 47,000.00 | (470.00) | 13.175 | 08/31/06 | 9/5/2006 | 16 | 11/1/2006 |
| 80934409 | 47,600.00 | (24.28) | 8.000 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81068652 | 48,150.00 | 232.56 | 11.750 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 80965395 | 50,000.00 | (1,305.00) | 7.250 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81087272 | 50,800.00 | (1,524.00) | 14.600 | 09/01/06 | 9/5/2006 | 15 | 10/1/2006 |
| 81070500 | 51,000.00 | (259.59) | 6.875 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81077992 | 52,200.00 | 2,149.07 | 10.375 | 09/01/06 | 9/5/2006 | 15 | 10/1/2006 |
| 81057523 | 55,000.00 | (405.35) | 13.375 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81063356 | 56,000.00 | - | 6.875 | 08/29/06 | 9/5/2006 | 18 | 11/1/2006 |
| 81055972 | 56,500.00 | (1,412.50) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81022741 | 61,600.00 | (200.20) | 6.500 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81046104 | 61,750.00 | (1,227.59) | 7.250 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81082463 | 68,500.00 | (665.13) | 7.250 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81056806 | 69,600.00 | (1,048.87) | 7.250 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81057747 | 75,550.00 | (1,768.63) | 7.125 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81026916 | 75,600.00 | 189.00 | 7.250 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81050320 | 78,665.00 | (1,573.30) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81037970 | 86,100.00 | (1,350.91) | 8.500 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 81022477 | 86,400.00 | (303.26) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81040859 | 86,541.00 | 1,643.03 | 5.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81055659 | 91,474.00 | (101.54) | 13.875 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |

8

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81047078 | 94,250.00 | (1,649.38) | 7.000 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81074718 | 96,461.00 | (1,074.57) | 6.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81047219 | 100,000.00 | (819.00) | 6.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81008054 | 100,485.00 | 1,140.50 | 5.750 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81054363 | 100,750.00 | (1,763.13) | 7.000 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81037269 | 102,362.00 | (380.79) | 6.750 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81035503 | 103,124.00 | 358.87 | 6.000 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81051997 | 105,471.00 | 1,536.71 | 5.750 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81043812 | 109,000.00 | 817.50 | 6.875 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81017972 | 110,000.00 | (2,266.00) | 7.125 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81057762 | 110,400.00 | (1,939.73) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81042483 | 112,000.00 | (403.20) | 6.625 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81016230 | 115,000.00 | - | 6.750 | 08/29/06 | 9/5/2006 | 18 | 11/1/2006 |
| 80990245 | 115,710.00 | (755.58) | 6.875 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81070781 | 119,145.00 | (1,348.72) | 6.750 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81042814 | 121,100.00 | (1,416.87) | 7.125 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81077976 | 121,800.00 | (1,781.93) | 7.875 | 09/01/06 | 9/5/2006 | 15 | 10/1/2006 |
| 81040776 | 122,220.00 | (684.43) | 7.000 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81023434 | 122,400.00 | (1,217.88) | 8.125 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81077638 | 123,000.00 | 3,136.50 | 5.875 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81079576 | 124,000.00 | - | 9.900 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81071870 | 126,800.00 | 221.90 | 7.750 | 08/30/06 | 9/5/2006 | 17 | 11/1/2006 |
| 81068058 | 128,000.00 | (1,216.00) | 6.750 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 80745029 | 128,660.00 | (302.64) | 6.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81026551 | 131,200.00 | (463.14) | 8.000 | 08/28/06 | 9/5/2006 | 19 | 10/1/2006 |
| 81068587 | 133,500.00 | (1,138.75) | 6.625 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81034654 | 135,960.00 | (2,690.65) | 9.375 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81083719 | 137,750.00 | (1,529.03) | 6.750 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81019515 | 139,000.00 | (1,430.31) | 7.000 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81059495 | 143,000.00 | (2,860.00) | 7.375 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 81056764 | 144,900.00 | (1,688.08) | 6.625 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81058570 | 149,000.00 | (338.23) | 6.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81005662 | 149,205.00 | (3,657.02) | 7.250 | 08/30/06 | 9/5/2006 | 17 | 11/1/2006 |
| 81034589 | 150,000.00 | 1,998.00 | 6.875 | 08/29/06 | 9/5/2006 | 18 | 11/1/2006 |
| 80974793 | 156,830.00 | (310.53) | 6.750 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 80994254 | 164,000.00 | (1,136.52) | 6.750 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81043093 | 164,000.00 | (1,564.56) | 6.750 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81057820 | 164,200.00 | (95.24) | 6.375 | 09/01/06 | 9/5/2006 | 15 | 11/1/2006 |
| 81060063 | 166,250.00 | - | 8.250 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81066904 | 167,200.00 | (3,200.21) | 7.135 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81040289 | 175,000.00 | (2,899.75) | 7.500 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 81068090 | 176,000.00 | (135.52) | 7.500 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81000317 | 176,300.00 | 1,874.07 | 7.500 | 08/29/06 | 9/5/2006 | 18 | 11/1/2006 |
| 81081234 | 178,000.00 | (3,337.50) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81035842 | 180,000.00 | (585.00) | 7.000 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81081325 | 185,000.00 | (2,913.75) | 7.250 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81065674 | 188,000.00 | 894.88 | 6.750 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81068637 | 192,598.00 | (3,208.65) | 7.500 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81031205 | 195,500.00 | (635.38) | 6.625 | 08/29/06 | 9/5/2006 | 18 | 10/1/2006 |
| 81092843 | 202,500.00 | 552.82 | 6.735 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81087165 | 203,200.00 | (136.14) | 7.625 | 09/01/06 | 9/5/2006 | 15 | 10/1/2006 |
| 80992142 | 208,000.00 | (2,387.84) | 7.750 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 81015885 | 214,400.00 | (3,218.14) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81039372 | 214,428.00 | (3,289.33) | 7.625 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81057309 | 220,000.00 | (1,339.80) | 7.375 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81058687 | 224,000.00 | (7,448.00) | 7.625 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 81059644 | 224,000.00 | (342.72) | 6.500 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |
| 81076663 | 224,000.00 | 392.00 | 6.875 | 08/30/06 | 9/5/2006 | 17 | 11/1/2006 |
| 81063463 | 239,900.00 | (729.30) | 6.625 | 08/25/06 | 9/5/2006 | 22 | 10/1/2006 |
| 81055634 | 274,421.00 | (5,145.39) | 7.875 | 08/31/06 | 9/5/2006 | 16 | 10/1/2006 |
| 80977069 | 303,000.00 | (8,950.62) | 7.625 | 08/30/06 | 9/5/2006 | 17 | 10/1/2006 |
| 81040990 | 335,000.00 | - | 6.625 | 08/25/06 | 9/5/2006 | 22 | 10/1/2006 |
| 81062333 | 392,000.00 | 6,812.96 | 6.125 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81059784 | 417,000.00 | 1,138.41 | 6.625 | 09/05/06 | 9/5/2006 | 11 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81079568 | 496,000.00 | (10,306.88) | 7.500 | 09/05/06 | 9/5/2006 | 11 | 11/1/2006 |
| 81047334 | 2,000,000.00 | (4,820.00) | 7.000 | 08/30/06 | 9/5/2006 | 17 | 11/1/2006 |
| 81076879 | 25,500.00 | (510.00) | 13.200 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 80989478 | 29,000.00 | 361.05 | 10.250 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 81015570 | 32,000.00 | 294.40 | 14.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81078735 | 32,000.00 | (2.56) | 14.000 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81068702 | 32,400.00 | - | 10.625 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 81002784 | 37,000.00 | 790.69 | 11.375 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 80980428 | 40,000.00 | (20.80) | 7.000 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81067480 | 40,800.00 | 102.00 | 10.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81018574 | 41,875.00 | 104.69 | 11.370 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81043739 | 42,000.00 | (31.08) | 7.625 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81004335 | 42,780.00 | 119.36 | 14.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81023384 | 44,000.00 | (50.60) | 12.125 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 80994999 | 46,500.00 | (408.73) | 7.375 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81077711 | 47,500.00 | 422.28 | 14.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81073546 | 50,000.00 | (56.50) | 10.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81037251 | 50,001.00 | - | 6.500 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 81077620 | 52,000.00 | 520.00 | 12.375 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 80971690 | 52,500.00 | 1,580.78 | 6.625 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81076770 | 59,500.00 | (1,205.47) | 7.375 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 81062937 | 59,800.00 | (324.12) | 6.875 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81087843 | 60,000.00 | (969.00) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 81030595 | 60,291.00 | (1,239.58) | 7.250 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81074742 | 60,840.00 | (68.75) | 13.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81063042 | 70,000.00 | (1,125.60) | 7.250 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 80990005 | 70,200.00 | (352.40) | 6.750 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81042970 | 76,000.00 | (1,140.00) | 7.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81007346 | 77,140.00 | (947.27) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81009987 | 79,000.00 | (63.20) | 13.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 80733333 | 80,733.00 | (815.40) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 80919657 | 84,346.00 | 843.46 | 6.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81078833 | 86,000.00 | (1,044.90) | 6.625 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81076564 | 88,609.00 | (2,146.99) | 7.000 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81065435 | 90,000.00 | (2,190.60) | 7.250 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81045916 | 90,500.00 | (786.45) | 6.500 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 81076192 | 91,500.00 | (1,314.86) | 7.875 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81055527 | 93,000.00 | (930.00) | 7.000 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 81061095 | 96,000.00 | (1,019.52) | 7.875 | 08/28/06 | 9/6/2006 | 19 | 11/1/2006 |
| 80956220 | 99,858.10 | 2,360.65 | 10.250 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 81068918 | 100,717.00 | (957.81) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81066680 | 103,500.00 | (50.71) | 7.875 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 81061079 | 104,500.00 | (60.61) | 6.375 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| 81047680 | 105,700.00 | - | 6.750 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81074817 | 108,160.00 | (2,974.40) | 7.625 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81085821 | 109,500.00 | (716.13) | 6.625 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81080301 | 112,720.00 | (1,642.33) | 7.625 | 09/05/06 | 9/6/2006 | 11 | 10/1/2006 |
| 80989387 | 116,000.00 | (1,829.32) | 7.500 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 80948243 | 117,000.00 | (2,069.73) | 7.250 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81014581 | 120,000.00 | (1,842.00) | 7.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81018541 | 125,625.00 | (1,216.05) | 7.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81091225 | 126,000.00 | (278.46) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81068678 | 129,600.00 | (745.20) | 7.000 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81021156 | 130,000.00 | 516.10 | 7.250 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81073850 | 130,000.00 | (2,715.70) | 7.000 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 80736358 | 130,840.00 | (1,308.40) | 6.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 80572092 | 131,147.00 | 2,642.32 | 5.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| 81005357 | 140,000.00 | - | 6.875 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81027963 | 140,000.00 | (438.20) | 6.625 | 09/06/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81049694 | 143,500.00 | 3,069.47 | 12.500 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81080434 | 147,000.00 | (845.25) | 6.500 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 81015638 | 149,714.00 | 748.57 | 7.000 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| 80940497 | 150,000.00 | (183.00) | 7.125 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| 80965783 | 150,356.00 | 751.78 | 6.875 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |

| LOAN | | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|---|
| | 81091662 | 155,737.00 | (1,769.17) | 6.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81067415 | 163,200.00 | (2,720.54) | 7.375 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81004301 | 171,120.00 | 580.10 | 7.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81023327 | 176,000.00 | (1,365.76) | 7.500 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81038523 | 176,000.00 | 40.48 | 6.375 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81046443 | 181,500.00 | (2,047.32) | 6.750 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81032187 | 183,000.00 | - | 7.250 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 80902471 | 188,000.00 | 329.00 | 6.625 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81065070 | 194,860.00 | (2,081.10) | 6.750 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81040446 | 195,200.00 | (1,366.40) | 6.500 | 09/05/06 | 9/6/2006 | 11 | 11/1/2006 |
| | 80805351 | 196,000.00 | (637.00) | 6.875 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81050254 | 197,671.00 | - | 6.875 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81035164 | 198,681.00 | (1,937.14) | 6.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81066995 | 199,000.00 | (4,023.78) | 7.625 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81073504 | 200,000.00 | (978.00) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81072878 | 203,162.00 | (3,723.60) | 7.500 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81036352 | 205,000.00 | - | 6.625 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81079956 | 207,000.00 | 103.50 | 6.500 | 09/06/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81077653 | 208,000.00 | (1,784.64) | 7.625 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81061764 | 229,500.00 | (1,893.38) | 7.125 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81062473 | 239,250.00 | (1,519.24) | 6.500 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81074833 | 240,500.00 | (2,046.66) | 7.000 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81081051 | 242,474.00 | (5,412.02) | 7.750 | 08/30/06 | 9/6/2006 | 17 | 10/1/2006 |
| | 81035396 | 247,100.00 | 264.40 | 6.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81040891 | 249,280.00 | (1,433.36) | 6.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81055675 | 252,000.00 | 1,071.00 | 6.500 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81057499 | 255,000.00 | (1,983.90) | 7.005 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81078701 | 256,000.00 | (1,541.12) | 7.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 80049257 | 259,250.00 | - | 7.250 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81056889 | 260,000.00 | (2,347.80) | 6.750 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81024036 | 264,000.00 | (2,587.20) | 7.250 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81049504 | 266,500.00 | (5,330.00) | 7.625 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81028508 | 279,125.00 | (4,466.00) | 7.000 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81052508 | 300,500.00 | (4,570.61) | 7.220 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81002669 | 302,900.00 | (6,058.00) | 7.500 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81033995 | 308,000.00 | (1,647.80) | 7.125 | 09/06/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81084923 | 316,000.00 | (3,792.00) | 7.750 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81039059 | 319,584.00 | (2,508.73) | 6.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81017329 | 329,200.00 | (10,034.02) | 7.375 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81068199 | 347,000.00 | (135.33) | 6.625 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81055501 | 348,000.00 | (6,215.28) | 7.250 | 08/31/06 | 9/6/2006 | 16 | 11/1/2006 |
| | 81058620 | 374,400.00 | (2,912.83) | 6.500 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81077570 | 380,000.00 | 771.40 | 9.875 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81035172 | 382,000.00 | (4,083.58) | 6.625 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81021461 | 416,000.00 | 1,768.00 | 6.500 | 08/31/06 | 9/6/2006 | 16 | 10/1/2006 |
| | 81036055 | 417,000.00 | (13,544.16) | 7.500 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 80994460 | 500,000.00 | (2,960.00) | 6.375 | 09/06/06 | 9/6/2006 | 10 | 10/1/2006 |
| | 81083982 | 512,000.00 | (4,480.00) | 7.750 | 09/06/06 | 9/6/2006 | 10 | 11/1/2006 |
| | 81031833 | 18,435.00 | 2.40 | 13.500 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| | 81091605 | 22,500.00 | 116.55 | 10.875 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81068165 | 25,800.00 | (774.00) | 13.700 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81054017 | 26,900.00 | 298.05 | 14.250 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81064701 | 27,400.00 | (822.00) | 13.700 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81066219 | 33,600.00 | 334.32 | 13.000 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81081424 | 34,800.00 | 348.00 | 12.125 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 81081879 | 40,000.00 | - | 12.820 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81031858 | 43,015.00 | (211.20) | 8.250 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| | 81046419 | 62,700.00 | 1,775.66 | 11.000 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81062945 | 65,900.00 | (896.89) | 7.125 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 80991458 | 69,700.00 | - | 8.250 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| | 80530249 | 70,400.00 | 147.84 | 6.625 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81067738 | 78,100.00 | (1,365.96) | 7.375 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 80992746 | 81,000.00 | (72.90) | 7.700 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 81032716 | 84,550.00 | (1,146.50) | 7.125 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81048084 | 86,072.00 | 322.77 | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81070922 | 92,000.00 | (287.96) | 7.450 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81053878 | 94,150.00 | (1,236.19) | 8.750 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81041436 | 97,900.00 | (1,312.84) | 7.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81077828 | 100,000.00 | (950.00) | 7.000 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81067324 | 103,200.00 | (1,328.18) | 8.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81043127 | 105,000.00 | (50.40) | 12.375 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81064651 | 109,600.00 | (1,410.55) | 8.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 80999386 | 115,710.00 | 1,459.10 | 6.000 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81055519 | 118,000.00 | (88.50) | 6.750 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81081754 | 120,000.00 | (418.80) | 7.250 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 80707474 | 120,384.00 | (1,203.84) | 7.250 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81071490 | 121,910.00 | 18.01 | 6.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81046724 | 123,500.00 | 619.97 | 6.750 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81091589 | 124,160.00 | (869.12) | 7.000 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81009136 | 125,758.00 | (301.82) | 6.375 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81083594 | 128,761.00 | (704.32) | 6.500 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81051047 | 128,900.00 | 204.96 | 7.000 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| 81060279 | 128,976.00 | (1,840.49) | 6.500 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 80779549 | 130,000.00 | (328.90) | 6.625 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| 81076226 | 130,000.00 | (2,260.70) | 6.875 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81019663 | 130,500.00 | 65.25 | 6.750 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| 81022485 | 132,000.00 | 409.20 | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81057929 | 132,000.00 | 1,021.68 | 6.125 | 09/05/06 | 9/7/2006 | 11 | 11/1/2006 |
| 81066193 | 134,400.00 | 904.51 | 7.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81064164 | 135,200.00 | (2,704.00) | 7.375 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| 81081416 | 139,200.00 | (1,392.00) | 7.875 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81065930 | 140,000.00 | (1,335.60) | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81075251 | 141,000.00 | (2,119.23) | 7.250 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81085219 | 151,320.00 | (1,531.36) | 7.625 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81037376 | 154,280.00 | (2,275.63) | 7.250 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81045411 | 155,000.00 | (1,269.45) | 6.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81037616 | 161,072.00 | 932.61 | 6.000 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81053605 | 164,430.00 | 100.31 | 6.375 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81075368 | 167,350.00 | (391.60) | 6.375 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| 81043226 | 176,250.00 | (2,203.13) | 7.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81043762 | 179,000.00 | 21.48 | 7.450 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81051989 | 179,406.00 | 1,203.81 | 6.375 | 09/07/06 | 9/7/2006 | 9 | 11/1/2005 |
| 81091597 | 180,000.00 | (237.60) | 6.750 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81080244 | 182,000.00 | (939.12) | 7.250 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| 81070617 | 185,000.00 | (3,529.80) | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81081135 | 185,000.00 | (2,220.00) | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81066078 | 186,400.00 | (2,549.95) | 7.250 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81062242 | 187,500.00 | 256.87 | 6.375 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81055352 | 188,485.00 | (2,376.80) | 7.250 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81067555 | 192,000.00 | (3,557.76) | 7.125 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81050387 | 195,000.00 | (3,186.30) | 7.125 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81042442 | 200,000.00 | 504.00 | 6.500 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81074916 | 205,000.00 | (1,742.50) | 6.625 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| 81068405 | 206,000.00 | (2,523.50) | 6.875 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81058927 | 207,000.00 | (517.50) | 6.750 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81077810 | 208,200.00 | 616.27 | 6.250 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81062515 | 212,600.00 | (6,282.33) | 7.250 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| 81090367 | 215,992.00 | 1,313.23 | 6.250 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81056871 | 218,000.00 | (981.00) | 6.750 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| 81042251 | 224,500.00 | (6,842.76) | 7.375 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81086621 | 230,750.00 | (2,655.93) | 6.750 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81075657 | 233,000.00 | 202.71 | 6.875 | 09/06/06 | 9/7/2006 | 10 | 10/1/2006 |
| 81035578 | 241,650.00 | (1,993.61) | 7.125 | 08/31/06 | 9/7/2006 | 16 | 10/1/2006 |
| 81046393 | 250,846.00 | 3,551.97 | 7.000 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81033938 | 252,000.00 | (693.00) | 6.500 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81072613 | 255,547.00 | (2,149.15) | 6.500 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| 81044984 | 263,000.00 | (1,046.74) | 6.625 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| 81057853 | 276,500.00 | (1,399.09) | 7.000 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |

| LOAN | | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|------|---|---|---|---|---|---|---|---|
| | 81076028 | 285,000.00 | 530.10 | 6.750 | 09/06/06 | 9/7/2006 | 10 | 10/1/2006 |
| | 81057879 | 313,000.00 | (2,472.70) | 6.625 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| | 81065500 | 390,000.00 | 479.70 | 6.500 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| | 81072043 | 396,800.00 | (1,428.48) | 6.625 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 81044935 | 410,000.00 | (1,016.80) | 6.750 | 09/01/06 | 9/7/2006 | 15 | 10/1/2006 |
| | 81055998 | 417,000.00 | (12,710.16) | 7.375 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 81043101 | 455,000.00 | (10,196.55) | 7.375 | 09/01/06 | 9/7/2006 | 15 | 11/1/2006 |
| | 81072423 | 498,600.00 | (2,622.64) | 6.625 | 09/07/06 | 9/7/2006 | 9 | 10/1/2006 |
| | 81072415 | 649,500.00 | (1,357.45) | 6.625 | 09/07/06 | 9/7/2006 | 9 | 11/1/2006 |
| | 81052102 | 16,400.00 | - | 12.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81089906 | 22,750.00 | (15.02) | 13.750 | 09/11/06 | 9/12/2006 | 5 | 11/1/2006 |
| | 81082349 | 31,000.00 | - | 9.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81064933 | 31,790.00 | (119.85) | 13.375 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 80952922 | 35,500.00 | (123.19) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81085896 | 35,861.00 | - | 12.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81089864 | 42,250.00 | (792.19) | 8.250 | 09/11/06 | 9/12/2006 | 5 | 11/1/2006 |
| | 81072316 | 49,440.00 | (150.30) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81095358 | 50,000.00 | (283.00) | 12.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81061335 | 51,100.00 | (383.25) | 12.900 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81051294 | 53,000.00 | (1,722.50) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 80959489 | 56,738.00 | (210.50) | 6.875 | 09/01/06 | 9/8/2006 | 15 | 10/1/2006 |
| | 81068710 | 58,710.00 | (450.30) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81044992 | 62,000.00 | (78.74) | 13.625 | 08/31/06 | 9/8/2006 | 16 | 10/1/2006 |
| | 80970403 | 62,000.00 | (1,708.72) | 8.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81063992 | 64,140.00 | (71.20) | 12.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81019390 | 64,750.00 | 1,107.87 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81052037 | 65,600.00 | (516.27) | 7.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81058158 | 71,250.00 | (700.39) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81024093 | 72,000.00 | (663.84) | 7.375 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 80959869 | 73,900.00 | (32.52) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81042541 | 74,600.00 | (187.99) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 80786254 | 74,750.00 | - | 6.750 | 08/29/06 | 9/8/2006 | 18 | 10/1/2006 |
| | 81044273 | 77,250.00 | (676.71) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81060394 | 81,340.00 | - | 8.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81071151 | 81,600.00 | 395.76 | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81074858 | 84,000.00 | (649.32) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 80892532 | 84,245.00 | (1,256.09) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81040453 | 84,500.00 | (763.88) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81062788 | 85,000.00 | (850.00) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81033037 | 85,500.00 | (512.15) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 80834518 | 86,472.00 | 2,269.89 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81067407 | 88,000.00 | (275.44) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81044869 | 91,350.00 | (796.57) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81068991 | 93,000.00 | (1,176.45) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81069304 | 93,663.00 | (922.79) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81061285 | 94,850.00 | (2,356.08) | 7.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81011058 | 95,000.00 | 458.85 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81034779 | 95,000.00 | (866.40) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81066706 | 95,275.00 | (1,519.64) | 7.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81088932 | 95,917.00 | (1,055.09) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81040735 | 98,400.00 | 651.41 | 6.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81054629 | 99,910.00 | (703.37) | 13.250 | 08/31/06 | 9/8/2006 | 16 | 10/1/2006 |
| | 81038473 | 103,500.00 | 701.73 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81062341 | 103,550.00 | (321.01) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81049223 | 105,500.00 | (1,036.01) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81046757 | 108,000.00 | (1,315.44) | 7.375 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81099905 | 108,000.00 | (318.60) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 80829864 | 110,000.00 | 116.60 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81064552 | 110,000.00 | (195.80) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81076812 | 110,175.00 | (2,564.88) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| | 81068207 | 111,000.00 | 59.94 | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 80995194 | 113,100.00 | (1,770.02) | 7.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81059453 | 113,200.00 | (598.83) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| | 81082786 | 114,207.00 | (974.18) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 80761240 | 114,207.00 | (1,467.56) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81033144 | 115,000.00 | (64.40) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80760218 | 115,362.00 | - | 6.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81090946 | 115,500.00 | (1,942.71) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81019267 | 116,000.00 | (2,642.48) | 8.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81066946 | 116,346.00 | 1,498.54 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81082497 | 116,720.00 | (1,843.01) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81015950 | 120,000.00 | (859.20) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80999196 | 121,000.00 | (273.46) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80737356 | 122,096.00 | (1,220.96) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81064420 | 122,550.00 | 401.96 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81054769 | 123,600.00 | 830.59 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81003261 | 123,895.82 | (753.92) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81082307 | 124,000.00 | (1,381.36) | 7.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81069353 | 125,100.00 | (312.75) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81069361 | 125,100.00 | (312.75) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81064842 | 127,160.00 | (2,225.30) | 8.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81033516 | 128,000.00 | 23.04 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81000572 | 128,150.00 | (727.89) | 7.260 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81045346 | 128,800.00 | 1,371.72 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81027138 | 129,000.00 | (1,286.13) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81085466 | 132,000.00 | (1,173.48) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81082737 | 132,520.00 | (2,319.10) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81083602 | 133,000.00 | (2,261.00) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80969942 | 133,941.00 | (1,052.77) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81080087 | 134,000.00 | 948.72 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81087553 | 134,000.00 | (1,168.48) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81089930 | 134,500.00 | (1,694.70) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81060014 | 135,471.00 | 899.53 | 6.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80548654 | 137,614.00 | (1,159.42) | 7.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81006157 | 141,750.00 | (1,068.80) | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81083552 | 143,440.00 | (2,784.17) | 7.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80767965 | 144,000.00 | (1,103.04) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80488398 | 144,480.00 | 1,330.66 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81056939 | 147,290.00 | (1,472.90) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81013328 | 147,900.00 | 603.43 | 6.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81032401 | 149,000.00 | 1,291.83 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81060899 | 149,400.00 | (1,266.91) | 6.375 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81031502 | 150,000.00 | 1,309.50 | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81059412 | 150,000.00 | (1,140.00) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80827470 | 150,300.00 | (211.92) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81002206 | 150,400.00 | 640.70 | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81009573 | 152,000.00 | 1,714.56 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81072357 | 154,000.00 | (1,532.30) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80906670 | 156,640.00 | (208.33) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80984891 | 158,500.00 | 122.05 | 7.700 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80989445 | 160,000.00 | (145.60) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81056251 | 161,000.00 | (969.22) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80982416 | 165,000.00 | 2,128.50 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81075152 | 168,000.00 | 1,421.28 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81090409 | 172,725.00 | (360.99) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80910003 | 174,900.00 | 1,948.39 | 7.125 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81085284 | 175,000.00 | 1,226.75 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81028912 | 175,000.00 | (715.75) | 7.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81046088 | 175,000.00 | 110.25 | 6.375 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81075244 | 175,435.00 | (2,061.36) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80963994 | 176,604.00 | (3,046.42) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81044174 | 179,200.00 | (3,023.10) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81030231 | 179,300.00 | (849.88) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81093031 | 181,452.00 | (1,578.63) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81051419 | 185,000.00 | (1,320.90) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81076259 | 190,512.00 | 1,179.27 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81035636 | 195,000.00 | 25.35 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81045734 | 198,000.00 | 2,189.88 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |

14

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 80986961 | 200,000.00 | 1,352.00 | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81028953 | 200,000.00 | (1,872.00) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81086258 | 200,000.00 | (2,496.00) | 7.010 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81095317 | 200,000.00 | (4,162.00) | 7.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81086340 | 201,000.00 | (385.92) | 7.000 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81042855 | 202,500.00 | 743.17 | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81046112 | 202,796.00 | 701.67 | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81034936 | 203,500.00 | (691.90) | 6.250 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80460637 | 204,000.00 | (1,350.48) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81030363 | 204,000.00 | (983.28) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81048837 | 208,900.00 | 1,148.95 | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81045569 | 209,000.00 | (2,946.90) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81048977 | 212,800.00 | 487.31 | 6.860 | 09/05/06 | 9/8/2006 | 11 | 11/1/2006 |
| 81051096 | 213,750.00 | 645.52 | 7.135 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81075772 | 215,616.00 | (1,832.74) | 6.500 | 09/07/06 | 9/8/2006 | 9 | 11/1/2006 |
| 80886914 | 216,000.00 | 1,674.00 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81072662 | 220,000.00 | 1,531.20 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81030652 | 225,000.00 | (252.00) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80980592 | 225,716.00 | 902.86 | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81058018 | 236,800.00 | (2,481.66) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81003253 | 244,500.00 | (325.19) | 7.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80963374 | 245,883.00 | 8,679.67 | 4.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81044968 | 248,000.00 | (4,416.88) | 9.250 | 08/31/06 | 9/8/2006 | 16 | 10/1/2006 |
| 81005761 | 249,500.00 | (1,252.49) | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81078610 | 250,000.00 | - | 6.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81021776 | 250,800.00 | (2,946.90) | 7.135 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81014243 | 251,100.00 | (2,237.30) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81063968 | 256,556.00 | (3,789.33) | 7.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81085577 | 259,000.00 | (2,022.79) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81077562 | 260,000.00 | (4,284.80) | 7.500 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81038655 | 264,000.00 | 171.60 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81078164 | 275,500.00 | 482.12 | 6.760 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81062267 | 310,000.00 | (4,309.00) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81071748 | 316,000.00 | (2,992.52) | 6.750 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 80943178 | 335,825.00 | - | 6.875 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 80993330 | 343,200.00 | (1,170.31) | 6.875 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81080665 | 358,500.00 | (10,927.08) | 7.375 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 79433546 | 359,650.00 | (5,394.75) | 7.000 | 9/8/2006 | 9/8/2006 | 8 | 11/1/2006 |
| 81061509 | 362,000.00 | 550.24 | 6.500 | 09/08/06 | 9/8/2006 | 8 | 10/1/2006 |
| 81061665 | 385,000.00 | (1,628.55) | 6.125 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81054470 | 399,640.00 | (10,610.44) | 8.000 | 08/31/06 | 9/8/2006 | 16 | 10/1/2006 |
| 81053993 | 560,000.00 | (3,942.40) | 6.625 | 09/08/06 | 9/8/2006 | 8 | 11/1/2006 |
| 81042905 | 16,500.00 | 41.25 | 10.650 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81047094 | 20,000.00 | 186.00 | 7.250 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81065575 | 23,400.00 | 847.08 | 10.750 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81081739 | 27,270.00 | - | 9.675 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81069932 | 28,500.00 | 427.50 | 13.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80916307 | 29,050.00 | (1.45) | 12.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81050288 | 29,400.00 | 375.44 | 9.000 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81008120 | 34,200.00 | (644.33) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81090839 | 36,000.00 | - | 11.320 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81088973 | 37,000.00 | 376.66 | 12.250 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81083057 | 38,912.00 | (463.83) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81038184 | 43,000.00 | 426.13 | 10.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80924178 | 45,000.00 | (254.25) | 7.125 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81009060 | 45,200.00 | 320.92 | 12.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81071128 | 51,100.00 | (383.25) | 12.900 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81053076 | 53,000.00 | (1,044.10) | 7.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80916216 | 53,950.00 | (1,281.31) | 8.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81056327 | 54,000.00 | 429.84 | 12.500 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81102576 | 54,200.00 | (247.69) | 13.750 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81065567 | 54,600.00 | (283.37) | 7.125 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81092058 | 57,204.00 | 1,194.99 | 9.125 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81100141 | 57,900.00 | (835.50) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81009565 | 58,500.00 | (20.48) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81107302 | 59,850.00 | (588.33) | 6.625 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81091050 | 60,000.00 | - | 10.445 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81002966 | 63,000.00 | (357.84) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81071763 | 64,750.00 | 636.49 | 9.125 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81013005 | 65,000.00 | (230.10) | 7.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81078560 | 68,600.00 | (51.45) | 6.375 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81076473 | 84,080.00 | (602.01) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81045676 | 86,640.00 | 420.20 | 6.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81054207 | 89,250.00 | | 13.125 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81030959 | 89,500.00 | 88.61 | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81076689 | 92,000.00 | 651.36 | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81070971 | 94,950.00 | (2,141.13) | 7.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81049553 | 96,425.00 | (1,871.61) | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81076234 | 99,000.00 | 303.93 | 7.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81074684 | 99,750.00 | (408.98) | 6.375 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81036444 | 100,000.00 | 101.00 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81088908 | 100,000.00 | 425.00 | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81030017 | 100,830.00 | (1,666.72) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80749773 | 101,000.00 | (569.64) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80784507 | 102,800.00 | (367.00) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80977523 | 103,000.00 | (259.56) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80990955 | 104,722.22 | (524.00) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81079287 | 109,000.00 | 1,947.83 | 7.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80921703 | 111,254.00 | (1,507.49) | 6.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81042798 | 113,172.00 | 935.93 | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81014516 | 115,000.00 | 1,308.70 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80868995 | 116,725.00 | (831.08) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81048167 | 117,000.00 | (234.00) | 7.000 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 80993116 | 117,075.00 | (3,334.29) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81027617 | 118,000.00 | 1,613.06 | 7.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80977630 | 118,400.00 | 951.94 | 6.250 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80732605 | 123,665.00 | (772.91) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81059933 | 124,800.00 | 470.50 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81048811 | 125,000.00 | (1,622.50) | 7.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81069338 | 125,100.00 | (312.75) | 6.500 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81017931 | 126,400.00 | (319.79) | 7.125 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81077307 | 126,773.00 | (1,509.87) | 6.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80779630 | 127,032.00 | 971.51 | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81073751 | 128,000.00 | 464.64 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81030546 | 130,400.00 | (618.10) | 7.375 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81036089 | 131,950.00 | (2,190.37) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81061145 | 132,700.00 | 2,515.99 | 7.250 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81049959 | 133,500.00 | - | 6.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81047813 | 134,910.00 | (1,528.53) | 6.750 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 80799794 | 138,522.00 | (672.14) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81020646 | 140,456.00 | (897.51) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81048027 | 142,000.00 | (2,851.36) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81027112 | 142,500.00 | (1,158.52) | 7.250 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81059032 | 144,000.00 | - | 6.625 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81090268 | 144,000.00 | (2,616.48) | 6.750 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 80933799 | 145,900.00 | 230.52 | 7.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81020190 | 146,000.00 | 1,460.00 | 6.875 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81057556 | 147,400.00 | (2,653.20) | 6.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81088965 | 148,000.00 | (1,808.56) | 7.250 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81056947 | 149,000.00 | (1,104.09) | 7.875 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81088288 | 150,671.00 | (1,583.55) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81038796 | 152,000.00 | (1,834.64) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81070567 | 152,000.00 | | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81042897 | 153,500.00 | (2,494.38) | 7.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81082604 | 156,500.00 | (932.74) | 7.125 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81036527 | 158,000.00 | (647.80) | 6.500 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81045262 | 158,500.00 | 266.28 | 6.750 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81045957 | 159,101.00 | 1,958.53 | 7.000 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| | | | 6.250 | | | | |

16

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81078487 | 160,000.00 | 104.00 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81025983 | 160,000.00 | 3,393.60 | 5.750 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81068470 | 160,000.00 | (400.00) | 6.500 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81037467 | 162,000.00 | (707.94) | 6.875 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81100364 | 164,000.00 | (483.80) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81042756 | 164,500.00 | (3,410.09) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81053191 | 165,000.00 | 714.45 | 7.125 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81005068 | 165,343.00 | 24.80 | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81054173 | 165,750.00 | (3,721.09) | 7.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81001992 | 166,000.00 | (190.90) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81047482 | 170,000.00 | 1,275.00 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81023697 | 171,000.00 | 4,316.04 | 7.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81051617 | 171,400.00 | (138.83) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81018186 | 172,000.00 | (1,806.00) | 7.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81075079 | 176,000.00 | (1,012.00) | 6.750 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 80994601 | 177,000.00 | (456.66) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81042699 | 177,000.00 | (637.20) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81066664 | 178,589.00 | 610.77 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81016099 | 179,000.00 | 4,831.21 | 6.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81058083 | 179,700.00 | 2,131.24 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81080699 | 180,000.00 | (696.60) | 7.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81008989 | 180,700.00 | (1,505.23) | 7.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80301864 | 182,000.00 | 2,833.74 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80998792 | 185,000.00 | 123.95 | 6.375 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81003527 | 186,350.00 | (1,382.72) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81078529 | 186,400.00 | (1,304.80) | 6.500 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81014631 | 186,400.00 | (2,138.01) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81079089 | 188,600.00 | (656.33) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81023459 | 189,805.00 | (2,374.46) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81077356 | 190,000.00 | (142.50) | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80989080 | 193,956.00 | (3,506.73) | 7.000 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 80941388 | 197,100.00 | (3,139.80) | 8.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81061020 | 198,386.00 | 369.00 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81029076 | 198,534.00 | (708.77) | 6.500 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81068124 | 200,000.00 | 1,656.00 | 6.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81091365 | 203,152.00 | (1,860.87) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81090565 | 205,650.00 | (2,482.20) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80982978 | 209,500.00 | (536.32) | 7.375 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81056202 | 216,000.00 | (1,198.80) | 7.625 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81075277 | 216,000.00 | (358.56) | 6.500 | 09/06/06 | 9/11/2006 | 10 | 11/1/2006 |
| 81102329 | 216,800.00 | (2,939.81) | 7.875 | 09/08/06 | 9/11/2006 | 8 | 11/1/2006 |
| 81081572 | 218,400.00 | 1,126.94 | 6.375 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81009615 | 220,000.00 | 352.00 | 6.375 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81058919 | 220,000.00 | (3,016.20) | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81035859 | 221,250.00 | (628.35) | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81058471 | 222,526.00 | (2,334.30) | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81047268 | 224,000.00 | 495.04 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81057077 | 224,000.00 | (1,744.96) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 80977606 | 228,000.00 | (574.56) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81092033 | 228,816.00 | (1,718.41) | 7.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81091670 | 240,000.00 | (2,800.80) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81074866 | 245,000.00 | 1,964.90 | 6.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81074106 | 245,000.00 | (7,467.60) | 7.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81052292 | 255,000.00 | (3,156.90) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81071524 | 259,000.00 | (5,827.50) | 7.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81028565 | 260,000.00 | (371.80) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81034571 | 265,600.00 | 698.53 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81041840 | 270,000.00 | 5.40 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81030827 | 278,000.00 | 1,392.78 | 6.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80929011 | 282,225.00 | 222.96 | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81033417 | 283,500.00 | 3,229.06 | 6.250 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81045551 | 284,900.00 | 2,418.80 | 6.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81055188 | 288,500.00 | - | 7.250 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81001174 | 290,400.00 | 1,237.10 | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81010084 | 291,869.00 | (1,938.01) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81064016 | 301,000.00 | 63.21 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81064040 | 301,500.00 | (1,004.00) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81081499 | 303,000.00 | (3,684.48) | 7.000 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81077760 | 305,000.00 | 1,573.80 | 6.375 | 09/05/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81035115 | 320,000.00 | 2,601.60 | 6.375 | 09/06/06 | 9/11/2006 | 11 | 11/1/2006 |
| 81091027 | 320,000.00 | (3,177.60) | 7.250 | 09/11/06 | 9/11/2006 | 10 | 11/1/2006 |
| 80987662 | 325,800.00 | (905.72) | 6.875 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81099830 | 331,400.00 | (3,582.43) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 10/1/2006 |
| 81059883 | 342,000.00 | (3,943.26) | 6.750 | 09/05/06 | 9/11/2006 | 11 | 10/1/2006 |
| 81009326 | 344,000.00 | 3,921.60 | 6.500 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81029621 | 375,000.00 | (3,165.00) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81099178 | 396,900.00 | (7,477.59) | 6.375 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81069957 | 408,000.00 | (10,771.20) | 7.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81008286 | 455,000.00 | (1,565.20) | 6.625 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81005159 | 675,500.00 | (16,873.99) | 7.250 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 80973191 | 750,000.00 | 2,002.50 | 6.750 | 09/11/06 | 9/11/2006 | 5 | 11/1/2006 |
| 81046633 | 16,500.00 | 432.30 | 13.125 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81086878 | 25,000.00 | 62.50 | 12.400 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81083016 | 26,250.00 | 65.63 | 14.025 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81095945 | 32,000.00 | (941.12) | 15.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81099731 | 35,250.00 | 677.15 | 8.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81017469 | 40,500.00 | (405.00) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81066631 | 42,550.00 | (212.75) | 12.400 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80967763 | 50,000.00 | 177.00 | 6.625 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81091845 | 52,800.00 | (24.29) | 12.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81016158 | 57,000.00 | 159.60 | 8.375 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81087637 | 57,600.00 | (432.00) | 12.300 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80992910 | 67,664.00 | (405.98) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80542582 | 68,000.00 | (367.20) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81094310 | 68,775.00 | (1,375.50) | 12.620 | 09/11/06 | 9/12/2006 | 5 | 11/1/2006 |
| 81008609 | 72,471.00 | (481.21) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81082976 | 73,500.00 | (654.15) | 7.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81084832 | 76,000.00 | (1,468.32) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81095754 | 76,396.00 | 360.59 | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81087470 | 78,380.00 | (467.93) | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81057838 | 78,900.00 | 258.79 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81066425 | 78,950.00 | (1,819.80) | 7.125 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81029068 | 79,000.00 | 434.50 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81044901 | 79,000.00 | (470.84) | 7.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81070955 | 79,500.00 | 781.49 | 13.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81048290 | 79,900.00 | (1,615.57) | 7.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81079303 | 80,000.00 | (772.80) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2008 |
| 79973830 | 83,000.00 | (1,589.45) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81040461 | 83,500.00 | 140.28 | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81066458 | 84,000.00 | (905.52) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81092702 | 84,000.00 | (195.72) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80882863 | 87,750.00 | (1,636.54) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81046625 | 88,000.00 | 271.04 | 7.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 2681080384 | 89,195.00 | - | 4.650 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81067290 | 90,000.00 | 225.00 | 10.750 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 80836505 | 90,400.00 | (277.53) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81029803 | 91,000.00 | (419.51) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81036683 | 94,400.00 | 2,094.74 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80933880 | 95,216.00 | 1,445.38 | 11.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80777758 | 97,896.00 | 489.48 | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81086803 | 98,900.00 | 30.66 | 7.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81067944 | 105,000.00 | (1,942.50) | 7.000 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81079790 | 106,100.00 | (2,053.04) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81087629 | 106,900.00 | (2,357.15) | 7.125 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81036402 | 108,000.00 | 2,285.28 | 12.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81086886 | 110,000.00 | (1,108.80) | 6.750 | 09/12/06 | 9/12/2008 | 4 | 11/1/2006 |
| 81095747 | 112,000.00 | (1,955.52) | 7.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81016370 | 113,000.00 | 305.10 | 7.450 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81037046 | 113,300.00 | (200.54) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81068009 | 113,443.00 | 655.70 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80479587 | 114,255.00 | - | 5.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81064529 | 115,000.00 | (46.00) | 6.625 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81053084 | 116,450.00 | (2,592.18) | 7.500 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81023681 | 116,655.00 | (1,117.56) | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81041295 | 117,740.00 | 123.63 | 6.375 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 80724628 | 118,305.00 | (1,183.05) | 6.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81068017 | 120,193.00 | 694.72 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81073686 | 121,440.00 | (1,902.96) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81071318 | 122,000.00 | (244.00) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81092991 | 123,200.00 | (257.49) | 7.125 | 09/11/06 | 9/12/2006 | 5 | 11/1/2006 |
| 81099673 | 125,012.00 | (2,781.52) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81094294 | 127,725.00 | (2,714.16) | 7.125 | 09/11/06 | 9/12/2006 | 5 | 11/1/2006 |
| 81093734 | 128,877.00 | (1,458.89) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81018400 | 129,862.00 | (415.56) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81040826 | 131,000.00 | (246.28) | 6.875 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81067050 | 133,150.00 | 898.76 | 6.875 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81086118 | 134,000.00 | (560.12) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81018137 | 135,000.00 | (2,025.00) | 7.875 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81085490 | 136,000.00 | 788.80 | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81070096 | 138,000.00 | (121.44) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81010431 | 140,000.00 | 1,614.20 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81085441 | 146,000.00 | (1,022.00) | 6.500 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 80963937 | 147,096.00 | 922.29 | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81076846 | 148,000.00 | (449.92) | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81077836 | 148,000.00 | 649.72 | 7.125 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81028359 | 149,200.00 | (860.88) | 7.125 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81019622 | 150,000.00 | 2,566.50 | 6.250 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80967508 | 151,250.00 | 264.69 | 6.750 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81079188 | 161,900.00 | 547.23 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81079840 | 163,440.00 | (3,636.54) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81094831 | 165,000.00 | (1,443.75) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81048407 | 171,660.00 | (815.39) | 6.375 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81016727 | 171,920.00 | 849.28 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81069494 | 174,000.00 | 1,666.92 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81047953 | 175,000.00 | 168.00 | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81006793 | 175,500.00 | 2,813.27 | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81093635 | 175,500.00 | (4,754.29) | 7.250 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81028284 | 178,641.00 | (2,136.55) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81056509 | 182,458.00 | (2,463.18) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81013146 | 184,000.00 | 355.12 | 7.875 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81079006 | 184,000.00 | (1,532.72) | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81070757 | 185,500.00 | (665.95) | 7.125 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81099509 | 188,000.00 | (3,301.28) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81050668 | 189,000.00 | 2,390.85 | 6.250 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80997489 | 190,400.00 | (860.61) | 7.450 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81080269 | 191,900.00 | (2,298.96) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81059586 | 192,000.00 | 1,891.20 | 7.625 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81024085 | 192,800.00 | (275.70) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81058299 | 192,850.00 | (2,121.35) | 6.500 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81082356 | 194,500.00 | (1,272.03) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81022873 | 195,500.00 | (725.31) | 6.875 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 80999568 | 199,000.00 | 768.14 | 6.625 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81077034 | 200,000.00 | (2,138.00) | 6.875 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81001927 | 200,000.00 | 6,274.00 | 6.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81020778 | 200,462.00 | 2,195.06 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81046062 | 203,000.00 | 184.73 | 7.000 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80867179 | 209,000.00 | (286.33) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81039281 | 210,000.00 | (12.60) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81091761 | 211,200.00 | (2,257.73) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81047664 | 211,678.00 | (1,479.63) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81034241 | 215,100.00 | 1,279.85 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81066953 | 220,000.00 | (1,790.80) | 7.000 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81072068 | 220,500.00 | (2,692.31) | 6.875 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80933690 | 222,169.00 | (2,359.43) | 7.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80937501 | 231,300.00 | 1,711.62 | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80925068 | 235,000.00 | 3,315.85 | 6.500 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 80922230 | 238,800.00 | 4,233.92 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81080939 | 239,000.00 | (7,564.35) | 7.500 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81050643 | 250,000.00 | (7,697.50) | 7.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81036394 | 252,000.00 | (4,193.28) | 8.250 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81053720 | 260,000.00 | (728.00) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81048795 | 275,120.00 | (1,925.84) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81081218 | 275,674.00 | (2,704.36) | 6.750 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81051609 | 280,000.00 | (3,214.40) | 7.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81085094 | 284,000.00 | 2,272.00 | 6.000 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81048456 | 288,800.00 | 2,047.59 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81080988 | 295,000.00 | (8,714.30) | 7.250 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81037053 | 302,000.00 | 631.18 | 6.875 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81075004 | 308,600.00 | (2,154.03) | 6.625 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81073199 | 317,400.00 | 758.59 | 6.750 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81033102 | 340,000.00 | (10,468.60) | 7.375 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81008872 | 352,000.00 | (1,488.96) | 7.125 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 81066599 | 360,000.00 | 172.80 | 7.625 | 09/07/06 | 9/12/2006 | 9 | 11/1/2006 |
| 81031494 | 408,000.00 | 1,456.56 | 6.500 | 09/12/06 | 9/12/2006 | 4 | 11/1/2006 |
| 80981798 | 463,650.00 | 4,534.50 | 6.375 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81063455 | 1,000,000.00 | (25,000.00) | 7.250 | 09/12/06 | 9/12/2006 | 4 | 10/1/2006 |
| 81099947 | 17,984.00 | 555.53 | 7.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81045171 | 19,400.00 | 25.22 | 8.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81056897 | 29,700.00 | (33.26) | 13.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81004665 | 30,000.00 | 95.70 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81027443 | 33,000.00 | 92.40 | 12.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 80883069 | 33,750.00 | 337.50 | 11.920 | 09/12/06 | 9/13/2006 | 4 | 11/1/2006 |
| 81072399 | 35,200.00 | - | 13.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81108490 | 36,900.00 | (24.35) | 12.375 | 09/12/06 | 9/13/2006 | 4 | 11/1/2006 |
| 81038929 | 38,750.00 | | 11.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81050841 | 40,000.00 | 581.60 | 11.875 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81069213 | 41,000.00 | 410.00 | 9.663 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81019697 | 49,735.00 | (410.31) | 6.500 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81067423 | 50,000.00 | (772.50) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81019408 | 50,000.00 | 27.00 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81039604 | 53,033.00 | (1,145.52) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81023541 | 53,449.00 | (454.85) | 6.500 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81044489 | 54,950.00 | (58.80) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81103012 | 57,000.00 | (738.72) | 15.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81041113 | 57,000.00 | (415.53) | 16.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81084691 | 58,225.00 | (648.63) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81057168 | 59,663.00 | (1,272.61) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81098386 | 59,800.00 | 483.78 | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81083123 | 60,000.00 | 927.00 | 12.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81074965 | 60,900.00 | 149.81 | 5.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81019416 | 61,200.00 | 14.69 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81049595 | 62,400.00 | (630.24) | 11.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81013070 | 63,000.00 | (1,214.64) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81059578 | 63,500.00 | (496.57) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81067878 | 68,600.00 | (351.23) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81094161 | 71,936.00 | (1,449.51) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81057515 | 74,800.00 | (611.12) | 7.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80995665 | 75,000.00 | (443.25) | 8.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81064743 | 77,140.00 | 623.30 | 6.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81038754 | 78,662.00 | (593.11) | 6.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81072175 | 78,764.00 | 710.45 | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81036121 | 80,000.00 | (119.20) | 6.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81031536 | 82,600.00 | 914.38 | 7.125 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81088999 | 83,000.00 | (419.98) | 6.500 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81037103 | 86,250.00 | (547.69) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81027690 | 86,813.00 | (690.16) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81073207 | 87,000.00 | 21.75 | 6.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81079774 | 89,600.00 | (813.57) | 6.750 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81067241 | 90,000.00 | (513.00) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81020703 | 92,000.00 | (471.04) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81061749 | 92,250.00 | (815.49) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81049579 | 101,250.00 | (358.43) | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81044471 | 102,050.00 | (1,575.66) | 7.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80999683 | 103,296.35 | (2,532.74) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81064560 | 103,500.00 | (2,147.63) | 7.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81050759 | 105,950.00 | (927.07) | 7.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81032922 | 107,500.00 | (1,825.35) | 8.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81012510 | 108,199.00 | (739.00) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81049645 | 109,500.00 | - | 6.625 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81091986 | 112,500.00 | 696.38 | 6.875 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81079378 | 113,900.00 | (1,244.92) | 7.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81058414 | 116,000.00 | (1,671.56) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81038879 | 116,250.00 | (947.44) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81016404 | 116,471.00 | (1,846.07) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81022386 | 120,000.00 | 482.40 | 7.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81015174 | 121,125.00 | (1,796.28) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81012031 | 121,977.00 | (924.59) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81086662 | 122,400.00 | (91.80) | 6.625 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81032179 | 123,830.00 | - | 7.000 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81089946 | 125,000.00 | (1,465.00) | 7.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80809700 | 125,037.00 | (323.84) | 6.750 | 09/12/06 | 9/13/2006 | 4 | 11/1/2006 |
| 81045635 | 125,507.00 | 1,625.32 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81049488 | 125,848.00 | 1,058.38 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81036329 | 127,000.00 | 1,450.34 | 6.875 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 80999204 | 127,400.00 | (1,542.81) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81085524 | 127,458.00 | (2,835.94) | 7.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81089039 | 128,000.00 | 220.16 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81089559 | 130,000.00 | 192.40 | 6.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81052177 | 130,000.00 | (105.30) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81027393 | 132,000.00 | 542.52 | 7.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81014318 | 134,010.00 | (1,127.02) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81044240 | 135,925.00 | 2,481.99 | 6.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81083149 | 136,422.00 | (1,316.47) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 80912595 | 137,200.00 | 898.66 | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81106650 | 139,800.00 | (1,019.14) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81072035 | 140,800.00 | (601.22) | 7.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80791478 | 145,830.00 | (707.60) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81069577 | 146,000.00 | (2,007.50) | 7.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81094203 | 147,000.00 | (3,110.52) | 7.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81107310 | 147,600.00 | (2,491.49) | 7.250 | 09/13/06 | 9/13/2006 | 4 | 11/1/2006 |
| 81087504 | 148,494.00 | (1,063.22) | 6.500 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81086647 | 150,350.00 | (287.17) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81089765 | 151,128.00 | 867.47 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81044497 | 152,000.00 | (874.00) | 6.750 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81061921 | 154,800.00 | 1,116.11 | 6.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80975345 | 156,000.00 | 1,079.52 | 6.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81016297 | 157,821.00 | (617.08) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81056855 | 158,400.00 | (2,605.68) | 7.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81033367 | 158,512.00 | (1,347.35) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81054884 | 159,862.00 | (1,205.36) | 6.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81093692 | 160,000.00 | (475.20) | 6.375 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81032682 | 160,000.00 | 1,665.60 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81069189 | 164,000.00 | (252.56) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81098048 | 164,900.00 | (3,009.42) | 7.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81066300 | 168,300.00 | (552.02) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81096943 | 171,000.00 | (983.25) | 6.750 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81103004 | 171,000.00 | (3,271.23) | 9.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81061152 | 174,000.00 | (687.30) | 6.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81053373 | 178,000.00 | 890.00 | 8.000 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81054702 | 178,500.00 | (519.44) | 6.625 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81032534 | 188,000.00 | (795.24) | 7.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81070526 | 188,000.00 | 2,171.40 | 6.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81084261 | 188,000.00 | (4,848.52) | 7.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81091639 | 190,000.00 | 2,033.00 | 6.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81013096 | 190,000.00 | 1,844.90 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81023590 | 190,000.00 | (364.80) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81093700 | 191,250.00 | (4,932.35) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81086399 | 192,500.00 | (19.25) | 6.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81033110 | 195,000.00 | (2,152.80) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81047086 | 195,549.00 | 2,530.40 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81091076 | 196,800.00 | 875.76 | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81020950 | 197,000.00 | 114.26 | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81027302 | 197,819.00 | (939.64) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81013468 | 198,500.00 | 958.76 | 6.500 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81089062 | 198,855.00 | (791.44) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81030421 | 199,500.00 | 1,496.25 | 8.000 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81068256 | 202,000.00 | (1,167.56) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81083545 | 203,162.00 | 127.99 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81065310 | 204,000.00 | (2,070.60) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81036733 | 205,000.00 | 1,107.00 | 6.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81032773 | 206,000.00 | (875.50) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81059875 | 207,000.00 | (1,540.08) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81039083 | 208,988.00 | (3,038.69) | 7.000 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80940463 | 212,000.00 | (67.84) | 6.875 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81020869 | 214,000.00 | 115.56 | 6.250 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81012841 | 215,000.00 | 1,038.45 | 6.500 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81068884 | 217,000.00 | (2,875.25) | 7.250 | 09/08/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81030454 | 219,000.00 | (2,299.50) | 6.750 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 80953490 | 219,710.33 | 1,258.94 | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81018228 | 220,000.00 | 3,471.60 | 6.125 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81099434 | 226,271.16 | 2,002.50 | 6.125 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81092132 | 226,773.00 | 63.50 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81075145 | 227,000.00 | (2,640.01) | 7.125 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81045585 | 227,547.00 | (5,463.40) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81098287 | 239,200.00 | (581.26) | 7.875 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80988330 | 239,540.00 | (498.24) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81085938 | 249,000.00 | (1,150.38) | 7.250 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81087108 | 249,500.00 | (7,662.10) | 7.375 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81091407 | 265,500.00 | (4,834.75) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81056467 | 272,000.00 | (3,476.16) | 6.750 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81081523 | 279,000.00 | 6,875.00 | 6.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 80936321 | 288,400.00 | 3,576.16 | 6.750 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81022956 | 305,000.00 | (2,263.10) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81084758 | 308,000.00 | 563.64 | 7.000 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81029936 | 324,000.00 | (2,144.88) | 6.750 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81024762 | 330,000.00 | 303.60 | 7.375 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81089161 | 347,000.00 | (9,247.55) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81096307 | 356,000.00 | (10,324.00) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81079352 | 378,000.00 | (10,190.88) | 7.250 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 81019382 | 378,600.00 | (4,153.24) | 7.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81085185 | 410,000.00 | (4,210.70) | 6.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 81045536 | 417,000.00 | 792.30 | 6.500 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 80869886 | 417,000.00 | 4,536.96 | 6.375 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81076002 | 457,000.00 | (8,070.62) | 7.125 | 09/08/06 | 9/13/2006 | 8 | 11/1/2006 |
| 80965429 | 533,000.00 | (4,114.76) | 7.125 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81060592 | 622,000.00 | 447.84 | 6.500 | 09/13/06 | 9/13/2006 | 3 | 11/1/2006 |
| 80955271 | 649,999.00 | (3,289.00) | 6.625 | 09/13/06 | 9/13/2006 | 3 | 10/1/2006 |
| 81010753 | 25,000.00 | (10.00) | 12.375 | 09/13/06 | 9/14/2006 | 3 | 11/1/2006 |
| 81090508 | 26,000.00 | 32.50 | 12.400 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81061475 | 28,400.00 | 71.00 | 12.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81088643 | 37,950.00 | (40.61) | 14.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81006835 | 43,200.00 | 1,845.07 | 7.625 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81054900 | 45,000.00 | (765.00) | 7.125 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 80767460 | 55,550.00 | 307.19 | 6.750 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |

| LOAN | | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|---|
| | 81034456 | 55,627.00 | (464.49) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81095366 | 56,650.00 | (462.83) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81045353 | 58,650.00 | 759.52 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 80981673 | 60,841.00 | 136.89 | 6.500 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81083396 | 65,619.00 | (1,181.14) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81054256 | 68,990.00 | - | 11.425 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81075764 | 70,000.00 | (13.30) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81084279 | 73,667.00 | (2,184.96) | 7.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81055816 | 74,700.00 | (857.55) | 7.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81090441 | 77,000.00 | (1,031.80) | 7.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81059305 | 79,000.00 | (124.82) | 7.950 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81099095 | 80,000.00 | (946.40) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81031767 | 80,800.00 | (378.14) | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81024804 | 84,333.00 | 752.25 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81051310 | 87,000.00 | (408.03) | 11.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81005753 | 87,000.00 | (281.01) | 6.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81021792 | 87,000.00 | (557.67) | 7.250 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81115990 | 87,320.00 | (1,593.59) | 7.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81072530 | 88,301.00 | (983.67) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81088619 | 88,550.00 | (1,351.28) | 7.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81040362 | 90,000.00 | (634.50) | 7.825 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81027146 | 92,300.00 | (1,575.56) | 7.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81067654 | 92,700.00 | (486.68) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81038218 | 93,000.00 | (1,595.88) | 7.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80938871 | 96,485.00 | (254.72) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81056541 | 98,900.00 | (842.63) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81010720 | 100,000.00 | (2,083.00) | 7.875 | 09/13/06 | 9/14/2006 | 3 | 11/1/2006 |
| | 80257215 | 101,000.00 | (71.71) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80991409 | 102,000.00 | (165.24) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81038903 | 102,000.00 | (174.42) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81070443 | 103,174.00 | (1,776.66) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81060147 | 105,000.00 | (1,147.65) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81052169 | 105,000.00 | 700.35 | 7.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 80901655 | 109,000.00 | - | 13.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81024234 | 109,137.00 | 121.14 | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80810740 | 110,300.00 | (830.55) | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81051930 | 110,301.00 | (459.96) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81079477 | 110,635.00 | 658.28 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81061293 | 113,600.00 | (1,029.22) | 7.750 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81086506 | 114,000.00 | (2,803.26) | 7.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81018210 | 116,000.00 | 1,146.08 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 80895030 | 117,065.00 | (2,460.71) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81049215 | 117,150.00 | (694.70) | 7.125 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81069171 | 118,400.00 | 853.66 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81041915 | 118,500.00 | 1,023.84 | 7.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81036063 | 120,500.00 | (633.83) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81066292 | 120,950.00 | 1,112.74 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81033482 | 123,200.00 | 427.50 | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80622160 | 124,309.00 | - | 5.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81091217 | 128,000.00 | (2,560.00) | 8.625 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81083305 | 129,500.00 | (529.66) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81051120 | 131,000.00 | (493.87) | 7.700 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81021453 | 131,100.00 | (470.64) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81097305 | 131,885.00 | (1,875.41) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81099541 | 133,000.00 | (1,125.18) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80864143 | 137,025.00 | (1,438.76) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81040339 | 139,200.00 | (1,052.35) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81021164 | 142,300.00 | 2,168.65 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81071805 | 143,200.00 | (959.44) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80991631 | 143,419.00 | 1,039.79 | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81035784 | 143,600.00 | 2,230.11 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| | 81044679 | 144,300.00 | (1,492.06) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 81043952 | 144,590.00 | (2,045.95) | 7.010 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| | 80976509 | 145,221.00 | (503.91) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81058885 | 145,847.00 | 271.28 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81046138 | 146,900.00 | (854.96) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81042046 | 147,500.00 | 1,467.63 | 7.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81043606 | 148,799.00 | 2,060.87 | 5.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80972276 | 149,500.00 | 1,919.58 | 7.450 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81060410 | 150,000.00 | (184.50) | 7.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81108714 | 151,905.00 | 1,441.57 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81049900 | 154,000.00 | 1,387.54 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81031445 | 154,246.00 | (2,472.56) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 80891229 | 155,200.00 | 325.92 | 6.500 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81105082 | 158,000.00 | (1,106.00) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81025256 | 161,689.00 | 2,266.88 | 6.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81081713 | 163,150.00 | (4,948.34) | 7.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81095986 | 163,584.00 | 2,353.97 | 5.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81097453 | 164,420.00 | (4,169.69) | 7.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81041774 | 165,000.00 | (999.90) | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80937980 | 168,000.00 | 288.96 | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81017055 | 168,743.00 | (2,073.85) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81052110 | 172,296.00 | 1,449.01 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81002115 | 173,000.00 | 306.21 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81063547 | 175,000.00 | (1,953.00) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81078388 | 175,000.00 | (320.25) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 79583597 | 176,000.00 | 117.92 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81089179 | 183,549.00 | (2,044.74) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81035297 | 184,171.00 | 3,342.70 | 6.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81090524 | 185,000.00 | 847.30 | 7.075 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81069403 | 185,000.00 | (2,081.25) | 7.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81023632 | 189,600.00 | (1,774.66) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81074973 | 194,000.00 | 568.42 | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81080210 | 195,367.43 | (900.64) | 7.125 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81066094 | 196,270.00 | (3,222.75) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81093759 | 196,910.00 | (2,229.02) | 6.750 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81079923 | 200,000.00 | 638.00 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81062002 | 200,000.00 | (582.00) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81076887 | 201,904.00 | (4,239.98) | 7.250 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81023723 | 203,095.00 | (1,218.57) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 80950785 | 205,200.00 | (410.40) | 7.375 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 80472335 | 208,000.00 | 472.16 | 6.625 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81080228 | 208,075.00 | (4,286.34) | 7.000 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81034019 | 214,432.00 | 4,168.55 | 5.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81029316 | 215,000.00 | (969.65) | 6.750 | 09/13/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81024549 | 215,000.00 | (546.10) | 6.500 | 09/14/06 | 9/14/2006 | 3 | 11/1/2006 |
| 81024705 | 229,000.00 | 1,905.28 | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80912678 | 238,000.00 | (80.92) | 6.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81045924 | 240,000.00 | (1,680.00) | 6.750 | 09/13/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81071722 | 250,000.00 | 2,042.50 | 6.500 | 09/14/06 | 9/14/2006 | 3 | 11/1/2006 |
| 81058331 | 255,375.00 | (1,156.85) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81066227 | 258,750.00 | 2,142.45 | 6.250 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81045866 | 268,000.00 | (1,299.80) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81075061 | 277,695.00 | 3,693.34 | 6.125 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 81089476 | 288,500.00 | (8,882.91) | 7.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80980824 | 305,000.00 | 10,031.45 | 6.000 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81094336 | 307,900.00 | (791.30) | 6.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81047342 | 308,000.00 | (9,483.32) | 7.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81065393 | 320,000.00 | (10,553.60) | 7.375 | 09/05/06 | 9/14/2006 | 11 | 11/1/2006 |
| 81051286 | 348,000.00 | (1,336.32) | 7.125 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81053977 | 350,000.00 | (374.50) | 6.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80980097 | 351,000.00 | 1,505.79 | 7.125 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81065450 | 353,000.00 | (11,084.20) | 7.625 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80995244 | 367,960.00 | 1,784.61 | 7.375 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 80295280 | 390,000.00 | (7,047.30) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 10/1/2006 |
| 80881279 | 436,000.00 | | 7.500 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81063877 | 500,000.00 | (5,495.00) | 6.875 | 09/14/06 | 9/14/2006 | 2 | 11/1/2006 |
| 81103780 | 12,980.00 | (27.65) | 12.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |

24

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81042525 | 16,050.00 | 32.42 | 13.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81001968 | 18,000.00 | 700.02 | 10.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81096760 | 20,000.00 | - | 13.320 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81039091 | 25,000.00 | 250.00 | 10.795 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81094179 | 28,000.00 | - | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81051724 | 28,560.00 | - | 12.450 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088957 | 32,250.00 | (21.29) | 12.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088411 | 32,600.00 | 466.51 | 14.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81099079 | 34,600.00 | (962.23) | 16.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81095648 | 37,950.00 | - | 11.820 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81105959 | 43,600.00 | 579.44 | 9.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81086571 | 44,250.00 | 553.13 | 13.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81073124 | 45,400.00 | - | 11.000 | 08/31/06 | 9/15/2006 | 16 | 10/1/2006 |
| 81106999 | 46,875.00 | (41.25) | 10.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81093379 | 47,000.00 | (31.02) | 12.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81008419 | 49,250.00 | (81.26) | 13.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81085060 | 49,400.00 | 1,264.15 | 9.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81086902 | 50,000.00 | (671.50) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81099145 | 50,600.00 | (81.47) | 12.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81103798 | 51,920.00 | (801.64) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81084055 | 52,312.00 | (909.18) | 6.750 | 09/08/06 | 9/15/2006 | 8 | 11/1/2006 |
| 81065997 | 52,620.00 | 260.47 | 12.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81098196 | 58,750.00 | (587.50) | 12.720 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81068447 | 59,175.00 | - | 13.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088197 | 59,500.00 | - | 12.320 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81066862 | 60,000.00 | (861.00) | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81078602 | 60,000.00 | 410.40 | 13.750 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81079451 | 60,000.00 | 410.40 | 13.750 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81073553 | 63,950.00 | (716.24) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81081812 | 64,750.00 | 442.89 | 13.750 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81082166 | 65,000.00 | 444.60 | 13.750 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81043887 | 65,383.00 | (51.65) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81018756 | 65,600.00 | (310.94) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81051690 | 66,640.00 | - | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81059685 | 67,438.89 | (638.65) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062861 | 69,000.00 | (536.82) | 6.750 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81026163 | 69,000.00 | (98.67) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81102386 | 70,500.00 | (1,328.22) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81001919 | 71,900.00 | (865.68) | 8.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81044836 | 72,000.00 | (385.20) | 6.250 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81044794 | 72,500.00 | (1,580.50) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81047284 | 72,900.00 | 438.13 | 6.875 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81057275 | 75,000.00 | (822.75) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81031122 | 75,721.00 | (187.03) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81094773 | 77,000.00 | (375.76) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81069692 | 77,140.00 | (1,427.09) | 7.000 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81113870 | 77,750.00 | (1,550.00) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2008 |
| 80970114 | 78,500.00 | (1,138.25) | 7.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81072696 | 78,662.00 | (748.07) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81092959 | 78,750.00 | (1,168.65) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80858806 | 79,200.00 | (691.42) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81096729 | 80,000.00 | 272.80 | 7.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80912744 | 80,000.00 | (96.80) | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81070484 | 80,800.00 | (404.00) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81057010 | 81,200.00 | (367.84) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80736713 | 82,500.00 | (565.13) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81087223 | 82,500.00 | (1,393.43) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81110181 | 83,500.00 | (376.59) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81100877 | 83,900.00 | 162.77 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088601 | 84,000.00 | (1,719.48) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81095622 | 84,720.00 | (1,083.57) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81079725 | 85,000.00 | (228.65) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81042509 | 85,600.00 | (1,097.39) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81095630 | 88,550.00 | (1,215.79) | 7.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |

25

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81044703 | 88,580.00 | (769.76) | 7.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062739 | 89,900.00 | (1,111.16) | 7.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81015166 | 90,800.00 | (720.04) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81065757 | 92,720.00 | - | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80762966 | 93,285.00 | (932.85) | 7.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80748577 | 94,872.00 | - | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81089377 | 95,000.00 | (427.50) | 7.450 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81091852 | 95,000.00 | (1,158.05) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81036501 | 95,500.00 | (709.57) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81093007 | 97,000.00 | - | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81091084 | 97,300.00 | (886.40) | 6.375 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81068272 | 98,185.00 | (2,256.29) | 7.625 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81032377 | 98,356.00 | (242.94) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81083073 | 99,500.00 | (218.90) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81086472 | 100,000.00 | (1,146.00) | 6.875 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81022642 | 100,000.00 | (214.00) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80986664 | 100,000.00 | (556.00) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81013195 | 100,000.00 | (340.00) | 8.250 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 80982754 | 100,485.00 | 289.40 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81082828 | 100,700.00 | (479.33) | 8.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81063273 | 101,000.00 | 1,165.54 | 6.950 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81106932 | 101,562.00 | (2,031.24) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81080467 | 102,650.00 | (1,767.63) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81079865 | 103,000.00 | (1,034.12) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81098477 | 103,086.43 | (1,995.75) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81086563 | 103,250.00 | (1,385.62) | 8.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81056681 | 103,500.00 | (587.88) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81073959 | 104,193.00 | (491.79) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 80929342 | 106,118.00 | (193.13) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81033631 | 107,000.00 | (615.25) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088130 | 110,500.00 | (1,512.75) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81032542 | 112,000.00 | (189.28) | 8.875 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 78164340 | 112,106.34 | - | 6.350 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81039257 | 112,411.00 | 890.29 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81064370 | 113,163.00 | 140.82 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81059719 | 113,984.00 | (1,008.76) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81036410 | 114,489.40 | 17.17 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81034050 | 117,232.00 | (1,665.86) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81069106 | 119,000.00 | (2,510.90) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81092611 | 120,000.00 | (715.20) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81043283 | 120,000.00 | 92.40 | 11.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81089740 | 120,000.00 | 1,872.00 | 6.000 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81097206 | 121,049.00 | (1,166.70) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81093015 | 123,200.00 | (52.98) | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81079733 | 123,900.00 | 182.13 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81054637 | 123,920.00 | (2,821.66) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81066508 | 124,000.00 | (657.20) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81093775 | 125,249.25 | (2,254.49) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81057085 | 125,352.00 | (740.83) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81041246 | 125,500.00 | (2,648.05) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81008385 | 128,050.00 | (3,756.99) | 7.625 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81014136 | 128,500.00 | 620.66 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81112344 | 129,843.00 | 488.21 | 6.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80312622 | 130,000.00 | 1,220.70 | 5.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81088353 | 130,400.00 | (293.40) | 9.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81111338 | 131,000.00 | (1,393.84) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81070625 | 131,200.00 | (642.88) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81107617 | 131,461.00 | (1,084.55) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81078941 | 132,535.00 | 955.58 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81061541 | 133,293.92 | (1,416.91) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81103103 | 134,000.00 | (523.94) | 8.375 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81087462 | 136,000.00 | 1,685.04 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80979099 | 137,738.00 | (1,619.80) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81121964 | 137,837.00 | (161.27) | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days in WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81098907 | 138,400.00 | (1,775.67) | 7.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062796 | 139,200.00 | 846.34 | 6.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81081564 | 139,894.00 | (500.00) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81083586 | 140,070.00 | 935.67 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81069569 | 140,500.00 | (948.38) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81049918 | 143,629.84 | 1,136.11 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80963275 | 144,000.00 | (156.96) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81030934 | 144,872.06 | (615.71) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81104705 | 145,000.00 | 1,581.95 | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81096885 | 146,000.00 | (519.76) | 6.750 | 09/14/06 | 9/15/2006 | 2 | 11/1/2006 |
| 80684657 | 146,545.00 | 1,910.95 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81064776 | 148,100.00 | 555.38 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81091944 | 148,117.00 | (3,295.60) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81053951 | 149,716.00 | - | 5.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81082653 | 151,295.00 | 1,012.17 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81108623 | 153,589.00 | (2,979.63) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81085029 | 160,000.00 | 889.60 | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80957863 | 160,515.00 | 1,958.29 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81107773 | 162,400.00 | (3,196.03) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81079980 | 162,958.00 | (1,815.35) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81085532 | 164,000.00 | (1,028.28) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81035594 | 164,430.00 | (575.50) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81073074 | 164,900.00 | - | 6.875 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81109589 | 165,000.00 | (156.75) | 6.250 | 09/14/06 | 9/15/2006 | 2 | 11/1/2006 |
| 81054405 | 165,000.00 | (33.00) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81026023 | 167,800.00 | 1,800.49 | 7.450 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81036212 | 168,000.00 | (1,438.08) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81031486 | 168,000.00 | (809.76) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81078321 | 169,000.00 | 395.46 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 80997257 | 170,096.00 | 850.48 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81083537 | 171,500.00 | (1,932.80) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81066334 | 171,931.00 | (2,477.53) | 6.500 | 09/14/06 | 9/15/2006 | 2 | 11/1/2006 |
| 81088690 | 172,000.00 | (3,424.52) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81075202 | 173,920.00 | (747.86) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81062887 | 174,070.00 | (372.51) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81105876 | 174,400.00 | (209.28) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81090763 | 175,138.00 | 1,945.79 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81068454 | 177,525.00 | 12.43 | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80737802 | 179,110.00 | (1,232.28) | 7.450 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81077190 | 180,000.00 | (1,787.40) | 7.875 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81079444 | 180,000.00 | (1,787.40) | 7.875 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81073108 | 181,600.00 | (860.78) | 7.250 | 08/31/06 | 9/15/2006 | 16 | 10/1/2006 |
| 73224206 | 183,960.86 | - | 6.250 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81065971 | 184,170.00 | (1,598.60) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81093122 | 188,000.00 | (2,453.40) | 7.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062572 | 188,510.00 | (1,837.97) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80955404 | 188,898.00 | (2,861.80) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80973316 | 190,000.00 | (414.20) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81095010 | 194,064.00 | 316.33 | 6.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81080624 | 194,250.00 | (1,928.90) | 7.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81011397 | 195,000.00 | (2,012.40) | 7.125 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81082109 | 195,000.00 | (1,936.35) | 7.875 | 09/12/06 | 9/15/2006 | 4 | 11/1/2006 |
| 81013021 | 196,000.00 | 482.16 | 6.625 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81080178 | 197,000.00 | (1,132.75) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81084626 | 197,600.00 | (3,280.16) | 7.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81099210 | 197,600.00 | 3.95 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81071441 | 198,824.43 | 662.09 | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81072928 | 200,000.00 | - | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81023756 | 200,350.00 | (2,003.50) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81096430 | 201,000.00 | (998.97) | 8.500 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81099012 | 202,400.00 | (508.02) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80993777 | 204,224.00 | 816.90 | 6.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80824071 | 208,624.00 | 1,787.91 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2008 |
| 81059735 | 210,000.00 | 88.20 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |

| LOAN | 09/15/06 UPB | Discount | IR | Close Date | Fund Date | Days In WH | Next Due |
|---|---|---|---|---|---|---|---|
| 81096398 | 210,000.00 | 2.10 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80909930 | 211,000.00 | 1,550.85 | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81036295 | 213,500.00 | (546.56) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81064156 | 214,500.00 | 36.46 | 7.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81058430 | 215,687.00 | (1,719.02) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81077786 | 220,000.00 | (6,397.60) | 7.250 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81086910 | 221,062.00 | (3,242.98) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81072118 | 221,523.00 | (2,348.14) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81110884 | 221,523.00 | (1,606.04) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062366 | 225,000.00 | (2,567.25) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81062705 | 225,000.00 | 738.00 | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81044851 | 225,600.00 | 2,587.63 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81052391 | 225,900.00 | 1,129.50 | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81113490 | 227,125.00 | (738.16) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81051054 | 230,000.00 | (1,085.60) | 7.000 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81061863 | 232,815.34 | (449.33) | 7.450 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80992399 | 234,617.00 | 1,102.70 | 6.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81097610 | 234,800.00 | (4,696.00) | 9.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81092553 | 235,094.27 | (1,843.14) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81103533 | 238,520.00 | (238.52) | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81030660 | 239,410.00 | 418.97 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81033771 | 240,000.00 | (424.80) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81068074 | 240,300.00 | (2,174.72) | 7.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81096935 | 242,200.00 | (2,300.90) | 6.625 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81039737 | 242,400.00 | 305.42 | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81051849 | 244,900.00 | (1,361.64) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81082513 | 251,750.00 | (886.16) | 6.375 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81075137 | 252,000.00 | (2,769.48) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81073041 | 260,050.00 | (210.65) | 6.375 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81043234 | 264,568.00 | (2,947.29) | 6.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81091860 | 270,000.00 | (1,822.50) | 6.775 | 09/14/06 | 9/15/2006 | 2 | 11/1/2006 |
| 81098758 | 271,900.00 | (1,816.29) | 7.875 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81084725 | 277,000.00 | 717.43 | 5.875 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81093114 | 281,115.00 | (3,423.98) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81064008 | 285,000.00 | 1,459.20 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81089708 | 288,000.00 | (2,782.08) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80997802 | 292,000.00 | 5,340.68 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81114290 | 295,000.00 | (1,684.45) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 80995749 | 300,000.00 | (2,100.00) | 6.750 | 09/15/06 | 9/15/2008 | 1 | 11/1/2006 |
| 81077703 | 300,000.00 | (6,000.00) | 10.620 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81065823 | 303,688.00 | (1,339.27) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81065484 | 312,068.00 | (4,066.25) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81060618 | 322,262.00 | (1,965.80) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81089583 | 332,800.00 | (3,687.42) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81044034 | 341,900.00 | 2,988.21 | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81070393 | 357,600.00 | (4,230.41) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81047235 | 359,500.00 | 237.27 | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81106692 | 387,000.00 | (2,472.93) | 6.625 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81084972 | 417,000.00 | (11,242.32) | 7.250 | 09/11/06 | 9/15/2006 | 5 | 11/1/2006 |
| 81045468 | 417,000.00 | (3,727.98) | 6.500 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81022584 | 580,500.00 | 4,945.86 | 6.750 | 09/15/06 | 9/15/2006 | 1 | 10/1/2006 |
| 81077695 | 595,000.00 | (11,102.70) | 7.250 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81044075 | 952,000.00 | (3,151.12) | 7.500 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81055014 | 1,300,000.00 | (10,439.00) | 6.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| 81043267 | 1,680,000.00 | (24,158.40) | 7.750 | 09/15/06 | 9/15/2006 | 1 | 11/1/2006 |
| **Total Mortgage Loans Held for Sale** | **289,817,240.31** | **(1,678,162.59)** | | | | | |

# EXHIBIT A

# Part 4 of 4

**Schedule 1.1(b)(ii)**
Pipeline Loans and Pipeline Applications

See Attachment 1.1(b)(ii), which is incorporated herein by reference.

**Schedule 1.1(b)(iii)**
Assigned Contracts

1.   Correspondent and Origination Sales Agreements between Seller and the parties listed in Exhibit A to Schedule 1.1(b)(iii) and the amendments and addenda thereto, are incorporated herein by reference

2.   Loan Broker Agreements between Seller and the parties listed in Exhibit B to Schedule 1.1(b)(iii) and the amendments and the addenda thereto, are incorporated herein by reference

3.   Mortgage Purchase Agreement between Seller and HSBC Mortgage Corporation effective 1/1/2002 for loan delivery; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

4.   Flow Mortgage Loan Purchase and Warranties Agreement between Seller and GS Mortgage Securities Corp., as assignee from Goldman Sachs Mortgage Co. effective 9/1/2004; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

5.   Flow Interim Servicing between Seller and GS Mortgage Securities Corp., as assignee from Goldman Sachs Mortgage Co. effective 9/1/2004 for interim servicing for sale; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

6.   Purchase and Sale Agreement between Seller and Greenwich Capital Financial Products, Inc.; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

7.   Seller Agreement between Seller and Morgan Stanley Mortgage Capital, Inc. effective 11/22/2004 for loan sale and delivery; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being

6

understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

8.  Service Agreement between Seller and US Tax Verification dated 12/5/2000 for social security number verification service

9.  Amended and Restated Master Loan Purchase Agreement between Seller and Goldman Sachs effective 10/1/2005 for loan delivery; provided, however, Seller will retain rights and obligations with respect to loans sold prior to the Closing Date and loans that are not Company Mortgage Loans or Pipeline Loans, it being understood that only rights and obligations related to Pipeline Loans will be assigned at Closing. Rights and obligations related to Company Mortgage Loans will be assigned on the Warehouse Transfer Date.

10. Electronic Access and Trading Agreement between Seller and Goldman Sachs & Co dated 2/25/2005

11. See real property leases listed in Schedule 1.1(b)(iv), which is incorporated herein by reference.

12. See personal property leases listed in Schedule 1.1(b)(v), which is incorporated herein by reference.

13. See software licenses listed in Schedule 1.1(b)(vii), which is incorporated herein by reference.

14. All Contracts listed on the final form of Schedule 4.22, which is incorporated herein by reference, as the same is updated immediately prior to Closing in accordance with Section 6.5 of the Agreement, but subject to the proviso in the definition of "Assigned Contracts" with respect to any such Contracts listed in Schedule 4.22 that have a settlement date after September 5, 2006.

**Contracts and agreements related to services for branch locations:**

15. Oral agreement between Seller and Absolute Bottled Water for Newport News for water

16. Maintenance Agreement between Seller and Anago effective 9/30/2005 for Jacksonville for janitorial service

17. Beverage Service Agreement between Seller and Aramark effective 10/10/2005 for Houston for coffee

18. Oral agreement between Seller and Braden Business Systems for Lake Worth for fax maintenance

19. Customer Service Agreement and Customer Purchase Agreement between Seller and Culligan Water Conditioning effective 6/19/2003 for Phoenix for water

20. Oral agreement between Seller and Hillyard's for Newark for fax maintenance

21. Service Agreement between Seller and Infoshred effective 2/15/2005 for Rocky Hill for shredding

22. Customer Service Agreement between Seller and Shred-It Denver effective 5/2/2005 for Englewood for shredding

23. Service Agreement between Seller and Initial Tropical Plants effective 4/22/2003 for Fishers for tropical plant services

24. Oral agreement between Seller and Botanical Gardens effective 1/1/2006 for Englewood for plant care and rental

25. Oral agreement between Seller and IOS Capital, LLC for Independence for fax maintenance

26. Oral agreement between Seller and IOS Capital, LLC for HQ Wholesale for fax maintenance

27. Oral agreement between Seller and IOS Capital, LLC for Atlanta for fax maintenance

28. Oral agreement between Seller and IOS Capital, LLC for Atlanta for fax maintenance (transferred from Glen)

29. Oral agreement between Seller and IOS Capital, LLC for Baton Rouge for fax maintenance

30. Oral agreement between Seller and IOS Capital, LLC for Lake Worth for fax maintenance

31. Oral agreement between Seller and IOS Capital, LLC for Suffolk for fax maintenance

32. Oral agreement between Seller and IOS Capital, LLC for Cincinnati for fax maintenance

33. Oral agreement between Seller and IOS Capital, LLC for HQ-Loan Quality for fax maintenance

34. Oral agreement between Seller and IOS Capital, LLC for Jacksonville for fax maintenance

35. Oral agreement between Seller and IOS Capital, LLC for Direct Lending for fax maintenance

36. Oral agreement between Seller and IOS Capital, LLC for Houston for fax maintenance

37. Oral agreement between Seller and IOS Capital, LLC for Eden Prairie for fax maintenance

38. Oral agreement between Seller and IOS Capital, LLC for Ft. Myers for fax maintenance

39. Oral agreement between Seller and IOS Capital, LLC for LSC for fax maintenance

40. Oral agreement between Seller and IOS Capital, LLC for Clearwater for fax maintenance

41. Oral agreement between Seller and IOS Capital, LLC for Downers Grove for fax maintenance

42. Oral agreement between Seller and IOS Capital, LLC for Phoenix for fax maintenance

43. Oral agreement between Seller and IOS Capital, LLC for Rocky Hill for fax maintenance

44. Oral agreement between Seller and IOS Capital, LLC for San Antonio for fax maintenance

45. Oral agreement between Seller and IOS Capital, LLC for Monroe for fax maintenance

46. Oral agreement between Seller and IOS Capital, LLC for Overland Park for fax maintenance

47. Oral agreement between Seller and IOS Capital, LLC for Longwood for fax maintenance

48. Oral agreement between Seller and IOS Capital, LLC for Newark for fax maintenance

49. Oral agreement between Seller and IOS Capital, LLC for Englewood for fax maintenance

50. Oral agreement between Seller and IOS Capital, LLC for Colorado Springs for fax maintenance

51. Oral agreement between Seller and IOS Capital, LLC for Salt Lake City for fax maintenance

52. Oral agreement between Seller and IOS Capital, LLC for Plano for fax maintenance

53. Maintenance Services/Professional Services Agreement between Seller and IOS dated 4/10/2002 for Clifton Park for copier maintenance

54. Irwin Mortgage Order Form between Seller and Braden Business Systems dated 3/20/2002 for Baton Rouge for copier maintenance

55. Service Agreement between Seller and Iquest Internet, LLC effective 3/1/2004 for internet services

56. Iron Mountain Standard Terms and Conditions between Seller and Iron Mountain effective 8/1/2005 for Atlanta for off-site records storage

57. Customer Agreement between Seller and Iron Mountain effective 1/1/2005 for Englewood for off-site storage

58. Agreement between Seller and Safesite effective 1/1/2006 for Plano for offsite storage for computer tapes

59. Oral agreement between Seller and Melbaline Sills for Monroe for Office Cleaning

9

60.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 7/26/2005 for Brentwood for message on hold production

61.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 11/22/2005 for Overland Park for message on hold production

62.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/27/2005 for Eden Prairie for message on hold production

63.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Newark for message on hold production

64.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 5/20/2004 for Downers Grove for message on hold production

65.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Atlanta for message on hold production

66.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 6/2/2004 for Clifton Park for message on hold production

67.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Baton Rouge for message on hold production

68.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Houston for message on hold production

69.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 12/2/2005 for Cincinnati for message on hold production

70.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Englewood for message on hold production

71.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/3/2005 for Colorado Springs for message on hold production

72.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Salt Lake City for message on hold production

73.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 12/29/2005 for Plano for message on hold production

74.    Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 1/15/2006 for Phoenix for message on hold production (transferred from Glen)

75.    Client Referral Agreement between Seller and Message Vision Inc. effective 10/2/2005 for Atlanta for document management

76.    Hold Harmless Agreement and Monitoring Contract between Seller and Network Electric & Security Systems effective 12/18/2005 for Rocky Hill for alarm monitoring

77.    On-Hold Loaner Program Service Agreement between Seller and Original Marketing Group effective 5/23/2005 for Ft. Myers for message on hold service

78. Oral agreement between Seller and PAC Services for Rocky Hill for office cleaning

79. Service Agreement between Seller and Recall Secure Destruction Services effective 5/22/2006 for Jacksonville for shredding

80. Agreement between Seller and Security Data Destruction effective 3/31/2003 for Phoenix for shredding

81. Client Service Agreement between Seller and Shred-It effective 9/12/2005 for Independence for shredding

82. Client Service Agreement between Seller and Shred-It effective 4/6/2005 for Cincinnati for shredding

83. Associated Vendor Agreement between Seller and Shred Pro effective 2/10/2005 for Salt Lake City for shredding

84. Agreement between Seller and Spring Lake Premium Bottled Water for Suffolk for water

85. Purchase Order between Seller and The Waterman effective 7/11/2005 for Baton Rouge for water

86. Water Refreshment Program Installation Agreement and Contract between Seller and United Coffee Service effective 11/8/2005 for Downers Grove for coffee

87. Order between Seller and Arch Telecom for a toll-free number for Newport News for agents

88. Oral agreement between Seller and Berry Coffee Company effective 1/1/2006 for Eden Prairie for coffee

89. Oral agreement between Seller and Crystal Springs effective 1/1/2006 for Brentwood for water

90. Service Agreement between Seller and Custom Security Systems effective 6/1/2002 for Baton Rouge for security service

91. Advertising Contract between Seller and Homes & Land, LLC effective 5/1/2006 for Indy Retail for advertising service

92. Advertising Agreement between Seller and Homes Illustrated effective 3/1/2000 for Indy Retail for advertising services

93. Service order between Seller and IOS Capital, LLC for Newport News for fax maintenance

94. Secure Shredding Agreement between Seller and Iron Mountain effective 7/18/2005 for Houston for shredding service

95. Oral Agreement between Seller and Ken's Coffee Service effective 1/1/2004 for Monroe for coffee and water

96. Contract for Services between Seller and Master Service effective 11/8/2005 for Clifton Park for cleaning services

97.   Contract for Services between Seller and Muzak effective 9/1/2005 for Atlanta for office music

98.   Contract for Services between Seller and Muzak effective 9/6/2005 for Atlanta for Muzak Television - News and Financial

99.   Oral agreement between Seller and R&L Cleaning Service effective 1/1/2006 for Baton Rouge for cleaning service

100.  Oral agreement between Seller and Redd Pest Control effective 1/1/2004 for Monroe for pest control

101.  Advertising Agreement between Seller and ShopOnlineAmerica.com effective 3/1/2006 for Rocky Hill for advertising services

102.  Oral agreement between Seller and Shred-It effective 1/1/2006 for Brentwood for shredding

103.  Oral Agreement between Seller and Take a Break effective 1/1/2006 for Newark for water

104.  Space Reservation Agreement between Seller and The Real Estate Book of Indianapolis effective 3/1/2006 for Indy Retail for advertising

105.  Order for phone services between Seller and AT&T for Atlanta

106.  Order for Frame services between Seller and Sprint for Atlanta

107.  Order for phone services between Seller and Bell South for Baton Rouge

108.  Order for Cable services between Seller and Cox for Baton Rouge

109.  Order for phone services between Seller and Bell South for Brentwood

110.  Order for Frame services between Seller and Sprint for Brentwood

111.  Order for phone services between Seller and Cincinnati Bell for Cincinnati

112.  Order for DSL services between Seller and Cincinnati Bell for Cincinnati

113.  Order for phone services between Seller and Verizon for Clearwater

114.  Order for Cable services between Seller and Comcast for Clearwater

115.  Order for phone services between Seller and Verizon for Clifton Park

116.  Order for Frame services between Seller and Sprint for Clifton Park

117.  Order for phone services between Seller and Qwest for Colorado Springs

118.  Order for DSL services between Seller and Qwest for Colorado Springs

119.  Order for phone services between Seller and Bell South for West Monroe

120.  Order for Frame services between Seller and Sprint for West Monroe

121.  Order for phone services between Seller and SBC for Downers Grove

122.  Order for MPLS services between Seller and SBC for Downers Grove

123.  Order for phone services between Seller and Qwest for Eden Prairie

124. Order for Frame services between Seller and Sprint for Eden Prairie

125. Order for phone services between Seller and Qwest for Englewood

126. Order for Frame services between Seller and Sprint for Englewood

127. Order for phone services between Seller and Sprint for Fort Meyers

128. Order for Frame services between Seller and Sprint for Fort Meyers

129. Order for phone services between Seller and Time Warner for Houston

130. Order for Frame services between Seller and Sprint for Houston

131. Order for phone services between Seller and SBC for Independence

132. Order for DSL services between Seller and SBC for Independence

133. Order for phone services between Seller and Bell South for Jacksonville

134. Order for DSL services between Seller and Bell South for Jacksonville

135. Order for phone services between Seller and Bell South for Lake Worth

136. Order for Frame services between Seller and Sprint for Lake Worth

137. Order for phone services between Seller and SBC for Longwood

138. Order for DIA services between Seller and SBC for Longwood

139. Order for phone services between Seller and Verizon for Newark

140. Order for Frame services between Seller and Sprint for Newark

141. Order for phone services between Seller and Verizon for Newport News

142. Order for Cable services between Seller and Cox for Newport News

143. Order for phone services between Seller and SBC for Overland Park

144. Order for DSL services between Seller and SBC for Overland Park

145. Order for phone services between Seller and Qwest for Phoenix

146. Order for Frame services between Seller and Sprint for Phoenix

147. Order for phone services between Seller and Time Warner for Plano

148. Order for Frame services between Seller and Sprint for Plano

149. Order for phone services between Seller and SBC for Rocky Hill

150. Order for DSL services between Seller and SBC for Rocky Hill

151. Order for phone services between Seller and Qwest for Salt Lake City

152. Order for DSL services between Seller and Qwest for Salt Lake City

153. Order for DSL services between Seller and Verizon for Suffolk

154. Order for phone services between Seller and Sprint for Warsaw

155. Order for Cable services between Seller and Comcast for Warsaw

13

156.  Order for phone services between Seller and Qwest for West Des Moines

157.  Order for DSL services between Seller and Qwest for West Des Moines

158.  Reuters America Agreement between Seller and Reuters America, LLC dated 5/23/2005 for Monroe for Reuters Trader for Mortgage Brokers service

159.  Music Service Agreement between Seller and Muzak, LLC effective 5/25/2004 for Phoenix for television services

160.  Music Service Agreement between Seller and Muzak, LLC dated 11/8/2005 for Longwood for Muzak Commercial TV

161.  Agreement between Seller and Continuity Programs Incorporated effective 11/6/2000 for Greensboro for marketing services

162.  Oral agreement between Seller and Culligan Water Systems for Houston for drinking water

163.  Oral agreement between Seller and Zephyrhillis for Lake Worth for drinking water

164.  Oral agreement between Seller and Cathy's Cleaning Service for Clearwater for office cleaning

165.  Preventive Maintenance Agreement between Seller and Aircom dated 10/14/2003, for Clearwater for HVAC service

166.  Oral agreement between Seller and Secure Document Destruction, Inc. for Ft. Meyers for shredding services

167.  The Work Number from TALX Corporation Member Verifier Services Agreementbetween Seller and TALX for Newark for VOE/VOI service

168.  Universal Membership Agreement between Seller and The Work Number Services for Eden Prairie for VOE/VOI services

169.  The Work Number from TALX Corporation Member Verifier Services Agreement between Seller and TALX for Phoenix for VOE/VOI service

170.  The Work Number from TALX Corporation Member Verifier Services Agreement between Seller and TALX for Longwood, Clearwater, Jacksonville, and Lake Worth for VOE/VOI service

171.  License Agreement Presence Program between Seller and Virginia Beach Executive Suites T/A Columbus Executive Suites dated 04/15/03 for Newport News conference room rental.

172.  See branch services and voice/data services agreements listed on Schedule 4.10(c), which is incorporated herein by reference.

**Contracts related to Information Technology resources:**

173.  Software License Agreement between Seller and Altec Products, Inc. effective 10/1/2005 for Doc-link software

14

174. Software License and Services Agreement between Seller and Ascential Software Corporation effective 9/29/2002 for ETL Software license and services

175. Statement of Work between Seller and Berbee Information Networks Corporation effective 11/9/2004 for consulting services

176. ClientCare Support and Maintenance Agreement between Seller and Best Software (f.k.a. Sage) effective 10/31/2005 for support and maintenance agreement for Best software products

177. Software License and Related Services Agreement between Seller and Business Objects Americas effective 12/16/2002 for software license and maintenance support

178. Maintenance and Support Agreement between Seller and Century Software, Inc. effective 12/27/2005 for TinyTERM Plus software

179. License Agreement and Order Form between Seller and Computer Associates International, Inc.

180. DPS Agreement for the Resale of IBM Services between Seller and Data Processing Services, Inc. effective 6/16/2005 for purchase of equipment

181. Master Agreement between Seller and Dorado Network Systems Corporation effective 12/1/2004 for Pricing Engine

182. Encompass Anywhere Services Agreement between Seller and Ellie Mae effective 10/1/2005 for loan origination ASP

183. Collateral Management System Services Agreement between Seller and FNC, Inc. effective 3/11/2005 for licensing of software

184. OpenView Software License Terms and Conditions between Seller and Hewlett-Packard effective 12/17/2005 for software license and support services

185. Service Agreement between Seller and Liebert Global Services/Fuller Engineering effective 1/1/2006 for maintenance contract for Liebert equipment

186. License Agreement between Seller and Mobius Management Systems, Inc. dated 9/6/2005 for software license and services agreement

187. Oracle License and Services Agreement between Seller and Oracle USA, Inc. effective 10/28/2005 for Database SE Support

188. Agreement between Seller and Verizon for wireless services

189. Statelink Online Subscription Agreement & I-32 Software License Agreement between Seller and VMP Mortgage Solutions, Inc. nka Wolters Kluwer dated 1/4/2006 for loan origination forms

190. Agreement between Seller and Electronic Laser Forms dated 5/21/2003 for mortgage forms

191. End User License Agreement between Seller and Adobe Systems, Inc. for Photoshop

15

192.  SwiftView Tools Standard Software License Agreement between Seller and SwiftView, Inc. for software license agreement

193.  License Agreement between Seller and TENA Companies, Inc. for SecondLook software

194.  FirstWindow 2000® Software License Agreement between Seller and First Chicago NBD nka Chase Bank

195.  End-User License Agreement between Seller and Adobe Systems Incorporated for Adobe Type Manager Light

196.  License Agreement between Seller and Century Software, Inc. for TinyTerm

197.  Global Software License Agreement between Seller and Quark Distribution, Inc. for QuarkXPress and QuarkCopyDesk SE

198.  End-User License Agreement for TechSmith software between Seller and TechSmith for software license for SnagIT

199.  Crystal Reports 9 Standard License Agreement between Seller and Crystal Decisions, Inc. for Crystal Reports software

200.  License and Services Agreement between Shareholder and Electronic Data Systems Corporation dated 09/30/96 for software license for Lakewood

201.  Client Software License Agreement of Cisco Systems between Seller and Cisco Systems

202.  End-User License Agreement between Seller and Altec Products, Inc. for doc-link

203.  MAS 500 Customer License Agreement between Seller and Best Software (f.k.a. Sage) for MAS 500 software

204.  Support Contract, License and Warranty between Seller and HaXer, LLC, for RecoveryPAC (for Windows)

205.  Software License Agreement between Seller and Kofax Image Products, Inc. for Ascent Capture

206.  Software License Agreement between Seller and Kofax Image Products, Inc. for Developers Toolkit

207.  End-User License Agreement between Seller and Bloomberg, LP

208.  Software License Agreement between Seller and Elynx for eLynx NS software

209.  End User License Agreement between Seller and PGP Corporation for PGP Software

210.  License Agreement between Seller and Polaroid Digital Solutions, Inc. for ACl Collector

211.  End User License Agreement between Seller and A.T. Cross Company for GinnieNET 2020

212. Federal Home Loan Mortgage Corporation Software License Agreement between Seller and Freddie Mac

213. End User License Agreement between Seller and Captaris, Inc. for Alchemy Version 8.0

214. Master Service Agreement between Seller and Versitec, a division of Cranel, Incorporated effective 3/17/2006 for equipment maintenance and support

**Contracts related to Loan Origination, Underwriting, Insuring and Quality Control:**

215. Appraisal Management Company Services Agreement between Seller and ATM Corporation of America effective 2/12/2002 for real estate valuation services

216. Centrax Software License Agreement between Seller and Centrax Services, Inc. effective 1/1/2004 for HMDA & CRA Data Management Software

217. Subscriber Application and Service Agreement between Seller and ChoicePoint Services, Inc. effective 11/1/2000 for various reporting services

218. Subscriber Application and Service Agreement between Seller and CoreLogic effective 11/7/2001 for various credit reporting services

219. Marketing Services Agreement between Seller and CP Morgan Communities, L.P. effective 1/1/2006 for marketing services

220. Participating Lender Agreement between Seller and Ellie Mae effective 10/14/2003 for ClickLoan®

221. Service Agreement between Seller and Elynx effective 1/1/2006 for Web posting services

222. Investor Participation Agreement between Seller and eMagic.com, LLC effective 11/3/2000 for wholesale storefront web hosting

223. Agreement for Service between Seller and Equifax Information Services effective 8/12/2002 for Credit Report Services

224. ExactTarget Email Services Agreement between Seller and ExactTarget, LLC effective 12/19/2003 for email services

225. Agreement to Provide Loan Prospector ® Interface and Related Services between Seller and Freddie Mac dated 07/01/2005 for tri-party submission to Freddie Mac

226. Data Integrity Risk Systems and Services Agreement between Seller and Interthinx effective 6/9/2005 for Credit Quality Services

227. Loan Prospector Interface and Related Services between Seller and MGIC Investor Services Corporation effective 7/1/2000 for Contract Underwriting Retail and Wholesale

228. Desktop Underwriter Interface and Related Services between Seller and MGIC Investor Services Corporation effective 7/1/2000 for Contract Underwriting Retail and Wholesale

229. Loan Underwriting Services Agreement between Seller and MGIC Investor Services Corporation effective 2/28/2001 for Contract Underwriting Retail and Wholesale

230. Loan Prospector Interface and Related Services between Seller and MGIC Investor Services Corporation effective 11/1/2002 for Contract Underwriting NCD

231. Desktop Underwriter Interface and Related Services between Seller and MGIC Investor Services Corporation effective 11/1/2002 for Contract Underwriting NCD

232. Assetwise Interface and Related Service between Seller and MGIC Investor Services Corporation effective 11/1/2002 for Contract Underwriting NCD

233. Loan Underwriting Services Agreement between Seller and MGIC Investor Services Corporation effective 11/1/2002 for Contract Underwriting NCD

234. Application for Service Agreement between Seller and Old Republic Credit Services effective 9/24/2003 for Credit Report Services

235. Settlement Services Agreement between Seller and Old Republic National Title Insurance Company effective 9/22/2003 for outsourced settlement services

236. Loan Underwriting Services Agreement between Seller and PMI Mortgage Services Co. effective 1/29/2001 for Contract Underwriting

237. Loan Underwriting Services Agreement between Seller and Radian Services, Inc. effective 3/30/2001 for Contract Underwriting

238. Loan Underwriting Services Agreement between Seller and Republic Mortgage Insurance Company (RMIC) effective 3/30/2001 for Contract Underwriting

239. Service Agreement between Seller and SMI effective 11/5/2005 for insuring and document retrieval

240. Quality Control Outsourcing Agreement between Seller and Stone Hill Group, Inc. effective 6/8/2005 for Quality Control Outsourcing Services

241. Loan Underwriting Services Agreement between Seller and Triad Guaranty Insurance Corporation effective 11/2/2002 for Contract Underwriting

242. Loan Underwriting Services Agreement between Seller and United Guaranty Services, Inc. effective 5/21/2001 for Contract Underwriting

243. Appraisal Management Company Services Agreement between Seller and Valocity effective 12/12/2002 for real estate valuation services

**Contracts for Miscellaneous Services at Headquarters:**

244. Oral agreement between Seller and Icon Advisory for pricing service

245. Master Service Agreement between Seller and Integrated Payment Systems, Inc. effective 9/5/2003 for Electronic Funds Transfer (Wire)

246. Master Service Agreement between Seller and Integrated Payment Systems, Inc. effective 10/29/2004 for MultiCheck ® Services Agreement

247. Service Agreement between Seller and Mortgage Resource Center, Inc., dba AllRegs effective 9/1/2005 for online compliance research service

248. Customer Service Agreement between Seller and Shred-It Indiana effective 11/12/2003 for file destruction

249. Tradeweb User Agreement between Seller and Tradeweb LLC effective 7/16/2001 for electronic data and trading system

250. Correspondent Loan Purchase and Sale Agreement between Seller and Irwin Home Equity effective 12/11/2003 for loan sale

251. Agreement for MIDEX-Complete Services between Seller and Mortgage Asset Research Institute, Inc. effective on 11/25/2005 for MARI reporting

**Contracts and agreements for various facility and equipment-related services at Headquarters:**

252. Coffee & Beverage Service between Seller and Calderon Brothers Vending Co. effective 12/18/2003 for coffee service

253. Oral agreement between Seller and Calderon Brothers Vending Co. effective 12/18/2003 for vending machine services

254. Oral agreement between Seller and Braden Business Systems for Direct Lending for fax maintenance

255. Oral Agreement between Seller and Insight for cable services at Headquarters

256. Oral agreement between Seller and Langsdale Recycling for paper recycling and onsite shredding service at Headquarters

257. Enserve OTC Medication Vending Program between Seller and New Age Vending effective 9/8/2003 for medicine dispenser

258. Oral agreement between Seller and Braden Business Systems for LSC/Direct Lending for fax maintenance

259. Oral agreement between Seller and Same Day Courier Services, Inc. effective 1/1/2003 for courier services

260. Local Service Agreement between Seller and Time Warner Telecom effective 11/1/2005 for Phone Services

261. Broker Agreement between Seller and Irwin Home Equity effective 11/3/2003 for loan delivery

262. Standard RCA Dome License Agreement between Seller and Capital Improvement Board of Managers of Marion County effective 8/1/1999 for suite lease at RCA dome

Leases for branches at which services under the contracts listed below are provided are scheduled to expire prior to Closing. If such leases are allowed to expire in accordance with their terms, arrangements will need to be made with respect to the following related contracts for services:

263. Equipment Lease Agreement between Seller and Braden Business Systems effective 7/15/2004 for Vernon for copier lease

264. Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 9/29/2005 for Rocky Hill and Vernon for message on hold production

265. Agreement between Seller and Pitney Bowes Credit Corporation for Vernon for postage meter lease

266. Order for phone services between Seller and SBC for Vernon

267. Order for DSL services between Seller and SBC for Vernon

268. Service Agreement between Seller and Alsco effective 6/22/2004 for Greensboro for air freshener and floor mat service

269. Oral agreement between Seller and IOS Capital, LLC for Greensboro for fax maintenance

270. Product Schedule between Seller and IOS Capital, LLC effective 5/28/2003 for Greensboro for copier lease

271. Production and Warranty Contract between Seller and Message On Hold Plus, Inc. effective 10/18/2005 for Greensboro for message on hold production

272. Agreement between Seller and Pitney Bowes Credit Corporation for Greensboro for postage meter lease

273. Oral Agreement between Seller and Shred-It for Greensboro for shredding

274. Oral Agreement between Seller and Steve Covington for Greensboro for cleaning service

275. Order for phone services between Seller and Nuvox for Greensboro

276. Order for DSL services between Seller and Bell South for Greensboro

277. The Work Number from TALX Corporation Member Verifier Services Agreement between Seller and TALX for Greensboro for VOE/VOI service

Contracts assigned to Buyer subject to contract sharing provisions in the Transition Services Agreement:

278. Multivendor Information Technology Recovery Services between Seller and IBM for disaster recovery services

279. Oral agreement between Seller and IBM for maintenance agreement for AS400

280. McAfee Desktop Firewall between Seller and McAfee, Inc. effective 5/27/2005 for firewall software license and support

20

281. McAfee Active Virus Defense Suite between Seller and McAfee, Inc. effective 12/5/2005 for antivirus software license and support

282. Service Agreement between Seller and Recall Total Information Management effective 2/1/2006 for Information Management Services Agreement

283. Master License Agreement for Software between Seller and Storagetek effective 7/2/2003 for software licensing

284. Support Services Agreement for Ironmail between Seller and CipherTrust, Inc. effective 5/25/2004 for maintenance and support services for software

285. End User License Agreement between Seller and Interactive Intelligence, Inc. for software license

286. End User License Agreement between Seller and Bridger Systems for Insight software

287. Software License between Seller and Invoq Systems, Inc. for AlarmPoint ver. 5

288. Master Sale and License Agreement between Seller and CipherTrust, Inc. for email security hardware and software

289. IBM Base License Agreement between Seller and IBM for basic software license

290. Network Associates Perpetual End User License Agreement between Seller and Network Associates, Inc (NAI Financial Services-Telesales Grp.) for McAfee

291. Master Lease Agreement between Seller and Dell Financial Services, LP effective 4/1/2004 for Hardware Leasing

**Contracts paid in full through the end of the contract term under which Seller will retain rights under the Transition Services Agreement:**

292. Support Entitlements between Seller and IBM for passport advantage

293. Microsoft Licensing Product Use Rights between Seller and Microsoft for universal license terms

294. Microsoft Enterprise Agreement between Seller and Microsoft Licensing, GP dated 4/28/2004, as amended[1]

**Other Contracts:**

295. Commodity Agreement between Seller and R. J. O'Brien & Associates, Inc. effective 5/4/1998 for Account for Purchase and Sale of Mortgages and Securities

---

[1] This agreement will be reparented under Buyer's own Microsoft Business Agreement and the incorporation by reference of the Microsoft Business Agreement will be deemed to refer to the terms and conditions of Buyer's Microsoft Business Agreement. The Microsoft Business Agreement between Shareholder and Microsoft is not being assigned to Buyer.

296. Membership Contract between Seller and CBC Companies effective 10/24/2001 for Credit Report Services

297. Agreement for Services between Seller and First American Credco effective 6/1/2001 for Credit Report Services

298. Appraisal Management Services Agreement between Seller and i Mortgage Services LLC effective 2/21/2002 for real estate valuation services

299. Credit Reporting Subscriber Agreement between Seller and LandAmerica Credit Services effective 1/20/2005 for credit reporting and related

300. Appraisal Management Company Services Agreement between Seller and Landsafe Appraisal Services, Inc. effective 11/17/2003 for real estate valuation services

301. Master Agreement for Contract Services between Seller and TechDisposal.com effective 2/23/2004 for Disposal, remarketing and/or resale of computer and related equipment

302. Letter Agreement between Seller and Bear Stearns dated 8/26/2003 for securities execution and clearance services related to Pressprich brokerage account

303. Agreement between UPS and Seller effective 11/29/2004 until 11/29/2007 for shipping services

**At the request of the third parties to the Contracts listed below, the Contracts listed below will not be assigned to Buyer, but in lieu thereof, the Buyer will enter into replacement agreements with the respective third parties, which agreements shall provide substantially the same material benefits to Buyer as Seller has under such Contracts. Notwithstanding the foregoing, the following Contracts are still subject to Section 9.1(g) except for Contracts with Progress Software Corporation. In the event that such third parties later consent to assignment of the Contracts listed below in lieu of the Buyer entering into replacement agreements, such Contracts will be assigned to Buyer pursuant to the Assignment and Assumption Agreement between Buyer and Seller delivered at the Closing.**

304. Software License Agreement between Seller and Financial Industry Computer Systems, Inc. effective on 11/12/2002 for software license

305. Maintenance Agreement between Seller and Progress Software Corporation effective 3/1/2006 for software support for Lakewood

306. User Agreement between Seller and Progress Software dated 8/3/1999 for Lakewood software

307. Custom Interface Agreement - LoanProspector between Seller and Freddie Mac effective 4/17/2006 for Automated Underwriting Services

308. Amendment for EPD notification dated 10/26/2005 to Amended and Restated Master Loan Purchase Agreement between Seller and Goldman Sachs effective 10/1/2005

309.    Master Agreement between Seller and Fannie Mae effective 2/24/2004 for loan sale and delivery; provided, however, that Buyer will assume and honor those whole loan commitments with Fannie Mae listed on Attachment 4.22 to Schedule 4.22 pursuant to its own agreements with Fannie Mae.

## Schedule 4.2(a)
### No Conflict

The following contracts require consent to assignment:

1.  Master Securities Forward Transaction Agreement between Bear Stearns & Co., Inc. and Seller dated 10/15/2002

2.  Master Securities Forward Transaction Agreement between Countrywide Securities Corporation and Seller dated 1/20/2001

3.  Master Securities Forward Transaction Agreement between Greenwich Capital Markets, Inc. and Seller dated 2/8/2006

4.  Master Securities Forward Transaction Agreement between Lehman Brothers, Inc. and Seller dated 8/1/2006

5.  Master Securities Forward Transaction Agreement between WaMu Capital Corp. and Seller dated 7/29/2003

6.  Master Securities Forward Transaction Agreement between Wachovia Bank, National Association and Seller dated 8/25/2003

7.  Master Sale and License Agreement between Seller and CipherTrust, Inc. for email security hardware and software

8.  Client Contract between Seller and GMAC RFC dated 12/16/2002

9.  Wells Fargo - Over-The-Counter Purchase Contract between Prudential Home Mortgage Company, Inc. and Seller dated 10/20/1995

10. Software License Agreement between Seller and Altec Products, Inc. dated 10/1/2005

11. Software License and Services Agreement between Seller and Ascential Software Corporation dated 9/29/2002 for ETL Software license and services

12. ClientCare Support and Maintenance Agreement between Seller and Best Software (f.k.a. Sage) dated 10/31/2005

13. Software License and Related Services Agreement between Seller and Business Objects Americas dated 12/16/2002

14. Membership Contract between Seller and CBC Companies effective on 10/24/2001 for Credit Report Services

15. Centrax Software License Agreement between Seller and Centrax Services, Inc. dated 1/1/2004

16. Subscriber Application and Service Agreement between Seller and ChoicePoint Services, Inc. dated 11/1/2000 for various reporting services

17. Subscriber Application and Service Agreement between Seller and CoreLogic dated 11/7/2001 for various credit reporting services

18. Marketing Services Agreement between Seller and CP Morgan Communities, L.P. dated 1/1/2006

19. Crystal Reports 9 Standard License Agreement between Seller and Crystal Decisions, Inc. for Crystal Reports software

20. Master Lease Agreement between Seller and Dell Financial Services, LP dated 4/1/2004 for Hardware Leasing

21. Master Agreement between Seller and Dorado Networks Systems Corporation dated 12/1/2004 for Pricing Engine

22. Encompass Anywhere Services Agreement between Seller and Ellie Mae dated 10/1/2005 for loan origination ASP

23. Service Agreement between Seller and Elynx dated 1/1/2006 for Web posting services

24. Investor Participation Agreement between Seller and eMagic.com, LLC dated 11/3/2000 for wholesale storefront web hosting

25. Agreement for Service between Seller and Equifax Information Services dated 8/12/2002 for Credit Report Services

26. ExactTarget Email Services Agreement between Seller and ExactTarget, LLC dated 12/19/2003

27. Collateral Management System Services Agreement between Seller and FNC, Inc. dated 3/11/2005 for licensing of software

28. Master Lease Agreement between Seller and GE Capital Corporation dated 8/1/2002 for Furniture and Equipment Lease

29. OpenView Software License Terms and Conditions between Seller and Hewlett-Packard dated 12/17/2005

30. Master Lease and Financing Agreement between Seller and HP Financial Services dated 6/15/1999

31. Customer Agreement between Seller and IBM dated 4/29/2005 for Application Development and Maintenance Services (consent required for use under Transition Services Agreement)

32. Master Service Agreement between Seller and Integrated Payment Systems, Inc. dated 9/5/2003 for Electronic Funds Transfer (Wire)

33. Master Service Agreement between Seller and Integrated Payment Systems, Inc. dated 10/29/2004 for MultiCheck ® Services Agreement

34. Data Integrity Risk Systems and Services Agreement between Seller and Interthinx, Inc. dated 6/9/2005 for Credit Quality Services

35. Master Equipment Agreement between Seller and IOS Capital, LLC effective 1/13/2003 for copier lease (master agreement)

36. Service Agreement between Seller and Iquest Internet, LLC dated 3/1/2004

37. Iron Mountain Standard Terms and Conditions between Seller and Iron Mountain effective 8/1/2005 for Atlanta – off-site records storage

38. License and Services Agreement between Shareholder and Electronic Data Systems Corporation dated 09/30/96 for software license for Lakewood

39. Master Equipment Lease between Seller and Leasenet dated 10/1/2005 for leases for technology equipment

40. Service Agreement between Seller and Liebert Global Services/Fuller Engineering dated 1/1/2006 for maintenance contract for Liebert equipment

41. License Agreement between Seller and Mobius Management Systems, Inc. dated 9/6/2005 for software license and services agreement

42. Agreement for MIDEX-Complete Services between Seller and Mortgage Asset Research Institute, Inc. dated 11/25/2005 for MARI reporting

43. Service Agreement between Seller and Mortgage Resource Center, Inc., dba AllRegs dated 9/1/2005 for online compliance research service

44. Settlement Services Agreement between Seller and Old Republic National Title Insurance Company dated 9/22/2003

45. Lease Agreement and Service Agreement between Seller and Pitney Bowes, Inc. dated 12/18/2003 for Mailing Machine Lease and postage meters leases

46. Agreement between Seller and Pitney Bowes Credit Corporation effective for Brentwood for postage meter lease

47. Agreement between Seller and Pitney Bowes Credit Corporation for Houston for postage meter lease

48. Agreement between Seller and Pitney Bowes Credit Corporation for Greensboro for postage meter lease

49. Agreement between Seller and Pitney Bowes Credit Corporation for Suffolk for postage meter lease

50. Agreement between Seller and Pitney Bowes Credit Corporation for Eden Prairie for postage meter lease

51. Agreement between Seller and Pitney Bowes Credit Corporation for Downers Grove for postage meter lease

52. Agreement between Seller and Pitney Bowes Credit Corporation for Clifton Park for postage meter lease

53. Agreement between Seller and Pitney Bowes Credit Corporation for HQ/retention for postage meter lease

54. Agreement between Seller and Pitney Bowes Credit Corporation for Cincinnati for postage meter lease

55. Agreement between Seller and Pitney Bowes Credit Corporation for Atlanta for postage meter lease

56. Agreement between Seller and Pitney Bowes Credit Corporation for Vernon for postage meter lease

57. Agreement between Seller and Pitney Bowes Credit Corporation for HQ/mail center for postage meter lease

58. Agreement between Seller and Pitney Bowes Credit Corporation for Lake Worth for postage meter lease

59. Agreement between Seller and Pitney Bowes Credit Corporation for Monroe for postage meter lease

60. Agreement between Seller and Pitney Bowes Credit Corporation for Phoenix for postage meter lease

61. Agreement between Seller and Pitney Bowes Credit Corporation for Rocky Hill for postage meter lease

62. Agreement between Seller and Pitney Bowes Credit Corporation for Longwood for postage meter lease

63. Agreement between Seller and Pitney Bowes Credit Corporation for Clearwater for postage meter lease

64. Agreement between Seller and Pitney Bowes Credit Corporation for Newark for postage meter lease

65. Agreement between Seller and Pitney Bowes Credit Corporation for Newport News for postage meter lease

66. Service agreement between Seller and Pitney Bowes Credit Corporation for Jacksonville for postage meter lease

67. Agreement between Seller and Pitney Bowes Credit Corporation for Englewood for postage meter lease

68. Agreement between Seller and Pitney Bowes Credit Corporation for Plano for postage meter lease

69. Loan Underwriting Services Agreement between Seller and PMI Mortgage Services Co. dated 1/29/2001

70. Loan Underwriting Services Agreement between Seller and Radian Services, Inc. dated 3/30/2001

71. Loan Underwriting Services Agreement between Seller and Republic Mortgage Insurance Company (RMIC) dated 3/30/2001

72. Service Agreement between Seller and SMI dated 11/5/2005 for insuring and document retrieval

73. Master License Agreement for Software between Seller and Storagetek dated 7/2/2003

74. Tradeweb User Agreement between Seller and Tradeweb LLC dated 7/16/2001 for electronic data and trading system

75. Loan Underwriting Services Agreement between Seller and Triad Guaranty Insurance Corporation dated 11/2/2002

76. Loan Underwriting Services Agreement between Seller and United Guaranty Services, Inc. dated 5/21/2001

77. Statelink Online Subscription Agreement & I-32 Software License Agreement between Seller and VMP Mortgage Solutions, Inc. nka Wolters Kluwer dated 1/4/2006 for loan origination forms

78. Licensing Agreement for Electronic Mortgage Forms between Seller and Wolters Kluwer dated 1/5/2006 for mortgage forms

79. Lease Agreement between Seller and Xerox Corporation dated 7/14/2003 for Monroe for copier lease (Scheduled to expire prior to Closing)

80. Lease Agreement between Seller and Xerox Corporation effective 3/12/2004 for Fishers (transferred from Englewood) for copier lease

81. Lease for the premises located at 1600 E. Northern Ave., 250, Phoenix, AZ 85020 beginning 5/15/2003 between Seller and 1600 E. Northern Ave, LLC c/o Camidor Property Services

82. Lease for the premises located at 5825 Delmonico Drive, 215, Colorado Springs, CO 80919 beginning 3/1/2001 between Seller and CSJ 1, LLC

83. Lease for the premises located at 435 Hartford Turnpike, Vernon, CT 06066 beginning 11/1/2005 between Seller and Talcottville Development Company LLC

84. Lease for the premises located at 2080 Silas Deane Highway, Rocky Hill, CT 06067 beginning 9/1/2005 between Seller and 2080 Realty LLC

85. Lease for the premises located at 111 Continental Drive, 217, Newark, DE 19713 beginning 9/1/2005 between Seller and Atapco Christina, Inc. c/o Atapco Properties, Inc.

86. Lease for the premises located at 2891 Center Point Drive, 209, Fort Myers, FL 33916 beginning 2/1/2005 between Seller and Citec Florida, LLC

87. Lease for the premises located at 2180 West SR 434 2180 Sanlando Center, 2160 & 2180, Longwood, FL 32779 beginning 3/16/2004 between Seller and CB Sanlando Center, Inc.

88. Lease for the premises located at 13773 Icot Blvd, 503, Clearwater, FL 33760 beginning 6/1/2002 between Seller and Icot Center

89. Lease for the premises located at 3898 Via Poinciana, 16, Lake Worth, FL 33467 beginning 3/1/2003 between Seller and Estancia Assets, LLC c/o Asset Specialists, Inc.

90. Lease for the premises located at 8833 Perimeter Park Blvd., 1001 & 1002, Jacksonville, FL 32216 beginning 12/1/2005 between Seller and Colonial Properties of N.E. FL, Inc.

91. Lease for the premises located at 400 Interstate North Parkway, 580, Atlanta, GA 30339 beginning 8/1/2005 between Seller and US Office II, LP c/o Blue Capital Management, Inc. including storage facility under an oral agreement

92. Lease for the premises located at Executive Towers West I 1431 Opus Place, 515, Downers Grove, IL 60515 beginning 8/1/2003 between Seller and Duke Realty

93. Lease for the premises located at 10500 Kincaid Drive, Fishers, IN 46037 beginning 3/17/2003 between Seller and Lantern Partners, LLC

94. Lease for the premises located at 216 Centerview Drive, 108, Brentwood, TN 37027 beginning 6/1/2004 between Seller and SBP Nashville LLC

95. Lease for the premises located at 40 Corporate Woods 9401 Indian Creek Parkway, 510, Overland Park, KS 66210 beginning 3/1/2004 between Seller and Knickerbock Properties, Inc. XXI

96. Lease for the premises located at 107 Crosley Street, West Monroe, LA 71291 beginning 4/9/2003 between Seller and West River Park, LLC

97. Lease for the premises located at 2645 O'Neal Lane, B-2, Baton Rouge, LA 70816 beginning 9/30/2005 between Seller and Prem & Vimla Menon Family, LLC

98. Lease for the premises located at 11095 Viking Drive, 330, Eden Prairie, MN 55345beginning 7/1/2004 between Seller and Talcott III Southwest Crossing, LLC C/o Colliers Turley Martin Tucker

99. Lease for the premises located at 14D Oak Branch Drive, Greensboro, NC 27407 beginning 10/1/2003 between Seller and Koury Associates, LP c/o Koury Corp.

100. Lease for the premises located at 21 Corporate Drive, 210, Clifton Park, NY 12065 beginning 6/1/2005 between Seller and Sitterly Associates II, LLC c/o Abele Builders, LLC

101. Lease for the premises located at 4050 Executive Park Drive, 215, Cincinnati, OH 45241 beginning 5/1/2005 between Seller and Executive Park Investors Ltd.

102. Lease for the premises located at 4700 Rockside Road, 510, Independence, OH 44131 beginning 7/1/2003 between Seller and Summit Office Park, LLC

103. Lease for the premises located at 11011 Richmond, 505, Houston, TX 77042 beginning 9/1/2004 between Seller and Houston GPI, Ltd.

104. Lease for the premises located at 16607 Blanco Road, 613, San Antonio, TX 78232 beginning 2/1/2006 between Seller and The Park On Blanco

105. Lease for the premises located at 5505 South 900 East, 235, Murray (Salt Lake City), UT 84107 beginning 4/1/2005 between Seller and Sports Mall Plaza I LLC c/o Perry Realty

106. Lease for the premises located at 825 Diligence Drive, 220, Newport News, VA 23606 beginning 4/1/2005 between Seller and Starmount Company

107. Lease for the premises located at 1548 Holland Road, Suffolk, VA beginning 8/1/2005 between Seller and Douglas A. Ward and Ronald C. Ward

108. End User License Agreement between Seller and Bridger Systems for Insight software

109. License Agreement between Seller and Century Software, Inc. for TinyTerm

110. Software License between Seller and Invoq Systems, Inc. for AlarmPoint ver. 5

111. Global Software License Agreement between Seller and Quark Distribution, Inc. for QuarkXPress and QuarkCopyDesk SE

112. End-User License Agreement for TechSmith software between Seller and TechSmith for software license for SnagIT

113. Reuters America Agreement between Seller and Reuters America, LLC dated 5/23/2005 for Monroe for Reuters Trader for Mortgage Brokers service

114. Music Service Agreement between Seller and Muzak, LLC dated 11/8/2005 for Longwood for Muzak Commercial TV

115. Client Software License Agreement of Cisco Systems between Seller and Cisco Systems

116. Master Service Agreement between Seller and Versitec, a division of Cranel, Incorporated effective 3/17/2006 for equipment maintenance and support

117. Standard RCA Dome License Agreement between Seller and Capital Improvement Board of Managers of Marion County effective 8/1/1999 for suite lease at RCA dome

118. Correspondent Loan Purchase and Sale Agreement between Seller and Irwin Home Equity effective 12/11/2003 for loan sale

119. Microsoft Services Agreement between Shareholder and Microsoft Licensing, GP dated 4/28/2004

120. Credit Reporting Subscriber Agreement between Seller and LandAmerica Credit Services effective 1/20/2005 for credit reporting and related

121. Loan Underwriting Services Agreement between Seller and MGIC Investor Services Corporation dated 2/28/2001 for Contract Underwriting Retail and Wholesale

122. Loan Underwriting Services Agreement between Seller and MGIC Investor Services Corporation dated 11/1/2002 for Contract Underwriting NCD

123. Agreement between UPS and Seller effective 11/29/2004 until 11/29/2007 for shipping services

124. Electronic Access and Trading Agreement between Seller and Goldman Sachs & Co dated 2/25/2005

The following contracts require notice to assign:

125. Hold Harmless Agreement and Monitoring Contract between Seller and Network Electric & Security Systems effective 12/18/2005 for Rocky Hill for alarm monitoring

126. Enserve OTC Medication Vending Program between Seller and New Age Vending effective 9/8/2003 for medicine dispenser

127. MAS 500 Customer License Agreement between Seller and Best Software (f.k.a. Sage) for MAS 500 software

128. Support Contract, License and Warranty between Seller and HaXer, LLC, for RecoveryPAC (for Windows)

129. Lease between Seller and Aqua Chill of Golden effective 10/10/2005 for Englewood for water

130. Oral Master Agreement between R.W. Pressprich & Co., Inc. and Seller for Brokerage Account

131. Microsoft Enterprise Agreement between Seller and Microsoft Licensing, GP dated 4/28/2004, as amended

The contracts set forth below are not assignable pursuant to their terms, but are still considered Assigned Contracts and subject to Section 9.1(g) of the Agreement:

132. Oracle License and Services Agreement between Seller and Oracle USA, Inc. effective on 10/28/2005 for Database SE Support

133. Lease for the premises located at 1200 Valley West Drive, 403-7, West Des Moines, IA 50266 beginning 10/1/2005 between Seller and West Colony Office Assoc.

134. On-Hold Loaner Program Service Agreement between Seller and Original Marketing Group dated 05/23/2005 for Ft. Myers for message on hold service

135. Rental/Service Agreement between Seller and Quench USA dated 02/06/2003 for Atlanta water

136. Agreement to Provide Loan Prospector ® Interface and Related Services between Seller and Freddie Mac dated 07/01/2005 for tri-party submission to Freddie Mac

137. Appraisal Management Company Services Agreement between Seller and ATM Corporation of America dated 2/12/2002 for real estate valuation services

138. Appraisal Management Services Agreement between Seller and i Mortgage Services LLC effective 2/21/2002 for real estate valuation services

139. Appraisal Management Company Services Agreement between Seller and Landsafe Appraisal Services, Inc. effective 11/17/2003 for real estate valuation services

140. Appraisal Management Company Services Agreement between Seller and Valocity dated 12/12/2002 for real estate valuation services

13

141. Desktop Underwriter Interface and Related Services between Seller and MGIC Investor Services Corporation dated 7/1/2000 for Contract Underwriting Retail and Wholesale

142. Loan Prospector Interface and Related Services between Seller and MGIC Investor Services Corporation dated 7/1/2000 for Contract Underwriting Retail and Wholesale

143. Assetwise Interface and Related Service between Seller and MGIC Investor Services Corporation dated 11/1/2002 for Contract Underwriting NCD

144. Desktop Underwriter Interface and Related Services between Seller and MGIC Investor Services Corporation dated 11/1/2002 for Contract Underwriting NCD

145. Loan Prospector Interface and Related Services between Seller and MGIC Investor Services Corporation dated 11/1/2002 for Contract Underwriting NCD

146. End-User License Agreement between Seller and Bloomberg, LP

147. Software License Agreement between Seller and Elynx for eLynx NS software

148. Network Associates Perpetual End User License Agreement between Seller and Network Associates, Inc (NAI Financial Services-Telesales Grp.) for McAfee

149. End User License Agreement between Seller and PGP Corporation for PGP software

150. License Agreement between Seller and Polaroid Digital Solutions, Inc. for ACI Collector

151. End User License Agreement between Seller and A.T. Cross Company for GinnieNET 2020

152. Federal Home Loan Mortgage Corporation Software License Agreement between Seller and Freddie Mac for MIDANET

153. End User License Agreement between Seller and Captaris, Inc. for Alchemy Version 8.0

154. Software License Agreement between Seller and Kofax Image Products, Inc. for Ascent Capture

155. Amended and Restated Master Loan Purchase Agreement between Seller and Goldman Sachs effective 10/1/2005 for loan delivery

156. Lease/Rental Agreement between Seller and Superior Water and Air, Inc. for Salt Lake City for water

The following software license agreements require the Buyer to agree to the terms of the license agreement and obtain consent from the provider:

1. End-User License Agreement between Seller and Altec Products, Inc. for doc-link

2. IBM Base License Agreement between Seller and IBM for basic software license

3. Software License Agreement between Seller and Kofax Image Products, Inc. for Developers Toolkit

At the request of the third parties to the Contracts listed below, the Contracts listed below will not be assigned to Buyer, but in lieu thereof, the Buyer will enter into replacement agreements with the respective third parties, which agreements shall provide substantially the same material benefits to Buyer as Seller has under such Contracts. Notwithstanding the foregoing, the following Contracts are still subject to Section 9.1(g) except for Contracts with Progress Software Corporation. In the event that such third parties later consent to assignment of the Contracts listed below in lieu of the Buyer entering into replacement agreements, such Contracts will be assigned to Buyer pursuant to the Assignment and Assumption Agreement between Buyer and Seller delivered at the Closing.

1.  Custom Interface Agreement - LoanProspector between Seller and Freddie Mac dated 4/17/2006 for Automated Underwriting Services

2.  Maintenance Agreement between Seller and Progress Software Corporation effective 03/01/2006 for software support for Lakewood

3.  User Agreement between Seller and Progress Software dated 8/3/1999 for Lakewood software

4.  Software License Agreement between Seller and Financial Industry Computer Systems, Inc. effective on 11/12/2002 for software license

5.  Amendment for EPD notification dated 10/26/2005 to Amended and Restated Master Loan Purchase Agreement between Seller and Goldman Sachs effective 10/1/2005

6.  Master Agreement between Seller and Fannie Mae effective 2/24/2004 for loan sale and delivery; provided, however, that Buyer will assume and honor those whole loan commitments with Fannie Mae listed on Attachment 4.22 to Schedule 4.22 pursuant to its own agreements with Fannie Mae

**Schedule 4.5**
Absence of Changes or Events

Disclosure under Section 4.5(c):

The Irwin Mortgage Corporation Retirement and Profit Sharing Plan experienced a partial termination in 2005. As a result, the accounts of the affected employees have become fully vested.

Seller will also incur a partial termination of the Irwin Mortgage Corporation Retirement and Profit Sharing Plan as of the date of closing.

Disclosure under Section 4.5(f):

Seller has entered into a Master Agreement for a Mortgage Servicing Package with Fidelity Information Services, Inc. dated as of 5/2/2005 as amended and including all Addenda and attachments thereto, (the "MSP Agreement") relating to Seller's planned implementation of Fidelity's MSP servicing platform (in replacement of Seller's LSAMS software system). In the first quarter of 2006, in connection with the announcement by Shareholder of its intention to explore strategic alternatives with respect to its mortgage banking line of business, including the sale of Seller (the "Proposed Transaction"), Seller delayed further implementation of the MSP platform pending further developments related to the Proposed Transaction. Seller has since been notified by Fidelity of the latter's contention that Seller has failed to use commercially reasonable efforts to convert to the MSP platform as contemplated by the MSP Agreement.

The following Contracts have been terminated since the Latest Balance Sheet:

1.  Lease for the premises located at 1270 US Highway 412 W, F, Siloam Springs, AR 72761 beginning 4/1/2005 between Seller and Leon Davis Constructions

2.  Sublease for the premises located at 10445 E. US 36, Avon, IN 46123, beginning 11/1/2005 between Seller and IUBT (Ninety days notice of termination given to IUBT for termination effective 9/20/2006)

3.  Agreement between Shareholder and Copyright Clearance Center, Inc., effective 5/31/2006 (will be terminated with respect to Seller)

The following Contracts have been entered into or renewed since the Latest Balance Sheet:

1.  NCR Maintenance Order Form between Seller and NCR Maintenance dated 8/1/2003 for software maintenance; renewed 8/1/06 through 1/31/2007

2.  Contracts of the type listed in Exhibits A and B to Schedule 1.1(b)(iii) have been entered into and terminated in the ordinary course of business

18

3.  Letter Agreement between Seller and JP: Morgan Chase entered into 6/30/2006 to extend (i) Participation Sale Agreement and (ii) Master Repurchase Agreement through 8/31/2006

4.  Lease for the premises located at 5825 Delmonico Drive, 215, Colorado Springs, CO 80919 renewed for six months beginning 6/30/2006 between Seller and CSJ 1, LLC.

5.  Lease for the premises located at 1200 Valley West Drive, 403-7, West Des Moines, IA 50266 renewed for six months beginning 6/30/2006 between Seller and West Colony Office Assoc.

6.  Seller has instituted a policy whereby all compensation increases in excess of 5 percent must be approved by Bob Griffith, President.

7.  Seller ceased making charitable contributions (with the exception of pre-committed grants).

8.  As part of on-going improvement in secondary marketing execution, the Seller has recently begun to deliver Alt-A production (defined for this purpose as mortgage loans that do not conform to Agencies' conventional underwriting guidelines primarily due to documentation, but which still qualify for purchase by the Agencies) to Fannie Mae.

9.  Seller cancelled plans for summer company picnic.

10. Seller ceased participation in Mortgage Bankers Association Future Leaders Program (in which Seller had participated since Program's inception).

11. Seller ceased conducting "Diversity Is" and Irwin Guiding Philosophy Training for employees.

12. Seller closed Construction Perm lending department (resulting in loss of Tulsa branch).

13. Seller commenced program of paying production personnel double commissions as a retention tool, with plans to cease this program concurrently with the execution of the Agreement and the announcement of the transaction.

14. Seller and IHE decided to cease value sharing activity in the second quarter of 2006, as described in disclosure number 18 of Schedule 4.25.

### Schedule 4.6
#### Undisclosed Liabilities

See Schedule 4.11 (Litigation), which is incorporated herein by reference.

The Business has ongoing liabilities arising under the terms of the Contracts listed in the Disclosure Schedules and the schedules to the Agreement to which Seller or Shareholder is a party or by which they or their respective Assets and Properties are bound.

## Schedule 4.10(a)
### Material Contracts

(i)

1. Statement of Work between Seller and Berbee Information Networks Corporation effective on 11/9/2004 for consulting services

2. Customer Agreement between Seller and IBM effective on 4/29/2005 for Application Development and Maintenance Services

3. Services Agreement between Seller and Aerotek, Inc. effective on 2/13/2006 for employee temp-to-hire

4. Seller has entered into a Transaction Assistance and Separation and General Release Agreement and Covenant Not to Sue (each, a "Separation Agreement") with each of Bob Griffith, Les Acree, Mark Braden, Duncan Chiu and John Macke, pursuant to which the named executive is to entitled to a Separation Package (as defined therein) based upon and subject to certain terms and conditions. Shareholder has entered into a letter agreement with each of Messrs. Acree, Braden, Chiu and Macke pursuant to which Shareholder has agreed, conditional upon the occurrence of the Closing and such executive's acceptance of employment with Buyer, to cause Seller (i) to waive a condition in the Separation Agreement relating to nonpayment of the Separation Package in the event the executive accepts a position with an acquirer, and (ii) to pay the portion of the Separation Package that is based on salary and bonus levels concurrent with the Closing.

5. In connection with providing offers of employment to each of Bill Bennett and Dan Hastings, employees in Seller's correspondent lending division, Seller has agreed to pay to each of Mr. Bennett and Mr. Hastings, in the event of a "change of control," an amount equal to one year's annualized base salary within 90 days after the change of control occurs. For this purpose, a "change of control" has occurred if Seller merges into, sells or otherwise transfers substantially all of its assets to another entity and such change materially diminishes the employee's job function, job responsibilities and/or job title.

6. IMC has entered into a Retirement and General Release Agreement and a related Waiver and Release Agreement and Covenant Not to Sue with Timothy L. Murphy related to the latter's retirement from Seller effective 3/10/2006. Following Mr. Murphy's retirement, Seller also entered into a temporary employment arrangement with Mr. Murphy to provide for the latter's continued service to Seller for a term of two (2) months. The temporary employment was renewed on 5/11 for an additional period of two (2) months, and may be reevaluated and renewed month-to-month thereafter. The arrangement is terminable by either party with thirty (30) days' notice.

7. In connection with Shareholder's announcement of its intention to explore strategic alternatives with respect to its mortgage banking line of business, including the sale of Seller, Seller established a retention program for employees who lose their jobs as a result of such sale. For non-production employees, the program generally provides for a severance package containing three components: (i) continued payment of the affected employee's salary at its current level for a period of time following severance based upon such employee's length of service with Seller, (ii) the provision by Seller of COBRA coverage for the same period during which severance is paid, and (iii) outplacement services provided to the affected employee at Seller's expense. An employee is not eligible for the severance package, however, if he or she either voluntarily separates from employment with Seller or if he or she receives an offer of a comparable position with an acquirer of Seller or with another Irwin company. For production employees, the program contemplates the payment of commissions on any loans closed within 30 days following the affected employee's separation of employment, plus COBRA coverage for such 30-day period.

(ii) None

(iii) None

(iv)

1. Equipment Lease Agreement between Seller and Braden Business Systems effective 6/4/2004 for Valparaiso for copier lease

2. Equipment Lease Agreement between Seller and Braden Business Systems effective 8/31/2004 for San Antonio for copier lease

3. Equipment Lease Agreement between Seller and Braden Business Systems effective 7/15/2004 for Vernon for copier lease

4. Equipment Lease Agreement between Seller and Braden Business Systems effective 8/31/2004 for Newport News for copier lease

5. Oral agreement between Seller and Braden Business Systems for Lake Worth for fax maintenance

6. Oral agreement between Seller and Braden Business Systems for Direct Lending for fax maintenance

7. Oral agreement between Seller and Braden Business Systems for LSC/Direct Lending for fax maintenance

8.  Equipment Lease Agreement between Seller and Braden Business Systems effective 6/18/2004 for New Construction for copier lease

9.  Master Lease Agreement between Seller and Dell Financial Services, LP effective on 4/1/2004 for Hardware Leasing

10. Master Lease Agreement between Seller and GE Capital Corporation effective on 8/1/2002 for Furniture and Equipment Lease

11. Master Lease and Financing Agreement between Seller and HP Financial Services effective on 6/15/1999 for equipment lease

12. Master Equipment Agreement between Seller and IOS Capital, LLC effective on 1/13/2003 for copier rental and all schedules related thereto for Purchased Assets

13. Master Equipment Lease between Seller and Leasenet effective on 10/1/2005 for leases for technology equipment

14. Lease Agreement and Service Agreement between Seller and Pitney Bowes, Inc. effective 12/18/2003 for Mailing Machine Lease and postage meters leases

(v)

1.  Multivendor Information Technology Recovery Services between Seller and IBM effective on 12/20/2005 for disaster recovery services

2.  DPS Agreement for the Resale of IBM Services between Seller and Data Processing Services, Inc. effective on 6/16/2005 for purchase of equipment

3.  Encompass Anywhere Services Agreement between Seller and Ellie Mae effective on 10/1/2005 for loan origination ASP

4.  Software License and Services Agreement between Seller and Fair Isaac Software, Inc. effective on 4/3/2003 for software license and support services for Fortracs, LSAMS, TCL and Telwin/Telink

5.  Tax Outsourcing Service Agreement between Seller and First American Real Estate Solutions of Texas, LP effective on 4/1/2005 for tax escrow services

6.  Service Agreement between Seller and ZC Sterling Insurance Agency, Inc. effective on 6/28/2001 for Hazard and Flood Insurance Tracking

7.  Flood Determination Service Agreement between Seller and First American Flood Data Services effective on 10/1/2002 for Determination of whether properties fall within flood zone and require flood insurance

8.  Membership Contract between Seller and CBC Companies effective on 10/24/2001 for Credit Report Services

9.  Agreement for Services between Seller and First American Credco effective on 6/1/2001 for Credit Report Services

48

10. Settlement Services Agreement between Seller and Old Republic National Title Insurance Company effective on 9/22/2003 for outsourced settlement services

11. Application for Service Agreement between Seller and Old Republic Credit Services effective on 9/24/2003 for Credit Report Services

12. Data Integrity Risk Systems and Services Agreement between Seller and Interthinx, Inc. effective 6/9/2005

13. Master Agreement between Seller and Dorado Network Systems Corporation dated 12/1/2004 for Pricing Engine

14. Microsoft Essential Support Standard Plan Services Description between Seller and Microsoft dated 4/28/2004

(vi)    See Schedule 4.22, which is incorporated herein by reference.

(vii)   None

(viii)

1. Line of Credit between Seller and Irwin Union Bank & Trust effective 1/1/2004 for Line of Credit

2. Master Repurchase Agreement for Whole Mortgage Loans between Seller and JP Morgan Chase Bank, N.A. dated 6/6/1994

(ix)

1. Master Repurchase Agreement for Whole Mortgage Loans between Seller and JP Morgan Chase Bank, N.A. dated 6/6/1994

2. Master Lease Agreement between Seller and Dell Financial Services, LP effective on 4/1/2004 for Hardware Leasing

3. Master Lease Agreement between Seller and GE Capital Corporation effective on 8/1/2002 for Furniture and Equipment Lease

4. Master Equipment Agreement between Seller and IOS Capital, LLC effective on 1/13/2003 for copier rental

5. Master Equipment Lease between Seller and Leasenet effective on 10/1/2005 for leases for technology equipment

6. Affiliate Collateral Pledge and Security Agreement between Seller and Federal Home Loan Bank of Indianapolis effective 10/1/2002

49

(x)

1.    ISDA Master Agreement between Seller and Bank of America, NA effective 6/11/2003 for Swap

2.    ISDA Master Agreement between Seller and Bank One effective 9/8/2003 for Derivative Dealer/ISDA

3.    ISDA Master Agreement between Seller and Bear Stearns effective 5/1/2003

4.    ISDA Master Agreement between Seller and Citibank, NA effective 5/20/2004 for Swap

5.    ISDA Master Agreement between Seller and JP Morgan effective 5/1/2003 for Swap

6.    ISDA Master Agreement between Seller and The Bank of New York effective 11/1/2003 for Swap

7.    ISDA Master Agreement between Seller and Wachovia Bank, NA effective 7/18/2005 for Swap

8.    ISDA Master Agreement between Seller and Lehman Brothers Special Financing, Inc. effective 7/10/2003 for Swap

9.    Oracle License and Services Agreement between Seller and Oracle USA, Inc. effective on 10/28/2005 for Database SE Support

10.   Software License Agreement between Seller and Financial Industry Computer Systems, Inc. effective on 11/12/2002 for software license

11.   See also Contracts disclosed in Schedule 4.2(a) that are not assignable.


(xi) None

## Schedule 4.10(b)
### Breaches of Material Contracts

See disclosure under Section 4.5(f) on Schedule 4.5, which is incorporated herein by reference.

See the disclosure relating to the Early Mortgage Pay-Off Plan on Schedule 4.11, which is incorporated herein by reference.

See any breach of contract actions disclosed in Schedule 4.11 (Litigation), which are incorporated herein by reference.

Transfer of 50% or more of Seller's assets constitutes a default under the Lease for the premises located at 5825 Delmonico Drive, 215, Colorado Springs, CO 80919 beginning 3/1/2001 between Seller and CSJ 1, LLC.

Transfer of the Lease for the premises located at 5505 South 900 East, 235, Murray (Salt Lake City), UT 84107 beginning 4/1/2005 between Seller and Sports Mall Plaza I LLC c/o Perry Realty without prior written consent of the landlord constitutes a default under the lease.

Some of the Seller's Contracts provided to Buyer, its representatives and advisors contain confidentiality provisions, which may have been violated by such disclosure.

The following Assigned Contract has not been delivered or made available to Buyer:

1.    Agreement between Seller and Verizon for wireless services

## Schedule 4.25
### Interested Party Transactions

The following is a list of all Contracts and arrangements currently in effect between Seller, on the one hand, and any Affiliate of Seller, on the other hand:

1.  The Intercompany Credit Line

2.  The Intercompany Capital Loan

3.  Tax Allocation Agreement among Shareholder and its subsidiaries, including Seller , effective as of 7/1/2006

4.  Tax Sharing Agreement between Irwin Union Bank and Trust Company ("IUBT") and Irwin Reinsurance Company effective as of 1/1/2006

5.  Inter-Company Fee Agreement among Shareholder, IUBT, and their subsidiaries, effective as of 1/1/2006, including related letter agreements by and between (i) Seller, on the one hand, and Shareholder, on the other hand, and (ii) Seller, on the one hand, and IUBT, on the other hand, in each case related to services provided by Shareholder and IUBT to Seller from time to time throughout the year

6.  Lease Agreement between Seller (as landlord) and Shareholder (as tenant) effective 9/1/2005 (expiring on 12/31/2006)

7.  Loan Broker Agreement between Seller and IUBT (as broker)

8.  Loan Broker Agreement between Seller and Irwin Union Bank, F.S.B. (as broker)

9.  Loan Broker/Correspondent Agreement between IUBT and Seller (as broker/correspondent)

10. Correspondent Loan Purchase and Sale Agreement between Seller and Irwin Home Equity dated 12/11/2003

11. Broker Agreement between Seller and Irwin Home Equity dated 11/3/2003

12. Sublease for the premises located at 555 W. Crosstown Pkwy., Kalamazoo, MI 49008 beginning 1/1/2003 between Seller and IUBT

13. Sublease for the premises located at 10445 E. US 36, Avon, IN 46123, beginning 11/1/2005 between Seller and IUBT. This has been terminated effective 9/30/2006

14. Seller has an informal arrangement with IUBT pursuant to which (i) Seller deposits its escrow funds in accounts maintained at IUBT (and has free use of such deposits to fund its balance sheet), (ii) Seller has the benefit of a preferential float arrangement, and (iii) IUBT provides a courier service to Seller for the purpose of collecting the escrow funds for deposit into the accounts maintained at IUBT. Seller pays IUBT a service charge in the range of $30,000-$40,000 per month for these services

15. From time to time over the past twelve months, Seller has, pursuant to an informal arrangement with IUBT, performed MSR valuation services for IUBT's

commercial banking line of business using the Spectrum system. Seller has not charged IUBT for such services

16. Shareholder's Treasury Department has from time to time entered into a funding arrangement with the Federal Home Loan Bank ("FHLB") pursuant to which Seller has been requested by IUBT to pledge, and has pledged for the benefit of IUBT, certain collateral to the FHLB for the purpose of providing additional security for the advances made by the FHLB to IUBT. (Contract is entitled: Affiliate Collateral Pledge and Security Agreement between Seller and Federal Home Loan Bank of Indianapolis effective 10/1/2002)

17. Guarantee issued by Irwin Union Bank and Trust in favor of Bear Stearns under ISDA Master Agreement between Seller and Bear Stearns effective 5/1/2003

18. Seller and Irwin Home Equity Corporation (IHE) have entered into an informal strategic alliance arrangement in which the Seller originates product developed jointly with IHE with the intent to sell the loans. The arrangement contemplated a value sharing mechanism designed to split the net value created when Seller originates loans that IHE purchases and ultimately sells or securitizes. There is no formal underlying agreement describing this value sharing arrangement. Seller and IHE decided to cease this value sharing activity in the second quarter of 2006.

INDS01 870491v16

**Schedule 6.1(b)**
Conduct Prior to Closing

Seller may roll out a prepayment option arm program between the date of signing and the date of Closing.

**EXHIBIT B**



## CORRESPONDENT LOAN PURCHASE AND SALE AGREEMENT

This is a Correspondent Loan Purchase and Sale Agreement (the "Agreement"), dated as of December 11, 2003 by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California 94583 (individually and collectively, the "Purchaser") and Irwin Mortgage Corporation having an address of 9265 Counselors Row, Suite 200, Indianapolis, IN 46240 ("Seller").

### WITNESSETH

WHEREAS, the Seller desires from time to time to offer for sale to the Purchaser, and the Purchaser desires from time to time to purchase, on the terms and subject to the conditions set forth herein, certain loans ("Loans") owned by the Seller evidenced by notes and secured by mortgages of the agreed-upon priority on real property, owned by the borrowers ("Borrowers").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Whenever used herein, the following words and phrases, unless the context otherwise requires, shall have the following meanings:

Agreement: This Correspondent Loan Purchase and Sale Agreement including all Exhibits and Schedules attached hereto or delivered pursuant hereto, and all amendments hereof and supplements hereto.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer, or equivalent instrument in recordable form to reflect the sale of the Mortgage, which assignment, notice of transfer or equivalent instrument may not be in the form of one or more blanket assignments.

Broker: Anyone who solicits borrowers or lenders or negotiates loans or collects payments or performs services for borrowers or lenders in connection with loans secured directly or indirectly by liens on real property.

Business Day: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions, in the State of Indiana or the State of California or the state in which the Purchaser's servicing operations are located, are authorized or obligated by law or executive order to be closed.

Correspondent Partner Manual: The policies and procedures governing the sale and transfer of Loans between Purchaser and Seller, including the Underwriting Guidelines, as may be amended from time to time by Purchaser. Purchaser agrees to provide Seller with thirty (30) days' prior written notice of any changes to the Purchaser's Correspondent Partner Manual.

Discount Rate: The percent by which the Purchase Price is less than 100% of the outstanding principal balance of a Mortgage Loan as of the Sale Date. Also known as the Negative Service Released Premium.

Due Date: The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any grace period stipulated under the terms of the Mortgage Note.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, buy-down funds, optional insurance funds and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the requirements of the Mortgage or any other document.

HELOC:    A Mortgage Loan that is a home equity line of credit or any other arrangement under which the Mortgagor has the right to demand further advances from the mortgagee.

High Cost Loan:    A loan subject to the Home Ownership and Equity Protection Act of 1994 (also known as a "Section 32" or "HOEPA" loan) or such other loan that was defined as a "high cost" mortgage loan under federal, state or local law at the time of origination of such loan.

Maximum Loan Amount:    With respect to each Mortgage Loan that is a HELOC, the maximum principal amount that may be outstanding at any time under the terms of the related Loan Documents.

MERS: Mortgage Electronic Registration Systems, Inc.

Monthly Payment: The scheduled monthly payment of principal and interest on a Mortgage Loan.

Mortgage:  An individual mortgage, deed of trust or other instrument which creates a lien on an estate in fee simple in real property securing the Mortgage Note.

Mortgage Loan: An individual residential mortgage loan, which is the subject of this Agreement. Each Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage Loan File, and all Monthly Payments, Principal Prepayment payable after the Sale Date and amounts in any buydown account, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Documents: With respect to each Mortgage Loan, the related Mortgage Note, the endorsement of the Note, the Mortgage, the Assignment of Mortgage, all intervening assignments of the Mortgage and the title policy or marked up commitment or binder therefor.

Mortgage Loan File:  A file containing the following documents for each Mortgage Loan:

(a)  The original Mortgage Note signed by the Mortgagor and bearing Seller's endorsement to Purchaser;

(b)  The original recorded Mortgage executed contemporaneously with the Note; or copies thereof certified by Seller if such original have been delivered to a recording office and not yet returned.

(c)  The Assignment of Mortgage and a certified copy of any and all intervening assignments;

2

*IHE Agreement Revised 6/23/03*



(d) The original credit application;

(e) All credit information concerning the Mortgagor or any other person obligated on the Mortgage Loan and all guarantees and other agreements securing such transactions, including all credit reports;

(f) Evidence of application for adequate flood insurance coverage, if applicable, with respect to the Mortgaged Property, with Seller being declared or designated as mortgagee and loss payee or an authorization signed by the Mortgagor to add Seller, its successors and/or its assigns, as mortgagee;

(g) Copies of all disclosure statements required by any federal or state law, rule or regulation, including without limitation the Real Estate Settlement Procedures Act and any truth-in-lending act or similar consumer protection act, and all statements indicating that the Mortgagor has received such required disclosures, including any acknowledgment of receipt of the original statement shown thereon;

(h) The appraisal or property evaluation of the real estate secured by the Mortgage Loan, if required under the Underwriting Guidelines;

(i) A statement showing the unpaid principal balance of the Mortgage Loan, the amount of periodic installments and the date(s) to which principal and interest have been paid and, if required by Purchaser, information in electronic form for all receipts and disbursements from the inception of the Mortgage Loan including the date of each receipt or disbursement;

(j) The title insurance policy, opinion or report with respect to the lien priority of the Mortgage Loan, if required under the Underwriting Guidelines;

(k) All documents relating to any rights of rescission of the Mortgagor; and

(l) Any and all other documents, agreements or instruments related to the origination, closing, enforceability or purchase of the Mortgage Loan as applicable.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: The real property securing repayment of the debt evidenced by a Mortgage Note.

Mortgagor: The obligor on a Mortgage Note.

Note Interest Rate: The annual rate of interest stated on a Mortgage Note.

Premium: The amount equal to the Premium Rate multiplied by the outstanding principal balance of a Mortgage Loan as of the Sale Date.

Premium Rate: The percent by which the Purchase Price exceeds 100% of the outstanding principal balance of a Mortgage Loan as of the Sale Date. Also known as the Service Released Premium.

3                          IHE Agreement Revised 6/23/03

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Advice: The document, delivered by the Purchaser to the Seller on or immediately prior to each Sale Date, setting forth certain information regarding the Mortgage Loans, as of the Sale Date specified therein, scheduled to be transferred by the Seller to the Purchaser on such Sale Date. Such Purchase Advice shall be in the form of Exhibit "A" attached hereto.

Purchase Price: The aggregate of the amounts to be paid by the Purchaser to the Seller in exchange for the Mortgage Loans and related Servicing Rights for the related Mortgage Loans as agreed upon by the parties hereto.

Repurchase Date: The date on which the Seller repurchases a Mortgage Loan pursuant to the terms of this Agreement.

Sale Date: The date mutually agreed upon by the Seller and the Purchaser: (a) on which the Seller transfers ownership of the Mortgage Loans to the Purchaser; (b) upon which the receipt of payments, accrual of interest and other charges shall cease for the benefit of the Seller and begin for the benefit of the Purchaser; and (c) on which the Purchaser assumes the actual servicing of the related Mortgage Loans in accordance with the terms hereof.

Servicing Files: The documents, files and other items pertaining to Mortgage Loans and the servicing of such Mortgage Loans that are in the possession of the Seller on the Sale Date.

Servicing Rights: With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loan; (b) any payments or monies payable or received for servicing the Mortgage Loan; (c) any late fees, prepayment penalties, assumption fees, penalties or similar payments with respect to the Mortgage Loan; (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to any clean-up calls and termination options; (e) other payments with respect to the Mortgage Loan and any amounts actually collected with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; (g) possession and use of the Servicing File and any files pertaining to the past, present, or prospective servicing of the Mortgage Loan; and (h) all rights, powers and privileges incident to any of the foregoing.

Underwriting Guidelines: Purchaser's loan underwriting guidelines as may be amended from time to time.

## ARTICLE II
## ELIGIBLE LOANS; LOAN REVIEW

Section 2.01     Eligible Loans

Only those Mortgage Loans that comply fully with the Underwriting Guidelines and with all of the terms and conditions of this Agreement and the Correspondent Partner Manual are eligible for purchase under this Agreement. Notwithstanding anything to the contrary in this Agreement, Purchaser has the right, without prior notice to Seller, to cease accepting loan submissions for Loans in jurisdictions



which have enacted laws or in which cases have been decided that Purchaser, in its sole discretion, believes to be unduly burdensome or places Purchaser in high risk.

### Section 2.02.    Loan Pre-Approval

From time to time, Seller may present loan applications to Purchaser for Purchaser's preapproval prior to Seller's commitment to extend credit. With respect to each Loan for which Seller desires to obtain Purchaser's preapproval, Seller shall submit to Purchaser: (i) a completed underwriting and transmittal summary in the form required by Purchaser, a sample of which is provided in the Correspondent Partner Manual; (ii) a completed loan application; (iii) a credit report; and (iv) such other documents required by the Purchaser, as stated in the Correspondent Partner Manual. Upon receipt and review of these items by Purchaser, Purchaser may, in its sole discretion, conditionally preapprove the Mortgage Loan and may, at its sole discretion, issue a written commitment for such a preapproved Mortgage Loan. Seller acknowledges and understands that such preapproval is conditional only and that Purchaser shall have no obligation to purchase such Loan unless such Loan is closed and submitted for purchase in accordance with Section 2.03 and Purchaser thereafter elects, in its sole discretion, to purchase such Loan. Furthermore, in order for any commitment issued by Purchaser under this Section 2.02 to apply, the Loan must be closed and submitted to Purchaser in accordance with Section 2.03 within the time specified in such commitment.

### Section 2.03    Mortgage Loan Review and Approval

(a) From time to time, Seller will present closed Mortgage Loans to the Purchaser that the Seller proposes to sell to the Purchaser under the terms of this Agreement. Seller shall deliver to Purchaser the Mortgage Loan File related to said Mortgage Loan. The Purchaser shall review said Mortgage Loan File and shall approve or disapprove each such Mortgage Loan for purchase hereunder in accordance with the procedures set forth in the Purchaser's Correspondent Partner Manual.

(b) Seller acknowledges and agrees that Purchaser has no obligation to purchase Mortgage Loans submitted by Seller that do not meet Purchaser's standards as stated in the Correspondent Partner Manual or if Purchaser, in its discretion, believes any Mortgage Loan poses a credit and/or legal risk. Should Purchaser decide not to purchase a Mortgage Loan, Purchaser shall return the Mortgage Loan File and any other documents submitted to it to Seller. Seller may cure any deficiencies noted by Purchaser and may re-submit the Loan to Purchaser.

(c) In the event a Mortgage Loan is submitted for approval under the terms of this Section 2.03 for which Purchaser shall have issued a written preapproval as set forth in Section 2.02, Purchaser shall not be obligated to purchase said Mortgage Loan if such Mortgage Loan at the time it is delivered fails to meet the conditions of the pre-approval or contains any other defect that would cause said loan to fail to meet the standards set forth in the Correspondent Partner Manual.

(d) For any Loans purchased by Purchaser, the examination of the Mortgage Loan File shall not constitute a waiver of any representation, warranty, or covenant by the Seller, the Mortgagor or any other party connected with the Mortgage Loan, with respect to such Mortgage Loan.

Section 2.04    Notifications of Action Taken

In the event that Seller submits a loan application to Purchaser prior to Seller extending credit to the applicant, and neither Purchaser nor any other creditor extends credit to the applicant or the applicant does not accept or use any credit offered, Seller agrees to deliver to the applicant an adverse action notice in accordance with all applicable state and federal laws and regulations, including, without limitation, Regulation B and the Equal Credit Opportunity Act. Purchaser shall accurately and in a timely manner provide Seller with the information necessary for such notification.

## ARTICLE III
## CONVEYANCE FROM SELLER TO PURCHASER
## ASSUMPTION OF SERVICING BY PURCHASER

Section 3.01    Conveyance of Mortgage Loans and Servicing Rights

On each Sale Date, the Seller will sell, transfer, assign, set over and convey to the Purchaser, all right, title and interest of the Seller in and to the Mortgage Loans set forth in the related Loan Schedule and the Mortgage Loan Documents, Servicing Rights, the Mortgage Loan Files, Servicing Files related to the Mortgage Loans free and clear of all liens, security interests, charges or encumbrances.

Transfer of Title

(a) On each Sale Date, title to each Mortgage shall be conveyed by Seller: (i) delivering to the Purchaser an Assignment of Mortgage in the name of Purchaser or Purchaser's designee for each Mortgage Loan in a form acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located, or (ii) if the Mortgage Loan is registered with MERS, properly registering the transfer in ownership in the MERS system. Seller shall bear the cost and expense of preparing all such Assignments of Mortgages and shall pay the sum of Fifty dollars ($50.00) per Mortgage Loan towards the costs incurred by Purchaser associated with recording the Assignments of Mortgage.

(b) Title to each Mortgage Note shall be delivered by Seller to Purchaser by Seller endorsing each Mortgage Note in the manner specified by the Purchaser. Seller shall bear the cost and expense of preparing all such endorsements.

## ARTICLE IV
## PAYMENT OF THE PURCHASE PRICE

On the Sale Date, the Purchaser shall pay the Seller, by immediately available funds, the Purchase Price set forth on the Purchase Advice. The Purchase Price shall be determined according to the rate sheets in effect at the time of origination (or Sale Date if rates have changed; see the CPM for rate change guidelines), unless the parties mutually agree to a different Purchase Price for a Mortgage Loan prior to the Sale Date for such Loan.

*IHE Agreement Revised 6/23/03*

# ARTICLE V
## REPRESENTATIONS, WARRANTIES AND AGREEMENTS

<u>Section 5.01    Representations, Warranties and Agreements of the Purchaser</u>

The Purchaser, as a condition to the consummation of the transactions contemplated hereby, makes the following representations, warranties and agreements to the Seller as of each Sale Date:

(a) The Purchaser is duly organized, validly existing, and in good standing under the laws of the State of Indiana and has the power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement by the Purchaser and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action; this Agreement evidences the valid, binding and enforceable obligation of the Purchaser; and all requisite corporate action has been taken by the Purchaser to make this Agreement valid, binding and enforceable upon the Purchaser in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium and other, similar laws relating to or affecting creditors rights generally or the application of equitable principles in any proceeding, whether at law or in equity;

(b) All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, on Purchaser's that are necessary in connection with the execution of this Agreement and the performance of the transactions hereunder have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals;

(c) The consummation of the transactions contemplated by this Agreement will not result in the breach of any terms or provisions of the charter or by-laws of the Purchaser or result in the breach of any term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other material instrument to which the Purchaser or its property is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d) There is no action, suit, proceeding or investigation pending or, to the best of the Purchaser's knowledge, threatened against the Purchaser which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Purchaser or in any material impairment of the right or ability of the Purchaser to carry on its business substantially as now conducted, or in any material liability on the part of the Purchaser or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Purchaser contemplated herein, or which would be likely to impair materially the ability of the Purchaser to perform under the terms of this Agreement.

(e) From and after the Sale Date, Purchaser shall make all advances required to be made under any Mortgage Loan that is a HELOC.

*IHE Agreement Revised 6/23/03*

Section 5.02    Representations and Warranties of the Seller

1.  Seller, as a condition to the consummation of the transactions contemplated hereby, makes the following representations and warranties to the Purchaser as of the Sale Date. With respect to any representation or warranty of the Seller that is made to the best of the Seller's knowledge, if it is discovered by the Purchaser, that the substance of such representation and warranty was inaccurate as of the Sale Date, as applicable, and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, then notwithstanding the Seller's lack of knowledge with respect to the inaccuracy at the time the representation or warranty was made, such inaccuracy shall be deemed a breach of the applicable representation or warranty:

    (a)  Seller is a corporation duly organized and validly existing under the laws of the state of Indiana; it has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state in which any of the Mortgaged Property is located if the laws of such state require licensing or qualification in order to (i) conduct business of the type conducted by Seller (ii) insure enforceability of each Mortgage Note and Mortgage and (iii) perform its obligations hereunder, and no demand for such qualification has been made upon the Seller by any state having jurisdiction over Seller or any of the Mortgaged Property; Seller has the power and authority to hold each Mortgage Loan and to execute and deliver this Agreement and to perform in accordance herewith and all transactions contemplated hereby; the execution, delivery and performance of this Agreement (including but not limited to all instruments of transfer to be delivered pursuant to this Agreement) by Seller and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action; this Agreement evidences the valid, binding and enforceable obligation of Seller; and all requisite corporate action has been taken by Seller to make this Agreement valid, binding and enforceable upon Seller in accordance with its terms;

    (b)  All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any federal, state or other governmental authority or agency, that are necessary in connection with the purchase and sale of the Mortgage Loans and the execution and delivery by Seller of the documents to which it is a party, including but not limited to the Mortgage Loan Documents and this Agreement, have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken, and are adequate to authorize the consummation of the transactions contemplated by this Agreement and the other documents on the part of Seller and the performance by Seller of its obligations under this Agreement and such of the other documents to which it is a party;

    (c)  The origination of the Mortgage Loans, the sale thereof and the consummation of the transactions contemplated by this Agreement will not result in the breach of any terms or provisions of the charter or by-laws of Seller or result in the breach of any term or provision of, or conflict with or constitute a default under or result in the acceleration of any obligation under, any material agreement, indenture or loan or credit agreement or other material instrument to which Seller or its property is subject, or result in the violation or breach of any law, rule, regulation, legal restriction, order, judgment or decree to which Seller or its property is subject;

    (d)  Except as disclosed by Irwin Financial Corporation through SEC public filings, there is no action, suit, proceeding or investigation pending or to the best of Seller's knowledge, threatened

*IHE Agreement Revised 6/23/03*



against Seller which is reasonably likely to be adversely determined and if adversely determined, either in any one instance or in the aggregate, would result in any adverse change in the business, operations, financial condition, properties or assets of Seller or in any material impairment of the right or ability of Seller to carry on its business substantially as now conducted, or in any material liability on the part of Seller or which would draw into question the validity of this Agreement or the Mortgage Loans or of any action taken or to be taken in connection with the obligations of Seller contemplated herein, or which would be likely to impair the ability of Seller to perform under the terms of this Agreement;

(e)  Seller is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or otherwise) or operations of Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(f)  Seller does not believe, nor has any reason to believe, that it cannot perform each and every covenant contained in this Agreement;

(g)  Seller represents that upon payment of the Purchase Price by the Purchaser under this Agreement, the Purchaser will have good title to each Mortgage Loan free and clear of any lien, claim, charge or encumbrances;

(h)  The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by Seller pursuant to this Agreement are in the ordinary course of business of the Seller and are not subject to the bulk transfer or fraudulent conveyance laws or any similar statutory provisions in effect in any applicable jurisdiction; and

(i)  The origination and collection practices used by Seller with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, and prudent.

(j)  If Seller intends to offer HELOCs for sale to Purchaser, Seller has complied with Purchaser's then-current eligibility guidelines for sellers of HELOCs.

Representations and Warranties with respect to the Mortgage Loans

2.  Seller hereby represents and warrants with respect to each Mortgage Loan, as of the Sale Date:

(a)  To the best of Seller's knowledge, the information with respect to each Mortgage Loan set forth in the Purchase Advice is true and correct as of the date thereof.

(b)  Each Loan is valid and was originated in accordance with the loan origination, eligibility and credit underwriting standards of the Purchaser's Underwriting Guidelines then in effect. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage Loan.

(c)  The Seller holds good and indefeasible title to, and is the sole owner of each Mortgage Loan, subject to no liens, charges, mortgages, encumbrances or rights of others. Seller has full right to sell and assign the Mortgage Loan, and the related Servicing Rights to Purchaser pursuant to this Agreement. There has been no assignment, sale or hypothecation thereof by Seller.

9                    *IHE Agreement Revised 6/23/03*



(d) The transfer and assignment of the Mortgage Note and Mortgage from Seller to Purchaser is valid and sufficient to vest title to the Mortgage Note and Mortgage in Purchaser.

(e) The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded. The Mortgaged Property has not been released from the lien of the related Mortgage, and no instrument been executed which would affect such release, cancellation, subordination or rescission. No Mortgagor has been released, in whole or in part, from any obligation secured thereby.

(f) Each Mortgage is a valid, enforceable and subsisting first or second lien of record (as specified by Purchaser) on the Mortgaged Property, the Mortgage, and all subsequent assignments of the original Mortgage, if any have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof.

(g) The Mortgaged Property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which would give rise to any such lien.

(h) There is no delinquent tax or assessment lien on the Mortgaged Property, and each Mortgaged Property is free of material damage and is in at least average repair.

(i) Each Mortgage Loan at the time it was made complied in all respects with applicable state, local, and federal laws and regulations, including, without limitation, usury, Section 32, consumer credit, equal credit opportunity, real estate settlement procedures, privacy, truth-in-lending and disclosure laws, and high cost laws and regulations. Seller has maintained and continues to maintain adequate training programs and written policies and procedures to ensure that all such requirements are met with respect to the Mortgage Loan. The Mortgagor has duly executed appropriate evidence indicating that the Mortgagor has received the disclosure materials as required by applicable laws and regulations.

(j) No Mortgagor on any Loan is the subject of, or is in any way affected by, any pending or, to the knowledge of Seller, threatened legal proceeding which might adversely affect the collectability or enforceability of the Mortgage Loan or the collateral securing same.

(k) Where applicable as specified in the Underwriting Guidelines, the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a sound and financially responsible carrier that provides for fire, hazard and extended coverage, duly licensed and qualified to transact business; all such insurance policies contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee, such clause being in a form such that it may be endorsed to Purchaser as loss payee as required hereunder; all premiums thereon have been paid; and to the best of Seller's knowledge, there are no facts or circumstances which could provide a basis for revocation of any policies or defense to any claims made thereon.

(l) Each Loan is not subject to any right of rescission, set-off, counterclaim or defense nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or and no such right of rescission has been asserted with respect thereto.

*IHE Agreement Revised 6/23/03*



(m) To the best of Seller's knowledge, there is no proceeding, pending or threatened, for the total or partial condemnation of the Mortgaged Property, nor is such a proceeding currently occurring, and such property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty, so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended.

(n) With respect to each Loan, if upon origination (i) the Mortgaged Property is in an area identified as having special flood hazards, which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained and (ii) such flood insurance has been made available for such Mortgaged Property, then such flood insurance policy is in effect; such flood insurance policy contains a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee, such clause being in a form such that it may be endorsed to Purchaser as loss payee as required hereunder; each Mortgage Loan has in place a fully-paid life of loan flood certification from a generally acceptable and duly licensed insurance carrier authorized to issue such policy assigned in care of Seller, which provides for notification to the Seller of changes in designated flood areas which would affect such Mortgage Loan, and each Mortgage Loan is covered by a flood map tracking system which identifies changes in the designated flood areas.

(o) The origination, servicing and collection practices, with respect to each Loan have been conducted in all respects and in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business.

(p) Each Mortgage and Mortgage Note is genuine, and each is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization. All parties to the Mortgage Note and the Mortgage and any other related agreement had legal capacity to execute such documents, and such parties have duly and properly executed such documents, which documents have been acknowledged, where required. All certified copies of original documents are true copies of the originals.

(q) To the best of Seller's knowledge, all of the improvements which were included for the purpose of determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property.

(r) To the best of Seller's knowledge, no improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation.

(s) The terms of the Mortgage Note and the Mortgage have not been impaired, altered, waived or modified in any respect, except by a written instrument which has been recorded or is in the process of being recorded, if necessary, to protect the interest of the Purchaser and which are in the Mortgage Loan Documents and have been or will be delivered to the Purchaser all in accordance with this Agreement; the substance of any such alteration, waiver or modification is reflected on the Purchase Advice.

(t) The proceeds of the Mortgage Loan have been fully disbursed either by payment to the Mortgagor or by payment made on Mortgagor's request or approval, and there is no obligation to make future advances thereunder; any and all requirements as to completion of any on-site or off-



site improvements and as to disbursements of any escrow funds therefor have been complied with; all costs, fees, taxes and expenses incurred in making, closing or recording the Mortgage Loans were paid and Mortgagor is not entitled to any refunds of amounts paid or due under the Mortgage Note or Mortgage;

(u) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(v) Unless the Purchaser has agreed to accept loans originated by a third party by attaching an addendum to this Agreement, each Mortgage Loan was originated by Seller, and not by any other third party, including but not limited to, a Broker. Seller is the original beneficiary or mortgagee in the Mortgage.

(w) The Mortgage contains a customary provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event the related Mortgaged Property is sold or transferred without the prior consent of the mortgagee thereunder;

(x) Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended thereby, including but not limited to(i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure; no other exemption exists available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage; the Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Soldiers and Sailors Civil Relief Act of 1940;

(y) No action of foreclosure has been initiated against, and no judgment of foreclosure been rendered against, any of the Mortgaged Properties; and to the best of Seller's knowledge, no Mortgaged Property is the subject of pending hazard or flood insurance claims;

(z) There are no Mortgage Loans with forced place insurance premiums;

(aa) There are no Mortgage Loans requiring monthly impounds, Escrow Payments, corporate advances, or any similar payments;

(bb) The first Monthly Payment Due Date for each Mortgage Loan is a date that is at least thirty (30) days after the Mortgage Loan funded.

(cc) There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note or any event which with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and Seller has not consented to or waived or permitted to exist any default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note.

(dd) No Mortgagor is insolvent to the best knowledge of Seller.

(ee) Seller complied with the purchase and post-purchase requirements of the Correspondent Partner Manual with respect to the Mortgage Loans.

(ff) No Mortgage Loan is made within six (6) months of the date of any previous loan made by Seller or an affiliate of Seller secured by a Mortgage on the Mortgaged Property the proceeds of which are used in whole or in part to pay off such previous loan without Purchaser's prior written approval.

(gg) The Mortgagor on the Mortgage Loan has reasonably demonstrated an ability to repay the Mortgage Loan on the terms and conditions set forth in the Mortgage Loan Documents.

(hh) If the Mortgage Loan is a HELOC, the Mortgage is in a form and contains terms sufficient to be an "open-end" mortgage under the laws of the jurisdiction in which the Mortgaged Property is located so as to secure advances made after the initial recording of the Mortgage up to the Maximum Loan Amount with the same priority as advances secured thereby that have been made at the time of recording of the Mortgage.

### ARTICLE VI
### REMEDIES

<u>Section 6.01    Remedies for Breach of Representations and Warranties of the Seller; Definition of the Term "Defect"</u>

It is understood and agreed that the representations and warranties set forth in Article V shall survive for the life of the Mortgage Loans, and shall inure to the benefit of the Purchaser, its successors and assigns.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Section 5.02 shall accrue upon (i) discovery of such breach by the Seller or notice thereof by the Purchaser to such party, (ii) failure by the Seller, as applicable, to cure such breach, and (iii) demand upon the Seller, as applicable, by the Purchaser for compliance with this Agreement. The prevailing party in any litigation arising under this Agreement shall be entitled to the recovery of reasonable attorneys' fees. The remedies stated herein are not intended to limit any rights and remedies available at law or equity to Purchaser.

Following the purchase of any Loan by Purchaser pursuant to this Agreement, and notwithstanding the review of the Mortgage Loan Documents pursuant to Article II hereof, it will be deemed a "Defect" in the Mortgage Loan should any one or more of the following events occur with regard to a Mortgage Loan:

(a) Any document constituting a part of the Mortgage Loan Documents on the Sale Date, in the reasonable judgment of the Purchaser, is demonstrated by Purchaser through reasonable means to have been, defective or inaccurate in any material respect,

(b) Any such document executed by one or more of the parties to the Mortgage Loan is not valid and binding,

(c) Any representation or warranty of the Seller contained in this Agreement, in the reasonable judgment of the Purchaser is untrue or incorrect in a manner that materially and adversely affects the value or collectability of a Mortgage Loan,

(d) The Mortgagor fails to make the first Monthly Payment due to Purchaser after the Sale Date within thirty (30) days of the Monthly Payment Due Date, regardless of whether such payment is subsequently paid by the Mortgagor or if any Monthly Payment in the form of a check is returned for insufficient funds thus causing the delinquency to occur

(e) Notification to the Seller from the Purchaser within one hundred and twenty (120) days from the Sale Date related to that Loan, that a Loan does not materially conform to the characteristics for such Loan set forth in the Purchase Advice, or

(f) Seller's breach of, or failure to perform or observe, any covenant or provision of this Agreement.

(g) If (i) Purchaser determines that the Mortgage Loan is not eligible for purchase by an investor, or, (ii) Purchaser has sold the Mortgage Loan to an investor and is required to repurchase such Mortgage Loan; provided the reason for such ineligibility or repurchase shall be one of the reasons set forth in this Section 6.01.

(h) An original or copy of any document (certified by the recording office) submitted for recordation to the appropriate public recording office is not so delivered to the Purchaser or Purchaser's designee within thirty (30) days following the Sale Date.

The Seller shall cure any Defect within forty-five (45) days from the time of Seller's receipt of Purchaser's written notice to Seller of the existence of such Defect or such shorter period as may be required by applicable law. Notwithstanding anything to the contrary, in the event of a Defect under Section 6.01 (d) above or a Defect with respect to a High Cost Loan, the Seller may not cure such Defect.

Section 6.02    Repurchase of Mortgage Loan

The Seller agrees that, if a Defect occurs under the terms of Section 6.01 and cannot be cured, it will repurchase the Mortgage Loan to which the Defect relates within fifteen (15) days of receipt of written notice from Purchaser or the expiration of the 45-day curing period discussed in Section 6.01, whichever is later, at a price equal to the sum of:

(a) 100% of the unpaid principal balance of such Mortgage Loan at the Repurchase Date; or in the event Purchaser purchased the Mortgage Loan at a Discount Rate, the Purchase Price for such Loan, less the aggregate amount of principal paid to Purchaser on such Mortgage Loan as of the Repurchase Date;

(b) any interest accrued and unpaid up to the Repurchase Date calculated at the Note Interest Rate;

(c)  any reasonable fees and expenses charged by other third parties and incurred by the Purchaser relating to the repurchase of the Mortgage Loan; and

(d)  Any Premium paid in the Purchase Price by Purchaser to Seller.

Any repurchase pursuant to this Section 6.02 shall be accomplished by wire transfer by the repurchasing party of immediately available federal funds to the account designated by the Purchaser. The option to request or accept repurchase of any Mortgage Loan is at the sole discretion of Purchaser.

Section 6.03    Repurchase of High Cost Loans

In the event that Purchaser purchases a High Cost Loan and: (a) such High Cost Loan is reasonably determined by Purchaser to have violated at the time of origination either the Truth in Lending Act or such other federal, state or local law relating to "high cost" mortgage loans, including without limitation a violation due to Seller's failure to disclose to the borrower the nature of such loan; or (b) Seller failed to disclose to Purchaser prior to the Sale Date that the Mortgage Loan is a High Cost Loan; the Seller, at the Purchaser's option, shall, within ten (10) days after receipt of a repurchase demand from Purchaser, repurchase the High Cost Loan from the Purchaser at the price and in the manner specified in Section 6.02 above.

Section 6.04    Indemnification

In addition to Seller's repurchase obligation, Seller shall indemnify Purchaser and protect, defend and hold Purchaser, its affiliates, officers, directors, employees, agents and successors harmless from and against any and all liability, loss, cost, demand, lawsuits, injury or expense, including without limitation all court costs, expert witness fees, trial preparation fees and attorney's fees, so long as such fees or costs are reasonable in amount, which Purchaser may incur for or by reason of:

(a)  A Defect in any Loan;

(b)  The breach of any warranty or the untruthfulness of any representation made by Seller in this Agreement;

(c)  Seller's breach of, or failure to perform or observe, any covenant or provision of this Agreement; or

(d)  Seller's servicing of the Loans on or at any time prior to the applicable Sale Date of any of the Loans sold to Purchaser.

(e)  Any action taken by Seller or failure to take action by Seller with respect to any Mortgage Loan prior to the Sale Date.

The foregoing provisions of this Section 6.04 shall be subject to the following conditions:

1.  Purchaser must promptly notify Seller upon commencement of any action or assertion of any claim which would give rise to a claim for indemnification if Seller is unaware of the action or assertion; and

2.  No settlement of action against Purchaser shall be made without the consent of Seller so long as indemnification continues to be sought.

15                          *IHE Agreement Revised 6/23/03*

This indemnification shall survive the Sale Date and shall not be limited by any due diligence or other investigation undertaken by Purchaser.

Section 6.05    Remedy to Ensure Accuracy of Real Estate Appraisals

Purchaser may, within 120 days after the Sale Date and at its own expense, verify the accuracy of drive-by or full appraisals prepared in connection with any Loan by ordering a reappraisal of the Mortgaged Property. In determining the appropriate appraisal value, any review appraiser selected pursuant to this Section 6.03 shall determine the appraised value as of the original appraisal date using comparable sales that were available as of the date of the original appraisal. If the new appraisal obtained by Purchaser indicates a fair market value of more than ten percent (10%) less than the original appraisal value, then upon receipt by Seller of a signed copy of the new appraisal from Purchaser, Seller shall repurchase the Loan at the repurchase price described in Section 6.02 above and reimburse Purchaser for the cost of the appraisal. Notwithstanding the foregoing, if Seller disputes the validity of the appraisal prepared by the Purchaser's appraiser, Seller may at its own expense request Purchaser to obtain a third appraisal. Only if such third appraisal is also more than ten percent (10%) less than the original appraisal value shall the Seller be required to repurchase the Loan. Purchaser shall choose the third appraiser with Seller's approval, which approval shall not be unreasonably withheld, but such appraiser must possess all the necessary licenses and permits to appraise property in the state where the Mortgaged Property is located.



## ARTICLE VII
## AGREEMENT NOT TO COMPETE;
## PREPAYMENT

### Section 7.01    Agreement Not to Compete

(a)  Seller shall not take any action or permit or cause any action to be taken by any of its affiliates or employees directly, to solicit any Mortgagor for the purpose of refinancing or paying off a Mortgage Loan, in whole or in part, or for any other purpose, without the prior written consent of Purchaser for a period of twelve (12) months from the Sale Date.

(b)  Notwithstanding the foregoing, it is understood and agreed that a promotion undertaken by Seller or any affiliate of Seller which is directed to the general public at large, including without limitation mass mailings based on commercially acquired mailing lists and newspaper, radio and television advertisements, general newsletters shall not constitute solicitation under this Article VII.

(c)  It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagor and the attendant right, title and interest in and to any list of such Mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to Purchaser pursuant to this Agreement as of the Sale Date, and Seller shall take no action to undermine these rights and benefits.

### Section 7.02    Prepayment

In the event a Mortgage Loan is prepaid as a result of a violation by Seller of Section 7.01, Seller shall be obligated to pay the Purchaser, within thirty (30) days of the date of prepayment, an amount equal to the Premium paid by Purchaser for such Mortgage Loan. Seller understands and agrees that if such prepaid Mortgage Loan contains a prepayment penalty, then Purchaser shall be entitled to such prepayment penalty pursuant to the terms and conditions of the Mortgage Note. Any payment pursuant to this Section 7.02 shall be accomplished by wire transfer by the Seller of immediately available federal funds to the account designated by the Purchaser.

### Section 7.03    Premium Recapture

(a)  In the event a Mortgage Loan is paid off in full during the first year following the Sale Date of such Loan, Seller shall be obligated to pay the Purchaser, within thirty (30) days of the date of prepayment, a portion of the Premium paid by Purchaser for such Loan as follows: One-twelfth (1/12) of the Premium paid for each full or partial month remaining in the one-year period following the Sale Date. This premium recapture requirement shall not apply to any Mortgage Loan that is paid off pursuant to a refinance loan made to the borrower by Purchaser. Seller understands and agrees that if such prepaid Mortgage Loan contains a prepayment penalty, then Purchaser shall be entitled to such prepayment penalty pursuant to the terms and conditions of the Mortgage Note. The Purchaser agrees to recapture the Premium from the proceeds of the prepayment penalty first and then from the Seller if there is any deficient balance, according to the refund calculation specified above.

*IHE Agreement Revised 6/23/03*

(b)    Within the first twelve (12) months after the Sale Date of Any Mortgage Loan, in the event a Mortgagor fails to make a Monthly Payment on such Mortgage Loan within ninety (90) days of its Payment Due Date, Seller is obligated to reimburse the Purchaser for the full amount of the Premium paid to Seller for such Loan.

Any payment pursuant to this Section 7.03 shall be accomplished by wire transfer by the Seller of immediately available federal funds to the account designated by the Purchaser.

Section 7.04    Refinancings by Seller to be Sold to Purchaser

In the event a Mortgagor refinances a Mortgage Loan with Seller or any affiliate of Seller, and such refinanced Mortgage Loan is then owned or serviced Purchaser or Purchaser otherwise retains a financial interest in the Mortgage Loan, Seller may offer such refinanced Mortgage Loan to Purchaser for purchase. If Purchaser purchases the refinancing loan, the Premium paid by Purchaser shall be based on only new monies advanced to the Mortgagor over and above the original principal balance of the Mortgage Loan.

## ARTICLE VIII
### MISCELLANEOUS PROVISIONS

Section 8.01    Costs

Each party hereto shall each pay any commissions due to their respective salespersons and, except as otherwise indicated in this Agreement, the legal fees and expenses of their respective attorneys. Seller shall pay the costs associated with the physical transfer of the Mortgage Loan Documents and the Mortgage Loan Files including all recording costs. The Purchaser shall pay all other costs incurred by the Purchaser.

Section 8.02    Cooperation

To the extent reasonably possible, the parties hereto shall cooperate with and assist each other, as requested, in carrying out the purposes of this Agreement, and each shall comply with all material laws and regulations governing the Mortgage Loans and Servicing Rights. The Seller hereby grants to the Purchaser the right to obtain all reasonable and relevant information concerning the Mortgage Loans being purchased which is in the possession of the Seller. The Seller shall provide to the Purchaser, in a format mutually acceptable to the Seller and the Purchaser, any information which is not contained in the Seller's computer records and which is reasonably necessary to effect transfer of the loan file data onto the Purchaser's computer system, and Seller shall make its personnel available to assist in the transfer of the Mortgage Loans and Servicing Rights including but not limited to assistance in field to field mapping. The Mortgage servicing files shall be converted from the Seller's computer system to the Purchaser's computer system prior to the Sale Date. The Seller agrees to provide information in a mutually agreeable format according to the Purchaser's specifications including test tapes as the Purchaser may request. Any inaccuracy in the information provided by Seller pursuant to this Section shall trigger the applicable remedies set forth in Article VI.

*IHE Agreement Revised 6/23/03*



### Section 8.03    Inspection of Records and Documents and On-Site Audit

Seller shall provide Purchaser access for inspection of its books, documents and records as Purchaser shall reasonably request from time to time. Purchaser will be allowed to conduct, from time to time, financial and operational audits at Seller's office during normal business hours and upon at least ten (10) Business Days' notice. Seller shall reasonably cooperate with Purchaser in its audit activities, and Purchaser shall cooperate to minimize any disruption of Seller's ongoing operations.

### Section 8.04    Protection of Confidential Information

Each party hereto shall keep confidential and shall not divulge to any party, without the other party's prior written consent, the purchase price paid for the Mortgage Loans and Servicing Rights, any information pertaining to the Mortgage Loans or any borrower thereunder, except to the extent permitted by law that it is appropriate for such party to do so in working with legal counsel, auditors, affiliates, taxing authorities or other governmental agencies, or as required by law. So long as any Mortgage Loan remains outstanding, neither Purchaser nor Seller or their respective affiliates, employees, agents or representatives shall divulge or disclose, directly or indirectly, any information, knowledge or data concerning the business practices of the other party to this Agreement, other than information which has been published or otherwise made available to the general public prior to the date hereof, or information as it relates to a Mortgagor which is given to the Mortgagor or at the Mortgagor's request to a third person unless required by law or court order. If a party hereto is required by law or court order to divulge or disclose any such information, such party shall divulge or disclose only such information as is required and shall immediately upon discovery of such requirement notify the other party of the same.

*IHE Agreement Revised 6/23/03*



**Section 8.05    Notices**

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, when received by the other party at the address shown below, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

All such demands or notices shall be made under the terms indicated above to:

Purchaser:
Spencer J. Carlsen
Vice President, Irwin Union Bank and Trust Company
C/O IRWIN HOME EQUITY CORPORATION
12677 Alcosta Blvd., Suite 500
San Ramon, CA  94583

with copies to:

Gary Iorfido
Vice President, Irwin Union Bank and Trust Company
C/O IRWIN HOME EQUITY CORPORATION
12677 Alcosta Blvd., Suite 500
San Ramon, CA  94583

Seller:

Raymond J Webber
Vice President, Irwin Mortgage Corporation
10500 Kincaid Dr.
Fishers, IN 46038

*IHE Agreement Revised 6/23/03*

Section 8.06    Severability Clause

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or enforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law, which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

Section 8.07    Counterparts

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 8.08    Termination; Suspension

(a) This Agreement may be terminated by either party at any time upon written notice; provided, however, that such termination shall not be effective for those Mortgage Loans that Purchaser has committed to purchase. The termination shall be effective upon delivery of written notice by the terminating party to the other party. Termination of this Agreement shall not in any way affect either party's obligations, representations, warranties or indemnifications with respect to Mortgage Loans already purchased by Purchaser.

(b) In addition to the termination rights set forth above, in the event that Purchaser reasonably demonstrates or believes in good faith that (i) there has been any deception, fraud, concealment, material misrepresentation, or (ii) breach of any representation or warranty by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Mortgage Loan sold to Purchaser pursuant to this Agreement; or (iii) that Seller will be unable to fulfill any of its obligations under the Agreement or the Correspondent Partner Manual, Purchaser may, in its sole and absolute discretion, immediately and without notice (i) terminate its obligations under this Agreement, or (ii) suspend this Agreement. Purchaser agrees to send a written notice to Seller within twenty-four (24) hours of such termination or suspension. Upon termination or during the suspension period, Purchaser shall not accept any new Mortgage Loan submissions from Seller or take any further action on Loans submitted by Seller prior to termination or suspension. Furthermore, Purchaser shall immediately return to Seller any Mortgage Loans subject to a commitment, and Seller shall accept such Mortgage Loans. Any suspension shall last until Purchaser, in its sole discretion, determines to reactivate Seller or terminate this Agreement.

21

*IHE Agreement Revised 6/23/03*



### Section 8.09    Arbitration

Upon written request by either party that is submitted according to the applicable rules for arbitration, any claim, demand or cause of action, which arises out of or is related to this Agreement (collectively "Claims"), may be resolved by binding arbitration in the State of California, in accordance with (i) the Federal Arbitration Act; (ii) the Code of Procedure ("Code") of the National Arbitration Forum ("Administrator" or "NAF") and (iii) this Agreement which shall control any inconsistency between it and the Code. The decision of an arbitrator on any Claims submitted to arbitration shall follow applicable substantive law and be in writing setting forth the findings of fact and law and the reasons supporting the decision. Such decision shall be final and binding upon the parties, subject to the right of appeal described below. Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator has exclusive authority to resolve any dispute relating to the applicability or enforceability of this Agreement, including the provisions of this section. Either party shall have the right to appeal to the appropriate court any errors of law in the decision rendered by the arbitrator. After a demand for arbitration is made, each party may conduct a limited number of depositions (including the production of documents) by mutual agreement or as permitted by the arbitrator.

### Section 8.10    Attorney Fees

If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

### Section 8.11    Forum; Governing Law

All questions regarding the validity, interpretation, or performance of any of the terms of this Agreement or of any rights or obligations of the parties shall be governed by and construed in accordance with California law. Any action between the parties relating to or arising under this Agreement shall be tried in the federal or state courts located in Contra Costa County, California.

### Section 8.12    Further Agreements

The Seller and the Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be requested from time to time by either party, as may be necessary or appropriate to effectuate the purposes of this Agreement (including but not limited to updates of Exhibits and Schedules to be attached hereto and incorporated herein).

*IHE Agreement Revised 6/23/03*

Section 8.13    Successors and Assigns; Assignment of Agreement

This Agreement shall bind and inure to the benefit of and be enforceable by the Purchaser and the Seller and the respective successors and assigns of the Purchaser and the Seller. No party hereto may transfer this Agreement without consent of others hereto.

Section 8.14    No Third Party Beneficiary

No provision of this Agreement shall be deemed or construed to be for the benefit of any third party.

Section 8.15    Waivers

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 8.16    Exhibits; Schedules

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 8.17    General Interpretive Principles

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c) references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall mean by reason of enumeration:

*IHE Agreement Revised 6/23/03*

<u>Section 8.18    Reproduction of Documents</u>

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _____

Name: Brenda Nirenstein

Title: AVP, Home Equity Lending

Date: 1-6-04

Attest: _____
         Assistant Secretary

_____
(Seller)

By: _____

Name: Raymond J Webber

Title: VP Product Development

Date: 12/12/2003

24                              *IHE Agreement Revised 6/23/03*

## ADDENDUM TO CORRESPONDENT LOAN PURCHASE AND SALE AGREEMENT
### (Third Party Originators)

This Addendum amends, modifies, and revises that certain Correspondent Loan Purchase and Sale Agreement dated *12/16/2003* (the "Agreement") by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California 94583 (individually and collectively, the "Purchaser") and *Irwin Mortgage Corporation* having an address of *10520 Kincaid, Fishers IN 46038* ("Seller").

WHEREAS, Seller desires from time to time to offer for sale to the Purchaser Loans that were not originated by Seller;

WHEREAS, Seller has been approved by Purchaser to offer such Loans for sale;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

A. The following terms shall be added to Article 1:

   Ineligible List: The list of persons that are ineligible to do business with Purchaser, as such list is published by Purchaser from time to time.

   Third-Party Originator: Any person, including a Broker, other than the Seller who originates a Mortgage Loan.

B. The following representation and warranty shall be added to Section 5.02 (1):

   (e)   Seller has complied with Purchaser's then-current eligibility guidelines for sellers of third-party originated Mortgage Loans.

C. The following representations and warranties shall be added to Section 5.02 (2):

   (ff)   All parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee, Third-Party Originator or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (ii)(A) qualified to do business in such state, or (B) not doing business in such state so as to require qualification or licensing;

RECEIVED

DEC 1 7 2003

(gg)    Any and all requirements of any federal, state or local law including, but not limited to, usury, Section 32, consumer credit, equal credit opportunity, real estate settlement procedures, privacy, truth-in-lending and disclosure laws applicable to the Mortgage Loan have been complied with by the Third-Party Originator of such Mortgage Loan;

(hh)    The origination practices of the Third-Party Originator with respect to each Mortgage Loan are in accordance with the proper, prudent and customary practices in the mortgage origination business;

(ii)    No person listed on the Purchaser's then-current Ineligible List was involved, directly or indirectly, in originating the Mortgage Loan;

D.  The following shall be added to Section 6.04:

(f)    Any action taken by Third-Party Originator or failure to take action by Third-Party Originator with respect to any Mortgage Loan.

E.  The following shall be added to Section 8.08:

(c)    The Addendum may be terminated by either party at any time; provided however, that such termination shall not be effective for those Mortgage Loans that Purchaser has committed to purchase. The termination shall be effective upon delivery of written notice by the terminating party to the other party. Termination of this Addendum shall not in any way affect each party's obligations, representations, warranties or indemnifications under the Agreement and with respect to Mortgage Loans already purchased by Purchaser.

(d)    In the event that Purchaser reasonably demonstrates or believes in good faith that: (i) there has been any deception, fraud, concealment, material misrepresentation by the Third-Party Originator, its officers, directors, or employees; (ii) that there has been a breach of any representation or warranty by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with the Addendum or in connection with any Mortgage Loan sold to Purchaser pursuant to the Addendum; or (iii) that Seller will be unable to fulfill any of its obligations under the Addendum; Purchaser may, in its sole and absolute discretion, immediately and without notice (i) terminate its obligations under the Addendum, (ii) suspend the Addendum, (iii) terminate its obligations under the Agreement, or (iv) suspend the Agreement. Purchaser agrees to send a written notice to Seller

2

within twenty-four (24) hours of such termination or suspension. Upon termination or during the suspension period, Purchaser shall not accept any new Loan submissions from Seller or take any further action on Loans submitted by Seller prior to termination or suspension. Furthermore, Purchaser shall immediately return to Seller any Mortgage Loans subject to a commitment, and Seller shall accept such Mortgage Loans. Any suspension shall last until Purchaser, in its sole discretion, determines to reactivate Seller or terminate this Agreement.

5.   Any capitalized words or phrases used and not defined in this Addendum shall have the meanings ascribed to them in the Agreement.

6.   All provisions of the Agreement, except as modified by this Addendum, shall remain in full force and effect. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, the provisions of this Addendum shall govern and control.

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _____

Name: Brenda Nirenstein

Title: AVP, Home Equity Lending

Date: 1-6-04

Attest _____
      Assistant Secretary

_____
(Seller)

By: _____

Name: Raymond J. Webbo

Title: V.P. Product Development

3

## EXHIBIT A

### ADDENDUM TO CORRESPONDENT LOAN PURCHASE AND SALE AGREEMENT
#### (Non-Standard Loans)

This Addendum amends, modifies, and revises that certain Correspondent Loan Purchase and Sale Agreement dated December 11, 2003 (the "Agreement") by and between IRWIN UNION BANK AND TRUST COMPANY, having an address of 500 Washington Street, Columbus, Indiana 47201 and/or IRWIN HOME EQUITY CORPORATION, having an address at 12677 Alcosta Blvd., Suite 500, San Ramon, California 94583 (individually and collectively, the "Purchaser") and IRWIN MORTGAGE CORPORATION having an address at 9265 Counselors Row, Suite 200, Indianapolis, IN 46240 ("Seller").

WHEREAS, Seller desires for a limited period of time to offer for sale to the Purchaser Loans that may not meet the credit underwriting standards of Purchaser's Underwriting Guidelines (the "Non-Standard Loans");

WHEREAS, Seller has been approved by Purchaser to offer such Loans for sale subject to the terms of this Addendum;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which each party hereby acknowledges hereto, the Seller and the Purchaser hereby agree as follows:

A.    Section 5.02(2)(b) is deleted in its entirety and replaced with the following :

> Except as otherwise disclosed to Purchaser in writing as a Non-Standard Loan, each Loan is valid and was originated in accordance with the loan origination, eligibility and credit underwriting standards of the Purchaser's Underwriting Guidelines then in effect; provided, however, that the total aggregate amount of the Purchase Price paid by Purchaser for Non-Standard Loans will not exceed FIVE MILLION US DOLLARS ($5,000,000.00). The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud was committed in connection with the origination of the Mortgage.

B.    Any capitalized words or phrases used and not defined in this Addendum shall have the meanings ascribed to them in the Agreement.

1

02/10/04

# EXHIBIT A

C.    All provisions of the Agreement, except as modified by this Addendum, shall remain in full force and effect. In the event of any conflict, inconsistency, or incongruity between any provision of this Addendum and any provision of the Agreement, the provisions of this Addendum shall govern and control.

IN WITNESS THEREOF, the Purchaser and Seller have caused their names to be signed hereto b y t heir r espective o fficers t hereunto d uly authorized a s o f the date first above written. ..

IRWIN UNION BANK AND TRUST COMPANY
(Purchaser)

By: _Edwin K. Corbin_

Name: _EDWIN K. CORBIN_

Title: _VICE PRESIDENT_

Date: _2/16/04_

Attest: _Teraise Thurnberg_
_ASST. SECRETARY_

IRWIN MORTGAGE CORPORATION
(Seller)

By: _Paul J. Webber_

Name: _Raymond J. Webber_

Title: _V.P. Product Development_

Date: _2/12/04_

2                                                02/10/04

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Freedom Mortgage Corporation

**(b)** County of Residence of First Listed Plaintiff   Burlington, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Attorney Name Here, MORRIS, NICHOLS, ARSHT & TUNNELL LLP,
1201 North Market Street, P.O. Box 1347,
Wilmington, DE  19899-1347, (302) 658-9200

## DEFENDANTS

Irwin Financial Corporation
Irwin Mortgage Corporation

County of Residence of First Listed Defendant   Bartholomew, IN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 371 Truth in Lending | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 810 Selective Service |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) |
| ☒ 190 Other Contract | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | ☐ 875 Customer Challenge 12 USC 3410 |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | ☐ 890 Other Statutory Actions |
| | | | | ☐ 891 Agricultural Acts |

(OTHER STATUTES column continued):
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

(FORFEITURE/PENALTY column):
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. s. 1332

Brief description of cause:
Contract action for breach, specific performance

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE  3/12/08

SIGNATURE OF ATTORNEY OF RECORD
*William M. Lafferty*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE